## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| POSIGEN, PBC, *et al.*,[1] | ) Case No. 25-90787 (ARP) |
| | ) |
| Debtors. | ) (Joint Administration Requested) |
| | ) |

## DEBTORS' INFORMATIONAL BRIEF

---

[1]   The last four digits of PosiGen, PBC's tax identification number are 9706.  A complete list of each of the Debtors in these chapter 11 cases and the last four digits of their federal tax identification numbers may be obtained on the website of the Debtors' proposed claims and noticing agent at https://cases.ra.kroll.com/PosiGen.  The Debtors' service address in these chapter 11 cases is 1000 Elmwood Park Boulevard, Suite A, Harahan, LA 70123.

## <u>TABLE OF CONTENTS</u>

I.      INTRODUCTION ..................................................................................................1

II.     THE DEBTORS' BUSINESS OPERATIONS ....................................................6

    A.      PosiGen's Solar System Development Business ..................................7

    B.      Financing the Business ..........................................................................9

        1.      Tax Equity Partnerships .............................................................10

        2.      The Backleverage Facility .........................................................13

    C.      The Debtors' Management and Servicing Business ..........................15

    D.      PosiGen's Business Related to Government Incentives .....................17

III.    CORPORATE AND CAPITAL STRUCTURE....................................................18

    A.      Prepetition Capital Structure................................................................18

        1.      Secured Funded Debt Obligations .............................................19

        2.      Unsecured Funded Debt Obligations.........................................21

        3.      Other Unsecured Obligations....................................................22

IV.     CIRCUMSTANCES LEADING TO THESE CHAPTER 11 CASES......................22

    A.      PosiGen's Vulnerability to Market Pressures ...................................23

    B.      The 2025 Bridge Financings................................................................24

    C.      Acceleration of the Backleverage Facility.......................................24

    D.      The TSA and Promissory Note ...........................................................26

    E.      The Proposed Transition Plan and Foreclosure Notices ..................29

## I.      Introduction[1]

1.      PosiGen, PBC ("**PosiGen**" and, together with its direct and indirect subsidiaries, the "**Company**") is a leading provider of affordable solar and energy efficiency to working-class families in the United States.  PosiGen was founded in New Orleans in 2011 with a mission to help bring energy efficiency, lower utility bills, and valuable tax benefits to lower-income families that needed it most.  The Company's "Solar For All" leases for solar and energy efficiency generate significant energy bill savings for customers without requiring any initial outlay of cash from the customers.  As of the end of 2024, the Company has offered solar energy to over 40,000 customers across 15 states, resulting in approximately $170 million in cumulative savings for its customers.

2.      The Company's financing structure is complex and described in more detail herein but, at a high level, PosiGen, PBC is the primary obligor on approximately $206 million of funded debt, which has historically been used to finance its corporate operations and servicing business.  PosiGen's non-Debtor subsidiaries are obligors under a "backleverage" warehouse credit facility issued primarily by affiliates of Brookfield Asset Management ("**Brookfield**").  The proceeds of the Backleverage Facility have historically been used to finance the purchase and development of Solar Systems, which are sold to tax equity partnerships.  PosiGen's Debtor subsidiary, PosiGen Provider, LLC ("**Provider**") is the servicer for these Solar Systems.  Ultimately, although the Backleverage Facility is a non-Debtor obligation, PosiGen's and its Debtor subsidiaries' roles with respect to developing and servicing the Solar Systems and administering the tax equity partnerships are critical to ensuring that Brookfield's investment in the Backleverage Facility is realized.

---

[1]      Capitalized terms used and not otherwise defined in this Section I shall have the meanings ascribed to such terms in the remainder of the Brief (as defined below).

3.    Despite its initial success, PosiGen has suffered recently, both as a result of larger market conditions and its own mistakes.  Beginning in the summer of 2025, the Company began facing severe liquidity constraints, largely due to the downturn in the market caused by changes in federal government policy.  By the end of July, PosiGen's non-Debtor subsidiary, PosiGen Backleverage, LLC ("**Backleverage**"), had used all of the committed financing available under its $600 million first-lien credit facility and its lenders were not willing to commit to additional funding.  Without access to the Backleverage Facility or alternative financing, the Company was unable to fund construction of new Solar Systems for its customers, further constraining its financial position.  On July 31, 2025, Backleverage missed an interest payment due under the Backleverage Facility, which caused an event of default under the Backleverage Credit Agreement.  Brookfield accelerated the Backleverage Facility, triggering cross-defaults under many of the Company's other funded debt obligations.

4.    White & Case and FTI were retained promptly after the missed interest payment and began to uncover problems with the way the Company had previously done business.  The advisors learned that the Company had taken actions that violated many of its contractual obligations, including using a centralized cash management system for operating cash and lease revenues and raising short-term financing secured by overlapping collateral.  These facts were immediately disclosed to PosiGen's board of directors, as well as to Brookfield and other creditors, who had not been aware of these issues.  On August 15, 2025, Brookfield exercised its right to install an independent manager to take control over the Backleverage portion of the Company's business (*i.e.*, PosiGen's non-Debtor affiliates).  But, despite all the Company's past problems, Brookfield still needed the Company.  That is because the Backleverage Facility is secured by equity pledges on tax equity partnerships that own the majority of the Solar Systems constructed

2

by PosiGen and its partners, and its sources of repayment are the lease payments made by customers for those systems or a "take-out" transaction.  The Company performs all activities related to those Solar Systems, including servicing, customer care, accounting, tax credit administration, and collection, as well as the fund management and administration of the tax equity partnerships.  If customers do not receive the necessary service for their Solar Systems, they will stop making payments.  PosiGen is the only entity with the people, technology, and know-how to provide that service in the short term.

5.      The company ran out of money following Brookfield's acceleration and was unable to secure additional financing.  On August 24, 2025, Brookfield initially agreed to finance the servicing operations of the Company's business on a week-to-week basis through a transition services agreement (the "**TSA**").  Because the TSA funding did not cover payroll for all employees, PosiGen made the difficult decision to terminate 470 employees, including all employees in its sales and development business.

6.      PosiGen worked with Brookfield and its advisors to commence transitioning its business to Brookfield's chosen back-up servicer, Omnidian.  Brookfield funded each week by releasing cash each Friday or Monday from either the Backleverage Account or the Backleverage Debt Service Reserve Account, in accordance with an agreed budget.  PosiGen's operations were severely constrained by the week-to-week nature of the funding.  PosiGen asked each week for longer-term, committed financing to provide stability and a process to address the Company's many issues.  Brookfield said that it would not finance any longer-term financing or a chapter 11 case without first obtaining contributions from the financial sponsors of PosiGen's three open tax equity funds.  The TSA has been extended on a weekly basis through the Petition Date, but the last 4 extensions only covered payments to Omnidian, rather than the full cost of servicing operations

for the week.  Instead, when the cash in the Backleverage Account and the Backleverage Debt Service Reserve Account was exhausted, Brookfield purchased inventory from PosiGen and PosiGen used the proceeds of that sale to meet its funding needs for the next week.  After that, Brookfield began to fund the Company's working capital needs, again on a weekly basis, through a secured promissory note issued by PosiGen.

