## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| POSIGEN, PBC, *et al.*,[1] | ) Case No. 25-90787 (ARP) |
| | ) |
| Debtors. | ) (Joint Administration Requested) |
| | ) |

## DECLARATION OF ROBERT DEL GENIO IN SUPPORT OF
## DEBTORS' PETITIONS AND REQUESTS FOR FIRST DAY RELIEF

1.      I, Robert Del Genio, declare pursuant to 28 U.S.C. § 1746 as follows:

2.      I am the Chief Restructuring Officer of PosiGen, PBC ("**PosiGen**" and, collectively with the other debtors and debtors in possession in the above-captioned chapter 11 cases, the "**Debtors**" and, together with their non-Debtor affiliates, the "**Company**").  I am authorized to submit this declaration (this "**Declaration**") on behalf of the Debtors in the above-captioned chapter 11 cases.

3.      I submit this Declaration in support of the Debtors' voluntary petitions for relief under chapter 11 of title 11 of the United States Code (the "**Bankruptcy Code**"), and certain "first-day" relief requested in motions filed concurrently herewith (the "**First Day Motions**"). I have reviewed the First Day Motions or have otherwise had their contents explained to me, and it is my belief that the relief sought therein is essential to the uninterrupted operation of the Debtors' business and to the Debtors' reorganization. I am authorized to submit this Declaration on behalf of the Debtors.

---

[1]      The last four digits of PosiGen, PBC's tax identification number are 9706.  A complete list of each of the Debtors in these chapter 11 cases and the last four digits of their federal tax identification numbers may be obtained on the website of the Debtors' proposed claims and noticing agent at httpsL//cases.ra.kroll.com/PosiGen.  The Debtors' service address in these chapter 11 cases is 1000 Elmwood Park Boulevard, Suite A, Harahan, LA 70123.

4.      Except as otherwise indicated, all facts set forth in this Declaration are based upon my personal knowledge, my review of relevant documents, information provided to me by employees working under my supervision, or my opinion based upon experience, knowledge and information concerning the operations of the Debtors. If called upon to testify, I would testify competently to the facts set forth in this Declaration.

<u>**Background and Qualifications**</u>

5.      I am a Chief Restructuring Officer of PosiGen and the co-leader of the Corporate Finance and Restructuring segment of the New York Metro Region at FTI, the proposed financial advisor to the Debtors. I have over forty years of experience in restructuring and mergers and acquisitions and have served as a financial advisor to both public and private companies, specializing in advising companies, lenders, creditors, corporate boards, and equity sponsors across a wide range of industries, both domestically and international. I have undertaken both advisory and executive roles, including Interim Chief Executive Officer, Chief Strategic Officer, Strategic Planning Officer, and Chief Restructuring Officer.

6.      I have played a key role in many successful company side chapter 11 restructurings, including, but not limited to, serving as the financial advisor to Audacy Inc., Waypoint Leasing Holdings Ltd., TPC Group, Inc., GNC Holdings Inc., Catalina Marketing Corporation, Frontier Communications Corporation, OSG Group Holding, Inc., Mobileum Inc., Altera Infrastructure, LP, ESSAR Steel, Algoma Steel Inc., Reichhold Holdings US, Inc., Milacron, Inc., Bowflex Inc., Caraustar Industries, Inc., MicroAge, Inc., CST Industries, Inc., Dan River, Inc., WheelingPittsburgh Steel Corp., US Internetworking, Factory Card Outlet, Malden Mills, and Metal Forming Technologies. I have also acted as the Chief Restructuring Officer or Strategic Planning Officer, as applicable, of the following entities during their chapter 11 proceedings:

Voyager Aviation Holdings, LLC, CHC Group Ltd., RHI Entertainment, Inc., The Weinstein Company Holdings LLC, PHI, Inc., F & W Media, Inc., and Western Global Airlines LLC. In addition, I previously served as the Chief Strategic Officer of Production Resources Group, L.L.C., Chief Restructuring Officer of City Brewing and the interim Chief Executive Officer of Panavision Inc. Further, I am a member of the board of Panavision Inc., and previously served on the boards of Voyager Aviation Management Ireland, CHC Group Ltd., Washington Group International, Inc., Lazare Kaplan International, Inc., and Buffets, Inc.

7.    I joined FTI in 2017 when it acquired CDG Group plc, where I was a co-founder and managing member. Prior to that, I was a Corporate Finance Partner and a National Director of Ernst & Young Global Limited. I graduated from the University of Notre Dame in 1980 with high honors and a bachelor's degree in business administration and received a master's in management from the Kellogg Graduate School of Management at Northwestern University. I am also a fellow of the American College of Bankruptcy.

8.    In my role as Chief Restructuring Officer of PosiGen, I am involved with PosiGen's operations and familiar with PosiGen's history, business and financial affairs, books and records, and the circumstances leading to the commencement of these chapter 11 cases. Except where specifically noted, the statements in this declaration are based on: (a) my personal knowledge; (b) information provided to me by the Company's management team, employees, the FTI team and the Advisors; (c) my review of relevant documents and information concerning the Company's operations, financial affairs, and restructuring initiatives; or (d) my opinions based on my experience, knowledge, and familiarity with the Company's business and operations.

## Commencement of Bankruptcy Proceedings

9.      On the date hereof (the "**Petition Date**"), each Debtor filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code with the Court. The Debtors intend to continue to operate their businesses and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

10.     The Debtors' principal place of business is in Texas.  The Debtors historically occupied an office located at 720 N. Post Oak Road, Houston, Texas 77024.  The Debtors' right to possession under the lease for that office terminated on October 31, 2025.

## I.     First Day Motions

11.     On November 24, 2025, (the "**Petition Date**"), each Debtor filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code.  The Debtors filed the First Day Motions concurrently with the filing of their chapter 11 petitions. In my opinion, the granting of each First Day Motion constitutes a critical element in achieving a successful and smooth transition to chapter 11.

12.     For a more detailed description of the First Day Motions than set forth below, I respectfully refer the Court to the respective First Day Motions. To the extent that this Declaration and the provisions of any of the First Day Motions are inconsistent, the terms of the First Day Motions shall control.  Capitalized terms that are used in this Part I but not otherwise defined herein shall have the meanings ascribed to them in the relevant First Day Motions.

## A.  Administrative Motions

1.      *Debtors' Emergency Motion for Entry of an Order (I) Directing Joint Administration of Cases and (II) Waiving Requirements of Bankruptcy Code Section 342(c)(1) and Bankruptcy Rules 1005 and 2002(o) (the "**Joint Administration Motion**").*

13.     The Debtors seek entry of an order: (a) directing procedural consolidation and joint administration of these chapter 11 cases and (b) waiving the requirements of section 342(c)(1) of

title 11 of the United States Code and rule 2002(o) of the Federal Rules of Bankruptcy Procedure that the case caption and other notices mailed in these chapter 11 cases contain the tax identification number and address for each Debtor. Specifically, the Debtors request that the Clerk of the United States Bankruptcy Court for the Southern District of Texas maintain one file and one docket for all of the jointly administered cases under the case of PosiGen, PBC.

14. Joint administration of these chapter 11 cases will provide significant administrative convenience without harming the substantive rights of any party in interest. Many of the motions, hearings, and orders in these chapter 11 cases will affect each Debtor entity. The entry of an order directing joint administration of these chapter 11 cases will reduce fees and costs by avoiding duplicative filings and objections. Joint administration also will allow the United States Trustee and all parties in interest to monitor these chapter 11 cases with greater ease and efficiency.

15. The use of the simplified case caption, without reference to the Debtors' respective tax identification numbers and other detail specified by section 342(c) of the Bankruptcy Code and Bankruptcy Rule 2002(n), will eliminate cumbersome and confusing procedures and ensure a uniformity of pleading identification. The name of the lead Debtor and the last four digits of its tax identification number will be set forth in the footnote to the caption. The footnote to the caption will also include a link to a webpage maintained by the Debtors' proposed claims and noticing agent, where the names of the other Debtors and their tax identification numbers will be readily available. Further, such case-specific information will be listed in the petitions for each Debtor, which are publicly available or will be provided by the Debtors upon request; and this information will be included in key notices to parties in interest, such as the notices required under Bankruptcy Rules 2002(a)(1), 2002(a)(7), and 2002(b), applicable to these chapter 11 cases.

16.     In my opinion, the relief requested in the Joint Administration Motion will not adversely affect the Debtors' respective constituencies.  The Debtors seek only administrative, not substantive, consolidation of the Debtors' estates.  Parties in interest will benefit from the cost reductions associated with the joint administration of these chapter 11 cases.   The joint administration of these chapter 11 cases is in the best interests of the Debtors' estates, their creditors, and all other parties in interest and constitutes a critical element in achieving a successful and smooth transition to chapter 11.

> 2.     *Debtors' Emergency Motion for Entry of an Order (I) Authorizing the Debtors to (A) File a Consolidated Creditor Matrix and (B) Redact Certain Identifying Information of Natural Persons, (II) Approving the Form and Manner of the Notice of Commencement; and (III) Granting Related Relief (the "**Creditor Matrix Motion**").*

17.     The Debtors request entry of an order: (i) authorizing the Debtors to (a) file a consolidated creditor matrix and (b) redact certain personally identifiable information of natural persons; (ii) approving the form and manner of notice of commencement of these chapter 11 cases; and (iii) granting related relief.

18.     The Debtors request authority to redact from any paper filed or to be filed with the Court in these chapter 11 cases (including the Creditor Matrix, the Schedules and Statements, proofs of claim, and any affidavits of service) the names, physical and email addresses, and other personal identifying information of all natural persons, including the Debtors' current and former employees, current and former customers, and individual equity holders.  This relief is requested because (a) such personal identifying information can be used to perpetrate identity theft and phishing scams or to locate survivors of domestic violence, harassment, or stalking and (b) disclosure of such personal identifying information or Personal Data risks violating applicable laws and regulations, thereby potentially exposing the Debtors to civil liability and financial penalties.

19.     The Debtors propose to provide unredacted versions of the Creditor Matrix, Schedules and Statements, proofs of claim, any affidavits of service, and any other filings redacted pursuant to the order approving the Creditor Matrix Motion to: (a) the Court; (b) the U.S. Trustee; (c) counsel to any official committee appointed in these chapter 11 cases; (d) Kroll Restructuring Administration, LLC ("**Kroll**"), the proposed claims and noticing agent; (e) any party in interest upon the written consent of the Debtors (email being sufficient), subject to any applicable privacy or data protection law or regulation and agreement of the non-Debtor party not to transfer or otherwise provide such unredacted document to any person or entity not party to the request; and (f) any party in interest that obtains relief from the Court to receive unredacted information.  The Debtors will also distribute, as applicable, any notices that are received at the Debtors' service address and that are intended for current employees.  Furthermore, to the extent notice and/or service by mail (as opposed to email) is required or requested, the Debtors will instruct Kroll to serve individuals at their physical addresses, ensuring that each individual will receive the same notices in the chapter 11 cases as all other creditors without the unnecessary public disclosure of his or her physical address.

20.     Not only is email service likely the most efficient and cost-effective manner by which service of all interested parties can be completed, it is also more likely to facilitate creditor responses. In addition, this method of service will help alleviate administrative burdens and costs on the Debtors' estates, given the exceptionally large number of customers who have previously conducted business with the Debtors and who would need to receive service.

21.     The Debtors propose that Kroll undertake all mailings and email service, as applicable, directed by the Court or the U.S. Trustee or as required under section 342(a) of the Bankruptcy Code and Bankruptcy Rules 2002(a) and (f), including serving the notice of

commencement of these chapter 11 cases, on all parties listed on the Creditor Matrix to advise them of the commencement of the chapter 11 cases.  Service of the Notice of Commencement on the Creditor Matrix will not only avoid confusion among creditors but also prevent the Debtors' estates from incurring unnecessary costs associated with serving multiple notices to the parties listed on the Creditor Matrix.

22.     The Debtors further request authority to distribute notices to parties in interest via email in lieu of mailing.  The Debtors do not maintain records of mailing addresses for many parties in interest.  Accordingly, distribution of notices via email to such parties is warranted under the circumstances and will alleviate an administrative burden otherwise imposed on the Debtors, as well as eliminate a significant cost associated with mailing physical notices.  If the Debtors do not have an email address for a party in interest, the Debtors will proceed with mailing in lieu of email.

23.     In my opinion, the relief requested in the Creditor Matrix Motion is in the best interests of the Debtors' estates, their creditors, and all other parties in interest and constitutes a critical element in achieving a successful and smooth transition to chapter 11.

   3.   *Debtors' Emergency Ex Parte Application for Entry of an Order Authorizing the Employment and Retention of Kroll Restructuring Administration LLC as Claims, Noticing, and Solicitation Agent (the* "**Claims, Noticing and Solicitation Agent Motion**"*).*

24.     The Debtors request entry of an order appointing Kroll as claims, noticing, and solicitation agent.

25.     Kroll's rates are competitive and reasonable. Kroll has the expertise required in a complex chapter 11 case.

26.     The Debtors request that Kroll's fees and expenses be paid as administrative expenses in the ordinary course of the Debtors' business without further application or order of

the Court.  Kroll will provide a monthly invoice to the Debtors, Debtors' counsel, the United States Trustee for the Southern District of Texas (the "**U.S. Trustee**"), counsel for any official committee, and any party in interest who specifically requests service of the monthly invoices.  Should a dispute develop, the matter will be brought to the Court for resolution.  Kroll agrees to maintain records of all services showing dates, categories of services, fees charged, and expenses incurred.

27.     On or about August 20, 2025, the Debtors paid Kroll an advance in the amount of $50,000 to be applied to prepetition fees.  On November 17, 2025, the Debtors paid Kroll $20,000 on account of prepetition fees and expenses.  Kroll seeks to replenish and continue to hold the $50,000 advance as contemplated in the Engagement Letter during the chapter 11 cases as security for payment of fees and reimbursement of expenses incurred.  Following termination of the Engagement Letter, Kroll will return to the Debtors any amount of the advance that remains following application of the advance to payment of unpaid invoices.

28.     The Debtors have agreed to indemnify Kroll as set forth in the Engagement Letter. Notwithstanding anything to the contrary, Kroll will not be indemnified for liability arising out of gross negligence, willful misconduct, fraud, or certain other matters identified in the order approving the Claims, Noticing and Solicitation Agent Motion.

29.     In my opinion, Kroll's employment is in the best interest of the Debtors' estates, their creditors, and all other parties in interest and constitutes a critical element in achieving a successful and smooth transition to chapter 11.

