**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| In re: | ) | |
| | ) | Chapter 11 |
| POSIGEN, PBC, *et al.*, | ) | |
| | ) | Case No.  25-90787 (CML) |
| Debtors.[1] | ) | |
| | ) | (Jointly Administered) |
| | ) | |

**OBJECTION OF POSIGEN DECATUR PROJECT COMPANY, LLC AND POSIGEN DECATUR 2 PROJECT COMPANY, LLC TO DEBTORS' EMERGENCY MOTION TO CONTINUE OPERATION OF EXISTING CASH MANAGEMENT SYSTEM**

PosiGen Decatur Project Company, LLC ("Decatur 1") and PosiGen Decatur 2 Project Company, LLC ("Decatur 2," collectively the "Decatur Partnerships"), by and through Sunstrong Management LLC ("SunStrong") as Managing Member of the Decatur Partnerships, file this *Objection of PosiGen Decatur Project Company, LLC and PosiGen Decatur 2 Project Company, LLC to Debtors' Emergency Motion to Continue Operation of Existing Cash Management System* (the "Objection"), and in support thereof, respectfully states as follows:

**OBJECTION**

1.     Prior to the bankruptcy filing, the above-captioned Debtors mismanaged and diverted funds that were property of, and should have been retained by the Decatur Partnerships. This is not merely SunStrong's or the Decatur Partnerships' characterization of events.  The Debtors openly admit their prepetition malfeasance in respect of cash management in their first-day filings.  Nevertheless, they now ask this Court for permission to continue those faulty cash

---

[1] The last four digits of PosiGen, PBC's tax identification number are 9706. A complete list of each of the Debtors in these chapter 11 cases and the last four digits of their federal tax identification numbers may be obtained on the website of the Debtors' proposed claims and noticing agent at https://cases.ra.kroll.com/PosiGen. The Debtors' service address in these chapter 11 cases is 1000 Elmwood Park Boulevard, Suite A, Harahan, LA 70123.

1

management practices.  To avoid further harm to the Decatur Partnerships and similarly situated tax equity partnerships, the Debtors' request should be denied and the Debtors should not be permitted to continue to control non-debtor funds in the name of the Debtors' convenience.

**A.     Background**

2.     SunStrong is the current Managing Member of the Decatur Partnerships, pursuant to that certain Amended and Restated Limited Liability Company Agreement of PosiGen Decatur Project Company, LLC, dated as of April 28, 2023 (the "Decatur 1 LLCA," attached hereto as Exhibit A), and that certain Amended and Restated Limited Liability Company Agreement of PosiGen Decatur 2 Project Company, LLC, dated as of November 19, 2024 (the "Decatur 2 LLCA," attached hereto as Exhibit B; the two LLCAs collectively are the "Decatur LLCAs") in each case by and between M&T Community & Environmental Development LLC ("M&T") and PosiGen Decatur Manager, LLC, a non-debtor affiliate of the Debtors ("PosiGen Manager"). PosiGen Manager was removed as Managing Member of each of the Decatur Partnerships on November 1, 2025, and M&T appointed SunStrong as the Managing Member of the Decatur Partnerships. *See* Exhibit C, the *Notices of Appointment of Managing Member*.

3.     The Decatur Partnerships' business was based on purchasing from the Debtors title to the various solar projects, including the rights to revenues associated therewith.  These purchases were facilitated by respective Master Engineering, Procurement and Construction Agreements (respectively the "Decatur 1 EPC Agreement" and the "Decatur 2 EPC Agreement," collectively the "Decatur EPC Agreements," attached hereto as Exhibit D) along with related bills of sale.  The Decatur Projects EPC Agreements make clear that the Decatur Partnerships, not the Debtors, own the projects and all rights associated with the projects following the sale.  *See*, *e.g.*, Decatur 1 EPC Agreement § 3.1(m) ("Legal title of each such Project shall, on the applicable

2

Purchase Date, upon consummation of the Purchase thereof pursuant to this Agreement, pass to and remain with Purchaser [Decatur 1], free and clear of all Liens (other than Permitted Liens)."). Likewise, each of the bills of sale executed for these transactions state that the Decatur Partnerships own the customer agreement leases, their cash flow, and their related Solar Renewable Energy Certificates ("SRECs"). *See*, *e.g.*, Exhibit E ¶ 1 ("Seller does hereby, effective from and after the date hereof, sell, convey, assign, transfer and deliver unto Purchaser all of Seller's right, title and interest in, to and under each of the Purchase Projects . . .").

