Gary F. Eisenberg
PERKINS COIE LLP
1155 Avenue of the Americas, 22nd floor
New York, NY 10036-2711
Telephone: (212) 262-6902
Facsimile:(212) 977-1632
geisenberg@perkinscoie.com

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | |
|---|---|
| In re:<br><br>PosiGen, PBC, *et al.*,[1]<br><br>Debtors. | Chapter No. 11<br><br>Case No.: 25-90787 (CML) |

**OBJECTION OF EAST WEST BANK TO CONFIRMATION OF DEBTORS'
MODIFIED FIRST AMENDED COMBINED DISCLOSURE STATEMENT AND JOINT
CHAPTER 11 PLAN OF POSIGEN, PBC AND ITS AFFILIATED DEBTORS**

East West Bank, a California banking corporation ("EWB"), through its undersigned counsel, hereby objects to the *Modified First Amended Combined Disclosure Statement and Joint Chapter 11 Plan of PosiGen, PBC and its Affiliated Debtors* (the "Plan") proposed by the above-captioned debtors (the "Debtors"), and in support thereof states as follows:

---

[1] An order has been entered in accordance with Rule 1015(b) of the Federal Rules of Bankruptcy Procedure and Rule 1015-1 of the Bankruptcy Local Rules directing joint administration of the chapter 11 cases of: PosiGen, PBC, Case No. 25-90787; PosiGen Developer, LLC, Case No. 25-90788; PosiGen Holdings, LLC, Case No. 25-90789; PosiGen Operations, LLC, Case No. 25-90790; PosiGen Owner 2, LLC, Case No. 25- 90791; PosiGen Provider, LLC, Case No. 25-90792; PosiGen Owner 3, LLC, Case No. 25- 90793; PosiGen Rampart Holdco, LLC, Case No. 25-90794; PosiGen Rampart, LLC, Case No. 25-90795; PosiGen, LLC, Case No. 25-90796. All further pleadings and other papers shall be filed in and all further docket entries shall be made in Case No. 25-90787 (ARP).

## INTRODUCTION

Confirmation should be denied because the Plan is structured to sanitize, suppress, or shift control over accountability for pervasive prepetition misconduct—double sales/pledges of thousands of Projects, centralized commingling and diversion of segregated Project Company revenues, and tax-credit ownership and registration failures—rather than to remediate and maximize recoveries from fraud-related estate claims. These facts undermine good faith under section 1129(a)(3) of title 11 of the United States Code (the "Bankruptcy Code"), adequate information/solicitation under sections 1125 and 1129(a)(2), best interests under section 1129(a)(7), and the public-policy/management findings under section 1129(a)(5).

## ARGUMENT

### I. The Plan Fails to Satisfy Section 1129(a)(7) Because Unsecured Creditors Would Receive Less Than in a Chapter 7 Liquidation.

Section 1129(a)(7), the "best interests of creditors" test, requires that each impaired, dissenting creditor receive under the chapter 11 plan not less than the amount such holder would receive if the debtor were liquidated under chapter 7 on the plan's effective date. 11 U.S.C. § 1129; *see also In re Samurai Martial Sports, Inc.*, 644 B.R. 667, 693 (Bankr. S.D. Tex. 2022). A plan that grants broad releases of valuable estate or creditor claims—without providing equivalent value—can depress plan recoveries below the chapter 7 baseline. When that occurs, the plan fails the "best interests" test.

A detailed liquidation analysis must be provided so that creditor recoveries may be evaluated under both a proposed chapter 11 plan and a hypothetical chapter 7 liquidation. Courts have denied confirmation because the debtor failed to provide an updated liquidation analysis, making it impossible to assess if the best interests test was satisfied. *See In re Samurai Martial Sports, Inc.*, 644 B.R. at 694; *see also In re Save Our Springs (S.O.S.) Alliance, Inc.*, 388 B.R. 202,

215 (Bankr. W.D. Tex. 2008) (noting that the plan did not meet the best interests test due to the lack of a meaningful liquidation analysis). The liquidation analysis must include a comprehensive schedule of assets and liabilities of each of the Debtors. Without that information, creditors cannot determine whether they are receiving as much as they would in a chapter 7 liquidation, as required by the Bankruptcy Code.