7.      During this time, PosiGen continued to service its customers' Solar Systems to the best of its ability and provided regular information to its lenders and other financing counterparties, such as Brookfield.  PosiGen also made arrangements to back up and store all its data in the event that Brookfield would refuse to fund any given week and the Company would be forced to cease operating.  PosiGen also tried to engage with its tax equity partners and other creditors besides Brookfield in discussions around potential solutions, but those attempts were unsuccessful.  While the weekly funding cadence from Brookfield was far from ideal, the Company elected to accept funding under the Promissory Note for a time because it determined that the situation was better for all its stakeholders than a disorderly shutdown, which was the only other available alternative. But this situation could not continue indefinitely.

8.      Then, on the evening of November 13, 2025, Brookfield's advisors sent a proposal outlining the proposed steps for such a transition, on a professionals' eyes only basis, to the Company's advisors.  They also sent draft notices of Brookfield's intent to foreclose on the Class B memberships in project companies held by two of the four tax equity partnerships pledged in connection with the Brookfield Facility (the "**Foreclosure Notices**").[2]  Brookfield then sent

---

[2]   The Foreclosure Notices define the "Specified Collateral" as all the assets of Backleverage, PosiGen Owner, LLC ("**Owner**"), Marengo Manager, and Rooftop Manager, including all outstanding Class B membership interests (including all voting and economic rights) in each of Marengo Project Company and the Rooftop Solar Companies, but excluding membership interests in Bienville Manager, Decatur Manager, Marengo Manager, Rooftop Manager, and Owner and any other stock, membership, partnership or other ownership interests owned by Backleverage, Owner, Marengo Manager, or Rooftop Manager.

executed Foreclosure Notices, along with a slightly updated transition plan, to PosiGen on Friday, November 14, 2025.  In its proposal, Brookfield set out a plan through which the Company would hand over its servicing business to Omnidian, which would then hire some of the Company's employees on an at-will or consultant basis.  Omnidian would continue to service the Solar Systems that were held by the tax equity partnerships that Brookfield proposed to foreclose on (representing approximately 30,000 of the Company's approximately 40,000 customers) and leave the rest of the business behind.  While the plan after that was uncertain, it became clear that Brookfield did not plan to fund a chapter 11 process.

9. During the TSA period, the Company's board of directors and management team determined that continuing to operate on a weekly basis was in the best interest of the Company because it mitigated the potential damage from a disorderly shutdown to its creditor body as a whole.  Each time the board was presented with a host of bad options, it selected the course that would minimize the harm suffered by as many creditors as possible.  But, after seeing the transition plan and Foreclosure Notices, the Company's board realized that, while accepting the limited funding offered by Brookfield had been the best option available, continuing down that path would be to the detriment of its other creditors.  While the Company had tried everything possible to avoid filing for chapter 11 without a committed source of funding, it finally reached the point where it had no other option.

10. There is a potential value-maximizing restructuring—one that can address the collective challenges presented by the Company's financial issues—to be implemented through these chapter 11 cases.  PosiGen's operations and servicing business must continue to address its customers' issues, collect lease payments, mint and sell tax credits, and manage the accounting and administrative function of the tax equity partnerships.  If it does not, those creditors may assert

5

claims against the Company.  The Company also owes significant amounts to its Channel Partners for partially completed Solar Systems.  If an arrangement can be reached to resume construction and complete these systems (presumably financed by the Debtors' current financing counterparties), they can be transferred to the relevant tax equity partnerships, those structures can be closed, and the Company's Channel Partners, lenders, and tax equity investors would have an opportunity for a greater recovery than they would otherwise receive in a disorderly shutdown. The Company filed these cases to secure the protections of chapter 11, halt the slow dismemberment of the company and the nationwide flurry of litigation that has begun since the Company stopped development operations, provide a centralized forum to adjudicate the many disputes over the Company's assets, and maximize the value of the Debtors assets and distribute that value to its creditors in accordance with the requirements of chapter 11.

* * *

The Debtors submit this informational brief (this "**Brief**") to provide background information to the Court and parties in interest.  The Brief first describes the Debtors, their business operations, and their corporate and capital structures and then describes the circumstances leading to the commencement of these chapter 11 cases.

## II.    The Debtors' Business Operations

11.    In PosiGen's initial years, the Company focused on growing its operational capacity and customer base throughout Louisiana.  In 2014, PosiGen expanded into Connecticut to provide solar and energy efficiency to underserved communities across the state.  From Connecticut, the Company continued to expand throughout New England and the mid-Atlantic region.  The Company expanded its operations and sales teams to serve New Jersey in 2018.  In 2021, the Company started operating in Mississippi and Pennsylvania and launched operations in Massachusetts, West Virginia, Rhode Island, and New Hampshire in 2024.

A.    **PosiGen's Solar System Development Business**

12.    At its outset, the Company primarily developed and installed its own photovoltaic systems that convert solar radiation into electrical energy usable by standard electrical appliances (the "**Solar Systems**").  Solar Systems include the following components: (a) solar photovoltaic panels that turn sunlight into direct current electricity; (b) inverters that convert solar-generated direct current electricity into alternating current electricity; (c) racking systems that attach the solar photovoltaic panels to the roof or ground; (d) remote monitoring systems that measure and monitor the system; and (e) in certain cases, battery energy storage systems.

13.    The Company then expanded to develop relationships and work with local, independent channel partners (the "**Channel Partners**") to market, sell, and install products and services, including Solar Systems, leases for the use of Solar Systems ("**Solar Leases**"), and power purchase agreements to customers ("**PPAs**" and, together with the Solar Leases, the "**Customer Agreements**") using PosiGen's financing platform, described in greater detail below.  The Company's business with Channel Partners grew as it expanded.  Working with Channel Partners provided PosiGen with the ability to enter new markets without the fixed costs associated with operating in those markets directly.  The Channel Partner program also enabled the Company to leverage the Channel Partners' specialized knowledge, connections, and experience in local markets, while providing the Channel Partners with access to high-quality products at competitive prices, as well as technical oversight and expertise.  Prior to the Petition Date, the Company had more than 60 Channel Partners. The Company's development business with the Channel Partners was shuttered when it encountered liquidity issues in August 2025 and it lacked the available funding to develop new Solar Systems.