## B.  Operational Motions

> 1.  *Debtors' Emergency Motion for Entry of Interim and Final Orders (I) Authorizing The Debtors to (A) Continue to Operate Their Existing Cash Management System, (B) Maintain Existing Bank Accounts, Business Forms, Books and Records, (C) Pay Related Prepetition Obligations, (D) Maintain Fuel Card Program; and (E) Continue Intercompany Transactions; (II) Granting Administrative Expense Status to Intercompany Claims Among The Debtors; and (III) Granting Related Relief (the "**Cash Management Motion**").*

30.     The Debtors request entry of interim and final orders:  (a) authorizing the Debtors to (i) continue operating their Cash Management System, (ii) maintain and continue to use their existing Bank Accounts, Business Forms, and Books and Records (each as defined herein), (iii) pay related prepetition obligations, (iv) maintain their Fuel Card Program (as defined herein); and (v) continue to perform Intercompany Transactions (as defined herein), (b) granting administrative expense status to postpetition Intercompany Claims (as defined herein) among the Debtors, and (c) related relief.

### a.   The Cash Management System

31.     The Debtors, in the ordinary course of business, maintain an integrated cash management system (the "**Cash Management System**") that is essential to the operation of their businesses.  A schematic of the Cash Management System is attached hereto as **<u>Exhibit A</u>**.  The Cash Management System allows the Debtors to collect, concentrate, manage, invest, transfer, and disburse funds and facilitates the Debtors' cash monitoring, forecasting, and reporting.

32.     As of the Petition Date, the Cash Management System is made up of 47 bank accounts that PosiGen (directly or through one of its subsidiaries) owns and operates (such bank accounts, together with any other bank accounts PosiGen may open in the ordinary course of business, the "**Bank Accounts**").  Of the Bank Accounts, 28 are owned and controlled by the Debtors (the "**Debtor Bank Accounts**"). The remaining Bank Accounts (the "**Non-Debtor Bank Accounts**") are owned and controlled by non-Debtor affiliates.  The Bank Accounts are held at six banks (collectively, the "**Cash Management Banks**").  As of the Petition Date, the Debtors have approximately $13.4 million of unencumbered available cash on hand,[2] the majority of which cash is held at the KeyBank Lease Revenue Collection Account, as described further below.

---

[2]     Includes approximately $124,000 of cash held with respect to certain due and payable sales tax.

33.     The Cash Management System facilitates the collection, transfer, and disbursement of funds generated from the Company's operations. The Debtors made automatic daily transfers between Bank Accounts and manual transfers between Bank Accounts at varying intervals and as required from time to time.  Certain of these transfers occurred in the ordinary course between various Debtor entities and, on occasion, between Debtors and non-Debtor affiliates, in connection with Intercompany Transactions (as defined below).  All Intercompany Transactions are tracked in the Debtors' accounting system and the Debtors can identify and account for all Intercompany Transactions in real time.

34.     The Debtors have implemented appropriate and robust mechanisms to ensure that unauthorized payments will not be made on account of obligations incurred before the Petition Date.  Specifically, the Debtors, with the assistance of their advisors, have implemented internal control procedures that prohibit payments on account of prepetition debts without the prior approval of the Debtors' treasury department.

35.     Because of the nature of the Debtors' businesses, any disruption to the Cash Management System would impair the Debtors' businesses and harm their estates and stakeholders.  To minimize any such disruptions and maximize the value of the Debtors' estates, the Debtors request authority to continue operating their Cash Management System in the ordinary course of business during these chapter 11 cases and to close any Bank Accounts that the Debtors deem unnecessary in their business judgment.

**b.  Bank Accounts**

36.     As of the Petition Date, the Cash Management System is comprised of 47 Bank Accounts at six banks (the "**Cash Management Banks**"):

- Amalgamated Bank ("**Amalgamated Bank**");
- Bank of America, N.A. ("**BoA**");

- ComputerShare Ltd. ("**ComputerShare**");
- First Horizon Bank ("**First Horizon**");
- KeyBank National Association ("**KeyBank**"); and
- M&T Bank ("**M&T Bank**")

37.    The Debtors own 28 of the Bank Accounts, which are located at BoA, First Horizon, and KeyBank.  A list of all of the Cash Management Banks and Bank Accounts is attached hereto as **Exhibit B**, and the various Bank Accounts owned by the Debtors are described in the following table;

| Debtor Bank Accounts | |
|---|---|
| **Bank Accounts** | **Description of Bank Accounts** |
| **First    Horizon    Concentration Account**<br><br>PosiGen Developer, LLC<br>First Horizon x8078 | The First Horizon Concentration Account, owned by Debtor PosiGen Developer, LLC ("**Developer**"), is the Debtors' primary bank account.  The Debtors maintain a balance sufficient to fund daily cash needs in the First Horizon Concentration Account.   It is funded from various other Bank Accounts described herein. |
| **KeyBank ZBA Master Account**<br><br>PosiGen Developer, LLC<br>KeyBank x3252 | The KeyBank ZBA Master Account, owned by Developer, serves as the source of funds for the KeyBank Disbursement Accounts.   The KeyBank ZBA Master Account is funded from the First Horizon Concentration Account manually as needed, typically once per week. |
| **KeyBank Disbursement Accounts**<br><br>Posigen Developer, LLC<br>KeyBank x0972<br>KeyBank x0244<br>KeyBank x7844<br>KeyBank x7851<br>KeyBank x7836<br>KeyBank x7828<br>KeyBank x7794 | The KeyBank Disbursement Accounts, owned by Developer, are used to pay regulatory permit and inspection fees arising from the operations of the non-Debtor tax equity partnerships (the "**TEPs**" and each, a "**TEP**").   The KeyBank Disbursement Accounts are automatically funded from the First Horizon Concentration Account, typically once per week. |
| **KeyBank    Lease    Revenue Collection Account**<br><br>PosiGen, PBC<br>KeyBank x0135 | The KeyBank Lease Revenue Collection Account, owned by PosiGen, receives customer lease payments from customers. Genpact (UK) Ltd invoices the customers, monitors payments, and provides certain other services with respect to customer collections through the Genpact Servicing Agreement. Historically, PosiGen calculated the amounts to be transferred to each TEP on a periodic basis and transferred those amounts from the KeyBank Lease Revenue Collection Account to the applicable account at each TEP.  Prior to the Petition |

| | |
|---|---|
| | Date, as a result of liquidity constraints, on certain occasions the Debtors would manually transfer funds from the KeyBank Lease Revenue Collection Account to the First Horizon Concentration Account to fund ordinary operating expenses and then transfer funds from the First Horizon Concentration Account to the KeyBank Lease Revenue Collection Account before paying money to the applicable account at each TEP. |
| **KeyBank Lease Revenue Tax Account**<br><br>PosiGen, PBC<br>KeyBank x0127 | The KeyBank Lease Revenue Tax Account, owned by PosiGen, receives from the KeyBank Lease Revenue Collection Account amounts sufficient to pay sales taxes for the customer lease payments for the applicable TEPs under the Genpact Servicing Agreement and uses such amounts to satisfy such taxes. |
| **First Horizon CT Disbursement Account**<br><br>PosiGen Developer, LLC<br>First Horizon x9579 | The First Horizon CT Disbursement Account, owned by Developer, was used to pay regulatory permit and inspection fees. The First Horizon CT Disbursement Account was funded from the First Horizon Concentration Account manually as needed, semi-monthly.[3] |
| **Payroll Account**<br><br>PosiGen Developer, LLC<br>First Horizon x0369 | The Payroll Account, owned by Developer, is used to fund wages, taxes, 401(k), health savings account, and flexible spending account contributions for the Debtors' employees. Generally, Automated Data Processing, Inc., the Debtors' payroll processing servicer, withdraws funds from the Payroll Account two days prior to the employee wages payroll date and one day prior to the tax funding date. The Debtors also maintain a balance at the Payroll Account to process off-cycle payrolls as needed. The Payroll Account is generally funded manually from the Main Operating Account prior to a given pay date in an amount sufficient to cover wage and 401(k) obligations for a given pay period. |
| **Payroll Escrow Account**<br><br>PosiGen Developer, LLC<br>BoA x6994 | The Payroll Escrow Account, owned by Developer, is used to hold severance payment amounts for the Debtors' current employees. |

---

[3]    Prior to the Petition Date, as a result of liquidity constraints, the First Horizon CT Disbursement Account had, on occasion, been funded from excess funds in the Payroll Account and the First Horizon Receivable Collection Account.

| | |
|---|---|
| **First Horizon SREC Collection Account**<br><br>PosiGen, PBC<br>First Horizon x7999 | The First Horizon SREC Collection Account, owned by PosiGen, LLC, is used to collect proceeds from the sale of from Solar Renewable Energy Certificate ("**SRECs**") minted by energy generated by Debtor-owned solar energy systems ("**Solar Systems**"). The Debtors manually transferred the funds in the First Horizon SREC Collection Account to the First Horizon Concentration Account on an as-needed basis. |
| **First Horizon Receivable Collection Account**<br><br>PosiGen, LLC<br>First Horizon x0303 | The First Horizon Receivable Collection Account, owned by PosiGen, LLC, was used to receive the proceeds of the June 2025 Bridge Loan. The First Horizon Receivable Collections Account was also used to collect the proceeds from sales of SRECs owned by various Debtor entities. The Debtors manually transferred the funds in the First Horizon Receivable Collections Account to the First Horizon Concentration Account on an as-needed basis.[4] |
| **Utilities Adequate Assurance Account**<br><br>PosiGen Developer, LLC<br>First Horizon x4710 | The Utilities Adequate Assurance Account, owned by Developer, will function as the Adequate Assurance Account, as defined in the Utilities Motion. |
| **BoA Promissory Note Receivable Account**<br><br>PosiGen, PBC<br>BoA x9073 | The BoA Promissory Note Receivable Account, owned by PosiGen, is used to receive the proceeds of the Promissory Note fundings. After the weekly Promissory Note fundings are received, the Debtors manually transfer the funds in the BoA Promissory Note Receivable Account to the First Horizon Concentration Account to fund working capital needs. |
| **First Horizon Inactive Accounts**<br><br>PosiGen Owner 3, LLC<br>First Horizon x3129<br>First Horizon x3157<br>First Horizon x3917 | The First Horizon Inactive Accounts, owned by PosiGen Owner 3, LLC ("**Owner 3**"), are currently inactive and only maintain balances sufficient to pay Bank Fees (as defined herein). The First Horizon Inactive Account x3917 was used to receive the proceeds of the July 2025 Bridge Loan Facility. No payments are currently made out of the First Horizon Inactive Accounts. |
| **BoA Inactive Accounts**<br><br>PosiGen, PBC<br>BoA x5594<br><br>PosiGen Developer, LLC<br>BoA x7760 | The BoA Inactive Accounts, owned by PosiGen and Developer, are currently inactive and only maintain balances sufficient to pay Bank Fees. |

---

[4]   Prior to the Petition Date, as a result of liquidity constraints, the proceeds of the SREC sales have on occasion been deposited in the Payroll Account and the First Horizon CT Disbursement Account.

| BoA x6907 | |
| BoA x7621 | |
| BoA x5031 | |
| BoA x6868 | |
| BoA x6897 | |

38.     To minimize any disruptions that could impair the value of the Debtors' estates, the Debtors request authority to maintain the Cash Management System during these chapter 11 cases and to close any Bank Accounts that the Debtors deem unnecessary in their business judgment, including, but not limited to the Bank Accounts that are described as inactive above.

### c.  Administrative Expense Procedures

39.     The Debtors seek authority to open a Bank Account to hold in escrow amounts sufficient to satisfy administrative fees of funding the chapter 11 cases (the "**Administrative Expense Escrow Account**").  The Administrative Expense Escrow Account is intended to ensure that the Debtors maintain sufficient cash to fund the chapter 11 cases.  The Debtors seek authority to operate the Administrative Expense Escrow Account in accordance with the following procedures (the "**Administrative Expense Procedures**"):

| Administrative Expense Procedures | |
|---|---|
| **Administrative Expense Escrow Account** | The Debtors will operate the Administrative Expense Escrow Account as a dedicated and segregated account that holds in escrow funds sufficient to ensure payment of certain administrative expenses accruing during the pendency of the chapter 11 cases, namely, (a) all fees required to be paid to the Clerk of the Court and to the U.S. Trustee under section 1930(a) of title 28 of the United States Code, plus interest at the statutory rate (the "**Bankruptcy Fees**") and (b) all fees and expenses incurred during the chapter 11 cases by any persons or firms retained by the Debtors' estate in connection therewith (the "**Professionals**," and such fees the "**Professional Fees**").   All Bankruptcy Fees and Professional Fees will be paid from the Administrative Expense Escrow Account in accordance with and subject to any applicable Court orders. |

| | |
|---|---|
| **Covered Administrative Expenses** | The funds on deposit in the Administrative Expense Escrow Account shall not be available to general creditors of the Debtors' estates and may be used only to fund (a) Bankruptcy Fees and (b) Professional Fees in the ordinary course and subject to any applicable Court approvals, except as otherwise ordered by the Court. All Bankruptcy Fees and Professional Fees shall be paid from the Administrative Expense Escrow Account in accordance with and subject to any applicable Court orders, including approving the payment of Professional Fees. |
| **Weekly Variance Amount** | On Friday of every week following the Petition Date (the "**Weekly Reporting Date**"), the Debtors shall calculate an amount (the "**Weekly Variance Amount**") equal to (a) the sum of (i) the Debtors' good-faith estimate of the aggregate amount of all accrued and unpaid Professional Fees as of such Weekly Reporting Date based on estimates and invoices provided by the Professionals and (ii) the Debtors' good-faith estimate of all accrued and unpaid Bankruptcy Fees as of such Weekly Reporting Date, minus (b) the aggregate balance in the Administrative Expense Escrow Account as of the applicable Weekly Reporting Date.  If the Weekly Variance Amount is a positive number, then the Debtors shall transfer cash in an amount equal to the Weekly Variance Amount to the Administrative Expense Escrow Account by no later than 5:00 p.m. (prevailing Eastern Time) on the Tuesday following the applicable Weekly Reporting Date (or, if such date is not a business day, by 5:00 p.m. (prevailing Eastern Time) on the next available business day). |

40.     The Debtors submit that approval of the Administrative Expense Procedures is in the best interests of the Debtors' estates and all parties in interest, and will ensure the Debtors maintain sufficient cash to fund the amounts necessary to appropriately administer these chapter 11 cases, notwithstanding any delay in payment.

### d.  Receipts and Disbursements

41.     As described in greater detail in the Informational Brief, PosiGen developed Solar Systems, leased these systems to homeowners either directly or through its channel partners (such

leases, the "**Solar Leases**"), sold the systems into TEPs, monetized associated SRECs, Solar Investment Tax Credits ("**ITCs**"), and other government incentives generated by the Solar Systems, and serviced the Solar Systems and Solar Leases pursuant to servicing agreements by and among PosiGen Provider, LLC ("**Provider**") and the applicable TEP. PosiGen's operations were funded by proceeds from funded debt borrowings, sales of the Solar Leases into the TEPs, capital contributions from the TEP Class A Members, servicing fees, and were intended to be funded by proceeds from future securitization take-out transactions in connection with the TEPs, which were intended to be routed through the TEPs according to the distribution waterfalls set forth in the applicable agreements.