4.      Under each of the Decatur LLCAs,, PosiGen Manager was obligated to "ensure that the [respective Decatur Partnership] exists solely for the purpose of owning the Projects, conducts business only in its own name, does not engage in any business or have any assets unrelated to the Project, does not have any indebtedness other than as permitted by this Agreement, ***has its own separate books, records, and accounts (with no commingling of assets)*** . . ." Decatur LLCAs § 8.04 (emphasis added). Moreover, PosiGen Manager was required to maintain separate bank accounts for each tax equity partnership to hold partnership funds. *Id.* § 8.03. In other words, PosiGen Manager, as Managing Member of the Decatur Partnerships, was required to facilitate the routing of any funds of the Decatur Partnerships into segregated bank accounts that were not commingled with, for example, the customer lease payments from other tax equity partnerships.

5.      To accomplish this, PosiGen Manager caused both Decatur Partnerships to execute administrative services agreements (the "Services Agreements") (attached hereto as Exhibit F) with PosiGen Provider, LLC ("Provider"), a Debtor in the above-captioned case. Under the Services Agreements, Provider is obligated to perform (or would cause a subcontractor to perform) certain customer billing, servicing, and other administrative services on behalf of the Decatur Partnerships.

6.      Provider was obligated to collect the payments from solar customers whose assets are held by the Decatur Partnerships under such customers' respective customer agreements. *See* Exhibit A to the Services Agreements ("Provider will . . . administer or cause to be administered the billing and collections pursuant to the Customer Agreements."). The Debtors, as permitted by the Services Agreements, subcontracted many of these services to GenPact (UK) Ltd. ("GenPact"). If the Services Agreements were performed consistently with the Decatur LLCAs, Provider would have collected customer lease payments as they were made and deposited them directly into a separate bank account controlled by the Decatur Partnerships.

7.      Instead, to perform the customer billing and collections tasks under the Services Agreements, the Debtors opened the "KeyBank Lease Revenue Collection Account" (as defined in Exhibit 2 to the Cash Management Motion and in the *Declaration of Robert Del Genio in Support of Debtors' Petitions and Requests for First Day Relief* [Dkt. No. 12] (the "First Day Declaration")). By the Debtors' own admission in the First Day Declaration, the KeyBank Lease Revenue Collection Account was intended to receive customer lease payments from customers, after which the Debtors would "transfer[] those amounts from the KeyBank Lease Revenue Collection Account to the applicable account at each TEP." First Day Declaration, p. 12. By commingling funds from all of the various customers of the individual tax equity partnerships into a single bank account (the KeyBank Lease Revenue Collection Account), the Debtors were already acting in violation of the Decatur Partnerships LLCAs' requirement that the project companies maintain separate bank accounts for deposits like customer lease payments.

8.      On November 25, 2025, the Debtors filed the *Debtors' Emergency Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Continue to Operate Their Existing Cash Management System, (B) Maintain Existing Bank Accounts, Business Forms, and Books and*

4

*Records, (C) Pay Related Prepetition Obligations, (D) Maintain Fuel Card Program, and (E) Continue Intercompany Transactions; (II) Granting Administrative Expense Status to Intercompany Claims Among the Debtors; and (III) Granting Related Relief* (Dkt. 5) (the "<u>Cash Management Motion</u>").  In support of the Cash Management Motion, Debtors simultaneously filed the First Day Declaration and an *Informational Brief* [Dkt. No. 11] (the "<u>Brief</u>").

9.      After an emergency hearing, the Court granted the Cash Management Motion on an interim basis and entered the *Interim Order (I) Authorizing the Debtors to (A) Continue to Operate Their Existing Cash Management System, (B) Maintain Existing Bank Accounts, Business Forms, and Books and Records, (C) Pay Related Prepetition Obligations, (D) Maintain Fuel Card Program and (E) Continue Intercompany Transactions, (II) Granting Administrative Expense Status to Intercompany Claims Among the Debtors; and (III) Granting Related Relief* [Dkt. No. 51] (the "<u>Interim Cash Management Order</u>").