Courts have denied confirmation where a chapter 11 plan includes broad releases of valuable estate or creditor claims, which can potentially reduce recoveries for dissenting creditors below the chapter 7 baseline, thereby causing the plan to fail the requirements of section 1129(a)(7). *See, e.g.*, *In re Ditech Holding Corp.*, 606 B.R. 544, 607-08 (Bankr. S.D.N.Y. 2019) (chapter 11 debtors needed to account for value of consumer creditors' continuing rights against purchasers of the debtors' assets, which would be extinguished under a chapter 11 plan but would persist in a hypothetical chapter 7 liquidation). "If even one dissenting member of an impaired class would get less under the Plan than in a hypothetical liquidation, the fact that the class as a whole approved the Plan is immaterial." *In re Adelphia Commc'ns Corp.*, 361 B.R. 337, 364 (S.D.N.Y. 2007).

Section 1129(a)(7) mandates a creditor-by-creditor, class-agnostic comparison of recoveries, measured in present value, between the proposed distribution under the chapter 11 plan and the expected distribution in a hypothetical, contemporaneous chapter 7 liquidation. A liquidation analysis for the Plan was filed by the Debtors at Docket No. 452 as <u>Exhibit A</u>. It includes a liquidation analysis for PosiGen, PBC alone and the consolidated Debtors.

The liquidation analysis does not contain any value for litigation recoveries by a chapter 7 trustee. This is significant, because the Debtors propose to grant releases to many third parties ("Third Party Releases"). In a chapter 7 liquidation, Third Party Releases would not be granted

3

and potential recoveries from Third Party Release recipients could add to the total assets distributable by a chapter 7 trustee. With PosiGen, PBC's liquidation analysis showing only 0.2% projected higher recovery under the Plan versus in a chapter 7, such recoveries could change the analysis to a conclusion that EWB is receiving under the Plan less than it would receive in chapter 7.

In addition, the Plan's liquidation analysis does not include a separate liquidation analysis for each Debtor (other than PosiGen, PBC). This makes it impossible to evaluate whether EWB will recover more under the Plan than in a chapter 7 liquidation. In a chapter 7 liquidation, no consolidation would occur.

The liquidation analysis in the Plan posits a comparison between recovery for the consolidated non-PosiGen, PBC Debtors under the Plan versus recovery for the consolidated non-PosiGen, PBC Debtors in a chapter 7 liquidation. The comparison is not valid, though. In a chapter 7, non-occurrence of substantive consolidation would be the result, generating a need to compare a creditor recovery under the Plan versus against each particular non-PosiGen, PBC Debtor. Without that information, and as a result, determination of whether section 1129(a)(7) has been met is not possible, the Debtor cannot satisfy Section 1129(a)(7) as to EWB, and the Plan cannot be confirmed.

**II.     The Plan is Unfair and Inequitable Because it Effectuates Sales of Assets Obtained Through Improper Acts, to the Derogation of the General Body of Unsecured Creditors.**

A reorganization plan must be proposed in good faith and not by any means forbidden by law. 11 U.S.C. § 1129(a)(3); *In re Dernick*, 624 B.R. 799, 812 (Bankr. S.D. Tex. 2020). Courts have emphasized that good faith requires the plan to achieve results consistent with the objectives and purposes of the Bankruptcy Code, such as equitable treatment of creditors and the preservation

of value for the estate. *In re Sagewood Manor Assocs. Ltd. P'ship*, 223 B.R. 756, 761 (Bankr. D. Nev. 1998).

"Bad faith exists if there is no realistic possibility of reorganization and the debtor seeks merely to delay or frustrate efforts of secured creditors." *In re Boulders on the River, Inc.*, 164 B.R. 99, 103 (B.A.P. 9th Cir. 1994) (citing *In re Albany Partners, Ltd.,* 749 F.2d 670, 674 (11th Cir.1984)); *see also In re Martin*, 51 B.R. 490, 493-94 (Bankr. M.D. Fla. 1985) (bad faith is often raised when a debtor's actions are intended to delay or frustrate creditors' legitimate efforts to enforce their rights).

In particular, the Fifth Circuit has held that misconduct which depletes estate assets and results in an unconfirmable plan injures the creditor body and constitutes grounds for denying relief to the offending party. In *Cantu v. Schmidt (In re Cantu)*, the court highlighted that submitting an unconfirmable plan, which was the culmination of misconduct, harmed both the estate and creditors. 784 F.3d 253, 261-62 (5th Cir. 2015). The court noted that creditors are generally better off when the debtor reorganizes as a going concern, but improper actions that undermine this process can lead to denial of plan confirmation. *Id.* at 262. In particular, the "[d]iversion of property otherwise available to the estate" and "transferring assets away from the estate made it more difficult to confirm a plan of reorganization, which requires a sufficient corpus of cash to make necessary payments upon confirmation." *Id.* at 261. The *Cantu* court recognized that when a party's misconduct results in "the delay and cost" of failed reorganization efforts, such conduct "harmed the estate" and justified denying that party the benefit of its wrongful actions. *Id*. at 262.