14.    PosiGen (through Developer) and/or its Channel Partners (through channel partner agreements) are  generally  responsible  for:  (a)  in  compliance  with  PosiGen's  underwriting

standards, marketing, sourcing, verifying, and originating customers for Solar Systems; (b) designing, engineering, and procuring Solar Systems and other products from a list of manufacturers pre-approved by PosiGen; and (c) installing, commissioning, and connecting the Solar Systems to the local electrical grid pursuant to PosiGen's procedures and applicable regulatory requirements.

15.     PosiGen's customers enter into long-term Customer Agreements with respect to the Solar Systems installed on their roofs.  Under Solar Leases, customers lease Solar Systems from the Company for existing (also referred to as retrofit) or new homes in exchange for fixed monthly rates, without upfront payments.[3]  Under the PPAs, customers purchase power generated by the Solar Systems from the Company at a rate per kilowatt hour.

16.     Certain of the Solar Leases include performance guarantees, under which Developer would credit or provide a refund to a customer if a Solar System failed to meet a guaranteed minimum level of electricity output for each year of the initial term of the Solar Lease. The PPAs do not include performance guarantees as they provide that customers are billed based on power generation.  Many of the Solar Leases also include savings guarantees, under which Developer would credit a customer or offer additional services at no additional cost if the customer's electricity costs in the first year of the Solar Lease were greater than they would have been without the Solar System.

17.     Solar System projects typically progress in accordance with certain milestones: (a) a customer's execution of a Customer Agreement, either through a Channel

---

[3]     As described in more detail below, historically, the Company ultimately sold Solar Systems through Developer to the TEPs.  The Company serviced, operated, and maintained the Solar Systems through Provider until such time as they were sufficiently complete to be sold to a TEP.  The Company retained a significant economic interest in each TEP and was responsible for the day-to-day management of that TEP, for which a subsidiary was appointed as the managing member.

Partner or directly with Developer; (b) submission of permitting requests to relevant authorities having jurisdiction, based on a final design proposal ("**Permit Submission**"); (c) physical installation of the Solar System ("**Mechanical Completion**"); (d) completion and submission of all documentation required to commission the Solar System ("**Substantial Completion**"); and (e) Developer's final inspection of the Solar System, the Solar System's connection to the local power grid, and the Solar Systems' placement in service ("**Final Completion**").

18.     PosiGen grew dramatically in 2024, increasing its year-over-year installations by 35% and deploying 71 megawatts of solar power capacity across 8,771 Solar Systems.  PosiGen's Solar Systems resulted in cumulative savings of approximately $45 million for its customers in 2024 and approximately $170 million since it was founded.

### B.     Financing the Business

19.     Under PosiGen's Customer Agreements, customers are required to make monthly payments (after making no upfront payments).  But the installation of Solar Systems often requires significant up-front cash investments from the Company.  To finance its development operations, PosiGen ultimately sold the Customer Agreements and associated Solar Systems, through Developer, to financing vehicles which are generally referred to as "**Tax Equity Partnerships**" or "**TEPs**."  The use of TEPs allowed the Company and the TEPs to finance the cost of construction and receive the federal income tax attributes generated by the Solar Systems and monetize those tax credits.  The Company also raised structurally junior warehouse financing through the $600 million Backleverage Facility, which also provided a portion of the financing used to purchase Solar Systems from Developer.

### 1.      Tax Equity Partnerships

20.      A TEP is an LLC[4] jointly owned by a third-party TEP investor, which receives class A membership interests on account of its capital contribution (the "**Class A Member**"), and PosiGen, which retains class B membership interests through a non-Debtor special purpose "TEP Manager" entity (the "**Class B Member**").   The Class A Member provided up-front capital contributions used by the TEPs to purchase Solar Systems from Developer, in exchange for entitlements to cash flows, solar Investment Tax Credits ("**ITCs**"), and other tax attributes (*e.g.*, depreciation deductions and net operating losses) that such Solar Systems generated.

21.      The Class B Members of the PosiGen TEPs are (1) Rooftop Solar I Manager, LLC ("**Rooftop Manager**"), (2) PosiGen Bienville Manager, LLC ("**Bienville Manager**"), (3) PosiGen Decatur Manager, LLC ("**Decatur Manager**"), and (4) PosiGen Marengo Manager, LLC ("**Marengo Manager**" and, together with Rooftop Manager, Bienville Manager, and Decatur Manager, the "**Managers**").   Each Class B Member is a subsidiary of non-Debtor Backleverage. Rooftop Manager, in partnership with its Class A Member, G-I Energy Investments, LLC ("**GAF**"), owns five project companies, Rooftop Solar I, LLC, Rooftop Solar II, LLC, Rooftop Solar III, LLC, Rooftop Solar IV, LLC, and Rooftop Solar V, LLC (collectively, the "**Rooftop Project Companies**").   Bienville Manager, in partnership with its Class A Member, DFO Private Investments, L.P. ("**DFO**"), owns PosiGen Bienville Project Company, LLC ("**Bienville Project Company**").   Decatur Manager, in partnership with its Class A Member, M&T Community & Environmental Development, LLC ("**M&T**"), owns PosiGen Decatur Project Company, LLC and PosiGen Decatur 2 Project Company, LLC (collectively, the "**Decatur Project Companies**"). Finally, Marengo Manager, in partnership with its Class A Member, SAF PGN, LLC ("**Vision

---

[4]      Although a TEP is a limited liability company in corporate form, it is a partnership for tax purposes.

Ridge" and, together with GAF, DFO, and M&T, the "**Class A TEP Investors**"), owns PosiGen
Marengo Project Company, LLC ("**Marengo Project Company**" and, together with the Rooftop
Project Companies, Bienville Project Company, the Decatur Project Companies, and PosiGen
Owner, LLC, the "**Project Companies**"). The Class A TEP Investors have collectively invested
over $400 million into the TEPs.

22. Prior to the Petition Date, Developer (directly or through the relevant Channel
Partner) entered into a Customer Agreement with a homeowner, and either designed and installed
the Solar System or approved a Channel Partner's design and installation. PosiGen provided
equity funding to support sales and construction activities. The Solar System was then sold by
Developer to a TEP through a development and purchase agreement (a "**TEP Purchase**
**Agreement**"), with each of the Class A Members and Class B Members contributing its portion
of the purchase price. The TEP generally paid the purchase price in two installments – it paid 45-
55% at the Permit Submission milestone and the balance at Final Completion. In some cases, the
tax equity investor provided all of the value associated with the tax attributes of the Solar Systems;
in other cases, the tax equity investor funded only a portion, and the TEP would sell ITCs to third
parties. The Class B Member financed a significant portion of its obligation with debt financing,
including under the Backleverage Facility. Backleverage would advance 75% of the remaining
purchase price to fund work-in-progress Solar Systems and 83.3% of the remaining purchase price
to fund installed Solar Systems.