42. PosiGen's TEPs can mint SRECs through the production of each megawatt-hour of electricity generated by an eligible Solar System. SRECs are economically severable from the Solar Systems that generate them and, in certain jurisdictions, may be sold through established markets. PosiGen mints SRECs based on the energy generated by the TEPs' Solar Systems and subsequently monetizes them through sales to third parties. Proceeds from the sales of these SRECs were primarily collected in the First Horizon SREC Collection Account. As of the Petition Date, there is approximately $500,000 in the First Horizon SREC Collection Account. The First Horizon SREC Collection Account is not subject to a deposit account control agreement and is explicitly carved out of the collateral package of the Promissory Note.

43. PosiGen also collects lease payments from customers in the KeyBank Lease Revenue Collection Account. PosiGen outsources certain billing and collections functions to Genpact under the Genpact Servicing Agreement. Under that agreement, Genpact invoices each of PosiGen's customers. Those customers send their lease payments directly to the KeyBank Lease Revenue Collection Account, and Genpact tracks and reconciles all deposits and customer

payments.  Genpact also administers certain sales tax functions with respect to such accounts. The KeyBank Lease Revenue Collection Account is not subject to any deposit account control agreement or other restrictions on PosiGen's ability to use the cash in that account.  As of the Petition Date, there is approximately $10.5 million in the KeyBank Lease Revenue Collection Account.

44.     PosiGen would then periodically administer the waterfalls required by the various TEPs and distribute the customer collections.  This centralized cash collection system generally did not meet the requirements of the governing documents of each TEP, which required that lease collection be deposited in an account owned by the applicable TEP and prohibited commingling the lease collections with the funds of any other entity.

45.     In the ordinary course of business, the Debtors use various Bank Accounts to fund operations and make disbursements to third parties.  The Debtors use the First Horizon Concentration Account as the main source of disbursements.  Disbursements from the First Horizon Concentration Account are primarily made on account of (a) payments to channel partners (prior to the closing of the Debtors development business) and vendors, (b) service of funded-debt obligations other than the Backleverage Facility (which is funded from a separate account at Posigen Backleverage, LLC), and (c) payments to various Bank Accounts to fund payroll, regulatory and permitting fees, and certain obligations to customers.

### e.  Intercompany Transactions

46.     In the ordinary course of business, the Debtors and their non-Debtor affiliates engage in routine business transactions with each other (collectively, the "**Intercompany Transactions**"), which result in intercompany receivables and payables (collectively, the "**Intercompany Claims**").  The Intercompany Claims are reflected as journal entry receivables

and payables, as applicable, in the Debtors' accounting and treasury systems, and no settlement of these Intercompany Claims is typically made in cash.  The Debtors' treasury department closely monitors, records, and reconciles all Intercompany Transactions on a bi-annual basis pursuant to the Debtors' treasury department's intercompany payable policy.  Accordingly, the Debtors can trace, and account for all Intercompany Claims and will continue to do so postpetition.

47.     Requiring the Debtors to halt Intercompany Transactions would result in a severe financial and logistical burden to the detriment of their estates and all stakeholders.  Furthermore, granting postpetition Intercompany Claims among the Debtors administrative expense status will preserve value for the Debtors' estates and ensure that no stakeholders' substantive rights are altered.  The Debtors will continue to monitor and track every Intercompany Transaction to ensure compliance with all existing obligations and preserve value for the Debtors' estates.

48.     The Debtors seek the authority to continue the Intercompany Transactions in the ordinary course of business postpetition, and to grant administrative expense status to postpetition Intercompany Claims among the Debtors. The Debtors also seek, to the extent applicable, relief from the automatic stay in connection with postpetition Intercompany Transactions among the Debtors.

**f.   Bank and Processor Fees**

49.     The Debtors incur service charges and other fees in connection with the Cash Management System (the "**Bank Fees**").  Bank Fees have historically averaged approximately $20,000 per month.  The Bank Fees are debited from the applicable Bank Accounts when they are incurred.  The Debtors seek authority to pay all Bank Fees (including any accrued but unpaid prepetition Bank Fees) in the ordinary course in accordance with past practices.

**g.   Business Forms and Books and Records**

50. The Debtors use certain preprinted correspondence and business forms, such as letterhead, purchase orders, and invoices (collectively, the "**Business Forms**") in the ordinary course of business. The Debtors also record financial and operational results in their corporate books and records (the "**Books and Records**"). To avoid significant disruption to their business operations, minimize unnecessary additional expenses to their estates, and avoid confusion on the part of employees, customers, vendors, and suppliers during the pendency of these chapter 11 cases, the Debtors request authorization to continue using all of their Business Forms and Books and Records in a manner consistent with prepetition practices, without reference to the Debtors' status as debtors in possession.

### h. Fuel Card Program

51. The Debtors maintain a fuel card program (the "**Fuel Card Program**") with WEX, Inc. ("**WEX**"). Under the Fuel Card Program, the Debtors provide approximately 30 fuel cards (the "**Fuel Cards**") issued by WEX to certain of their field employees to enable them to purchase fuel for the vehicles used by the field employees to service the Debtors' solar systems. The Debtors make payments from the First Horizon Concentration Account to pay balances on the Fuel Cards.

52. The Fuel Card Program is an integral part of the Debtors' Cash Management System. Continued use of the Fuel Cards for payment of fuel for the Debtors' vehicles used to perform the operations, maintenance, and service functions of its business that will form the bulk of the Debtors' post-petition operations is critical for the Debtors' uninterrupted business. The Debtors estimate that they will spend approximately $16,600 each month over the next three months on account of the Fuel Card Program. As of the Petition Date, the Debtors owe approximately $30,000 under the Fuel Card Program. The Debtors request authority to pay all

outstanding amounts on account of the Fuel Card Program and to continue utilizing the Fuel Card Program in the ordinary course of business on a postpetition basis.

### i. Compliance of the Debtors' Bank Accounts with U.S. Trustee Guidelines and Section 345(b) of the Bankruptcy Code.

53.     The Region 7 Guidelines for Debtors-in-Possession (the "**U.S. Trustee Guidelines**") generally require chapter 11 debtors to, among other things, deposit all estate funds in accounts with an approved depository (each, an "**Approved Depository**") that agrees to execute a Uniform Depository Agreement with the U.S. Trustee pursuant to the U.S. Trustee Guidelines. The U.S. Trustee maintains a list of pre-approved Approved Depositories that have already executed the Uniform Depository Agreement.

54.     The Debtors' Bank Accounts are held at three different Cash Management Banks, each of which is an Approved Depository under the U.S. Trustee Guidelines.  Specifically, the Debtors own nine Bank Accounts at BoA, nine Bank Accounts at First Horizon, and ten Bank Accounts at KeyBank.

55.     Section 345(a) of the Bankruptcy Code authorizes a debtor to make deposits or investments of money as "will yield the maximum reasonable net return on such money, taking into account the safety of such deposit or investment."  For deposits or investments that are not "insured or guaranteed by the United States or by a department, agency, or instrumentality of the United States or backed by the full faith and credit of the United States," section 345(b) of the Bankruptcy Code requires debtors to obtain, from the entity with which the money is deposited or invested, a bond in favor of the United States and secured by the undertaking of an adequate corporate surety, "unless the court for cause orders otherwise."  11 U.S.C. § 345(a)–(b).

56.     The Debtors are in compliance with section 345(b) of the Bankruptcy Code.  All of the Debtors' Bank Accounts are insured by the FDIC and are held at Authorized Depositories. All

of the Debtors' Bank Accounts are maintained at Cash Management Banks that are well-capitalized and sophisticated financial institutions.

57.     In my opinion, the relief requested in the Cash Management Motion is necessary to avoid immediate and irreparable harm to the Debtors, is in the best interests of the Debtors' estates, their creditors, and all other parties in interest, and will enable the Debtors to continue to operate their businesses during the pendency of these chapter 11 cases.

> 2.     *Debtors' Emergency Motion for Entry of an Order (I) Authorizing the Debtors to (A) Pay Prepetition Wages, Other Compensation, Reimbursable Expenses, and Certain Severance Obligations and (B) Continue Employee Benefits Programs, (II) Authorizing and Approving the Debtors' Non-Insider Key Employee Retention Plan, (III) Authorizing and Approving the Debtors' Key Employee Incentive Plan for Certain Officers, and (V) Granting Related Relief (the "**Wages and Benefits Motion**").*

58.     The Debtors request (i) entry of an order authorizing, but not directing, the Debtors to (a) pay all prepetition wages, other compensation, reimbursable expenses, and certain severance obligations and (b) continue certain employee benefits programs, including payment of related prepetition obligations, in the ordinary course of business, (ii) entry of interim and final orders approving the Debtors' Non-Insider Key Employee Retention Program (the "**Non-Insider KERP**") for certain non-insider key employees; and (iii) granting related relief.  In addition, the Debtors request that the Court schedule a final hearing 21 days after the commencement of these chapter 11 cases, or as soon thereafter as practicable, to consider entry of the order approving the Debtors' Key Employee Incentive Program (the "**KEIP**") for certain officers, and approval of the Non-Insider KERP on a final basis.  For the avoidance of doubt, the Debtors are not seeking approval of the KEIP at the first day hearing.

### a.  The Debtors' Workforce

59.     As of the Petition Date, the Debtors employ approximately 144 full-time and part-time employees (together, the "**Employees**") located in 19 states throughout the United States.

Approximately 137 of these Employees are employed by Debtor PosiGen Developer, LLC, and approximately 7 Employees are employed by Debtor PosiGen, PBC.  Approximately 71 of the Debtors' Employees are salaried and approximately 73 are paid on an hourly basis.  In addition to the Employees, the Debtors have historically supplemented their workforce by relying on independent contractors (the "**Independent Contractors**" and, together with the Employees, the "**Workforce**").

60.    The Debtors' ability to maintain business operations and effectively serve the Company's customers depends on the support of their dedicated Workforce.  The Employees perform a wide variety of roles, including jobs related to administration, customer experience, customer servicing, information technology, and accounting and legal.  The Independent Contractors serve in various vital business functions.  Retaining the individuals that comprise the Workforce, with their specialized skills, expertise, and intimate understanding of the Debtors' businesses, is essential to the Debtors' ability to maintain business continuity and maximize the value of their estates in these chapter 11 cases.

61.    The vast majority of the Workforce relies on their Compensation and Benefits (as defined below) to pay their daily living expenses and support their families.  If the Debtors are not permitted to continue paying and honoring their obligations to their Workforce during these chapter 11 cases in the ordinary course of business, the Workforce would face significant financial hardship and would likely not remain with the Debtors.  Loss of the Debtors' Workforce would disrupt their business at the outset of these chapter 11 cases.  Absent the continued, uninterrupted services of the Workforce, the Debtors' ability to operate their business, and achieve their objectives in these chapter 11 cases would be materially impaired, to the detriment of all stakeholders and the public interest.

**b. Compensation and Benefits, Non-Insider KERP and KEIP**

62.     To minimize the personal hardship that the individuals comprising the Workforce would suffer if prepetition employee-related obligations are not paid or remitted when due or expected, the Debtors request authority, but not direction, to pay and honor, as applicable, (a) prepetition obligations that the Debtors have directly or indirectly incurred to the Workforce in the ordinary course of business, including in respect of: (i) Wage Obligations; (ii) Payroll Withholding and Processing Obligations; (iii) Reimbursable Expenses and Fees; (iv) Health and Welfare Benefits; (v) Department Incentive Plans; (vi) the 401(k) Plan; (vii) Paid Leave; (viii) the Workers' Compensation Program; and (ix) Severance Obligations (each as defined below and, collectively, the "**Compensation and Benefits**")[5], and (b) all costs related to or on account of the Compensation and Benefits provided to the Workforce on a postpetition basis in the ordinary course of business.  The Debtors also seek authority to pay or otherwise compensate (i) certain of the Debtors' key non-insider Employees through the Non-Insider KERP and (ii) certain of the Debtors' key Insider Employees through the KEIP.

63.     Out of an abundance of caution, the Debtors further request confirmation of their right to modify, change, and/or discontinue any of the programs and policies relating to the Compensation and Benefits, and to implement new programs, policies, and benefits on a postpetition basis in the ordinary course of business, in the Debtors' discretion, without the need for further Court approval, subject to applicable law.

---

[5]     The descriptions of the Compensation and Benefits set forth in the Wages and Benefits Motion constitute a summary.  The actual terms of the agreements, contracts, plans, programs, and manuals governing the Compensation and Benefits programs shall govern in the event of any inconsistency with the description thereof in the Wages and Benefits Motion.  The Debtors request authority, but not direction, to honor obligations related to Compensation and Benefits in the ordinary course of business, regardless of whether the Debtors inadvertently failed to include a particular benefit or aspect of compensation in the defined term "Compensation and Benefits," and any such inadvertently omitted benefit or aspect of compensation is included in the defined term "Compensation and Benefits" as used in the Wages and Benefits Motion.

64.     The chart below summarizes the estimated prepetition amounts the Debtors seek to pay on account of the Compensation and Benefits:

| Motion Category | Compensation and Benefits | Prepetition Amount |
|---|---|---|
| Wage Obligations | Employee Wages | $2,000 |
| | Independent Contractor Obligations | $30,000 |
| Withholding Obligations | Payroll Withholding | $750 |
| Processing Obligations | Payroll Processing Fees | $25,000 |
| Reimbursements | Reimbursable Expenses and Fees | $5,000 |
| Health and Welfare Benefits | Medical and Prescription Plans | $0 |
| | Dental Plan | $0 |
| | Vision Plan | $0 |
| | HSA Amounts | $3,500 |
| | FSA Amounts | $5,500 |
| | COBRA Obligations | $0 |
| | Life & AD&D Insurance Plans | $0 |
| | Disability Benefits | $0 |
| | EAP Obligations | $0 |
| | Additional Benefit Programs | $5,000 |
| Department Incentive Programs | Department Incentive Programs | $35,000 |
| 401(k) Plan | 401(k) Match Obligations | $0 |
| | 401(k) Fees | $0 |
| Paid Leave | Paid Leave Benefits | $25,000 |
| Workers' Compensation Program | Workers' Compensation Insurance Policy | $0 |
| Severance | Severance Obligations | $0 |
| **TOTAL:** | | **$136,750** |

### c. Wage Obligations

65.     In the ordinary course of business, the Debtors' obligations to the Workforce include the Employee Wages and Independent Contractor Obligations (each as defined below and, collectively, the "**Wage Obligations**").  On average, the Debtors pay approximately $1,340,000 per month on account of the Wage Obligations.  As of the Petition Date, the Debtors estimate that they owe approximately $32,000 on account of accrued and unpaid Wage Obligations, comprising (i) $2,000 for Employee Wages, and (ii) $30,000 for Independent Contractor Obligations.