**B.      The Cash Management Motion Should Be Denied Due to the Debtors' Admitted Prepetition Mismanagement of Decatur Partnerships' Funds.**

10.      SunStrong, as Managing Member of the Decatur Partnerships, objects to entry  of the proposed Cash Management Order.  The Debtors have admitted that they have consistently failed to properly manage both their cash and the cash of the entities that they controlled, including the Decatur Partnerships by, among other things, commingling that cash and treating it as their own.  The Debtors now shockingly ask the Court to authorize them to continue in the same troubling behavior.  The requested relief would clearly harm the Decatur Partnerships through the continued misuse of their funds.  The Court should deny the Cash Management Motion.

11.      The Debtors explicitly seek the authority to "operate each of the Bank Accounts that comprise the Cash Management System as each was maintained in the ordinary course of business before the Petition Date and as described herein." Cash Management Motion ¶ 35.  The

Debtors argue that changes to or limits on its cash management system would "severely disrupt, if not cripple, the Debtors' operations." *Id*. The KeyBank Lease Revenue Collection Account is defined as one of the "Bank Accounts" the Debtors seek to maintain ordinary course access to. *Id.*, Exhibit 2.

12. The Debtors' own first-day filings, however, provide clear reasons why such approval of the Debtors' prepetition cash management system cannot be permitted. Most importantly, the Debtors cannot be permitted to consider their prepetition "business as usual" approach because the Debtors' prepetition cash management system was fundamentally broken and dependent on the Debtors systematically violating the rights of the Decatur Partnerships and similarly situated tax equity partnerships. As the Debtors admitted, prior to the Petition Date the Debtors "had taken actions that violated many of its contractual obligations, including using a centralized cash management system for operating cash and lease revenues . . ." Brief at ¶ 4. The Debtors further admit that, as their restructuring advisors began investigating their faulty cash management practices, they learned that the Debtors' "cash management system and practices did not conform with the various governing and financing documents under its complicated financing structure, and that lease revenues, cash for debt service payments, and operating cash had been commingled." *Id.* at ¶ 61.

13. Indeed, the Debtors have even made clear that, prepetition, the Debtors made a habit of transferring cash between accounts for their own administrative convenience with utter disregard for who owned such cash, using property of the Decatur Partnerships (and other tax equity partnerships) whenever they felt constrained by liquidity shortfalls. For example, the Debtors admit that "[p]rior to the Petition Date, as a result of liquidity constraints, on certain occasions the Debtors would manually transfer funds from the KeyBank Lease Revenue Collection

Account to the First Horizon Concentration Account to fund ordinary operating expenses and then transfer funds from the First Horizon Concentration Account to the KeyBank Lease Revenue Collection Account before paying money to the applicable account at each TEP."   First Day Declaration at ¶ 37.

14.     Even more troubling, the Declaration alleges that "[a]s of the Petition Date, the Debtors have approximately $13.4 million of unencumbered available cash on hand, the majority of which cash is held at the KeyBank Lease Revenue Collection Account[2] . . . ."  *Id.* at ¶ 32.  The Debtors further allege that "[t]he KeyBank Lease Revenue Collection Account is not subject to any deposit account control agreement or other restrictions on PosiGen's ability to use the cash in that account."  *Id.* ¶ 43.  These statements are deeply concerning.  While the KeyBank Lease Revenue Collection Account is owned by the Debtors, the vast majority of the funds are rightfully the property of partnerships like the Decatur Partnerships.[3]  The Debtors, seemingly, believe that their admitted prepetition mismanagement of the Decatur Partnerships' funds means that they now own those funds and may use them as they see fit.

15.     It is this pattern of improper behavior—systematic mismanagement and misuse of non-debtor assets for the benefit of the Debtors in open disregard for the Debtors' contractual obligations and the governing documents of the tax equity partnerships—that the Debtors ask this Court to endorse and authorize to continue.