Here, the Plan is unfair and inequitable because it effectuates a sale of Debtors' assets that were obtained through improper acts, which ultimately harms creditors. Specifically, revenues

that should have been distributed to the Project Companies were misappropriated and held by certain Debtor entities.

### III. The Disclosure Statement Lacks Adequate Information Regarding Where Monies Went from the Debtors After Being Received from TEP Purchasers for Double-Sold Assets.

Under chapter 11 of the Bankruptcy Code, the adequacy of a disclosure statement is governed by 11 U.S.C. § 1125, which requires that the disclosure statement provide "adequate information" to enable a hypothetical reasonable investor to make an informed judgment about the plan. 11 U.S.C. § 1125. Courts have consistently emphasized the importance of full and transparent disclosure in chapter 11 proceedings, particularly regarding the debtor's assets, liabilities, and financial transactions. *See, e.g.*, *In re Divine Ripe, L.L.C.*, 554 B.R. 395, 406 (Bankr. S.D. Tex. 2016) (declining to approve the adequacy of the disclosure statement where the debtor, among other things, failed to properly disclose the debtor's financial condition and all assets); *In re Fuller's Serv. Ctr., Inc.*, No. 25-1345, 2025 WL 3714790, at *13 (Bankr. N.D. Ill. Dec. 9, 2025) ("The Bankruptcy Code and the Federal Rules of Bankruptcy Procedure require full disclosure, and this transparency is the foundation of chapter 11 bankruptcy.").

A chapter 11 debtor in possession has a clear duty to investigate and resolve accounting irregularities prior to plan confirmation. This duty arises from the fiduciary obligations imposed by the Bankruptcy Code and is essential to the reorganization process. *See, e.g.*, *In re Patel*, 621 B.R. 245, 254 (Bankr. E.D. Cal. 2020) ("One of those duties [imposed on a debtor in possession] is to be accountable for all property received [per 11 U.S.C. § 1106(a)(1)]."); *In re Ford*, 36 B.R. 501, 504 (Bankr. W.D. Ky. 1983) ("Inherent in debtor's fiduciary obligations under the Code is the duty to file accurate financial reports disclosing all transactions involving estate assets."). Failure to fulfill this duty can result in significant consequences, including the appointment of a trustee, dismissal of the case, or conversion to Chapter 7. *In re Fuller's Serv. Ctr., Inc.*, 2025 WL

3714790, at *12 (appointing a chapter 11 trustee following the debtor's failure to make adequate disclosures and gross mismanagement).

While "[t]he determination of what is adequate information is subjective and made on a case by case basis," *Matter of Texas Extrusion Corp.*, 844 F.2d 1142, 1157 (5th Cir. 1988), courts in this Circuit have looked to the so-called *Metrocraft* factors to determine whether a disclosure statement contains adequate information: (1) the events which led to the filing of a bankruptcy petition; (2) a description of the available assets and their value; (3) the anticipated future of the company; (4) the source of information stated in the disclosure statement; (5) a disclaimer; (6) the present condition of the debtor while in Chapter 11; (7) the scheduled claims; (8) the estimated return to creditors under a Chapter 7 liquidation; (9) the accounting method utilized to produce financial information and the name of the accountants responsible for such information; (10) the future management of the debtor; (11) the Chapter 11 plan or a summary thereof; (12) the estimated administrative expenses, including attorneys' and accountants' fees; (13) the collectability of accounts receivable; (14) financial information, data, valuations or projections relevant to the creditors' decision to accept or reject the Chapter 11 plan; (15) information relevant to the risks posed to creditors under the plan; (16) the actual or projected realizable value from recovery of preferential or otherwise voidable transfers; (17) litigation likely to arise in a nonbankruptcy context; (18) tax attributes of the debtor; and (19) the relationship of the debtor with affiliates. *In re Divine Ripe, L.L.C.*, 554 B.R. at 405 (citing to *In re Metrocraft Pub. Servs., Inc.*, 39 B.R. 567, 568 (Bankr. N.D. Ga. 1984).

Here, the Disclosure Statement is silent as to: (a) the total amount of funds received from TEP Purchasers for assets that were subsequently double-sold; (b) whether these funds remain in the Debtors' accounts or have been disbursed; (c) if disbursed, to whom and for what purpose; and

7

(d) whether any portion of these funds may be recoverable for the benefit of the estate. In essence, the Debtors have provided no information on where the money went from the double sales of projects which were not delivered to purchasers who paid real money for them but have not received those Projects.