23. Each TEP Purchase Agreement imposed an outside date by which all Solar Systems
must be completed. Failure to meet the outside date would require Developer to repurchase the
unfinished Solar Systems from the TEP by either (a) providing the TEP with a credit against future
capital contributions or (b) requiring Developer to transfer to the TEP commensurate conforming

Solar Systems.  Prior to the Petition Date, the Company used the purchase price payments from the TEP to settle Channel Partner account payables and fund working capital.

24.     Once the Solar Systems are in service, they generate cash flows from the associated Customer Agreements, as well as Solar Renewable Energy Certificates ("**SRECs**"), ITCs, and other tax attributes.  The distribution of these cash flows and tax attributes is governed by the TEP LLC agreements, all of which utilize one variation of a "partnership flip" structure.  Each TEP LLC agreement provides for different ratios but the structure generally provides that, until an agreed date (such date, the "**Flip Date**"),[5] substantially all the tax attributes of the TEP are allocated to the Class A Member, with the remainder allocated or distributed to the Class B Member.[6]  After the Flip Date, this is generally reversed.  Under the GAF LLCAs, cash is shared between the Class A and Class B members in fixed ratios regardless of whether the Flip Date has occurred; the majority of cash is distributed to the Class B Member, ranging from 88.7% on the high end to 76% on the low end. Under the other four TEP LLCAs, sharing of cash flows between the Class A and Class B Members changes after the Flip Date; the Class B Member is entitled to the majority of the cash prior to the Flip Date, and more after the Flip Date, subject in certain cases to a "priority" distribution paid to the Class A Member.  As of the Petition Date, all TEPs that utilize the partnership flip structure are pre-Flip Date.

25.     The payment flows relating to Customer Agreements owned through the TEPs were contemplated to be ultimately monetized through asset-backed securitization financings.  PosiGen

---

[5]     Three of the Company's TEPs specify a date certain as a Flip Date. One specifies a Flip Date that is determined by the tax equity investor's achievement of an agreed return. The remaining define the Flip Date as the later of (a) the end of the first fiscal year for which the TEP has net taxable income and (b) the end of the fiscal year in which the recapture period ends.

[6]     In one case, the tax equity investor takes an allocation of 85% of tax items prior to the "Flip Date"; in all other cases, 99%.

was in the process of beginning its first asset-backed securitization process when it became unable to pay its obligations and stopped the process.

### 2. The Non-Debtor Facilities

26. On April 21, 2023, Backleverage entered into that certain Credit Agreement (as amended, amended and restated, supplemented, or otherwise modified from time to time prior to the Petition Date, the "**Backleverage Credit Agreement**" and the facility issued thereunder, the "**Backleverage Facility**"), with PosiGen, as Sponsor, PosiGen Backleverage Holdco, LLC ("**Backleverage Holdco**"), as Pledgor, each of the Managers, the Lenders from time to time party thereto, and BID Administrator LLC, as administrative agent and collateral agent (in such capacities, the "**Backleverage Agent**"). Proceeds of the Backleverage Facility were used to, among other things, refinance prior debt, fund purchase prices of Solar Systems by Backleverage, any Manager, or any Project Company, and fund the development of Solar Systems by PosiGen Developer, LLC ("**Developer**"). As of the Petition Date, the aggregate principal amount outstanding under the Backleverage Facility was approximately $600,000,000.

27. The Backleverage Facility is secured by first priority liens and security interests in, among other things: (i) all of Backleverage's limited liability company interests in and rights of (including economic interests and voting rights) each Manager, as well as Backleverage's right to receive payments or distributions from the Managers in accordance with the applicable organizational documents of each Manager and (ii) all of Backleverage Holdco's limited liability company interests in and rights of (including economic interests and voting rights) Backleverage. The Backleverage Agent also has perfected liens on cash in the account held by Backleverage at First Horizon Bank (the "**Backleverage Account**"), and cash that was used to repay the debt service obligations under the Backleverage Facility was directed to an account held by Backleverage at Computershare (the "**Backleverage Debt Service Account**").

28.     PosiGen and Developer also entered into a Negative Pledge Agreement, dated as of April 9, 2024, under which PosiGen and Developer agreed that, until the Backleverage Facility had been discharged, neither entity would create or permit its affiliates to create a lien on any asset owned or thereafter acquired by Developer, any other affiliate of PosiGen carrying on the business of developing residential solar photovoltaic projects and/or energy storage, or the equity interests in any Project Company.  And, under a Cash Diversion Guaranty, dated as of April 21, 2023, made by PosiGen in favor of the Backleverage Agent (the "**Cash Diversion Guaranty**"), PosiGen provided a limited guarantee in connection with the Backleverage Facility.  The Cash Diversion Guaranty provides that, in the event that any Guaranteed Obligations (as defined therein) are paid to any Class A Member, otherwise diverted or escrowed and/or not paid to the Class B Member, or paid by any Class B Member to any Class A Member, then, in each such instance, PosiGen shall pay the same to or for the benefit of the Backleverage Agent for application pursuant to the Loan Documents (as defined in the Backleverage Credit Agreement).

29.     On December 12, 2018, Backleverage entered into a Second Lien Credit Agreement (as amended, amended and restated, supplemented, or otherwise modified prior to the Petition Date, the "**CGB 2L Credit Agreement**" and the facility issued thereunder, the "**CGB 2L Facility**") with the Lenders party to that agreement and Connecticut Green Bank, as administrative agent and collateral agent for the lenders (in such capacities, the "**CGB 2L Agent**").  The proceeds of the CGB 2L Facility were used to, among other things, fund purchase prices for Backleverage or the Project Companies to purchase Solar Systems.  As of the Petition Date, the aggregate principal amount outstanding under the CGB 2L Facility was approximately $33,000,000.  The CGB 2L Facility is secured by second priority liens and security interests in the same collateral that secures the Backleverage Facility.

30.     On May 18, 2022, Backleverage entered into a Solar Loan Agreement (as amended, amended and restated, supplemented, or otherwise modified prior to the Petition Date, the "**DCGB 3L Credit Agreement**" and the facility issued thereunder, the "**DCGB 3L Facility**") with Green Finance Authority, commonly referred to as DC Green Bank ("**DCGB**"), as Lender.  The proceeds of the DCGB 3L Facility were used to, among other things, fund purchase prices for Backleverage or the Project Companies to purchase Solar Systems.  As of the Petition Date, the aggregate principal amount outstanding under the DCGB 3L Facility was approximately $7,000,000.  The DCBG 3L Facility is secured by third priority liens and security interests in all of Backleverage's limited liability company interests in and rights of (including economic interests and voting rights) each Manager, as well as Backleverage's right to receive payments or distributions from the Managers in accordance with the applicable organizational documents of each Manager.