### i. Employee Wages

66.     In the ordinary course of business, the Debtors incur obligations to their Employees for wages, salaries, and other compensation (the "**Employee Wages**").  Employee Wages are paid bi-weekly in arrears via check or direct deposit every other Friday, for a pay period covering the week that ended the previous Friday.  On November 21, 2025, the Debtors ran a special payroll to prepay Employee Wages through November 28, 2025.  Nonetheless, the Debtors have accrued but not yet paid certain Employee Wages as of the Petition Date.  For example, Employee Wages may also be due and owing as of the Petition Date because of, among other things, potential discrepancies between amounts that the Debtors have paid and amounts that Employees believe they are owed.  The reconciliation process may reveal that additional amounts are owed to such Employees.  On average, the Debtors pay approximately $1,310,000 per month on account of Employee Wages.

67.     As of the Petition Date, the Debtors estimate that they owe approximately $2,000 in accrued and unpaid Employee Wages.  The Debtors request authority, but not direction, to pay all outstanding prepetition amounts owed on account of the Employee Wages and to continue to make all payments on account of the Employee Wages as they become due and payable postpetition in the ordinary course of business.

### ii.  Independent Contractor Obligations

68.     From time to time, the Debtors directly contract with and pay certain Independent Contractors for information technology functions, including data management, data engineering, and cybersecurity.  On average, the Debtors pay approximately $30,000 per month to Independent Contractors for services rendered and for reimbursement of out-of-pocket expenses incurred by Independent Contractors (the "**Independent Contractor Obligations**").  As of the Petition Date, the Debtors estimate that they owe approximately $30,000 in accrued and unpaid Independent Contractor Obligations.  The Debtors request authority, but not direction, to pay all outstanding

prepetition amounts owed on account of the Independent Contractor Obligations and to continue to make all payments on account of Independent Contractor Obligations as they become due and payable postpetition in the ordinary course of business.

### d.  Withholding Obligations

69.    During each payroll period, the Debtors routinely deduct certain amounts from Employees' pay checks, including garnishments, child support, and similar deductions as required by law.  The Debtors also deduct other pre- and post-tax amounts payable under certain employee benefit plans discussed herein, such as an Employee's share of healthcare benefits and insurance premiums, contributions under voluntary benefit programs, contributions to Retirement Plans (as defined below), and other miscellaneous deductions (collectively, the "**Deductions**").    The Debtors remit the Deductions to the appropriate third-party recipients.

70.    The Debtors are required by law to withhold from Employee Wages amounts related to, among other things, federal, state, and local income taxes, as well as Social Security and Medicare taxes for remittance to the appropriate federal, state, or local taxing authorities (collectively, the "**Employee Payroll Taxes**").  The Debtors must then match the Employee Payroll Taxes from their own funds on account of Social Security and Medicare taxes and pay, based on a percentage of gross payroll (subject to state-imposed limits), additional amounts for federal and state unemployment insurance and Social Security and Medicare taxes (collectively, the "**Employer Payroll Taxes**" and, together with the Employee Payroll Taxes, the "**Payroll Taxes**").[6]  The Payroll Taxes and the Deductions are collectively referred to herein as the "**Withholding Obligations**."  As of the Petition Date, the Debtors estimate that they owe

---

[6]    The Debtors generally utilize ADP, Inc. ("**ADP**") to process the Payroll Taxes and forward the Payroll Taxes to the appropriate federal, state, and local taxing authorities in compliance with remittance intervals and deadlines established by such taxing authorities.

approximately $750 on account of Withholding Obligations.  The Debtors request authority, but not direction, to pay or remit all outstanding prepetition amounts incurred or withheld on account of the Withholding Obligations and to continue to make all payments or remittances on account of the Withholding Obligations as they become due and payable postpetition in the ordinary course of business.

### e.   Payroll Obligations

71.     The Debtors employ ADP (the "**Payroll Processor**") to administer and manage the Debtors' payroll-related administrative functions, including the processing and payment of Employee Wages and related Withholding Obligations.  The Debtors also utilize ADP's timekeeping system in connection with payroll processing.  The Debtors pay fees to the Payroll Processor for performing such services (the "**Payroll Processing Fees**").  On average, the Debtors' monthly Payroll Processing Fees paid to the Payroll Processor total approximately $15,000.  As of the Petition Date, the Debtors estimate that they owe approximately $25,000 to the Payroll Processor on account of accrued and unpaid Payroll Processing Fees.  The Debtors request authority, but not direction, to pay all outstanding prepetition Payroll Processing Fees and to continue to make payments on account of all Payroll Processing Fees as they become due and payable postpetition in the ordinary course of business.

### f.   Reimbursable Expenses and Fees

72.     The Debtors routinely reimburse Employees for eligible business-related expenses incurred within the scope of their employment, including travel, lodging, transportation, meal allowances, taxi or ride-share services, cellphone stipends, and other expenses relating to the operation of the Debtors' businesses (the "**Reimbursable Expenses**").  If an Employee pays out-of-pocket, the Employee is responsible for submitting an expense report to the Debtors through

the Debtors' expense reimbursement administrator, Concur Expense. Once the Debtors determine that the charges are allowable and approved in accordance with the Debtors' internal policies and procedures, the Debtors promptly reimburse the Employee for such expenses. The Debtors pay Concur Expense for its expense reimbursement processing services (the "**Reimbursement Processing Fees**" and, together with the Reimbursable Expenses, the "**Reimbursable Expenses and Fees**").

73.     As of the Petition Date, the Debtors estimate that they owe approximately $5,000 on account of the Reimbursable Expenses and Fees. The Debtors request authority, but not direction, to pay all outstanding prepetition amounts incurred on account of the Reimbursable Expenses and Fees and to continue to make all payments on account of the Reimbursable Expenses as they become due and payable postpetition in the ordinary course of business.

### g.   Health and Welfare Benefits

74.     The Debtors offer various health and welfare benefits to eligible Employees for, among other things, the Medical and Drug Prescription Plans, the Dental Plan, the Vision Plan, HSA, FSA, and COBRA (each as defined below), and certain other health and welfare benefits (collectively, the "**Health and Welfare Benefits**"). The Health and Welfare Benefits are available to full-time Employees who work at least 30 hours per week. Each of the Health and Welfare Benefits is important to the maintenance of Employee welfare and morale and is therefore critical to the uninterrupted operation of the Debtors' business. Failure to continue the Health and Welfare Benefits would force participating Employees to either forgo health benefit coverage completely or obtain potentially costly out-of-pocket insurance coverage, which would, among other things, adversely affect morale and compromise the Debtors' ability to retain all or a substantial portion of their Employees.

75.     On average, the Debtors pay approximately $178,100 per month on account of Health and Welfare Benefits.  As of the Petition Date, the Debtors estimate that they owe approximately $14,000 on account of the Health and Welfare Benefits.  These amounts do not include Deductions that the Debtors withhold from Employees' pay and remit to the appropriate third-party recipients on account of certain Health and Welfare Benefits, the cost of which is borne in whole or in part by participating Employees.  Those Deductions are addressed in Section III.B, *supra*.  The Debtors request authority, but not direction, to pay all outstanding prepetition amounts that the Debtors owe on account of the Health and Welfare Benefits and to continue to make all payments on account of the Health and Welfare Benefits as they become due and payable postpetition in the ordinary course of business.

76.     The Debtors' Health and Welfare Benefits include the following plans, accounts, and benefits:

- **Medical and Prescription Drug Plans**.  The Debtors offer their eligible Employees and their dependents participation in any of three available self-funded medical coverage programs (each, a "**Medical Plan**") administered by United Healthcare.  In addition, participating Employees and their dependents are automatically provided with prescription drug coverage through United HealthCare (the "**Prescription Drug Plan**" and, together with the Medical Plan, the "**Medical and Prescription Drug Plans**").  On average, the Debtors cover approximately 63% of the premium owed under the Medical and Drug Prescription Plans, while eligible Employees cover the remaining balance.  The cost of the Medical and Drug Prescription Plans can vary depending on the total number of eligible and participating Employees but, on average, the Debtors pay approximately $133,500 per month on account of the Medical and Drug Prescription Plans.  As of the Petition Date, approximately 117 Employees (more than 80% of all Employees) participate in the Medical and Drug Prescription Plans, and the Debtors believe that, as of the Petition Date, they do not owe any amounts on account of the Medical and Drug Prescription Plans. For the avoidance of doubt, however, the Debtors request authority, but not direction, to pay or remit all outstanding prepetition amounts owed (if any) on account of the Medical and Drug Prescription Plans and to continue to make all payments on account of the Medical and Prescription Drugs Plans as they become due and payable postpetition in the ordinary course of business.

- **Dental Plan**.  The Debtors offer their eligible Employees a dental insurance plan administered by United Healthcare (the "**Dental Plan**").  On average, the Debtors cover approximately 55% of the premium owed under the Dental Plan, while eligible Employees cover the remaining balance.  The Dental Plan is fully insured.  On average, the Debtors remit approximately $12,500 per month on account of the Dental Plan.  As of the Petition Date, approximately 123 Employees participate in the Dental Plan, and the Debtors believe that, as of the Petition Date, they do not owe any amounts on account of Debtors' and Employees' premium payments due under the Dental Plan.  For the avoidance of doubt, however, the Debtors request authority, but not direction, to pay or remit all outstanding prepetition amounts owed (if any) on account of the Dental Plan and to continue to make all payments on account of the Dental Plan as they become due and payable postpetition in the ordinary course of business.

- **Vision Plan**.  The Debtors offer their eligible Employees a vision insurance plan administered by United Healthcare (the "**Vision Plan**").  On average, the Debtors cover approximately 63% of the premium owed under the Vision Plan, while eligible Employees cover the remaining balance.  The Vision Plan is fully insured.  On average, the Debtors remit approximately $1,700 per month on account of the Vision Plan.  As of the Petition Date, approximately 122 Employees participate in the Vision Plan, and the Debtors believe that, as of the Petition Date, they do not owe any amount on account of Debtors' and Employees' premium payments due under the Vision Plan.  For the avoidance of doubt, however, the Debtors request authority, but not direction, to pay or remit all outstanding prepetition amounts owed (if any) on account of the Vision Plan and to continue to make all payments on account of the Vision Plan as they become due and payable postpetition in the ordinary course of business.

- **Health Savings Account**.  The Debtors provide Employees that participate in the Medical Plan with the opportunity to make pre-tax contributions to a health savings account (an "**HSA**").  HSAs are administered by HSA Bank, and withholdings are remitted to HSA Bank on a bi-weekly basis.  The Debtors pay HSA Bank $300 on average on account of HSA administration fees (the "**HSA Administration Fee**") each month.  Participating Employees may contribute to their HSA up to certain amounts set annually by the Internal Revenue Service, and Employees can use such contributions to pay eligible wellness-related expenses.  The Debtors contribute $600 for any Employee with an HSA-eligible plan that elects individual medical coverage and $1,200 for any Employee with an HSA-eligible plan that elects family coverage.   The Debtors pay approximately $2,900 per month on account of Employee HSAs.  As of the Petition Date, the Debtors estimate that they owe approximately $3,200 on account of unpaid HSA contributions (the "**HSA Contributions**") and the HSA Administration Fee (collectively, the "**HSA Amounts**").  The Debtors request authority, but not direction, to pay all outstanding prepetition amounts owed on account of the HSA Amounts and to continue to make all payments on account of the HSA Amounts as they become due and payable postpetition in the ordinary course of business.

- **Flexible Spending Account**. The Debtors provide eligible Employees with the opportunity to make pre-tax contributions to a flexible spending account (an "**FSA**")[7] for certain eligible out-of-pocket health and dependent care expenses. The FSAs are administered by HealthEquity. There are two distinct types of FSAs administered: (a) health care FSAs with a $3,300 annual limit for Employees that are not HSA-eligible, and (b) dependent care FSAs with a $5,000 annual limit ($2,500 if married and filing separately) eligible to all Employees. If FSA amounts are not used within a specified timeframe, the eligible Employee forfeits the remaining amounts. On average, the Debtors deduct approximately $10,700 per month on account of eligible Employees' contributions to FSAs and pay approximately $5,000 on a bi-weekly basis to HealthEquity to administer FSAs. As of the Petition Date, the Debtors estimate that they owe approximately $5,300 to HealthEquity (the "**FSA Amounts**"). The Debtors request authority, but not direction, to pay all outstanding prepetition amounts to HealthEquity on account of the FSA Amounts and to continue to make all payments on account of the FSA Amounts as they become due and payable postpetition in the ordinary course of business.

- **COBRA**. The Debtors provide former Employees and their covered dependents with certain health benefits following their departure from the Debtors. Pursuant to the Consolidated Omnibus Budget Reconciliation Act of 1985 ("**COBRA**"), the Debtors' former Employees who have left, been terminated, or experienced a reduction in hours under certain circumstances (collectively, the "**COBRA Employees**") can continue to receive benefits under the Medical and Drug Prescription Plans, Dental Plan, and Vision Plan (the "**COBRA Benefits**") for a period of up to 36 months. The COBRA Employees are responsible for the cost of all COBRA Benefits. As of the Petition Date, the Debtors do not believe that they owe any obligations on account of COBRA Benefits. For the avoidance of doubt, however, the Debtors request authority, but not direction, to continue to make all payments on account of the COBRA Benefits as they become due and payable postpetition in the ordinary course of business.

- **Life and AD&D Insurance Plans**. The Debtors provide $50,000 of basic life and accidental death and dismemberment coverage for eligible Employees at no cost to the Employee (the "**Basic Life and AD&D Insurance**") administered by The Standard. Employees also have the option to purchase supplemental life and accidental death or dismemberment insurance coverage (the "**Supplemental Life and AD&D Insurance**" and, together with Basic Life and AD&D Insurance, the "**Life and AD&D Insurance Plans**") for themselves and their dependents through The Standard. Premiums for Supplemental Life and AD&D Insurance are fully funded by the Employee. Premiums paid by the Debtors for Basic Life and AD&D Insurance can vary based upon the number of Employees participating, but on average, the Debtors

---

[7]     Employees that contribute to a healthcare FSA are not eligible to contribute to an HSA.

pay approximately $5,500 per month on account of the Basic Life and AD&D Insurance. As of the Petition Date, the Debtors do not believe that they owe any amounts on account of the Basic Life and AD&D Insurance. For the avoidance of doubt, however, the Debtors request authority, but not direction, to pay all outstanding prepetition amounts incurred (if any) on account of the Basic Life and AD&D Insurance and to continue to make all payments on account of the Basic Life and AD&D Insurance as they become due and payable postpetition in the ordinary course of business.

- **Disability Benefits**. The Debtors provide eligible Employees with short-term disability benefits (the "**Employer-Provided Disability Benefits**"), including disability benefits required by federal and state law, and the ability for Employees to purchase additional disability benefits (the "**Optional Disability Benefits**" and, together with the Employer-Provided Disability Benefits, the "**Disability Benefits**"). The Employer-Provided Disability Benefits fund 60% of the Employee's base weekly earnings up to $1,500 per week, beginning 8 days after the date on which the disability occurs, and lasting until the earlier date on which the Employee is no longer disabled or 13 weeks after. Employees can elect to purchase long-term disability coverage. As of the Petition Date, the Debtors do not believe that they owe any amounts in connection with the Employer-Provided Disability Benefits. For the avoidance of doubt, however, the Debtors request authority, but not direction, to pay all outstanding prepetition obligations (if any) related to the Employer-Provided Disability Benefits and to continue to make all payments on account of the Employer-Provided Disability Benefits as they become due and payable postpetition in the ordinary course of business.