16.     Under no circumstances should the Court allow the Debtors to continue their current cash management practices, including by mismanaging cash generated by the Decatur

---

[2] The Debtors clarify that there is approximately $10.5 million in the KeyBank Lease Revenue Connection Account. *See* First Day Declaration ¶ 43.

[3] The Decatur Partnerships are not the only parties harmed by the Debtors' faulty cash management practices – many of the other project companies have filed an adversary complaint and limited objection to an employee retention plan in this case objecting to the Debtors' characterization of the funds as property of the estate. *See* Dkt. Nos. 110, 111.

Partnerships or controlling the KeyBank Lease Revenue Collection Account as they did prepetition. With respect to cash being generated by assets owned by the Decatur Partnerships on a go-forward basis, the Debtors' obligations are clear. Such cash is to be held in segregated accounts at the applicable Decatur Partnerships and not commingled with the cash of the Debtors or that of any other entity (including other tax equity partnerships). The Decatur Partnerships have appointed SunStrong as Managing Member to, among other things, correct these cash management errors. The Debtors should immediately cease interfering with SunStrong's management of cash being generated by the Decatur Partnerships and should instead affirmatively cooperate (including by causing its subcontractors, such as GenPact, to cooperate) in enforcing the cash management regime mandated by the Decatur Partnerships' governing documents and the Debtors' contractual obligations to the Decatur Partnerships.

17. With respect to the funds already contained in the KeyBank Lease Revenue Collection Account, while the account may be in the name of Debtor PosiGen, PBC, it contains funds which are the property of tax equity partnerships like the Decatur Partnerships. The Debtors, prepetition, ignored this fact and treated the KeyBank Lease Revenue Collection Account as if it contained exclusively Debtor funds that could be used for ongoing operations and to counteract its liquidity concerns. There is no justification to allow that to continue. The Debtors should immediately turn the Decatur Partnerships' share of such funds over to the Decatur Partnerships. To the extent the Debtors are unable to immediately reconcile the ownership of cash held in the KeyBank Lease Revenue Collection Account, the Debtors should be required to immediately freeze all funds held in that account pending such reconciliation.

18. Understandably, there is a dearth of judicial opinions where bankruptcy courts outright deny cash management motions, as such motions are either approved to protect a debtor's

reorganization hopes or are simply addressed without the need for judicial intervention. In a more egregious recent example, however, a Delaware bankruptcy court—faced with objections to a debtor's cash management, cash collateral, and other first day motions based on the debtor's principal's prepetition acts—responded by removing the debtor-in-possession entirely and allowing a Subchapter V Trustee to take over the case. *In re ComedyMX, LLC*, 647 B.R. 457, 465 (Bankr. D. Del. 2022) (removing the DIP based on the principal's statements that he "doesn't give a damn about the law," leading the court to "conclude that the statutory purposes of chapter 11 cannot be fulfilled with this debtor remaining in possession."). Although SunStrong does not yet have reason enough to move for removal of the debtors-in-possession in the above-captioned cases as in *ComedyMX*, the Debtors' prepetition actions at least show that they cannot be trusted with continuing to exercise control over bank accounts which hold the property of non-debtors like the Decatur Partnerships.

19. Bankruptcy courts do, on the other hand, scrutinize debtors' use of cash collateral, and tend to fashion the appropriate remedy to penalize inappropriate usage of cash collateral. *See, e.g.*, *In re Premier Interval Resorts, Inc.*, Nos. 99-38340-HCA-11, 2003 WL 145069 at *6 (N.D. Tex. Jan. 15, 2003) (affirming bankruptcy court's denial of a motion to use cash collateral due to the debtor's failure to segregate and account for cash collateral; burden to prove the contrary fell on the debtor); *In re Four Seasons Marine & Cycle, Inc.*, 263 B.R. 764, 770 (Bankr. E.D. Tex. 2001) (interpreting § 105(a) to allow a bankruptcy court to impose personal sanctions against the parties responsible for a corporate debtor's misuse of cash collateral); *In re Ohannes Karamoussayan*, 656 B.R. 652, 665 (B.A.P. 1st Cir. 2024) (noting that under § 1112(b)(4)(D), a court "shall" dismiss or convert a chapter 11 case where it finds "unauthorized use of cash collateral substantially harmful to 1 or more creditors."). Although SunStrong is not arguing that

9

the funds in the KeyBank Lease Revenue Account are cash collateral *per se,* the circumstances of this case warrant curtailment of the Debtors' ability to continue operating their bank accounts in the same grossly negligent manner as they had been prepetition.