These omissions are material and impact *Metrocraft* factors (2), (8), (14), (15), (16) and (17). Information regarding the disposition of funds from double-sold assets is needed for creditors to be able to evaluate meaningfully the Plan's proposed distributions and proposed releases, so that creditors know whether additional recoverable assets exist or whether the Debtors' management or affiliates engaged in conduct that could give rise to avoidance actions or surcharge claims. Simply put, the Debtors themselves admit to the "tranching" of Projects (see their motion filed at Docket No. 310)—selling them to multiple entities, receiving multiple purchase prices for them, not delivering Projects to certain parties who paid for them, and now not disclosing where the money paid for such Projects went.

Such a lack of disclosure over what in essence has been the core of the Debtors' misfeasance goes to the heart of determining whether full disclosure has happened here. How can any creditor be said to have received adequate information when the core of what ran awry for the Debtors is ignored?

For these reasons, the Court should not approve the Disclosure Statement on a final basis or confirm the Plan based on the lack of disclosure to date. One cannot assume such disclosure would not lead to alternative proposed treatment of creditors under the Plan.

**IV.     The Plan Improperly Consolidates the Debtors for Distribution Purposes.**

Substantive consolidation is defined as "the merger of two or more bankruptcy cases, usually pending against the same debtor or related debtors, into one estate for purposes of

8

distributing the assets, usually resulting in the two estates sharing assets and liabilities, and in the extinguishment of duplicate claims and claims between the debtors." *In re Introgen Therapeutics, Inc.*, 429 B.R. 570, 581 (Bankr. W.D. Tex. 2010) (quoting Black's Law Dictionary 351, 9th Ed. 2009). The Fifth Circuit has said that "[f]undamentally, substantive consolidation occurs when the assets and liabilities of separate and distinct legal entities are combined in a single pool and treated as if they belong to one entity." *Clyde Bergemann, Inc. v. Babcock & Wilcox Co. (In re Babcock & Wilcox Co.),* 250 F.3d 955, 958 fn. 5 (5th Cir. 2001).

Consolidation is an extraordinary measure that should be used sparingly,[2] and courts deny this remedy absent special circumstances. For example, in *Owens Corning,* the Third Circuit held that the "deemed" consolidation of a corporate debtor and related entities that had guaranteed their borrowing was impermissible as it deprived the lender of the guarantees for which it had bargained. *In re Owens Corning*, 419 F.3d 195, 199-200 (3d Cir. 2005), as amended; *see also Genesis Health Ventures, Inc. v. Stapleton (In re Genesis Health Ventures Inc.)*, 402 F.3d 416, 424 (3d Cir. 2005) (court disapproved deemed consolidation provision in a plan which had as its purpose the avoidance of quarterly fees payable to the office of the United States trustee for each joint debtor).

In considering whether to allow substantive consolidation, "[c]ourts have considered many different factors, most commonly looking at: (1) the degree of difficulty in segregating and ascertaining individual assets and liability; (2) the presence or absence of consolidated financial statements; (3) the profitability of consolidation at a single physical location; (4) the commingling of assets and business functions; (5) the unity of interests and ownership between the various

---

[2] Courts have consistently held that substantive consolidation in bankruptcy is an extraordinary remedy that should be used sparingly. *In re Introgen Therapeutics, Inc.*, 429 B.R. at 581-82 (describing substantive consolidation as an "extreme and unusual remedy" and noting that it should be applied sparingly); *In re KMC Real Est. Invs., LLC*, 531 B.R. 758, 768 (S.D. Ind. 2015) ("Courts generally hold that substantive consolidation is an 'extraordinary remedy' to be used sparingly because of the potential harm to creditors of a more solvent debtor if forced to share equally with creditors of a less solvent debtor.").

9

corporate entities; (6) the existence of parent and inter-corporate guarantees on loans; and (7) the transfer of assets without formal observance of corporate formalities." *In re Introgen Therapeutics, Inc.*, 429 B.R. at 582 (collecting cases). The Second Circuit distilled these many factors into two critical factors, which have been adopted by Texas bankruptcy courts: (1) whether creditors dealt with the entities as a single economic unit and did not rely on their separate identity in extending credit; and (2) whether the affairs of the debtors are so entangled that consolidation would benefit all creditors. *In re ADPT DFW Holdings, LLC*, 574 B.R. 87, 95 (Bankr. N.D. Tex. 2017) (citing *In re Augie/Restivo Baking Co., Ltd.*, 860 F.2d 515 (2d Cir. 1988)); *see also In re Introgen Therapeutics, Inc.*, 429 B.R. at 582–83.