### C.     The Debtors' Management and Servicing Business

31.     The Company services the Solar Systems and Customer Agreements it sells to the TEPs in exchange for fees paid under maintenance services agreements (collectively, the "**O&M Agreements**") and administrative services agreements (collectively, the "**Service Agreements**") by and among Provider and the applicable non-Debtor Project Companies.[7]

32.     Under the O&M Agreements and Service Agreements, Provider provides (i) operational, maintenance, collection, and other management services to keep the Solar Systems owned by the TEPs productive and in good condition to satisfy both the performance guarantees to customers and the production requirements under the TEP LLC agreements ("**O&M Services**," and the related fees, "**O&M Fees**") and (ii) services related to the administration of the Solar Systems and Customer Agreements, including billing, collections, customer support,

---

[7]    With respect to the TEPs affiliated with the Rooftop Project Companies, Provider provides maintenance and administrative services pursuant to one combined maintenance service agreement.

administration, dispute resolution, and reporting ("**Asset Administration Services**," and the related fees, "**Asset Administration Fees**").  O&M Fees and Asset Administration Fees are paid through proceeds of Customer Agreements prior to distributions to Class A Members and Class B Members of each TEP.

33.     Debtor PosiGen, LLC and the non-Debtor Project Companies are also party to a Servicing Agreement (as amended, amended and restated, modified or otherwise supplemented prior to the Petition Date, the "**Genpact Servicing Agreement**") with Genpact (UK) Limited ("**Genpact**"), under which PosiGen, LLC engaged Genpact to provide certain services in connection with the management of its consumer energy finance portfolio.  Genpact's services, as described more fully in the Genpact Servicing Agreement, include IT services, account monitoring and management, account on-boarding and setup, invoicing, payment processing, account maintenance, sales tax administration, account closing, reporting, control, financial reconciliations, and file maintenance (collectively, the "**Genpact Services**").  Debtor PosiGen, LLC pays invoiced fees and expenses of Genpact in accordance with the Genpact Servicing Agreement.  In the event PosiGen, LLC defaults in making such payments, the applicable non-Debtor party to the Genpact Servicing Agreement is responsible for making the payment.  Among other things, Genpact is responsible for invoicing the customers and monitoring the collection of lease receipts.  Although Genpact invoices the customers, customer lease payments are deposited directly into an account owned by PosiGen, PBC.

34.     PosiGen, Backleverage, and Computershare Trust Company, National Association ("**Computershare**") are also party to a Master Backup Services and Manager Transition Agreement dated as of April 21, 2023 (as amended, amended and restated, supplemented, or otherwise modified from time to time prior to the Petition Date, the "**MBUSA**").  The MBUSA

provides that, upon the occurrence of a transition event (which includes, among other things, a material breach by any Manager of its obligations under the agreements governing its respective TEP), Computershare will perform O&M Services and Asset Administration Services in respect of the non-Debtor Project Companies, unless a replacement operator or replacement manager is appointed, in each case with the consent of the Backleverage Agent.

        **D.**       **PosiGen's Business Related to Government Incentives**

       35.     In recent years, federal, state, and local governments in the United States have established incentives and financial mechanisms to reduce the cost and accelerate the adoption of solar energy. These incentives include rebates, tax credits, and other financial incentives, such as payments for renewable energy credits associated with renewable energy generation, exclusion of solar energy systems and energy storage systems from property tax assessments, and net metering programs. Incentives make Solar Systems more affordable to some homeowners, enable PosiGen to charge lower prices for Customer Agreements, and attract sophisticated institutional investors to invest in the TEPs.

       36.     The majority of U.S. states and the District of Columbia have implemented a renewable portfolio standard ("**RPS**"), which requires regulated electric utilities to generate or procure a specified percentage of total electricity delivered to customers in the state or territory from eligible renewable energy sources—such as solar energy systems—by specified dates. Roughly one-third of states with RPS policies require a minimum portion of the RPS to be met by electricity generation from solar energy systems, with substantial penalties for non-compliance. Electric utilities can meet their solar RPS requirements by purchasing solar renewable energy certificates ("**SRECs**"), which are minted through the production of each megawatt-hour of electricity generated by an eligible solar system. SRECs are economically severable from the Solar Systems that generate them and, in certain jurisdictions, may be sold through established

17

markets.  PosiGen's TEPs mint SRECs based on the energy generated by the TEP's Solar Systems and PosiGen monetizes those SRECs.

37.     Separately, the U.S. federal government provides ITCs for owners of solar energy projects.  Depending on certain project specifications, ITC percentages can range between 6 and 60 percent of eligible project costs.  In addition, the Inflation Reduction Act of 2022 allows qualifying homeowners who purchase a residential solar energy system and/or energy storage system to apply up to 30 percent of the cost of installing the system as a credit against their federal income taxes, thereby returning a material portion of the purchase price of the residential solar energy system and/or energy storage system to homeowners.

III.    **Corporate and Capital Structure**

38.     PosiGen is a holding company that was organized in 2011 under the laws of the State of Delaware and incorporated as a public benefit corporation in 2023 under the laws of the State of Delaware.  PosiGen is the direct or indirect parent company of each of the Debtors. PosiGen has one class of voting common equity.  As of the Petition Date, there were approximately 11.8 million shares of Class A common stock (one vote per share) issued and outstanding.

39.     An organizational chart depicting the Company's corporate structure, including Debtors and non-Debtors, is attached as **Exhibit 1**.

A.    **Prepetition Capital Structure**

40.     As of the Petition Date, the Debtors have (i) approximately $10,500,000 of unencumbered cash or cash equivalents in an account at KeyBank (the "**Lease Revenue Account**"), (ii) approximately $500,000 of unencumbered cash or cash equivalents in an account at First Horizon Bank (the "**SREC Account**"), and (iii) approximately $2,400,000 of other unencumbered cash.  The Debtors are not requesting the Court's authority to use any cash collateral of their prepetition secured creditors.

41.    As of the Petition Date, the Debtors have approximately $206 million of funded debt obligations, approximately 56% of which is secured and 44% of which is unsecured.  For the avoidance of any doubt, the Backleverage Facility, the CGB 2L Facility, and the DCBG 3L Facility are not Debtor obligations and are not included in this Section III.

| Funded Debt Obligations (as of November 24, 2025)[8] | | |
|---|---|---|
| Debt Instrument | Issuer / Borrower | Principal Amount |
| Secured Convertible Notes | PosiGen | $71,000,000 |
| Unsecured Convertible Notes | PosiGen | $91,000,000 |
| Battery Revolving Credit Facility | PosiGen | $2,000,000.00 |
| Promissory Note | PosiGen | $7,294,984.39 |
| June Bridge Loan Facility | PosiGen Owner 2, LLC | $9,350,000 |
| July Bridge Loan Facility | PosiGen Owner 3, LLC | $25,000,000.00 |
| **Total** | | **$205,644,984.89** |

1.    **Secured Funded Debt Obligations**

42.    As of the Petition Date, the Debtors have approximately $115 million of secured funded debt obligations, as summarized below.