- **Employee Assistance Program**. The Debtors offer eligible Employees and their eligible dependents an employee assistance program ("**EAP**") administered by Hidalgo Health Associates, LLC, which provides, on a confidential basis, access to certain resources and referral services for mental health and welfare services with licensed counselors, legal services, and financial services (the "**EAP Obligations**"). On average, the Debtors pay approximately $300 per month on account of the EAP Obligations. As of the Petition Date, the Debtors do not believe that they owe any amounts in connection with the EAP Obligations. For the avoidance of doubt, however, the Debtors request authority, but not direction, to pay all outstanding prepetition amounts (if any) on account of the EAP Obligations and to continue to make all payments on account of the EAP Obligations as they become due and payable postpetition in the ordinary course of business.

- **Additional Benefit Programs**. The Debtors also offer eligible Employees the opportunity to purchase (at their own expense) or participate in a range of general ancillary benefits, including accident coverage, critical illness coverage, hospital indemnity coverage, and identity theft, pet benefits, and legal coverage (collectively, the "**Additional Benefit Programs**"). The Additional Benefit Programs are administered by various insurance carriers, including The

Standard, IDShield, Pet Benefit Solutions, and LegalShield (collectively, the "**Additional Benefit Programs Providers**"). Generally, the Debtors deduct premiums for the Additional Benefit Programs from Employee paychecks and then remit these amounts to the Additional Benefit Programs Providers. On average, the Debtors remit approximately $4,100 per month to the Additional Benefit Programs Carriers in connection with the Additional Benefit Programs. As of the Petition Date, the Debtors owe $5,000 on behalf of participating Employees in connection with the Additional Benefit Programs. The Debtors request authority, but not direction, to pay all outstanding prepetition amounts owed on account of the Additional Benefit Programs and to continue to make payments on account of all Additional Benefit Programs as they become due and payable postpetition in the ordinary course of business.

### h.  Non-Insider Incentive Programs[8]

77.    To encourage and reward outstanding performance, the Debtors historically offered, and incurred obligations to, their Employees on account of various incentive programs in the ordinary course of business. As of the Petition Date, the Debtors maintain department-specific incentive programs for non-Insider Employees (the "**Department Incentive Plans**"). Bonuses paid under the Department Incentive Plans are based on performance metrics identified by specific departments (*i.e.*, customer experience, warehouse, operations). To the extent such metrics are achieved, bonuses under the Department Incentive Plan are paid to eligible Employees on a monthly or quarterly basis depending on the department and level of Employee. As of the Petition Date, the Debtors estimate that they owe approximately $35,000 on account of unpaid obligations under the Department Incentive Plans. The Debtors request authority, but not direction, to pay all outstanding prepetition amounts incurred on account of Department Incentive Plans and to

---

[8]    For the avoidance of doubt, the Debtors are not requesting authority to pay any "insider" as that term is defined in section 101(31) of the Bankruptcy Code (an "**Insider**") (a) on account of the Department Incentive Plans or (b) any amounts in excess of the priority amounts set forth in sections 507(a)(4) and 507(a)(5) of the Bankruptcy Code (as applicable, the "**Priority Amount**"). The Debtors reserve all rights with respect to the classification of any Employee as an Insider, and no description of any Compensation or Benefit hereunder indicating that such Compensation or Benefit covers or is made available to Insiders or non-Insiders shall be construed as an admission or concession by the Debtors that any Employee of the Debtors is an Insider. The Debtors also reserve the right to request relief that would modify, alter, or replace the Department Incentive Programs that are the subject of the Wages and Benefits Motion.

continue to make all such payments as they become due and payable postpetition in the ordinary course of business.

### i. 401(k) Plan

78.      The Debtors provide Employees the opportunity to participate in a 401(k) plan (the "**401(k) Plan**") administered by ADP.  The 401(k) Plan provides for pre-tax salary deductions of eligible compensation up to certain limits set forth in the Internal Revenue Code (the "**401(k) Plan Withholdings**"), which the Debtors remit to ADP's Retirement Services as soon as practicable after processing the applicable Employee's withholding obligations.

79.      The Debtors also match the participating Employee's 401(k) contributions at 100% for the first 2% of an Employee's annual contribution, plus 50% for the next 4% of the Employee's annual contribution (the "**401(k) Match Obligations**").   Employees are eligible for 401(k) matching contributions on the first day of the month following one year of employment with the Debtors.  The Debtors remit 401(k) Match Obligations on behalf of the Employees bi-weekly. Additionally, each year, Wegmann Dazet, APC audits the prior year's administration of the 401(k) Plan to ensure the financial integrity and regulatory compliance of the 401(k) Plan.

80.      On average, the Debtors (i) pay approximately $23,000 per month in 401(k) Match Obligations,  and  (ii) deduct  and  remit  approximately  $51,000  per  month  in  401(k) Plan Withholdings (collectively, the "**401(k) Plan Obligations**").  As of the Petition Date, the Debtors do not believe that they owe any amounts in connection with the 401(k) Match Obligations or any administrative fees paid to ADP (the "**401(k) Fees**").  For the avoidance of doubt, however, the Debtors request authority, but not direction, to pay all outstanding prepetition amounts owed on account of the 401(k) Match Obligations and 401(k) Fees (if any), and to continue to make all

payments on account of the 401(k) Match Obligations and 401(k) Fees as they become due and payable postpetition in the ordinary course of business.

### j.  Paid Leave Benefits

81.     In the ordinary course of business, the Debtors provide paid time-off ("**PTO**") to their Employees.  Salaried Employees are offered unlimited and flexible PTO ("**Flexible PTO**") that does not accrue, and thus, the Debtors do not generally owe any outstanding amounts on account of Flexible PTOs.  Hourly Employees, however, accrue PTO with each bi-weekly pay period completed, starting the first pay period after 60 days of employment.  In the event an hourly Employee accrues more than they have used and terminates their employment, the accrued but unused portion of the PTO is paid by the Debtors on the terminated Employee's final paycheck. Employees can typically carry forward up to 40 hours of unused PTO to be used no later than March 31 of the following year.  Accordingly, Employees who end their employment with the Debtors are entitled to a cash payment in lieu of their accrued but unused PTO.[9]

82.     The Debtors also provide Employees with other forms of leave, including, but not limited to, up to three days of paid bereavement leave ("**Bereavement Leave**"), up to three weeks of parental leave subject to certain employment tenure requirements ("**Parental Leave**"), and paid civic leave for jury duty or appearing in court as a witness ("**Civic Leave**," and together with the PTO, Bereavement Leave, and Parental Leave, the "**Paid Leave Benefits**").

83.     The Paid Leave Benefits are policies that Employees have come to regularly depend on and are essential in maintaining Employee morale and minimizing Employee attrition.  As of the Petition Date, the Debtors do not believe that they owe any prepetition obligations on account

---

[9]     PTO is typically a non-cash benefit.  Employees receive cash for accrued PTO only when they end their employment with the Debtors.  For the avoidance of doubt, the Debtors are seeking to pay outstanding PTO amounts only as they come due when an Employee's tenure with the Debtors ends.

of Paid Leave Benefits. If accrued and unpaid Paid Leave Benefits were to be fully monetized through Employees' termination of employment, the Debtors estimate that they would owe approximately $25,000 on account of Paid Leave Benefits. The Debtors therefore request authority, but not direction, to pay any prepetition Paid Leave Benefits (if any), to the extent such benefits are reduced to a cash payment obligation, and to continue to make all payments on account of the Paid Leave Benefits as they become due and payable postpetition in the ordinary course of business.

### k. Workers' Compensation Program

84. The Debtors maintain workers' compensation insurance for their Employees at the statutorily required level for each state in which they have Employees (collectively, and as described herein, the "**Workers' Compensation Program**"). The Debtors maintain various workers' compensation insurance policies as part of the Workers' Compensation Program (the "**Worker's Compensation Insurance Policies**"). On average, the Debtors pay an annual premium of approximately $700,000 related to the Workers' Compensation Insurance Policies. The Debtors must be able to continue the claim assessment, determination, adjudication, and payment process pursuant to the Workers' Compensation Program without regard to whether such liabilities are outstanding before the Petition Date to ensure that the Debtors comply with applicable workers' compensation laws and requirements. As of the Petition Date, there are seven open claims under the Workers' Compensation Program. The Debtors request authority, but not direction, to pay all outstanding prepetition amounts owed on account of the Workers' Compensation Program and to continue make all payments on account of the Workers' Compensation Insurance Policies as they become due and payable postpetition in the ordinary course of business.

### l.  Severance Obligations

85.     In limited instances, the Debtors offer, in their discretion, severance benefits under their severance program (the "**Severance Program**") to eligible Employees who are terminated without cause (the "**Severance Obligations**").  The Debtors have historically offered, on a case-by-case basis, to pay Severance Obligations, in a lump sum as a separate direct deposit on the first payroll processed after the Employee's termination in exchange for the terminated Employee's agreement to release all claims against the Debtors.  As of the Petition Date, the Debtors do not believe that they owe any amounts on account of Severance Obligations to former employees.   In the event that eligible current Employees are terminated without cause during the pendency of these chapter 11 cases, the Debtors request authority, but not direction, to pay such Employees a lump sum severance payment in an amount equal to two weeks of such Employee's base wage at the rate in effect immediately prior to termination, less applicable withholdings.  The Debtors have reserved amounts sufficient to pay such Severance Obligations to current Employees who are terminated during these chapter 11 cases.  Any payments made on account of the Severance Obligations will be subject to the Priority Amount set forth in section 507(a)(4) of the Bankruptcy Code, as applicable.  The Debtors believe that honoring these severance commitments to current Employees is important to demonstrate to current Employees that the Debtors fulfil their promises, thereby supporting employee morale and retention during these chapter 11 cases.  Accordingly, the Debtors request authority, but not direction, to honor their Severance Obligations to eligible Employees who are employed as of the Petition Date and terminated during the pendency of these cases, in accordance with the Company's standard practices and subject to the receipt of customary releases.

### m.  Non-Insider Key Employee Retention Plan

86.     Given the uncertainty created by these chapter 11 cases, the Debtors, in consultation with their advisors, determined that it was necessary to formulate and adopt a retention program to appropriately retain and incentivize continued performance of certain key non-Insider Employees during a critical stage in these chapter 11 cases.  Accordingly, the Debtors also seek approval of the Non-Insider KERP, which, in summary, provides 36 Employees the opportunity to earn six additional weeks' compensation if they continue to work for the Debtors through the earlier of: (i) 140 calendar days after the Petition Date, and (ii) the effective date of a chapter 11 plan (the "**Plan**").  The Non-Insider KERP will allow the Debtors to retain certain critical non-Insider Employees and is consistent with retention programs approved in similar chapter 11 cases.

87.     Specifically, the Non-Insider KERP provides for payment of cash retention awards to 36 of the Debtors' non-Insider Employees (each, a "**KERP Participant**" and, collectively, the "**KERP Participants**"), who the Debtors have identified as essential to ensuring continuity of operations, maintaining customer services, and preserving the value of the Debtors' assets.  Each KERP Participant serves a critical function in preserving the operations of the Debtors' business and their ability to meet the requirements of chapter 11 of the Bankruptcy Code.  The Debtors are aware that Omnidian has made offers to certain KERP Participants.  The departure of such key Employees during this crucial stage of these chapter 11 cases would destroy value and harm the Debtors' restructuring process.  Accordingly, the Debtors seek interim approval of the Non-Insider KERP so that the KERP Participants will have the assurance that they will be rewarded for remaining with the Debtors during this critical period.  The interim award of four weeks' pay is modest in amount and will not be paid unless the KERP Participant remains with the Debtors for the entire Retention Period (as defined below).

88.     The Debtors believe that implementation of the Non-Insider KERP is necessary and appropriate to preserve and maximize the value of the Debtors' business.  The Debtors have worked closely with their advisors, including FTI, to structure the proposed Non-Insider KERP, applying such advisors' knowledge of comparable retention plans that have been implemented in other chapter 11 cases in respect of similar Employees.  In particular, personnel from my team at FTI benchmarked comparable retention plans from select chapter 11 cases of 12 different companies that filed petitions from 2019 to 2024 with prepetition assets between one-half and two times the Debtors' assets, and KERPs covering 11 to 300 participants.  Based on my analysis of those comparable retention plans, I believe that the plan proposed by the Debtors is reasonable.  In light of the Debtors' circumstances and their restructuring process, the Debtors (in consultation with their advisors) concluded that the implementation of the Non-Insider KERP was appropriate and necessary under the circumstances of these chapter 11 cases.  The cost of the Non-Insider KERP on a KERP Participant-by-Participant basis is likely significantly less than the cost of replacing each KERP Participant and the detrimental harm losing any KERP Participant would have on the Debtors.  Moreover, the KERP Participants provide important support to the Debtors' advisors in meeting the additional demands imposed by these chapter 11 cases.  The Debtors' board of directors approved the Non-Insider KERP on November 24, 2025.

89.     Although certain KERP Participants have titles incorporating the word "senior director," "senior manager," or "senior vice president," no KERP Participant is an Insider of the Debtors.  Specifically, no KERP Participant in the proposed Non-Insider KERP is an Employee who: (a) exercises managerial control over, or has responsibility for, the Debtors' operations as a whole; or (b) directs the Debtors' overall corporate policy or governance.

90.     The key terms of the Non-Insider KERP are as follows:

a.  **Participants:** 36 non-Insider key Employees who perform critical tasks for the Debtors' businesses, including legal, human resources, information technology, accounting, finance, and certain other critical functions.

b.  **Non-Insider KERP Awards:** Total cash in the amount of approximately $570,000, payable in one instalment based on the continued employment of the KERP Participant through the expiration of the Retention Period.  Subject to the Court's approval of the Non-Insider KERP on a final basis, Non-Insider KERP awards shall equal a KERP Participant's salary for a six-week period.

c.  **Interim Non-Insider KERP Awards:** If approved by the Court on an interim basis, each KERP Participant who remains an Employee for at least 30 days following the Petition Date shall be entitled to receive an award equal to four weeks of his or her salary, regardless of whether the Motion is approved by the Court on a final basis, which award shall be payable on or reasonably promptly following the expiration of the Retention Period, subject to the KERP Participant remaining an Employee at the expiration of the Retention Period.

d.  **Payment Dates:** Payment shall be made as soon as practicable after the expiration of the Retention Period.

e.  **Retention Period:** Payment is subject to a KERP Participant's continued employment with the Debtors through the earlier of: (i) 140 calendar days after the Petition Date, and (ii) the effective date of the Plan (the "**Retention Period**").

f.  **Termination of Employment:**  If a KERP Participant voluntarily terminates his or her employment or is terminated for cause prior to the expiration of the Retention Period, the KERP Participant will not be entitled to receive any award under the Non-Insider KERP.  Notwithstanding any requirement that a KERP Participant remain an Employee at the expiration of the Retention Period, if a KERP Participant is terminated without cause prior to the expiration of the Retention Period, the KERP Participant will be entitled to receive an award under the Non-Insider KERP as if he or she had remained an Employee at the expiration of the Retention Period.