20.     Moreover, to the extent the Debtors warn in their Cash Management Motion that a failure to grant the Motion would "cripple" the Debtors' operations, such arguments lack merit. The Debtors' chapter 11 cases are hopelessly underfunded, as the Debtors purport to have only $13.4 million in unencumbered cash and have not disclosed any post-petition financing or other means to fund the cases. First Day Declaration at ¶ 32. Moreover, as mentioned above, the Decatur Partnerships (along with many of the other project companies) strongly object to the Debtors' characterization of the $13.4 million as property of the estate. SunStrong struggles to see how denial of the Debtors' Cash Management Motion would in any way impede what appears to be an in-court wind-down process. Based on the first day motions, the Debtors do not seem to be pursuing a true reorganization—they simply lack the resources to do so.[4]

21.     In short, SunStrong asks that this Court deny the Cash Management Motion in its entirety, as it would allow the Debtors to continue operating a cash management system which has harmed the interests of the tax equity partnerships like the Decatur Partnerships. To the extent the Court is inclined to grant the Cash Management Motion, SunStrong asks that certain safeguards be implemented to protect the interests of the Decatur Partnerships, including that (i) the KeyBank Lease Revenue Account be removed entirely from the Bank Accounts covered by the Cash Management Motion and all future transfers in or out of the account be frozen; and/or (ii) any transfers out of the KeyBank Lease Revenue Account only be permitted with the express written

---

[4] As of the filing of this Objection, the Debtors have filed a proposed *Joint Chapter 11 Plan* [Dkt. No. 123] on the murky prospect of a sale of substantially all of its assets. Given the Debtors' lack of funding for the chapter 11 case or sale process, and the lack of evidence of a clear purchase offer, there appears to be little chance at a successful confirmation of the current plan (which the Debtors themselves describe as a placeholder "framework").

consent of the Decatur Partnerships.  Such relief is necessary to prevent further commingling of non-Debtor funds with Debtor funds, and to stop the continued misappropriation of the Decatur Partnerships' property.

## CONCLUSION

WHEREFORE, for the reasons stated above, SunStrong, on behalf of the Decatur Partnerships, objects to the relief requested in the Cash Management Motion to the extent cited above and respectfully requests that it be denied, and that the Court grant such other and further relief as is deemed just and proper.

*[Reminder of Page Intentionally Left Blank]*

11

Dated: December 12, 2025

Respectfully submitted,

**NORTON ROSE FULBRIGHT US LLP**

*/s/ Julie Goodrich Harrison*
Julie Goodrich Harrison (SBT 24092434)
Maria Mokryzcka (SBT 24119994)
1550 Lamar, Suite 2000
Houston, Texas 77010
Telephone: (713) 651-5151
Facsimile: (713) 651-5246
Email: julie.harrison@nortonrosefulbright.com
Email: maria.mokryzcka@nortonrosefulbright.com


*- and -*

Eric Daucher (admitted *pro hac vice*)
Andrew Rosenblatt (admitted *pro hac vice*)
John Conover (admitted *pro hac vice*)
1301 Avenue of the Americas
New York, NY 10019-6022
Telephone: (713) 651-5151
Facsimile: (713) 651-5246
Email: eric.daucher@nortonrosefulbright.com
Email: andrew.rosenblatt@nortonrosefulbright.com
Email: john.conover@nortonrosefulbright.com

*Counsel to SunStrong Management LLC, as Managing*
*Member of the PosiGen Decatur Project Company, LLC*
*and PosiGen Decatur 2 Project Company, LLC*


**CERTIFICATE OF SERVICE**

I hereby certify that on December 12, 2025, a true and correct copy of the foregoing document was filed and served via the Court's electronic case filing and noticing system to all parties registered to receive electronic notices in this matter.

*/s/ Julie Goodrich Harrison*
Julie Goodrich Harrison