With respect to the first factor, EWB had no intention of dealing with the Debtors as a single economic unit. PosiGen, PBC is the ultimate parent of the Debtors. All other Debtors, as well as non-debtor Project Companies, are subsidiaries under PosiGen, PBC. They are purposefully structured as a series of different entities, each with their own unique interests, creating important protections for them as separate corporate entities. As discussed in the draft Adversary Proceeding complaint attached to EWB's proofs of claim [Claim Nos. 75-80, 82-85], Debtors were expressly obligated to segregate each Project Company's lease and other project-related revenues. The documents governing the Project Companies make clear that the revenues belonging to each Project Company were required to be deposited in a segregated account for the benefit of the Project Company that owned the Project and the entitlement to the revenue generated thereby.

10

Just as similarly as the Project Companies were separate entities from the Debtors, each Debtor was a separate entity. This is confirmed by the Information Brief filed by the Debtors themselves.[3]

Second, the Debtors have not established the affairs of the Debtors are so entangled that consolidation would benefit all creditors. Debtors systematically deposited revenues belonging to PosiGen Decatur 2 Project Company, LLC, and other Project Companies in an account in the name of the parent company and lead Debtor, PosiGen, PBC—separate from the other Debtor entities and not commingled. This state of affairs does not "benefit all creditors" because, as noted, these revenues are not property of the Debtors, and should not be considered property of the estate. These revenues belong to the Project Companies, who need these funds to fulfill contractual obligations to their lenders, including EWB.

In addition, the Debtors were capable of identifying the separateness of their entities and existences in the Information Brief. Substantive consolidation is completely at odds with the reality the Debtors presented to the Court in the Information Brief. The Debtors relied on statements in the Information Brief in support of numerous applications for relief in these administratively consolidated cases. Judicial estoppel prevents them from seeking substantive consolidation so at odds with the Information Brief.

By consolidating the estates for distribution purposes, the proposed Plan collapses separateness and reduces recoveries for creditors who intentionally obtained claims against multiple debtors (*e.g.*, through guarantees or joint-and-several obligations). This would deprive the Project Companies (and EWB) of the guarantees for which they bargained, while providing a windfall to other creditors. *In re Owens Corning*, 419 F.3d at 200. Thus, for example, while EWB

---

[3] Debtors instead operated an illicit, unauthorized centralized cash collection system, tortiously interfering with the ability of PosiGen Decatur 2 Project Company to perform its contractual obligations to EWB.

has a TCPA claim specifically against Parent, other creditors of other Debtors would in effect be deemed to be creditors of the same Parent from whom EWB particularly obtained its guaranty.

Specifically, substantive consolidation harms EWB because it:

(a) Eliminates intercompany claims and merges assets and liabilities into a single pool.

(b) Treats EWB, which has claims against multiple debtors, as having a single claim capped at one recovery, which dilutes EWB relative to what separate estates would have yielded.

(c) Allows other claims against non-PosiGen, PBC Debtors to be treated as claims against PosiGen, PBC.  EWB holds claims under its TCPA directly against PosiGen, PBC.  These include a guaranty which EWB negotiated against the backdrop and reality of affiliates of PosiGen, PBC being separate entities and creditors of those other entities not being creditors of PosiGen, PBC.  This reliance precludes substantive consolidation as against EWB.  "If an objecting creditor relied on the separateness of the entities, consolidation cannot be justified vis-à-vis the claims of that creditor." *In re Owens Corning*, 419 F.3d at 210.

(d) Reallocates value among various creditor bodies, benefiting some at the expense of others, which is disfavored absent compelling necessity and strict proof.

Given the facts and circumstances in these cases, substantive consolidation is improper. To the extent the Plan is premised on it, the Plan should not be confirmed.

## CONCLUSION

WHEREFORE, for the reasons stated herein, EWB respectfully requests that this Court sustain EWB's objection, deny confirmation of the Debtors' Plan, and grant such further relief as this Court deems just and proper.

Dated: February 18, 2026                                     Respectfully submitted,

/s/ *Gary F. Eisenberg*

Gary F. Eisenberg
PERKINS COIE LLP
1155 Avenue of the Americas, 22nd floor
New York, NY 10036-2711
Telephone: (212) 262-6902
Facsimile:(212) 977-1632
geisenberg@perkinscoie.com

**CERTIFICATE OF SERVICE**

    I certify that this document was filed through the ECF system on February 18, 2026, which caused a copy of this document to be served on all counsel of record in this action.

                                                         /s/ *Gary F. Eisenberg*