43.    Secured Convertible Notes.  On June 13, 2023, PosiGen issued secured convertible promissory notes due 2026 (the "**Secured Convertible Notes**") in the aggregate principal amount of $61,500,000 under a Note Purchase Agreement (as amended, amended and restated, supplemented, or otherwise modified prior to the Petition Date, the "**Secured Note Purchase Agreement**").  The Secured Convertible Notes are guaranteed by Debtors PosiGen, LLC, Developer, and PosiGen Operations, LLC (the "**Guarantors/Grantors**") and secured by a second-priority lien on substantially all of the assets of PosiGen and work-in-progress Solar Systems and

---

[8]    The descriptions herein of the Debtors' debt, including any security in respect of such debt, are provided for the convenience of the Court and parties in interest.  In certain cases, amounts stated are approximate.  The descriptions are not intended to be comprehensive nor should they be construed as an admission with respect to the terms, amount, validity or enforceability of any debt, any lien or security, or any other right or obligation. These descriptions are qualified in their entirety by the operative relevant debt and related documents.  The Debtors and their advisors are continuing to review their debt obligations and related matters and expressly reserve all rights relating thereto.

related collections and receivables of any of the Grantors (excluding any collateral that is subject to an agreement preventing the granting of a lien thereon). As of the Petition Date, an aggregate principal amount of approximately $71,000,000 remains outstanding.

44. <u>Battery Revolving Credit Facility</u>. On September 30, 2022, PosiGen issued secured revolving loans due 2025 (the "**Battery Revolving Credit Facility**") in the aggregate principal amount of $2,000,000 under a Revolving Credit Agreement by and among Connecticut Green Bank ("**CGB**") (as amended, amended and restated, supplemented, or otherwise modified prior to the Petition Date, the "**Battery Revolving Credit Agreement**"). The Battery Revolving Credit Facility is secured by battery inventory prior to installation at a qualifying residence. CGB sent a notice of acceleration of the Battery Revolving Credit Facility on August 25, 2025. As of the Petition Date, an aggregate principal amount of approximately $2,000,000 remains outstanding.

45. <u>June Bridge Loan Facility</u>. On June 13, 2025, PosiGen Owner 2, LLC ("**Owner 2**") issued secured term loans due 2025 (the "**June Bridge Loan Facility**") in the aggregate principal amount of $9,350,000 under a Secured Note, Loan and Security Agreement by and among Owner 2 and certain holders of Convertible Notes (as defined below). The June Bridge Loan Facility is secured by certain fully installed residential solar systems owned by Owner 2. As of the Petition Date, an aggregate principal amount of approximately $9,350,000 remains outstanding under the June Bridge Loan Facility.

46. <u>July Bridge Loan Facility</u>. On July 31, 2025, PosiGen Owner 3, LLC ("**Owner 3**") entered into a Credit Agreement by and among Owner 3, PosiGen Rampart, LLC ("**PosiGen Rampart**"), PosiGen, and the lenders party thereto for the issuance of a multi-draw secured term loan facility due 2026 (the "**July Bridge Loan Facility**") in the aggregate principal amount of up to $50,000,000. The first instalment of the July Bridge Loan Facility was advanced on August 8,

2025, in the amount of $25,000,000.  The July Bridge Loan Facility is secured by solar systems owned by Owner 3 and guaranteed by PosiGen Rampart and PosiGen.  No bill of sale was executed in connection with the July Bridge Loan Facility and it is unclear whether Owner 3 owns any solar systems.  As of the Petition Date, an aggregate principal amount of approximately $25,000,000 remains outstanding under the July Bridge Loan Facility.

47.    Promissory Note.  On October 28, 2025, PosiGen issued a secured promissory note due 2026 (the "**Promissory Note**") in the initial aggregate principal amount of $1,135,311.61 to BID Administrator, LLC, as administrative and collateral agent for the lenders thereunder (in such capacities, the "**Promissory Note Agent**")[9] (as amended, amended and restated, supplemented, or otherwise modified prior to the Petition Date, the "**Secured Promissory Note Agreement**").  The Secured Promissory Note Agreement provided that PosiGen could request additional extensions of credit.  PosiGen borrowed additional amounts on October 31, 2025 ($1,270,200), November 7, 2025 ($1,831,908.80), November 14, 2025 ($1,206,730), and November 21 ($1,341,882.22).  The Promissory Note is secured by an all-assets lien over PosiGen's assets and property, which does not include, among other exclusions, collateral securing the Battery Revolving Credit Facility or cash held in the Lease Revenue Account or the SREC Account.  As of the Petition Date, an aggregate principal amount of approximately $7,294,984.39 remains outstanding under the Promissory Note.

### 2.    Unsecured Funded Debt Obligations

48.    Unsecured Convertible Notes.  On February 2, 2023, PosiGen issued unsecured convertible promissory notes due 2026 (the "**Unsecured Convertible Notes**") in the aggregate principal amount of $54,000,000 under a Note Purchase Agreement (as amended, amended and

---

[9]    BID Administrator, LCC, an affiliate of Brookfield, is also the Backleverage Agent.

restated, supplemented, or otherwise modified prior to the Petition Date, the "**Unsecured Note Purchase Agreement**").  As of the Petition Date, an aggregate principal amount of approximately $91,000,000 remains outstanding.

### 3. Other Unsecured Obligations

49.     <u>Guarantees</u>.  PosiGen provided the limited Cash Diversion Guaranty in connection with the Backleverage Facility.  To the extent the Cash Diversion Guaranty was triggered prior to the Petition Date, the guaranteed amount would constitute a prepetition unsecured obligation of PosiGen.  PosiGen also guarantees Developer's, Provider's, and the applicable Manager's indemnity and payment obligations to the Class A TEP Investors pursuant to sponsor guarantees or indemnification obligations in the governing documents of the TEPs, as well as the obligations of certain subsidiaries of Backleverage in connection with tax credit transfer agreements.

50.     <u>Channel Partners</u>.  Developer is party to channel partner agreements with over 60 Channel Partners.  Developer estimates that approximately $19 million remains outstanding to Channel Partners as of the Petition Date.

51.     <u>Vendor Payables</u>.  The Debtors estimate that they have approximately $25 million of other unsecured obligations, including to vendors and suppliers.

## IV.    Circumstances Leading to These Chapter 11 Cases

52.     The residential solar business requires a developer to make a significant initial outlay of cash to purchase and construct Solar Systems, and the revenue streams from those Solar Systems are not sufficient to repay that initial cost for a long period of time.  In addition, while the developer is bringing in-progress Solar Systems to completion so that they can become profitable, it is also seeking to originate new business, which requires further cash investments.  While it is typical to operate a business in this way in the residential solar market, the cost structure associated with such operations is complicated and impacted by many variables, including macroeconomic

factors, the costs of goods used to develop Solar Systems, government incentives, and customer default rates.