91.     The Non-Insider KERP complies with the applicable provisions of the Bankruptcy Code, is justified by the facts and circumstances of these chapter 11 cases, and is within the Debtors' sound and reasonable business judgment.

### n.  Key Employee Incentive Plan for Certain Officers

92.    The Debtors, in consultation with their advisors, determined it was necessary to formulate and adopt a KEIP for certain officers to incentivize continued performance of critical functions through these chapter 11 cases and towards a successful restructuring.  Through the KEIP, the Debtors seek to motivate and incentivize six crucial senior members of their management team (each, a "**KEIP Participant**" and, collectively, the "**KEIP Participants**") to cause the Debtors to achieve *in a highly expeditious manner* certain chapter 11 milestones in exchange for (a) forgiveness of their existing promissory notes that would but for the KEIP later become due to the Debtors and (b) potential cash payments.  The Debtors are focused on working with their creditors and other parties in interest to propose, file, confirm, and consummate a chapter 11 plan expeditiously, especially due to the nature of the Debtors' remaining business and the limited funds presently available to administer these chapter 11 cases.

93.    The terms of the KEIP provide for a potential performance "bonus" that will serve as an important incentive for such KEIP Participants to go beyond their ordinary duties and obligations and take those important extra steps that will ensure a quick, efficient, and value-maximizing plan process and, ultimately, an orderly exit from these chapter 11 cases.

94.    Due to the severe reduction in workforce, members of the Debtors' senior management team have already been, and will continue to be, faced with the daunting challenge of maintaining the Debtors' businesses and motivating the Debtors' remaining Employees to perform their duties to assist with the chapter 11 plan process.  Further, the KEIP Participants are tasked with the additional responsibilities attendant to the filing of these chapter 11 cases, the related administration of such cases, and consummation of a plan.  Motivating the KEIP Participants is, therefore, critical to preserving the Debtors' value.  Among other things, senior management will be essential to a successful plan process.  For these reasons, implementation of

the KEIP is in the best interests of the Debtors and their estates.  The Debtors' board of directors

approved the KEIP on November 24, 2025.

95.     The KEIP Participants are obligors under the promissory notes (the "**Promissory**

**Notes**") issued to PosiGen, PBC in connection with the KEIP Participants' exercise of stock

options granted under its 2021 Equity Incentive Plan[10] and the resulting receipt of shares of the

Debtors.  The Promissory Notes are repayable by the KEIP Participants, among other things, at

maturity (*i.e.*, 10 years from issuance), upon a change of control, or six months following

termination of employment for any reason.  The Promissory Notes accrue interest at the applicable

Federal rate (long term; compounding semi-annually) in effect at the time of issuance.

96.     The Debtors have limited recourse to the KEIP Participants with respect to the

Promissory Notes, other than in respect of the shares issued upon the exercise of the options, which

shares are pledged to the Debtors to secure repayment of the Promissory Notes.  Such recourse is

limited to 51% of the of the principal amount and 100% of the accrued interest pursuant to the

terms of each Promissory Note (the "**Recourse Portion**").

97.     The KEIP requires the Debtors to achieve the following three milestones

(the "**Milestones**") in these chapter 11 cases: (1) file a chapter 11 plan of reorganization or

liquidation and disclosure statement within 30 calendar days of the Petition Date, (2) confirm a

chapter 11 plan within 110 calendar days of the Petition Date, and (3) consummate a chapter 11

plan within 130 days of the Petition Date (collectively, the "**Milestone Targets**").  Upon achieving

the Milestone Targets, a percentage of the KEIP Participants' principal and interest amount due

---

[10]     The Debtors incur obligations and make payments of cash and stock options to certain eligible Employees
for the period commencing February 7, 2025 through 10 years from the later of (a) the effective date of the
incentive plan, or (b) the earlier of the most recent board or stockholder approval of an increase in the number
of shares reserved for issuance under the plan (the "**2021 Equity Incentive Plan**").  The purpose of the 2021
Equity Incentive Plan was to attract and retain talent and promote the success of the Debtors' business by
granting eligible Employees Stock-Related Awards.

under the Promissory Notes (the "**Note Amount**") shall be forgiven or, in limited circumstances, a cash award will be given, as applicable.  In the event that the KEIP Participants' dedication to these chapter 11 cases enables the Debtors to achieve the Milestone Targets earlier than the dates contemplated by the KEIP, the KEIP Participants shall receive an additional percentage reduction of the Note Amount or equivalent cash payment, as applicable (the "**Premium Award**"). Additionally, the KEIP provides for a grace period (the "**Grace Period**") pursuant to which, in each case, the Milestone Target (but not the trigger date for a Premium Award) shall have been deemed to have been achieved if the Milestone is satisfied not later than 10 calendar days after the original Milestone Target date.  To optimize the tax treatment of the KEIP for each KEIP Participant, the nonrecourse portion of the principal amount of each KEIP Participant's Promissory Note(s) shall, upon Court approval of the KEIP, be deemed forgiven in exchange for the shares such KEIP Participant acquired at the time he or she issued his or her Promissory Note(s).

98.    Certain key terms of the KEIP are set forth below:

*KEIP Participants and the Promissory Notes*

| KEIP Participant | Promissory Note Date | Principal Amount | Recourse Portion |
|---|---|---|---|
| Chief Executive Officer | 2/24/2024 and 3/11/2024[11] | $2,137,240.95 | $1,089,992.89, plus interest |
| Executive Chairman of the Board | 3/12/2024 | $571,733.10 | $291,583.88, plus interest |
| Chief Revenue Officer | 5/24/2024 | $200,000.00 | $102,000.00, plus interest |
| Chief Legal Officer | 3/11/2024 | $191,591.55 | $97,711.69, plus interest |

---

[11]    The Debtors' Chief Executive Officer issued a Promissory Note dated February 24, 2025, in the amount of $464,617.50 and a Promissory Note dated March 11, 2024, in the amount of $1,672,623.45.

| | | | |
|---|---|---|---|
| Chief Administrative Officer | 3/19/2024 | $121,645.35 | $62,039.13, plus interest |
| Chief Financial Officer | 6/30/2025 | $106,250.00 | $54,187.50, plus interest |

*Milestones, Milestone Targets, and Awards*

| **First Milestone, Milestone Target, and Awards** | |
|---|---|
| *Milestone*: Filing of a Plan and related disclosure statement | *Milestone Target*: 30 calendar days after the Petition Date |
| *Award*: If the first Milestone is achieved on or prior to first Milestone Target (subject to the Grace Period (defined below)), then 25% of the Recourse Portion of each KEIP Participant's Promissory Note(s) will be deemed forgiven by the Debtors. | *Premium Award*: If the first Milestone is achieved at least 5 calendar days prior to the first Milestone Target (without regard to the Grace Period), then an additional 5% of the Recourse Portion of each KEIP Participant's Promissory Note(s) will be deemed forgiven by the Debtors. |
| **Second Milestone, Milestone Target, and Awards** | |
| *Milestone*: Confirmation of a Plan | *Milestone Target*: 110 calendar days after the Petition Date |
| *Award*: If the second Milestone is achieved on or prior to second Milestone Target (subject to the Grace Period), then 25% of the Recourse Portion of each KEIP Participant's Promissory Note(s) will be deemed forgiven by the Company. | *Premium Award*: If the second Milestone is achieved at least 5 calendar days prior to the second Milestone Target (without regard to the Grace Period), then an additional 5% of the Recourse Portion of each KEIP Participant's Promissory Note(s) will be deemed forgiven by the Company. |
| **Third Milestone, Milestone Target, and Award** | |
| *Milestone*: Consummation of a Plan | *Milestone Target*: 130 calendar days after the Petition Date |
| *Award*: If the third Milestone is achieved on or prior to the third Milestone Target (subject to the Grace Period), then 50% of the Recourse Portion of each KEIP Participant's Promissory Note will be deemed forgiven by the Company **but**, if less than 50% of the Recourse Portion of such Promissory Note(s) remains | *Premium Award*: If the third Milestone is achieved at least 5 calendar days prior to the third Milestone Target (without regard to the Grace Period), then an additional 5% of the Recourse Portion of each KEIP Participant's Promissory Note(s) shall be paid to the KEIP |

| | |
|---|---|
| unforgiven before applying the forgiveness referenced in this sentence (i.e., because a Premium Award was earned in respect of the first Milestone and/or the second Milestone), then (a) such lesser remaining unforgiven amount of the Recourse Portion of such Promissory Note(s) shall be deemed forgiven and (b) an amount equal to (i) 5% of the Recourse Portion of such Promissory Note(s) if only one Premium Award was earned in respect of the first Milestone or the second Milestone or (ii) 10% of the Recourse Portion of such Promissory note(s) if two Premium Awards were earned in respect of the first and second Milestones, shall be paid to the KEIP Participant in cash by the Company on the effective date of the Plan. | Participant in cash by the Company of the effective date of the Plan. |

| **Grace Period** |
|---|
| Each Milestone Target (but not for any Premium Award) shall be subject to the Grace Period, such that the Milestone Target shall be deemed to have been achieved if such Milestone is actually achieved not later than ten (10) calendar days after the Milestone Target. |

| **Effect of Achieving the Third Milestone After Having Not Achieved the First Milestone and/or the Second Milestone** |
|---|
| Notwithstanding anything in this summary to the contrary, if the third Milestone is achieved such that a KEIP Participant is entitled to the award (and, if applicable, the Premium Award) with respect to the third Milestone, each of the first Milestone and the second Milestone shall be deemed to have also been achieved on the Milestone Target applicable thereto (but, for the avoidance of doubt, not for purposes of any Premium Award) such that 100% of the Recourse Portion of such KEIP Participant's Promissory Note(s) shall be deemed forgiven by the Company on the effective date of the Plan. |

*Miscellaneous Provisions*

| **Effect of Termination** |
|---|
| If a KERP Participant's employment is terminated involuntarily by the Debtors ***other than for cause*** prior to consummation of a Plan, 100% of the Recourse Portion of such KEIP Participant's Promissory Note(s) shall be deemed forgiven. |
| If a KEIP Participant's employment by the Debtors is terminated (y) ***for cause*** or (z) voluntarily by such KEIP Participant, in each case, after an award or Premium Award has been earned, such KEIP Participant shall retain the benefit of such award or Premium Award resulting from such |

> Milestone having been achieved but shall be ineligible to receive any later award or Premium Award.

99.     I believe that the KEIP is reasonable and appropriate.  It provides incentives for the applicable executives to achieve a value-maximizing restructuring on an extremely tight timeline primarily using non-cash consideration.  The executives only have the potential to receive a cash payment in the event that a plan of reorganization is consummated.   In my opinion, the relief requested in the Wages and Benefits Motion is necessary to avoid immediate and irreparable harm to the Debtors, is in the best interests of the Debtors' estates, their creditors, and all other parties in interest, and will enable the Debtors to continue to operate their businesses during the pendency of these chapter 11 cases.

   3.   *Debtors' Emergency Motion for Entry of an Order (I) Authorizing the Payment of Certain Taxes and Fees and (II) Granting Related Relief (the "**Taxes and Fees Motion**").*

100.     The Debtors request entry of an order: (a) authorizing the Debtors to negotiate, remit, and pay, in the ordinary course of business, Taxes and Fees that are payable or become payable during these chapter 11 cases, including any obligations arising on account of an Audit or Assessment, without regard to whether such obligations accrued or arose before, on, or after the Petition Date; and (b) granting related relief.

101.     In the ordinary course of business, the Debtors collect, withhold, and incur: (a) income and franchise taxes; (b) property taxes; (c) sales and use taxes; (d) other taxes and fees; and (e) fees owed to a tax service provider on account of tax consulting services provided to the Debtors (collectively, the "**Taxes and Fees**").[12]  The Debtors pay or remit, as applicable, the Taxes

---

[12]     The Taxes and Fees Motion does not seek relief with respect to the Debtors' collection and remittance of employee-related taxes and withholdings, which are instead addressed in the Wages and Benefits Motion filed concurrently herewith.

and Fees to various governmental units (as such term is defined in section 101(27) of the Bankruptcy Code), including the Internal Revenue Service and other taxing authorities (collectively, the "**Taxing Authorities**") on a periodic basis depending on the nature and incurrence of a particular Tax or Fee and as required under applicable laws and regulations.

102.     For the 2024 calendar year, the Debtors paid approximately $161,100 in Taxes and Fees.  As of the Petition Date, the Debtors estimate that they owe approximately $36,100 in Taxes and Fees.  Accordingly, the Debtors request authority to pay all outstanding prepetition amounts on account of the Taxes and Fees as they become due and payable and to continue making such payments in the ordinary course of the Debtors' business.[13]

103.     As further described herein and in the Cash Management Motion, filed concurrently herewith, certain of the Debtors also own non-Debtor entities (such entities, the "**Non-Debtor Affiliates and Subsidiaries**").  Historically, the Debtors have prepared tax returns on behalf of certain of the Non-Debtor Affiliates and Subsidiaries (all such returns, the "**Non-Debtor Tax Returns**").  The Debtors have also historically paid Taxes and Fees each year on behalf of the Non-Debtor Affiliates and Subsidiaries in the ordinary course of business.  The Debtors seek the authority to (a) continue preparing the Non-Debtor Tax Returns, (b) provide the Non-Debtor Affiliates and Subsidiaries with access to the Debtors' books and records, as applicable, to allow the Non-Debtor Affiliates and Subsidiaries to prepare the Non-Debtor Tax Returns, and (c) pay Taxes and Fees on behalf of Non-Debtor Affiliates and Subsidiaries.

104.     In addition, in the ordinary course of business, the Debtors are subject to routine audit investigations and adjustments on account of tax returns and/or tax obligations ("**Audits**"),

---

[13]     These calculations are good-faith estimates based on the Debtors' books and records and remain subject to adjustments.  Moreover, the Debtors cannot predict the amounts of any potential Assessments that may result from Audits.  Accordingly, the Debtors' estimate of outstanding Taxes and Fees as of the Petition Date does not include any amounts relating to potential Assessments.

including as a result of any voluntary disclosures or similar procedural mechanisms.  Audits could result in additional prepetition Taxes and Fees being assessed against the Debtors (such additional Taxes and Fees, "**Assessments**").[14] In certain of the jurisdictions in which the Debtors operate, the Debtors must be able to accept a proposed resolution of an Audit and make a payment with respect to such resolution in a timely manner.  The Debtors seek authority to pay or remit tax obligations on account of any Assessments as they arise in the ordinary course of the Debtors' business, including as a result of any resolutions of issues addressed in an Audit.