### A.   PosiGen's Vulnerability to Market Pressures

53.     The residential solar market has faced significant macroeconomic pressures and regulatory uncertainty in recent years.  Such factors have led to chapter 11 filings by three major players—Solar Mosaic, LLC, SunPower Corporation, and Sunnova Energy International, Inc.—in 2024 and 2025, as well as the liquidations of several other industry participants.

54.     PosiGen's strategy focused on scaling the capacity of Developer to develop Solar Systems, which allowed the Company to further its goals of making clean energy available to the communities it serves and expand its business rapidly.  But PosiGen's financing structure was complex and vulnerable to market pressures, and the business was affected by legislative and regulatory challenges to solar and other renewable energy policy in the United States.  The Company's business model, like that of many solar companies, relied on incentives from federal, state, and local governments.  But the current presidential administration has deprioritized subsidization of the solar industry, including by modifying renewable energy tax credits and imposing steep tariffs on imported materials that are necessary to construct solar projects, including solar modules, inverters, racking, and structural steel.  The tax equity and asset financing markets for solar and renewable energy have accordingly stalled and government-backed financing programs have been constrained and impounded, all of which has limited PosiGen's access to alternative capital.

55.     The lack of alternative providers offering solar energy to low- or middle-income homeowners, along with the recent exit of major players in the residential solar market due to the above-referenced changes in the market, presented PosiGen with an opportunity to grow its business and make clean energy available to more customers, in furtherance of the public interest.

Prior to the Petition Date, PosiGen took advantage of that opportunity to further grow its business and entered into new installation contracts and channel partner agreements. But PosiGen's Backleverage Facility did not offer sufficient financing to progress or complete those projects. PosiGen requested an increase of the commitments under the Backleverage Facility to develop these Solar Systems. Brookfield did not agree to provide any additional financing. Brookfield instead encouraged PosiGen to focus on completing the Solar Systems in Brookfield's portfolio and commencing the securitization associated with those assets. PosiGen had to use its working capital to finance its new Solar Systems and quickly found itself in a precarious liquidity position.

### B. The 2025 Bridge Financings

56.     PosiGen attempted to bridge its cash needs with small bridge financing facilities, with the goal of securing additional long-term financing. In the summer of 2025, PosiGen raised additional short-term financing to address its liquidity needs while it progressed toward securitization. The Company raised certain non-Debtor financings as well as the June Bridge Loan Facility (which was provided by certain of PosiGen's equity investors) and the July Bridge Loan Facility (which was provided by a third-party lender).

57.     PosiGen also began discussions with a large third-party investor regarding a longer-term financing in June of 2025 (the "**Third-Party Bridge Financing**") and another party regarding an asset sale transaction (the "**Third-Party Asset Sale**").

### C. Acceleration of the Backleverage Facility

58.     On July 31, 2025, the Company elected not to make an interest payment under the Backleverage Facility to preserve capital to make payments to Channel Partners and pay operating expenses. Having seen the rapid unraveling of its competitors' businesses following their failure to pay Channel Partners and, in light of how integral Channel Partners were to its business and ability to make clean energy available to its customers, the Company chose to prioritize those

payments.  At the time, the Company expected that proceeds of the Third-Party Bridge Financing and the Third-Party Asset Sale would be available in the very near term and that it would be able to catch up on the missed interest payment quickly.  The Company believed that the business would not survive without the Channel Partners and hoped that Brookfield would understand that delaying the interest payment and preserving the Channel Partner relationships was in the best interests of both the Company and Brookfield.  But the Company also recognized that it needed restructuring advice and engaged White & Case and FTI after the grace period expired on the missed interest payment.

59.     On August 6, 2025, Brookfield exercised its right to exercise control over and freeze a significant amount of cash held in the Backleverage Account.  Discussions regarding a longer-term financing continued, but PosiGen no longer had access to the revenue it relied on to operate its business in the ordinary course.  Brookfield requested substantial diligence and, with the help of White & Case and FTI, PosiGen began to produce materials responsive to Brookfield's requests.  On the evening of August 12, 2025, Brookfield sent a notice of default under the Backleverage Facility.  Following in-person meetings with the Company's senior management team, on August 15, 2025, Brookfield accelerated the Backleverage Facility and exercised its proxy to appoint Neal Goldman as independent manager of Backleverage.  Mr. Goldman assumed all responsibilities of Backleverage's officers at that entity.

60.     The Company's prospective financing commitments were terminated as a result of Brookfield's acceleration and the Company's inability to meet the conditions precedent to those financing.  By the end of August, it became apparent to the Company that, without an immediate cash infusion, it would not be able to pay operating expenses, repay the missed interest payment to Brookfield, pay Channel Partners, and continue to make payroll following the end of the pay

period (ending August 24, 2025) that it had pre-funded.  The Company tried to raise capital from its equity investors but, although certain investors put together financing proposals, those proposals would not have provided a comprehensive solution and the Company could not satisfy the conditions necessary to close the contemplated transactions.

61.     As the Company's advisors performed diligence on the June Bridge Loan Facility and the July Bridge Loan Facility, they discovered that many assets that had purportedly been pledged under those facilities had been sold or pledged to multiple counterparties.  They also found that the Company's bridge financings violated the terms of other financings or the governing documents of the TEPs.  The advisors also discovered that the Company had received proceeds from the July Bridge Loan Facility without executing a bill of sale transferring the relevant assets to the lender.  PosiGen's advisors also learned that PosiGen's cash management system and practices did not conform with the various governing and financing documents under its complicated financing structure, and that lease revenues, cash for debt service payments, and operating cash had been commingled.  These facts were immediately disclosed to PosiGen's board of directors, lenders (including Brookfield), and equity investors, none of whom had known these facts prior to that disclosure.

### D.       The TSA and Promissory Note

62.     Brookfield was the only party willing to provide PosiGen with the money it needed to continue to operate and needed to do so to protect its investment in the Backleverage Facility. Brookfield has, since the date of the missed interest payment, funded approximately $23 million to the Company, through temporary transactions, such as the TSA, the inventory purchase, and the Promissory Note.[10]

---

[10]      Specifically, Brookfield: (i) agreed to release $15,116,061 of cash in the Backleverage Account; (ii) paid $1,417,274 to purchase certain inventory assets; and (iii) funded $6,107,429 under the Promissory Note.