105.    The Debtors seek authority to pay and remit all prepetition and postpetition obligations on account of Taxes and Fees (including any obligations subsequently determined upon Audit or otherwise to be owed), including: (a) Taxes and Fees that accrue or are incurred postpetition; (b) Taxes and Fees that have accrued or were incurred prepetition but were not paid prepetition, or were paid in an amount less than actually owed; (c) Taxes and Fees paid by the Debtors prepetition that were lost or otherwise not received in full by any of the Authorities; and (d) Taxes and Fees incurred for prepetition periods that become due and payable after the commencement of these chapter 11 cases, including as a result of Audits, if any.  In addition, for the avoidance of doubt, the Debtors seek authority to pay Taxes and Fees for so-called "straddle" periods.[15]

106.    The Taxes and Fees are summarized in the following table, and each category of Taxes and Fees is discussed in turn below:

---

[14]    One of the Non-Debtor Affiliates and Subsidiaries is currently subject to a pending Audit in connection with state sales taxes for the 2022 year.  Nothing in the Taxes and Fees Motion, or any related order, constitutes or should be construed as an admission of liability by the Debtors with respect to any Audit or Assessment. The Debtors expressly reserve all rights with respect to any Audit and the right to contest any Assessments claimed to be due as a result of any Audit.

[15]    The Debtors reserve their rights with respect to the proper characterization of any "straddle" Taxes and Fees and to seek any appropriate remedy including reimbursement of or reallocation of claims related to any portion of any payment made that ultimately is not entitled to administrative or priority treatment.

| Category | Description |
|---|---|
| Income and Franchise Taxes | The Debtors pay income and franchise taxes to federal and state Taxing Authorities in the United States. The amount of income and franchise taxes incurred is based on the jurisdictions in which the Debtors do business, and such taxes are payable on an annual basis. |
| Property Taxes | The Debtors incur taxes related to certain personal property holdings and pay such taxes to local Taxing Authorities in the ordinary course of business on an annual basis. |
| Sales and Use Taxes | The Debtors collect and remit sales and use taxes to state and local Taxing Authorities in connection with the sale of goods or services in such jurisdictions. The Debtors primarily accrue sales and use taxes upon the issuance of customer bills and remit or pay such Taxes generally on a monthly or quarterly basis. |
| Other Taxes and Fees | The Debtors make periodic payments in connection with gross receipts, compliance, licensing, and registration, generally payable on an annual basis. |
| Tax Service Provider Fees | The Debtors pay a third-party tax service provider in the ordinary course of business. |

### a. Income and Franchise Taxes

107.    In the ordinary course of business, the Debtors incur various state and federal income and franchise taxes, as applicable (the "**Income and Franchise Taxes**"), in the jurisdictions in which the Debtors operate. The Debtors typically pay Income and Franchise Taxes to the relevant Taxing Authorities based on an estimate of the Debtors' taxable income in accordance with the statutory requirements of each applicable jurisdiction (i.e., on an annual basis). In some jurisdictions, the Debtors remit estimated Income and Franchise Taxes in advance, which may result in tax credits or overpayments that may be refunded to the Debtors in certain circumstances. In 2024, the Debtors paid approximately $125,000 in Income and Franchise Taxes to the applicable Taxing Authorities.

108.    As of the Petition Date, the Debtors do not believe that they owe any amount in Income and Franchise Taxes to the applicable Taxing Authorities. Out of an abundance of caution, however, the Debtors request authority to pay all Income and Franchise Taxes, including

outstanding prepetition amounts, if any, and to continue paying Income and Franchise Taxes in the ordinary course of business during these chapter 11 cases.

### b.  Property Taxes

109.    Local laws in the state of Connecticut generally grant Taxing Authorities the power to levy taxes against the Debtors' personal property (collectively, the "**Property Taxes**").  To avoid the imposition of statutory liens on their property, the Debtors pay Property Taxes on an annual basis to the appropriate Taxing Authorities in the jurisdictions in which their property is located.  In 2024, the Debtors remitted approximately $35,000 in Property Taxes to the applicable Taxing Authorities.

110.    As of the Petition Date, the Debtors estimate that they owe approximately $35,000 in Property Taxes to the relevant Taxing Authorities.  Accordingly, the Debtors request authority to pay all Property Taxes, including outstanding prepetition amounts, and to continue paying Property Taxes in the ordinary course of business during these chapter 11 cases.

### c.  Sales and Use Taxes

111.    In the ordinary course of business, the Debtors incur, collect, and remit sales and use taxes (including interest and penalties on any late payments) to the relevant Taxing Authorities in connection with the sale, purchase, and use of goods and services (collectively, the "**Sales and Use Taxes**").  Sales and Use Taxes are general consumption taxes charged at either the point of purchase or the point of sale of goods and services upon the issuance of customer bills.  Sales and Use Taxes are usually set by the relevant Taxing Authorities as percentages of the retail prices of the goods or services purchased.  The process by which the Debtors remit Sales and Use Taxes varies depending on the Taxing Authority and the Debtors generally remit such taxes either

monthly or quarterly.  In 2024, the Debtors remitted approximately $100 in Sales and Use Taxes to the applicable Taxing Authorities.

112.    As of the Petition Date, the Debtors estimate that they owe approximately $100 in Sales and Use Taxes to the relevant Taxing Authorities.  Accordingly, the Debtors request authority to pay all Sales and Use Taxes, including outstanding prepetition amounts, and to continue paying Sales and Use Taxes in the ordinary course of business during these chapter 11 cases.

### d.  Other Taxes and Fees

113.    In the ordinary course of business, the Debtors may collect, withhold, or incur other Taxes and Fees such as gross receipts taxes, compliance taxes, licensing fees, and registration fees (collectively, the "**Other Taxes and Fees**").  In 2024, the Debtors remitted approximately $1,000 in Other Taxes and Fees to the applicable Taxing Authorities.

114.    As of the Petition Date, the Debtors do not believe that they owe any amount in Other Taxes and Fees to the relevant Taxing Authorities.  Out of an abundance of caution, however, the Debtors request authority to pay all Other Taxes and Fees, including outstanding prepetition amounts, if any, and to continue paying Other Taxes and Fees in the ordinary course of business during these chapter 11 cases.

### e.  Tax Service Provider

115.    In the ordinary course of business, the Debtors use a third-party tax service provider, Wegmann Dazet (the "**Tax Services Provider**") to facilitate the calculation and payment of the Taxes and Fees. Specifically, the Tax Service Provider assists the Debtors with (a) tax compliance and tax return preparation, (b) the calculation of the Sales and Use Taxes and Property Taxes, and (c) the remittance of taxes to the Taxing Authorities on the Debtors' behalf.

116.     The Debtors' businesses are complex and require precise tax compliance to operate effectively.  The Tax Service Provider plays a vital role in ensuring that the Debtors and the Non-Debtor Affiliates and Subsidiaries remain in compliance with their tax obligations.  The services of the Tax Service Provider reduce the risk of the Debtors having to pay reinstatement fees, penalties, or interest on missed payments, each of which, if incurred, would reduce the value of the Debtors' estates.  Accordingly, it is essential that the Debtors be permitted to pay all prepetition amounts owed to the Tax Service Provider.

117.     As of the Petition Date, the Debtors do not believe that they owe any amount to the Tax Service Provider on account of prepetition services.  Out of an abundance of caution, however, and to avoid a disruption in these vital services, the Debtors request authority to pay all outstanding amounts, if any, owed to the Tax Service Provider, including any prepetition amounts with respect thereto, as they become due and payable in the ordinary course of business during these chapter 11 cases.

118.     In my opinion, the relief requested in the Taxes and Fees Motion is necessary to avoid immediate and irreparable harm to the Debtors, is in the best interests of the Debtors' estates, their creditors, and all other parties in interest, and will enable the Debtors to continue to operate their businesses during the pendency of these chapter 11 cases.  A list of the Taxing Authorities is attached hereto as **Exhibit C**.

> 4.     *Debtors' Emergency Motion for Entry of an Order (I) Authorizing the Debtors to (A) Maintain Insurance Coverage Entered into Prepetition and Satisfy Prepetition Obligations Related Thereto, (B) Renew Amend, Supplement, Extend, Purchase, Cancel, and Enter Into New Insurance Policies, (C) Honor Prepetition Payment Arrangements, (D) Continue to Pay Brokerage Commissions, and (E) Maintain the Surety Bond Program; and (II) Granting Related Relief (the "**Insurance Motion**").*

119.     The Debtors request entry of an order: (a) authorizing the Debtors to (i) maintain insurance coverage entered into prepetition and satisfy prepetition obligations related thereto in

the ordinary course of business,[16] (ii) renew, amend, supplement, extend, purchase, cancel, and enter into new insurance policies in the ordinary course of business, (iii) honor and renew the terms of the Payment Arrangements (as defined below) entered into prepetition and satisfy obligations related thereto, and enter into new Payment Arrangements in the ordinary course of business, and (iv) maintain the Surety Bond Program (as defined below); and (b) granting related relief.[17]

### a.   The Insurance Policies and Related Payment Obligations

120.    The Debtors serve customers throughout the United States.  Prior to the Petition Date, the Debtors generally partnered with local, independent channel partners to market, sell, and install products and services, including solar energy systems and customer leases for the use of these systems, on the Debtors' behalf.  The Debtors operated in a competitive and nascent solar industry, which required them to manage substantial risk that derived from widespread operations providing affordable solar and energy efficiency to working-class families in the United States. Even though the Debtors have ceased substantially all operations, apart from servicing and related customer obligations, it is critical for the Debtors to maintain appropriate insurance coverage to ensure that their business and their customers are adequately protected from such risk.

121.    The Debtors maintain fourteen insurance policies (each, an "**Insurance Policy**" and, collectively, the "**Insurance Policies**") administered by thirteen third-party insurance carriers (collectively, the "**Insurance Carriers**").  The Insurance Policies provide coverage for losses related to the Debtors' real and personal property, general liability, automobile liability, cyber

---

[16]    Nothing in this Insurance Motion shall be deemed an admission of any payments due or past due under or relating to any of the Insurance Policies (as defined below).

[17]    To ensure uninterrupted coverage where needed, the Debtors seek authority to continue honoring their obligations under the Insurance Policies and Surety Bonds in the ordinary course of business.  At the same time, to avoid unnecessary costs, the Debtors also seek authority, in their business judgment, to cancel or non-renew any Insurance Policies or Surety Bonds that are no longer necessary to their operations.

liability, crime liability, and director and officer liability, among other things. A schedule of the Insurance Policies is attached hereto as **Exhibit D**.[18]

122.    The Debtors' ability to maintain and renew the Insurance Policies and enter into new policies is essential to preserve the value of the Debtors' business, properties, and assets. Maintaining such coverage is not entirely optional: in many instances, the Insurance Policies provide coverage that is required by the laws, regulations, credit documents, customer contracts, or other arrangements that govern the Debtors' operations. In addition, the Bankruptcy Code states that chapter 11 cases may be converted or dismissed for the "failure to maintain appropriate insurance that poses a risk to the estate or to the public,"[19] and the U.S. Trustee Guidelines published by the U.S. Trustee require, among other things, that a debtor "maintain insurance and pay all premiums as they come due."[20]  It is therefore critical for the Debtors to maintain appropriate insurance coverage at all times.

123.    As of the Petition Date, the Debtors estimate that they owe approximately $2.4 million on account of the Insurance Policies, all of which are fully financed under the Payment Arrangements (as defined below). The Debtors request authority to pay all outstanding amounts on account of the Insurance Policies, including any prepetition amounts with respect thereto, as they become due and payable in the ordinary course of the Debtors' business. The Debtors also request authority to maintain their existing Insurance Policies and to renew, amend, supplement,

---

[18]    The descriptions of the Insurance Policies set forth in **Exhibit D**, constitute a summary only. To the extent there is any inconsistency between the terms of the Insurance Policies and related agreements and the Insurance Motion, the Insurance Policies and related agreements govern.

Moreover, in addition to the Insurance Policies listed on **Exhibit D**, the Debtors maintain numerous insurance policies with respect to, among other things, workers' compensation, employee health, disability, and life insurance benefits. These programs are further described in the Wages and Benefits Motion, filed concurrently herewith.

[19]    11 U.S.C. § 1112(b)(4)(C).

[20]    U.S. Trustee Guidelines, Section III(A).

extend, purchase, cancel, and enter into new insurance policies, as applicable, in the ordinary course of business to ensure uninterrupted coverage.

### b. Premium Payments

124.    Historically, the Debtors spend approximately $4.6 million per year on account of aggregate premiums for all the Insurance Policies, not including applicable taxes and surcharges. The Insurance Policies are annual in length and renew at various times throughout the year.[21]

125.    The Debtors pay the Insurance Policies via premium financing agreements ("**Payment Arrangements**"). The Debtors finance the insurance premiums (the "**Insurance Premiums**") because it is not economically advantageous for the Debtors to pay the premiums in full at the start of each policy period.  Under the Payment Arrangements, the Debtors make a down payment on their Insurance Premiums, after which FIRST Insurance Funding (the "**Payment Arrangements Lender**") pays the Insurance Premiums in full.  The Debtors then pay the remaining balance (plus a finance charge) in monthly installments, with interest, to the Payment Arrangements Lender.  As security for repayment, the Payment Arrangements Lender holds a security interest in the unearned premiums under the financed policies—that is, the portion of the premiums that is refundable if a policy is cancelled mid-term—which are contractually assigned to the Payment Arrangements Lender and applied against the outstanding loan balance.

126.    Continuing to perform under the Payment Arrangements on a postpetition basis is in the best interests of the Debtors' estates.  In light of the Debtors' financial circumstances, alternative insurance premium financing providers may not be willing to provide insurance premium financing or other financing arrangements to the Debtors on attractive market terms while

---

[21]    The Debtors' Insurance Policies renew on March 1 or July 1, depending on the terms of the applicable Insurance Policy.

they are operating in chapter 11. As of the Petition Date, the Debtors estimate that they owe approximately $2.4 million on account of the Payment Arrangements. Accordingly, the Debtors request authority to pay all outstanding prepetition amounts on account of the Payment Arrangements as they become due and payable in the ordinary course of the Debtors' business. The Debtors also request authority to maintain, renew, amend, supplement, rollover, cancel, extend, or enter into new Payment Arrangements in the ordinary course of the Debtors' business.

### c.  Insurance Deductibles and Self-Insured Retentions

127.    Certain of the Insurance Policies require the Debtors to pay deductibles (the "**Deductibles**") or self-insured retentions (the "**SIRs**"). For the Insurance Policies with Deductibles, the Debtors administer the claims, make any payments, and then seek reimbursement from the Insurance Company for the amounts that exceed the Deductible. Insurance Policies with SIRs work in a similar fashion; however, the Debtors administer and pay for the claims only up to the SIR amounts. Once a claim meets the SIR amount, the Insurance Carrier will administer the claim and make any payments up to the Insurance Policy's limit.

128.    As of the Petition Date, the Debtors do not believe that they owe any amount on account of the Deductibles or SIRs. Out of an abundance of caution, however, the Debtors request authority to pay all outstanding prepetition amounts, if any, on account of the Deductibles or SIRs as they become due and payable and to continue making such payments in the ordinary course of the Debtors' business.