63.     Initially, Brookfield would only commit to fund PosiGen's servicing, operations, and management functions on a week-to-week basis through a transition services agreement. Backleverage, at Brookfield's request, engaged Omnidian to take over servicing from Provider.[11] The Company began providing Omnidian and Brookfield with access to its information and systems to plan a transition of its servicing functions, so that it could ensure its customers would still receive service and mitigate damages to its many counterparties.  PosiGen also continued to maintain its operations and perform its servicing, maintenance, customer care, and administration responsibilities to the best of its ability.  Without the ability to pay employees not covered by the TSA, on August 24, 2025, PosiGen made the difficult decision to terminate the employment of approximately 470 employees (over 70% of its workforce).

64.     The transition took much longer than Brookfield expected and, as of the Petition Date, had not been substantially completed.  Brookfield continued to keep the Company on a week-to-week budget.  Each week for the first two months after entry into the TSA, the parties would agree to extend the TSA for another week and negotiate and agree on a budget, and cash would be released each Friday or Monday.  The Company repeatedly explained to Brookfield that the week-to-week funding was unsustainable and that employees were resigning due to not knowing if they would have a source of income beyond the next few days.  Brookfield said that it would only provide longer-term financing if the structurally junior Class A Members participated, and that, once they did, Brookfield would provide financing under a longer-term bridge note that would roll up into a DIP facility to finance a chapter 11 case.

65.     Brookfield did not provide the Company with the specifics of its negotiations with the Class A Members until very recently.  At some point, Brookfield's negotiations with the Class

---

[11]   Although Brookfield chose Omnidian as its preferred replacement servicer, Omnidian is not a full service provider and must outsource management services, billing, and collections to another provider.

A Member of the Decatur Project Companies, broke down. The Company also understands that Brookfield's negotiations with the Class A Member of Bienvelle Project Company, also broke down, and that investor said that it would not participate in a Brookfield-led transaction. Although the Company made attempts to engage with those two Class A TEP Investors, including following the breakdown of their negotiations with Brookfield, such attempts were unsuccessful. On October 31, 2025, M&T removed Decatur Manager as the Class B Managing Member of the Decatur Project Companies. As of the Petition Date, the Company is not aware of M&T having installed a replacement Class B Managing Member.

66.     When the cash in the Backleverage Account and the Backleverage Debt Service Account was exhausted, Brookfield purchased inventory from PosiGen and PosiGen used the proceeds of that sale to meet its funding needs for the following week. After that, Brookfield began to fund the Company's working capital needs on a weekly basis under the Promissory Note issued by PosiGen. The CGB Revolving Credit Agreement provided CGB with a consent right over the incurrence of any additional indebtedness by PosiGen or any of its subsidiaries. CGB did not deliver that consent in connection with the Promissory Note and initiated a lawsuit in the United States District Court for the District of Connecticut to enjoin PosiGen from taking on the additional debt.[12] CGB's motion for a TRO was denied, although the matter remains pending as of the Petition Date.

67.     During this time, PosiGen continued to service its customers' Solar Systems to the best of its ability and provided regular information to its lenders and other financing counterparties, including primarily Brookfield. PosiGen also made efforts to back up and store its data in the event Brookfield stopped funding and it was forced to cease operating. While the weekly funding

---

[12]   *Conn. Green Bank v. PosiGen, PBC* (No. 3:25-cv-01841 (SVN)).

structure was far from ideal, the Company elected to accept funding under the Promissory Note for a time because it determined that the situation was better for all its stakeholders than a disorderly shutdown, which was the only other available alternative.

**E.    The Proposed Transition Plan and Foreclosure Notices**

68.    Although the Company believed that Brookfield's week-to-week funding structure was temporary and that, once Brookfield reached deals with the TEPs, it would fund a debtor-in-possession facility in a chapter 11 case, that turned out to not be the case. On November 14, 2025, Brookfield delivered its proposed transition plan, along with the Foreclosure Notices.

69.    The transition plan provided that the Debtors' servicing, customer care, operations and maintenance, and other operating businesses would be transitioned to Omnidian and provided no plan for the rest of the business, approximately 10,000 customers, Decatur Manager, the Decatur Project Companies, Bienville Manager, Bienville Project Company, or other creditors. Brookfield's transition plan also proposed terminating the employment of 92 additional employees that were not targeted for hire by Omnidian. The Company's management team and directors expressed serious concerns with Brookfield's proposal and reiterated that an organized process in chapter 11 would provide the greatest potential to maximize value for everyone through a collective process.

70.    The Company and its fiduciaries are unwilling to disadvantage their other stakeholders for no consideration. The Debtors determined to file the chapter 11 cases to establish a forum in which all stakeholders can have a seat at the table, with a view to maximizing recoveries for all creditors (including Brookfield) in accordance with the Bankruptcy Code's priority scheme. The Debtors have sufficient unencumbered cash to fund the initial portion of these cases. The Company's directors and management team are committed to doing the right thing for all the

Company's stakeholders, notwithstanding the Company's past actions and missteps, and view a court-supervised chapter 11 process as the only proper means for achieving that goal.

Dated:  November 25, 2025
Houston, Texas

/s/ *Charles R. Koster*

**WHITE & CASE LLP**
Charles R. Koster (Texas Bar No. 24128278)
609 Main Street, Suite 2900
Houston, Texas 77002
Telephone:      (713) 496-9700
Email:            charles.koster@whitecase.com

**WHITE & CASE LLP**
Thomas E Lauria (Texas Bar No. 11998025)
Michael C. Shepherd (*pro hac vice* pending)
Fan B. He (*pro hac vice* pending)
Andrea Kropp (*pro hac vice* pending)
Southeast Financial Center
200 South Biscayne Boulevard, Suite 4900
Miami, Florida 33131
Telephone:      (305) 371-2700
Email:            tlauria@whitecase.com
                    mshepherd@whitecase.com
                    fhe@whitecase.com
                    andrea.kropp@whitecase.com

- and -

- and -

**WHITE & CASE LLP**
Aaron E. Colodny (*pro hac vice* pending)
555 South Flower Street, Suite 2700
Los Angeles, California 90071
Telephone:      (213) 620-7700
Email:            aaron.colodny@whitecase.com

**WHITE & CASE LLP**
Andrea Amulic (*pro hac vice* pending)
1221 Avenue of the Americas
New York, New York 10020
Telephone:      (212) 819-8200
Email:            andrea.amulic@whitecase.com

*Proposed Counsel to the Debtors and Debtors in Possession*

**<u>Certificate of Accuracy</u>**

I certify that the foregoing statements are true and accurate to the best of my knowledge. This statement is being made pursuant to Bankruptcy Local Rule 9013-1(i).

*/s/ Charles R. Koster*

**<u>Certificate of Service</u>**

I certify that on November 25, 2025, I caused a copy of the foregoing document to be served via the Electronic Case Filing System for the United States Bankruptcy Court for the Southern District of Texas.

*/s/ Charles R. Koster*

## **EXHIBIT 1**

**Organizational Chart**