### d.  Insurance Policy Audits

129.    Certain of the Insurance Policies, including the Debtors' automobile liability and general liability policies, are subject to infrequent audits (the "**Insurance Policy Audits**"), which may result in adjustments of the premiums owed on account thereof. As of the Petition Date, the

Debtors do not believe that they owe any amount on account of the Insurance Policy Audits.  Out of an abundance of caution, however, the Debtors request authority to pay all outstanding prepetition amounts, if any, on account of the Insurance Policy Audits as they become due and payable and to continue making such payments in the ordinary course of the Debtors' business.

### e.  The Surety Bond Program

### i.  Surety Bonds

130.    The Debtors are required to maintain various surety bonds (each, a "**Surety Bond**" and collectively, the "**Surety Bonds**") that allow the Debtors to conduct core aspects of their business, guarantee their ability to perform certain work, and secure their performance obligations (the "**Surety Bond Program**").  Various state and local governments require the Debtors to maintain Surety Bonds that guarantee their ability to perform certain trade work (the "**Operational Licensing Bonds**").  Historically, the Debtors have performed certain general contracting, remodeling, and electrical work that falls under the purview of such regulations.  Consequently, the Debtors maintain the Operational Licensing Bonds so they can perform the specialized trade work that their business requires. The Debtors' remaining operations require the Debtors to maintain the Surety Bond Program. As of the Petition Date, the Debtors maintain 12 Surety Bonds. A schedule of the Debtors' Surety Bonds is attached hereto as **Exhibit E**.[22]

131.    In order to preserve the value of the Debtors' estates during these chapter 11 cases, the Debtors must maintain the existing Surety Bond Program, including paying bond premiums

---

[22]    The descriptions of the Surety Bonds set forth in the Insurance Motion, including **Exhibit E**, constitute a summary only.  To the extent there is any inconsistency between the terms of the Surety Bonds and related agreements and the Insurance Motion, the Surety Bonds and related agreements govern.  The Debtors request authority to honor the obligations with respect to, and renew in the ordinary course, as applicable, all Surety Bonds regardless of whether the Debtors inadvertently fail to include a particular surety bond on **Exhibit E**, and any such omitted surety bond is hereby included in the defined term "**Surety Bonds**" as used herein and in the order approving the Insurance Motion.

and related fees as they come due, providing the providers of the Surety Bonds (each, a "**Surety**" and collectively, the "**Sureties**") with collateral, renewing, canceling, or potentially acquiring additional bonding capacity as needed in the ordinary course of business, and executing other agreements, as appropriate, in connection with the Surety Bond Program.  Failure to provide, maintain, cancel, or timely replace the Surety Bonds as necessary could prevent the Debtors from undertaking essential functions related to their operations and fulfilling, among other things, their obligations under federal and state law.

132.    The issuance of a Surety Bond lessens the risk of the Debtors' nonperformance, noncompliance, or nonpayment by providing that the Surety will perform obligations, remedy noncompliance, or tender payment.  Unlike an insurance policy, if a surety incurs a loss on a Surety Bond, it is entitled to recover the full amount of that loss from the principal.  To continue their remaining operations during these chapter 11 cases, the Debtors must be able to provide financial assurance to the applicable state governments and regulatory agencies, including licensing boards and environmental regulation agencies.  In turn, the Debtors must be able to maintain the existing Surety Bond Program, including paying the premiums due in connection therewith and providing collateral, renewing, canceling, or potentially acquiring additional bonding capacity and executing other agreements as needed, in each case in the ordinary course of business in connection with the Surety Bond Program.

133.    Failing to maintain the Surety Bond Program will prevent the Debtors from undertaking essential functions related to their business model.  The premiums related to the Surety Bond Program are determined on an annual, per-bond basis, and are paid by the Debtors when the Surety Bonds are issued and annually upon renewal until the Surety Bonds are released (the "**Surety Premiums**").  Historically, the Debtors have spent approximately $2,000 per year on

account of the Surety Premiums.  As of the Petition Date, the Debtors do not believe that they owe

any amount on account of the Surety Premiums.  Out of an abundance of caution, however, and to

ensure uninterrupted coverage under the Surety Bonds, the Debtors request authority to pay all

outstanding prepetition amounts, if any, on account of the Surety Premiums as they become due

and payable and to continue making such payments in the ordinary course of the Debtors' business.

In addition, the Debtors request authority to cancel or decline to renew any Surety Bonds that are

no longer necessary in light of their postpetition operations to avoid incurring unnecessary costs.

### ii.  Surety Broker

134.    The Debtors' outstanding Surety Bonds are arranged by Legacy Risk and Insurance

Services (the "**Surety Broker**").  The Surety Broker plays a critical role in assisting the Debtors

to (a) obtain cost-effective Surety Bonds that meet the needs of their operations and (b) negotiate

the terms, provisions, and premiums of such Surety Bonds.  The commission payable to the Surety

Broker (the "**Surety Broker Commission**") varies by Surety Bond, typically ranges from

approximately 10% to 30%, and is paid directly by the applicable Surety Bond provider in

connection with the issuance of the Surety Bond.  The Debtors do not pay the Surety Broker

Commission directly, and accordingly, as of the Petition Date, the Debtors do not believe they owe

any amounts on account of the Surety Broker Commissions. Out of an abundance of caution,

however, and to ensure the Surety Broker continues to provide uninterrupted services, the Debtors

request authority to honor any Surety Broker Commissions in the ordinary course of business to

the extent they are later determined to give rise to an obligation of the Debtors' estates.

135.    In my opinion, the relief requested in the Insurance Motion is necessary to avoid

immediate and irreparable harm to the Debtors, is in the best interests of the Debtors' estates, their

creditors, and all other parties in interest, and will enable the Debtors to continue to operate their

businesses during the pendency of these chapter 11 cases.

5. *Debtors Emergency Motion for Entry of an Order (I) Approving the Debtor's Proposed Adequate Assurance of Payment for Utility Services, (II) Prohibiting Utility Providers from Altering, Refusing, or Discontinuing Services, (III) Approving the Debtors' Proposed Procedures for Resolving Adequate Assurance Requests, and (IV) Granting Related Relief (the "**Utilities Motion**").*

136. The Debtors request entry of an order: (a) determining that the Proposed Adequate Assurance provides the Utility Providers with adequate assurance of payment within the meaning of section 366 of the Bankruptcy Code, (b) prohibiting the Utility Providers from altering, refusing, or discontinuing services, (c) approving procedures for resolving any dispute concerning Adequate Assurance Requests, and (d) granting related relief.

### a. Utility Providers and Payment Methods

137. In connection with the Company's limited operation of its business and management of its properties, the Debtors obtain, either directly or indirectly, propane, waste, internet, and other similar services (collectively, the "**Utility Services**") from utility providers (collectively, the "**Utility Providers**"). A nonexclusive list of the Utility Providers and their affiliates that provide Utility Services to the Debtors as of the Petition Date in order to service the Debtors' limited operations is attached hereto as **Exhibit F** (the "**Utility Services List**"). Any interruption in Utility Services would have a material and adverse effect on the Debtors' businesses during the course of these chapter 11 cases.

138. The Debtors pay most of the Utility Providers directly. In addition, pursuant to certain of the Debtors' warehouse leases, certain Utility Services are billed to the Debtors' landlords and the Debtors are ultimately responsible for payment to the landlords under the terms of the applicable leases, including as part of the Debtors' rent or applicable common fees.[23]

---

[23] The Debtors respectfully submit that all landlords be required to continue to pay for Utility Services in the ordinary course of business until the effective date of the rejection of the applicable lease agreement, if any, pursuant to section 365 of the Bankruptcy Code.

139.    The Debtors historically paid an average of approximately $25,000 each month to the Utility Providers during the eight-month period ending August 31, 2025, excluding amounts paid to Utility Providers directly by landlords. From August through October of 2025, the Debtors have stopped occupying ten properties and, accordingly, no longer need the services provided by certain Utility Providers.  The Debtors expect to pay approximately $10,000 each month to the Utility Providers during the postpetition period. The Debtors request authority to continue to honor their obligations to Utility Providers and applicable landlords as they come due in the ordinary course of business postpetition.

140.    To the best of the Debtors' knowledge, no Utility Provider holds a deposit from the Debtors, and the Debtors have not allocated funds to prepay any other Utility Providers.  The Debtors further believe that, as of the Petition Date, any defaults or arrearages in connection with the Utility Services approximate $7,000.

### b.  Proposed Adequate Assurance of Payment

141.    The Debtors intend to pay all undisputed postpetition obligations owed to the Utility Providers in the ordinary course of business during these chapter 11 cases.  The Debtors believe that their cash on hand and expected cash flows from their reduced operations will be sufficient to pay the Utility Providers for Utility Services during these chapter 11 cases.

142.    To provide additional assurance of payment, the Debtors propose to deposit cash in the amount of $4,882.91 (the "**Adequate Assurance Deposit**") into a segregated interest-bearing bank account (the "**Adequate Assurance Account**") before the date that is 20 days after the Petition Date.  The Debtors propose to maintain the Adequate Assurance Deposit in an amount equal to approximately 50% of the Debtors' historical average monthly cost of Utility Services, subject to adjustment in the Debtors' discretion based upon the addition or termination of Utility

Services or other arrangements with respect to adequate assurance of payment reached with individual Utility Providers.  For the avoidance of doubt, the Adequate Assurance Deposit does not include (a) any prepetition deposit for Utility Services held by any Utility Provider, or (b) Utility Services billed directly to the Debtors' landlords.

143.    The Adequate Assurance Deposit will be held in the Adequate Assurance Account for the benefit of the Utility Providers until the earlier of: (a) the Debtors' termination of the Utility Services, if there are no outstanding disputes related to postpetition payments due, or (b) at the conclusion of these chapter 11 cases, subject to the Debtors' right to terminate or discontinue the applicable Utility Services.  The Adequate Assurance Deposit may be applied to any postpetition defaults in payment to the Utility Providers.  No liens senior to the interests of the Utility Providers will encumber the Adequate Assurance Deposit or the Adequate Assurance Account.

144.    The Adequate Assurance Deposit, in conjunction with the Debtors' cash and investments on hand and postpetition revenues (collectively, the "**Proposed Adequate Assurance**"), demonstrates the Debtors' ability to pay for the Utility Services in accordance with prepetition practice and provides adequate assurance of payment to the Utility Providers as required by section 366 of the Bankruptcy Code.

### c.  The Adequate Assurance Procedures

145.    The Debtors request that the Court approve the procedures set forth in the order approving the Utilities Motion (the "**Adequate Assurance Procedures**"), pursuant to which any Utility Provider that is not satisfied with the Proposed Adequate Assurance may make a request for additional or different adequate assurance of future payment (each, an "**Adequate Assurance Request**").  Any Utility Provider that is not satisfied with the Proposed Adequate Assurance may

make an Adequate Assurance Request pursuant to the Adequate Assurance Procedures. The Adequate Assurance Procedures set forth a streamlined process for Utility Providers to address potential concerns with respect to the Proposed Adequate Assurance. The Debtors, in their discretion, may resolve any Adequate Assurance Request by mutual agreement with the Utility Provider and without further order of the Court. If the Debtors determine that the Adequate Assurance Request cannot be resolved by mutual agreement, the Debtors may seek Court resolution of the Adequate Assurance Request, with any such dispute to be resolved on the timeline prescribed by section 366 of the Bankruptcy Code. Unless and until a Utility Provider files an objection or serves an Adequate Assurance Request, such Utility Provider shall be: (a) deemed to have received adequate assurance of payment "satisfactory" to such Utility Provider in compliance with section 366 of the Bankruptcy Code; and (b) prohibited from (i) altering, refusing or discontinuing services to, or discriminating against, the Debtors on account of any unpaid prepetition charges, the commencement of these chapter 11 cases, or any perceived inadequacy of the Proposed Adequate Assurance, or (ii) requiring additional assurance of payment other than the Proposed Adequate Assurance.

### d. Modifications to the Utility Services List

146.    The Debtors have made an extensive and good-faith effort to identify all Utility Providers and include them on the Utility Services List. Nevertheless, given the substantial number of Utility Providers that the Debtors deal with at any given time, it is possible that not all Utility Providers are on the Utility Services List. To the extent the Debtors subsequently identify new or additional Utility Providers (each, a "**Subsequently Identified Utility Provider**"), or discontinue Utility Services from an existing Utility Provider, the Debtors request authority, in their sole discretion, to amend the Utility Services List to add or remove any Utility Provider.

147. The Debtors request that the relief sought by the Utilities Motion, including the proposed Adequate Assurance Procedures and the order approving the Utilities Motion, apply to any Subsequently Identified Utility Provider, regardless of when the Debtors add such Utility Provider to the Utility Services List. For any Subsequently Identified Utility Provider, the Debtors request authority to serve such Utility Provider with a copy of the order approving the Utilities Motion and increase the Adequate Assurance Deposit by an amount equal to approximately 50% of the Debtors' average monthly payment for Utility Services to the Subsequently Identified Utility Provider without the need for further order from the Court. Such Subsequently Identified Utility Provider will have 21 days to make an Adequate Assurance Request.

148. For any Utility Provider that is subsequently removed from the Utility Providers List, the Debtors request the authority, in their discretion and without the need for further order of the Court, to decrease the Adequate Assurance Deposit by an amount equal to approximately 50% of the Debtors' average monthly payment for Utilities Services to the subsequently removed Utility Provider. The Debtors will provide 14 days' notice to the Utility Provider that it is being removed from the Utility Providers List and that the corresponding amount in the Adequate Assurance Deposit will be deducted from the Adequate Assurance Account. If such Utility Provider objects to such removal, the Debtors may either (a) resolve such dispute consensually without the need for further order of the Court or (b) request a hearing before the Court regarding such objection.

149. Additionally, the Debtors request that, pending the entry of the order approving the Utilities Motion and the resolution of any Adequate Assurance Request, objection or Determination Hearing (as defined in the order approving the Utilities Motion), all Utility Providers, including any Subsequently Identified Utility Provider, be prohibited from (a) discriminating against the Debtors, (b) altering, refusing, or discontinuing service to the Debtors,

or (c) requiring payment of a deposit or receipt of any other security for continued service other than the Adequate Assurance Deposit as a result of these chapter 11 cases or any unpaid prepetition obligations absent further order of the Court.

150.    In my opinion, the relief requested in the Utilities Motion is necessary to avoid immediate and irreparable harm to the Debtors, is in the best interests of the Debtors' estates, their creditors, and all other parties in interest, and will enable the Debtors to continue to operate their businesses during the pendency of these chapter 11 cases.

## **Conclusion**

151.     This Declaration illustrates the factors that warrant the relief requested in the First Day Motions. I declare under penalty of perjury that, to the best of my knowledge and after reasonable inquiry, the foregoing is true and correct.

Dated: November 25, 2025
         New York, New York                    */s/ Robert Del Genio*
                                               Robert Del Genio
                                               Chief Restructuring Officer