United States Bankruptcy Court
Southern District of Texas

**ENTERED**

February 24, 2026

Nathan Ochsner, Clerk

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| POSIGEN, PBC, *et al.*,[1] | ) | Case No. 25-90787 (CML) |
|  | ) |  |
| Debtors. | ) | (Jointly Administered) |
|  | ) |  |

**FINDINGS OF FACT, CONCLUSIONS OF LAW, AND ORDER (I) APPROVING THE DISCLOSURE STATEMENT, (II) CONFIRMING THE JOINT CHAPTER 11 PLAN OF POSIGEN, PBC AND ITS AFFILIATED DEBTORS, AND (III) GRANTING RELATED RELIEF**

The debtors and debtors in possession (collectively, the "**Debtors**") in the above-captioned chapter 11 cases (the "**Chapter 11 Cases**") having:[2]

a. commenced the Chapter 11 Cases on November 24, 2025 (the "**Petition Date**") by filing voluntary petitions for relief under chapter 11 of title 11 of the United States Code (the "**Bankruptcy Code**") in the United States Bankruptcy Court for the Southern District of Texas (the "**Court**");

b. continued to operate their businesses and manage their properties as debtors in possession in accordance with sections 1107(a) and 1108 of the Bankruptcy Code;

c. filed, on December 9, 2025, the *Combined Disclosure Statement and Joint Chapter 11 Plan of PosiGen, PBC and Its Affiliated Debtors* [Docket No. 123];

d. filed, on December 12, 2025, the *Debtors' Emergency Motion for Entry of an Order (I) Conditionally Approving the Disclosure Statement; (II) Approving the Solicitation and Notice Procedures; (III) Approving the Form of Ballots and Notices; (IV) Approving Certain Dates and Deadlines in Connection with the Solicitation and Confirmation of the Plan; (V) Scheduling a Combined Hearing on (A) Final Approval of the Disclosure Statement and (B) Confirmation of Plan; and (VI) Granting Related Relief* [Docket No. 185];

---

[1] The last four digits of PosiGen, PBC's tax identification number are 9706. A complete list of each of the Debtors in these chapter 11 cases and the last four digits of their federal tax identification numbers may be obtained on the website of the Debtors' claims and noticing agent at https://cases.ra.kroll.com/PosiGen. The Debtors' service address in these chapter 11 cases is 1000 Elmwood Park Boulevard, Suite A, Harahan, LA 70123.

[2] Capitalized terms used but not otherwise defined herein have the meanings ascribed to them in the *Second Amended Combined Disclosure Statement and Joint Chapter 11 Plan of PosiGen, PBC and Its Affiliated Debtors,* dated February 22, 2026 [Docket No. 581], attached hereto as **Exhibit A**.

e.    filed, on January 23, 2026, the *First Amended Combined Disclosure Statement and Joint Chapter 11 Plan of PosiGen, PBC and Its Affiliated Debtors* [Docket No. 424];

f.    filed, on January 27, 2026, the *Modified First Amended Combined Disclosure Statement and Joint Chapter 11 Plan of PosiGen, PBC and Its Affiliated Debtors* [Docket No. 452];

g.    obtained, on January 30, 2026, entry of the *Order (I) Conditionally Approving the Disclosure Statement; (II) Approving the Solicitation and Notice Procedures; (III) Approving the Form of Ballots and Notices; (IV) Approving Certain Dates and Deadlines in Connection with the Solicitation and Confirmation of the Plan; (V) Scheduling a Combined Hearing on (A) Final Approval of the Disclosure Statement and (B) Confirmation of the Plan; and (VI) Granting Related Relief* [Docket No. 467] (the "**Disclosure Statement Order**"), (i) conditionally approving the Disclosure Statement, (ii) approving the following solicitation materials (collectively, the "**Solicitation Materials**"): the solicitation, voting, and tabulation procedures (the "**Solicitation Procedures**"), the solicitation packages (the "**Solicitation Packages**"), the Ballot, the combined hearing notice (the "**Combined Hearing Notice**"), the publication notice (the "**Publication Notice**"), the notices of non-voting status (collectively, the "**Notices of Non-Voting Status and Disputed Claims**"), and other related notices, (iii) setting deadlines in connection with confirmation, and (iv) scheduling a combined hearing on final approval of the Disclosure Statement and confirmation of the Plan (the "**Combined Hearing**");

h.    caused the Solicitation Materials to be distributed beginning on or about February 4, 2026, and the Publication Notice to be published in the national edition of *The New York Times (National Edition)* and the *Houston Chronicle* on February 4, 2026, in each case in accordance with the Bankruptcy Code, the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**"), the Local Rules for the United States Bankruptcy Court for the Southern District of Texas (the "**Bankruptcy Local Rules**"), the Procedures for Complex Cases in the Southern District of Texas (the "**Complex Case Procedures**"), the Disclosure Statement Order, and the Solicitation Procedures, as evidenced by, among other things, the *Affidavit of Service of Solicitation Materials* [Docket No. 572] (the "**Solicitation Affidavit**") and the *Affidavit of Publication* [Docket Nos. 543] (the "**Publication Affidavit**");

i.    obtained, on February 11, 2026, entry of the *Order (I) Approving (A) the Global Settlement, (B) the Transition Procedures and the Transitions, (C) the Channel Partner Settlement Procedures, and (D) the Sale Transaction, the Asset Purchase Agreement, and the Sale Notice, and (II) Granting Related Relief* [Docket No 537] (as corrected by Docket No. 542, the "**Settlement Order**") and the *Order (I) Authorizing the Debtors to Obtain Postpetition Financing, (II) Granting Liens and Providing Superpriority Administrative Expense Claims, (III) Authorizing the Use of Cash Collateral, (IV) Granting Adequate Protection to the Prepetition*

*Secured Note Parties, (V) Modifying the Automatic Stay, and (VI) Granting Related Relief* [Docket No. 538] (the "**DIP Order**");

j.   filed, on February 12, 2026, the *Notice of Filing of the Plan Supplement* [Docket No. 539];

k.   filed, on February 20, 2026, the *Second Amended Combined Disclosure Statement and Joint Chapter 11 Plan of PosiGen, PBC and Its Affiliated Debtors* [Docket No. 576];

l.   filed, on February 22, 2026, an updated *Second Amended Combined Disclosure Statement and Joint Chapter 11 Plan of PosiGen, PBC and Its Affiliated Debtors*, dated February 22, 2026 [Docket No. 581], a copy of which is attached hereto as **Exhibit A** (as may be amended, supplemented, or modified from time to time in accordance with its terms, and including all exhibits, supplements, and schedules thereto, the "**Disclosure Statement**," "**Plan**," or "**Plan and Disclosure Statement**");

m.   filed, on February 22, 2026, the *Notice of Filing of the First Amended Plan Supplement* [Docket No. 584] (as may be amended, supplemented, or modified, the "**Plan Supplement**");

n.   filed, on February 22, 206, the *Stipulation Resolving Objection of East West Bank to Confirmation of Modified First Amended Combined Disclosure Statement and Joint Chapter 11 Plan of PosiGen, PBC and Its Affiliated Debtors* [Docket No. 585];

o.   filed, on February 22, 2026, the *Declaration of Craig E. Johnson of Kroll Restructuring Administration LLC Regarding the Solicitation of Votes and Tabulation of Ballots Cast on the Modified First Amended Combined Disclosure Statement and Joint Chapter 11 Plan of PosiGen, PBC and Its Affiliated Debtors* [Docket No. 586] (the "**Voting Report**");

p.   filed, on February 22, 2026, the *Debtors' Reply in Support of Confirmation of Second Amended Combined Disclosure Statement and Joint Chapter 11 Plan of PosiGen, PBC and Its Affiliated Debtors* [Docket No. 587]; and

q.   filed, on February 22, 2026, the *Declaration of Robert Del Genio in Support of Confirmation of Second Amended Combined Disclosure Statement and Joint Chapter 11 Plan of PosiGen, PBC and Its Affiliated Debtors* [Docket No. 588] (the "**Del Genio Declaration**");

the Court having:

a.   entered the Disclosure Statement Order on January 30, 2026;

b.   set February 18, 2026, at 5:00 p.m. (prevailing Central Time) as the deadline for voting on the Plan (the "**Voting Deadline**") and deadline for filing objections to

3

final approval of the Disclosure Statement and confirmation of the Plan (the "**Plan and Disclosure Statement Objection Deadline**");

c.   set February 23, 2026, at 2:00 p.m. (prevailing Central Time) as the date and time for the commencement of the Combined Hearing;

d.   considered the Plan, the Plan Supplement, the Del Genio Declaration; the Solicitation Affidavit, the Publication Affidavit, the Voting Report, and all pleadings, exhibits, declarations, affidavits, statements, responses, and comments regarding the Disclosure Statement and confirmation of the Plan, including all objections, statements, and reservations of rights filed by parties in interest on the docket of the Chapter 11 Cases;

e.   held the Combined Hearing on February 23, 2026;

f.   heard the statements and arguments made by counsel in respect of final approval of the Disclosure Statement and confirmation of the Plan;

g.   considered all oral representations, live testimony, proffered testimony, exhibits, documents, filings, and other evidence presented at the Combined Hearing; and

h.   overruled any and all objections to final approval of the Disclosure Statement and confirmation of the Plan and all statements and reservations of rights not consensually resolved or withdrawn; and

i.   made rulings on the record at the Combined Hearing.

NOW, THEREFORE, the Court having found that the Combined Hearing Notice and the opportunity for any party in interest to object to final approval of the Disclosure Statement and Confirmation of the Plan have been adequate and appropriate as to all parties affected or to be affected by the Plan and the transactions contemplated thereby; and the Court having found that the record of the Chapter 11 Cases and the legal and factual bases set forth in the documents Filed in support of final approval of the Disclosure Statement and Confirmation of the Plan, and all evidence proffered or adduced by counsel at the Combined Hearing establish just cause for the relief granted herein; and after due deliberation thereon and good cause appearing therefor, the Court hereby makes and issues the following findings of fact, conclusions of law, and order (collectively, this "**Order**"):

**FINDINGS OF FACT AND CONCLUSIONS OF LAW**

IT IS HEREBY FOUND, DETERMINED, ADJUDGED, DECREED, AND ORDERED THAT:

**A.      Findings of Fact and Conclusions of Law**

1.      The findings of fact and the conclusions of Law set forth and incorporated in this Order and in the record of the Combined Hearing (which are incorporated into this Order by reference) constitute the Court's findings of fact and conclusions of law under rule 52 of the Federal Rules of Civil Procedure, as made applicable herein by Bankruptcy Rules 7052 and 9014. To the extent any of the following findings of fact constitute conclusions of law, they are adopted as such. To the extent any of the following conclusions of law constitute findings of fact, they are adopted as such.

**B.      Jurisdiction and Venue**

2.      Venue in this Court was proper as of the Petition Date and continues to be proper under 28 U.S.C. §§ 1408 and 1409. Approval of the Disclosure Statement and confirmation of the Plan are core proceedings under 28 U.S.C. § 157(b)(2). The Court has subject matter jurisdiction over this matter under 28 U.S.C. §§ 157 and 1334. The Court has exclusive jurisdiction to determine whether the Disclosure Statement and Plan comply with the applicable provisions of the Bankruptcy Code and should be approved and confirmed, respectively, and to enter a final order with respect thereto.

**C.      Commencement and Joint Administration of the Chapter 11 Cases**

3.      On the Petition Date, the Debtors commenced the Chapter 11 Cases, and the Court entered an order authorizing the joint administration of the Chapter 11 Cases in accordance with Bankruptcy Rule 1015(b) [Docket No. 13]. The Debtors have operated their businesses and managed their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the

Bankruptcy Code. The Debtors were at all times during the Chapter 11 Cases and continue to be entities eligible for relief under section 109 of the Bankruptcy Code, and the Debtors are proper proponents of the Plan under section 1121(a) of the Bankruptcy Code. No trustee or examiner has been appointed in the Chapter 11 Cases. On December 5, 2025, the Office of the United States Trustee (the "**U.S. Trustee**") appointed an official committee of unsecured creditors (the "**Committee**") pursuant to section 1102 of the Bankruptcy Code. [Docket No. 95]. On December 18, 2025, the U.S. Trustee reconstituted the Committee. [Docket No. 216].

**D.      Judicial Notice**

4.      The Court takes judicial notice of the docket of the Chapter 11 Cases maintained by the clerk of the Court, including, but not limited to, all pleadings and other documents filed, all orders entered, and all evidence and arguments made, proffered, adduced, and/or presented at the various hearings held before the Court during the pendency of the Chapter 11 Cases. Any resolution of objections to Confirmation explained on the record in the Chapter 11 Cases is hereby incorporated by reference.

**E.      Objections**

5.      All parties have had a fair opportunity to litigate all issues raised, or that might have been raised, in objections to final approval of the Disclosure Statement and confirmation of the Plan and such objections, if any, have been fully and fairly litigated or resolved. All unresolved objections, statements, informal objections, and reservations of rights, if any, related to the Disclosure Statement or Confirmation of the Plan are overruled on the merits.

**F.      Plan Supplement**

6.      On February 12, 2026, the Debtors filed the Plan Supplement with the Court. The Plan Supplement (including as subsequently modified, supplemented, or otherwise amended in accordance with the Plan as of the date hereof), complies with the terms of the Plan. The Debtors

provided good and proper notice of the filing of the Plan Supplement in accordance with the Bankruptcy Code, the Bankruptcy Rules, and the Disclosure Statement Order. All documents included in the Plan Supplement are integral to, part of, and incorporated by reference into the Plan. No other or further notice is or will be required with respect to the Plan Supplement. Subject to the terms of the Plan (including the consent rights of certain parties as set forth in the Plan), the Debtors reserve the right to alter, amend, update, or modify the Plan Supplement in accordance with the terms of the Plan, this Order, the Bankruptcy Plan, and the Bankruptcy Rules.

## G.   Modifications to the Plan

7.     Pursuant to section 1127 of the Bankruptcy Code, any modifications to the Plan made after the entry of the Disclosure Statement Order, including those described or set forth in this Order, constitute technical or clarifying changes, changes with respect to particular Claims by agreement (now or, in connection with the WARN Action Settlement, hereinafter) with Holders of such Claims, or modifications that do not otherwise materially or adversely affect or change the treatment of any other Claim or Interest under the Plan. These modifications are consistent with the disclosures previously made pursuant to the Disclosure Statement and Solicitation Materials served pursuant to the Disclosure Statement Order, and the filing with the Court of the Plan reflecting such modifications constitutes adequate and appropriate notice thereof under the facts and circumstances of the Chapter 11 Cases. In accordance with Bankruptcy Rule 3019, these modifications do not require additional disclosure under section 1125 of the Bankruptcy Code or the resolicitation of votes under section 1126 of the Bankruptcy Code, and they do not require that Holders of Claims be afforded an opportunity to change previously cast acceptances or rejections of the Plan. Accordingly, the Plan, as modified and attached hereto, is properly before this Court and shall constitute the Plan submitted for Confirmation by the Court, and all votes cast with

respect to the Plan prior to such modifications shall be binding and shall apply with respect to the Plan.

## H.    Adequacy of the Disclosure Statement

8.    The Disclosure Statement contains extensive material information regarding the Debtors so that parties entitled to vote on the Plan could make informed decisions regarding the Plan. The Disclosure Statement contains "adequate information" (as such term is defined in section 1125(a) of the Bankruptcy Code and used in section 1126(b)(2) of the Bankruptcy Code) with respect to the Debtors, the Plan, and the transactions contemplated therein, and complies with any additional applicable requirements of the Bankruptcy Code, the Bankruptcy Rules, and non-bankruptcy law. The Debtors' solicitation of votes on the Plan via transmittal of the Disclosure Statement and the other Solicitation Materials was authorized by and complied with the Disclosure Statement Order and was appropriate under the circumstances.

## I.    Disclosure Statement Order and Notice

9.    On January 30, 2026, the Court entered the Disclosure Statement Order. As evidenced by the Solicitation Affidavit, the Publication Affidavits, and the record in the Chapter 11 Cases, the Debtors provided due, adequate, and sufficient notice of the Plan and Disclosure Statement, the Disclosure Statement Order, the Solicitation Materials, the Plan Supplement, the settlement, release, exculpation, and injunction provisions contained in the Plan, the Combined Hearing, the Voting Deadline, the Plan and Disclosure Statement Objection Deadline, and any other applicable bar dates described in the Disclosure Statement Order, in compliance with the Bankruptcy Code, the Bankruptcy Rules, including Bankruptcy Rules 2002(b), 3016, 3017, 3019, and 3020(b), the Bankruptcy Local Rules, the Complex Case Procedures, the Solicitation Procedures, and the Disclosure Statement Order. No other or further notice is or shall be required.

**J.      Solicitation**

10.      The Debtors and their respective Professionals solicited votes for acceptance and rejection of the Plan in good faith, and such solicitation complied with the Bankruptcy Code, including sections 1125 and 1126 of the Bankruptcy Code, the Bankruptcy Rules, including Bankruptcy Rules 3017, 3018, and 3019, the Disclosure Statement Order, the Solicitation Procedures, the Bankruptcy Local Rules, the Complex Case Procedures, and all other applicable rules, laws, and regulations. Transmission and service of the Solicitation Packages was timely, adequate, and sufficient under the facts and circumstances of the Chapter 11 Cases. No other or further notice, transmission, or solicitation is or shall be required. The period during which the Debtors solicited votes on the Plan is a reasonable and adequate period of time for Holders of Claims in the Voting Classes to have made an informed decision to accept or reject the Plan.

**K.      Service of Opt-Out Form**

11.      The Ballot and Notices of Non-Voting Status included a form for opting out of the Third-Party Release (as defined below) (the "**Opt-Out Form**") and instructions for opting out of the Third-Party Release through the submission of the Opt-Out Form to the Claims and Noticing Agent for recording or the filing of a pleading on the docket that includes an election to opt out of the Third-Party Release by February 27, 2026, at 5:00 p.m. (prevailing Central Time). As described in the Disclosure Statement Order, the Solicitation Procedures, and the Solicitation Affidavit, the process followed by the Debtors and the Claims and Noticing Agent to identify the relevant parties on which to serve the Ballot and Notices of Non-Voting Status and Disputed Claims and to distribute the Opt-Out Forms was reasonably calculated to ensure that each of the Holders of Claims and Interests was informed of its ability to opt out of the Third-Party Release and the consequences for failing to timely do so. Transmission and service of the Opt-Out Forms

9

was timely, adequate, and sufficient under the facts and circumstances of the Chapter 11 Cases. No other or further notice is or shall be required.

**L.     Voting Report**

12.     The Voting Report was admitted into evidence during the Combined Hearing without objection. The procedures used to tabulate Ballots were fair, in good faith, and conducted in accordance with the Disclosure Statement Order, the Solicitation Procedures, the Bankruptcy Code, the Bankruptcy Rules, the Bankruptcy Local Rules, the Complex Case Procedures, and all other applicable rules, laws, and regulations.

13.     As set forth in the Plan, Holders of Claims in Classes 3-A, 4-A, 5-A, 6-A, 7-A, 8-A, 3-B, 4-B, 5-B-1, 5-B-2, 6-B, and 7-B (the "**Voting Classes**") were eligible to vote to accept or reject the Plan in accordance with the Solicitation Procedures. As evidenced by the Voting Report, (i) Classes 3-A, 4-A, 7-A, 8-A, 3-B, 4-B, 6-B, and 7-B at each Debtor entity voted to accept the Plan in accordance with section 1126 of the Bankruptcy Code, and (ii) Classes 5-A, 6-A, 5-B-1, and 5-B-2 abstained from voting on the Plan and are thus deemed to have accepted the Plan under Article VII.E thereof.

**M.     Bankruptcy Rule 3016**

14.     The Plan and all modifications thereto are dated and identify the entities submitting them, satisfying Bankruptcy Rule 3016(a). The Debtors appropriately filed the Plan and Disclosure Statement with the Court, satisfying Bankruptcy Rule 3016(b). The injunction, release, and exculpation provisions in the Plan and Disclosure Statement describe, in bold font and with specific and conspicuous language, all acts to be enjoined and identify the entities that will be subject to the injunction, satisfying Bankruptcy Rule 3016(c).

**N.      Burden of Proof**

15.      The Debtors, as proponents of the Plan, have met their burden of proving the applicable elements of sections 1129(a) and 1129(b) of the Bankruptcy Code by a preponderance of the evidence, the applicable evidentiary standard for confirmation. Further, to the extent applicable, the Debtors have proven the elements of sections 1129(a) and 1129(b) by clear and convincing evidence. Each witness who testified (by declaration, proffer, or otherwise) on behalf of the Debtors in connection with the Combined Hearing was credible, reliable, and qualified to testify as to the topics addressed in his or her testimony.

**O.      Compliance with the Requirements of Section 1129 of the Bankruptcy Code**

16.      Based on the following findings of fact and conclusions of law, the Plan, all pleadings, documents, exhibits, statements, declarations, and affidavits filed in connection with confirmation of the Plan, and all evidence and arguments made, proffered, or adduced at the Combined Hearing, all requirements for plan confirmation set forth in section 1129 of the Bankruptcy Code have been satisfied.

**1.      Section 1129(a)(1): Compliance with Applicable Provisions of the Bankruptcy Code**

17.      The Plan complies with all applicable provisions of the Bankruptcy Code, including sections 1122 and 1123, as required by section 1129(a)(1) of the Bankruptcy Code.

**a.      Sections 1122 and 1123(a)(1): Proper Classification**

18.      The Plan designates all Claims and Interests, other than the Claims of the type described in sections 507(a)(2), 507(a)(3), or 507(a)(8) of the Bankruptcy Code, into twenty-two Classes. The Claims or Interests in each designated Class have the same or substantially similar rights as the other Claims or Interests in such Class. Valid business, legal, and factual reasons exist for separately classifying the various Classes of Claims and Interests under the Plan. The

classifications were not promulgated for any improper purpose, and the creation of such Classes does not unfairly discriminate between or among Holders of Claims or Interests. The Plan, therefore, satisfies sections 1122 and 1123(a)(1) of the Bankruptcy Code.

### b. Section 1123(a)(2): Specification of Unimpaired Classes

19. The Plan specifies that Claims in Classes 1-A, 2-A, 1-B, and 2-B are Unimpaired (the "**Presumed Accepting Classes**") within the meaning of section 1124 of the Bankruptcy Code, thereby satisfying section 1123(a)(2) of the Bankruptcy Code.

### c. Section 1123(a)(3): Specification of Treatment of Impaired Classes

20. The Plan specifies that Claims or Interests in Classes 3-A, 4-A, 5-A, 6-A, 7-A, 8-A, 9-A, 10-A, 11-A, 3-B, 4-B, 5-B-1, 5-B-2, 6-B, 7-B, 8-B, 9-B, and 10-B are Impaired within the meaning of section 1124, and specifies the treatment of such Classes, thereby satisfying section 1123(a)(3) of the Bankruptcy Code.

### d. Section 1123(a)(4): No Disparate Treatment

21. The Plan provides for the same treatment for each Claim or Interest in each respective Class unless the Holder of a particular Claim or Interest has agreed to less favorable treatment on account of such Claim or Interest. Accordingly, the Plan satisfies section 1123(a)(4) of the Bankruptcy Code.

### e. Section 1123(a)(5): Adequate Means for Plan Implementation

22. The Plan, the various documents included in the Plan Supplement, and the terms of this Order provide adequate and proper means for the implementation of the Plan, including, among other things: (a) the deemed substantive consolidation of the Consolidated Debtors for the limited purposes of voting and distribution, as provided in the Plan; (b) the consummation of the Transition Procedures and the assignment and vesting of the Debtors' rights and obligations under the Transitions and the Sale Documents in the Plan Trust on the Effective Date; (c) the sources of

consideration for Distributions under the Plan, including proceeds of the DIP Facility or the Sale Transaction and distributions from the Plan Trust Assets; (d) the authorization and approval of all corporate and governance actions necessary to effectuate the actions contemplated by the Plan; (e) the cancellation of notes, instruments, certificates, and other documents evidencing Claims and Interests, except as otherwise provided in the Plan; and (f) the preservation, vesting, and enforcement of the Retained Estate Claims and Causes of Action by the Plan Administrator on behalf of the Plan Trust. Accordingly, the Plan satisfies the requirements of section 1123(a)(5) of the Bankruptcy Code.

### f. Section 1123(a)(7): Directors, Officers, and Trustees

23. In accordance with the Plan, the Plan Administrator will be selected and appointed by Brookfield and the Committee. The identity of the Plan Administrator will be disclosed in a Plan Supplement filed prior to the Effective Date. The Plan therefore satisfies the requirements of section 1123(a)(7) of the Bankruptcy Code.

### g. Sections 1123(a)(6) and 1123(a)(8): Inapplicable Provisions

24. The Plan does not provide for the issuance of new equity interests and, therefore, section 1123(a)(6) of the Bankruptcy Code is inapplicable. Additionally, none of the Debtors are individuals and, therefore, section 1123(a)(8) of the Bankruptcy Code is inapplicable.

### h. Section 1123(b): Discretionary Contents of the Plan

25. The Plan's discretionary provisions comply with section 1123(b) of the Bankruptcy Code and are not inconsistent with the applicable provisions of the Bankruptcy Code. The Plan therefore satisfies section 1123(b) of the Bankruptcy Code.

### 1. Impairment/Unimpairment of Any Class of Claims or Interests

26. In accordance with section 1123(b)(1) of the Bankruptcy Code, each Class of Claims and Interests is either Impaired or Unimpaired under the Plan.

**2. Assumption and Rejection of Executory Contracts and Unexpired Leases**

27.     In accordance with section 1123(b)(2) of the Bankruptcy Code, the Plan provides that, on the Effective Date, except as otherwise provided therein, each Executory Contract and Unexpired Lease not previously rejected, assumed, or assumed and assigned, including any employee benefit plans, severance plans, and other Executory Contracts under which employee obligations arise, shall be deemed automatically rejected pursuant to sections 365 and 1123 of the Bankruptcy Code effective as of the Effective Date, unless such Executory Contract or Unexpired Lease: (a) is subject to a motion (or a notice issued pursuant to a motion) to reject, assume, or assume and assign pending as of the Effective Date; (b) is a contract, instrument, release, or other agreement or document entered into in connection with the Plan; (c) is an Insurance Policy; (d) is a Sale Document; or (e) is subject to post-Effective Date assumption in accordance with the terms and conditions of the Sale Documents with the consent of the applicable non-Debtor counterparty or as otherwise permitted by the Asset Purchase Agreement (provided that, for the avoidance of doubt, in the absence of assumption of any such Executory Contract or Unexpired Lease in accordance with the terms and conditions of the Sale Documents, such Executory Contract or Unexpired Lease shall be deemed rejected as of the Effective Date, except as otherwise provided in the Plan).

28.     Neither the Plan nor this Order is intended to or shall be construed as limiting or otherwise prejudicing (a) the Debtors' authority under the Settlement Order to assume and assign Executory Contracts and Unexpired Leases to the Purchasers in accordance with the Asset Purchase Agreement or (b) the Purchaser's rights, or the Debtors' obligations, under the Asset Purchase Agreement.

29.     The Debtors' determinations regarding the assumption (or assumption and assignment) or rejection of Executory Contracts and Unexpired Leases are based on, and within, the sound business judgment of the Debtors, are necessary to the implementation of the Plan, and are in the best interests of the Debtors, their Estates, Holders of Claims and Interests, and other parties in interest in the Chapter 11 Cases. Entry of this Order by the Court shall constitute approval of such assumptions, assumptions and assignments, and/or rejections, as applicable, pursuant to sections 365(a) and 1123 of the Bankruptcy Code.

### 3.  Compromise and Settlement

30.     In accordance with section 1123(b)(3)(A) of the Bankruptcy Code, and in consideration for the Distributions, releases, and other benefits provided under the Plan, and with the support of the various creditors, stakeholders, and other parties in interest, including the Committee, upon the Effective Date, the provisions of the Plan constitute a good-faith compromise and settlement of all Claims, Interests, Causes of Action, as applicable, and controversies released, settled, compromised, or otherwise resolved pursuant to the Plan. Such settlements and compromises are fair, equitable, and reasonable and in the best interests of the Debtors, their Estates, and Holders of Claims and Interests.

### 4.  Preservation of Retained Estate Claims and Causes of Action

31.     In accordance with section 1123(b)(3)(B) of the Bankruptcy Code, the Plan provides that all Retained Estate Claims and Causes of Action that a Debtor may hold against any Entity shall be preserved and transferred to, and vest in, the Plan Trust in accordance with sections 1123(b) and 1141 of the Bankruptcy Code. The Plan and the Plan Supplement, including the Schedule of Retained Estate Claims and Causes of Action, provide adequate disclosure with respect to the Retained Estate Claims and Causes of Action that the Plan Trust shall retain. The Plan and Plan Supplement, including the descriptions of Retained Estate Claims and Causes of

Action as contained in the Plan and the Schedule of Retained Estate Claims and Causes of Action and potential defendants therein, are specific and unequivocal with respect to Causes of Action to be preserved and retained by the Plan Trust and comply with standards set forth in *Dynasty Oil & Gas, LLC v. Citizens Bank (In re United Operating, LLC)*, 540 F.3d 351, 355 (5th Cir. 2008) and its progeny. All parties in interest received adequate notice with respect to such Retained Estate Claims and Causes of Action. The provisions regarding Retained Estate Claims and Causes of Action in the Plan are appropriate and in the best interests of the Debtors, their respective Estates, and Holders of Claims and Interests.

32.     **No Person or Entity (other than the Released Parties) may rely on the absence of a specific reference in the Schedule of Retained Causes of Action, the Plan, the Plan Supplement, or the Disclosure Statement to any Cause of Action against it as any indication that the Debtors or the Plan Administrator, as applicable, will not pursue any and all available Causes of Action against it. The Debtors and the Plan Administrator expressly reserve all rights to prosecute any and all Causes of Action against any Person or Entity, except as otherwise expressly provided in the Plan.**

### 5.   Debtor Release

33.     Article XII.B of the Plan (the "**Debtor Release**") describes certain releases granted by the Debtors and their Estates. The Debtor Release represents a valid exercise of the Debtors' business judgment and is the result of a good-faith and arm's-length negotiation between sophisticated parties that had representation from able counsel and advisors. Such releases are a necessary and integral element of the Plan, and are fair, reasonable, and in the best interests of the Debtors, their Estates, and Holders of Claims and Interests. Entry of this Order shall constitute the Court's approval, pursuant to Bankruptcy Rule 9019, of the Debtor Release, and shall further constitute the Court's finding that the Debtor Release is: (a) in exchange for the good and valuable

consideration provided by the Released Parties; (b) a good-faith settlement and compromise of the Claims released by the Debtor Release; (c) given and made after due notice and opportunity for hearing; (d) appropriately tailored under the facts and circumstances of the Chapter 11 Cases; and (e) a bar to any of the Debtors and their Estates asserting any Cause of Action released by the Debtor Release against the Released Parties or their property. Accordingly, the Debtor Release is approved.

34.     The Debtors have satisfied their burden with respect to the propriety of the Debtor Release. The Debtor Release appropriately offers protection to parties that provided consideration to the Debtors and that participated in the Debtors' restructuring process. The Released Parties made significant concessions and contributions to the Chapter 11 Cases, including by actively supporting the Sale Transaction, the Plan, and the Chapter 11 Cases. The scope of the Debtor Release is appropriately tailored under the facts and circumstances of the Chapter 11 Cases and the Debtor Release is given and made after due notice and opportunity for hearing.

**6.   Release by Holders of Claims and Interests**

35.     Article XII.C of the Plan (the "**Third-Party Release**") describes certain releases granted by the Releasing Parties to the Released Parties, which include: (a) each Third-party Released Party; (b) Brookfield, (c) the DIP Lenders; (d) the DIP Agent; (e) the Project Companies; (f) Backleverage; (g) G-I; (h) GAF; (i) Vision Ridge; (j) M&T; (k) DFO; (l) the Owner 3 Parties; (m) SunStrong; (n) the Committee; (o) the Committee Members; (p) the Purchaser; and (q) each Related Party of each Entity in clauses (b) through (p); provided that any holder of a Claim or Interest that opts out of the releases shall not be a Released Party.

36.     Notwithstanding anything to the contrary in the Plan Documents, the Holders of Claims and Interests in Classes 9-A, 10-A, 11-A, 8-B, 9-B, and 10-B shall not constitute Releasing Parties or Released Parties and shall not be bound by nor entitled to the benefit of the Third-Party

Release in their capacities as such. Within three (3) Business Days following entry of this Order, the Debtors shall serve the Affirmative Consent Notice (as defined hereinafter) on Holders of Claims and Interests in such Classes describing the procedures and deadline for submitting an Affirmative Consent Notice to Third-Party Release (each, a "**Notice of Consent**"). Any Holder of a Claim or Interest in such Classes that affirmatively elects to grant and receive the Third-Party Release must file a Notice of Consent with the Court no later than ten (10) Business Days after service of the Affirmative Consent Notice. Any Holder in such Classes that does not timely file a Notice of Consent shall not constitute a Releasing Party or Released Party and shall neither grant nor receive the Third-Party Release in its capacity as such.

37.     The Releasing Parties were provided proper and sufficient notice of the Plan, the Third-Party Release, and the Plan and Disclosure Statement Objection Deadline through the service of the Solicitation Materials, the Schedule of Third-party Released Parties, and the publication of the Publication Notice in the national edition of *The New York Times (National Edition)* and the *Houston Chronicle* on February 4, 2026. No further notice is necessary. The Plan, the Ballot, the Notices of Non-Voting Status, and the Combined Hearing Notice each included the Third Party Release provision in conspicuous, boldface type, and the Ballot and Notices of Non-Voting Status informed Holders of Claims or Interests in the Debtors that they would be deemed to have consented to the Third Party Release if they did not (a) timely return the Opt-Out Form included in the Ballot and Notices of Non-Voting Status by the Voting Deadline or (b) object to their inclusion as a Releasing Party by the Plan and Disclosure Statement Objection Deadline. The Plan provides appropriate and specific disclosure with respect to the claims and Causes of Action that are subject to the Third-Party Release, and no other disclosure is necessary. The Third-Party Release is specific in language, integral to the Plan, and given for substantial consideration.

38.    The Third-Party Release is (a) consensual with respect to the Releasing Parties, (b) an essential provision of the Plan, (c) given in exchange for the good and valuable consideration provided by the Released Parties, (d) a good-faith settlement and compromise of the Causes of Action released by the Third-Party Release, (e) materially beneficial to, and in the best interests of, the Debtors, their Estates, and their stakeholders, and important to the overall objectives of the Plan to finally resolve certain Cause of Actions among or against certain parties in interest in the Chapter 11 Cases, (f) fair, equitable, and reasonable, (g) given and made after due notice and opportunity for hearing, (h) a bar to any of the Releasing Parties asserting any Cause of Action released by the Third-Party Release against any of the Released Parties or their property, and (i) consistent with sections 105, 524, 1123, 1129, and 1141 and other applicable provisions of the Bankruptcy Code. Accordingly, the Third-Party Release is approved.

### 7.  Exculpation

39.    The exculpation set forth in Article XII.D of the Plan (the "**Exculpation**") is appropriate under applicable law, including *In re Highland Capital Mgmt., L.P.*, 48 F. 4th 419 (5th Cir. 2022), because it was proposed in good faith, was formulated following extensive good-faith, arm's-length negotiations with key constituents, and is appropriately limited in scope. Without limiting anything in the Exculpation, each Exculpated Party has participated in the Chapter 11 Cases in good faith and is appropriately released and exculpated from any Cause of Action for any claim related to any act or omission occurring on or after the Petition Date and before the Effective Date in connection with, relating to, or arising out of the Chapter 11 Cases before the Effective Date, the Debtors (including management, ownership, or operation thereof), the Debtors' restructuring efforts, intercompany transactions, the formulation, preparation, dissemination, negotiation, filing, pursuit, performance, or consummation of the Chapter 11 Cases (including, without limitation, any payments, distributions or transfers in connection therewith), the Plan and

Disclosure Statement, the Settlement, the Transitions, the DIP Facility, the DIP Loan Documents, the DIP Credit Bid, the Sale Transaction, the Sale Documents, or any contract, instrument, release or other Plan Document, agreement, or document created or entered into in connection with the Plan and Disclosure Statement, the Settlement, the Transitions, the DIP Facility, the DIP Loan Documents, the DIP Credit Bid, the Sale Transaction, the Chapter 11 Cases, Confirmation, or Consummation, the administration and implementation of the Plan, including the distribution of property under the Plan or any other related agreement, any payments, distributions, or transfers made by the Debtors during the Chapter 11 Cases, any settlement or agreement in the Chapter 11 Cases or upon the negotiations regarding or concerning any of the foregoing or any other act or omission, transaction, agreement, event, or other occurrence relating to the foregoing taking place on or after the Petition Date and before the Effective Date, except for claims related to any act or omission that is determined in a Final Order to have constituted actual fraud, willful misconduct, a criminal act, or gross negligence, but in all respects such Entities shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities pursuant to the Plan. The Exculpated Parties have, and upon completion of the Plan shall be deemed to have, participated in good faith and in compliance with the applicable laws with regard to the solicitation of votes and Distribution of consideration pursuant to the Plan and, therefore, are not, and on account of such Distributions shall not be, liable at any time for the violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan or such distributions made pursuant to the Plan. Notwithstanding anything to the contrary in the foregoing, the exculpation set forth above does not exculpate any obligations arising on or after the Effective Date of any party or Entity under the Plan, this Order, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan.

### 8. Injunction

40. The injunction provisions set forth in Article XII.E of the Plan (the "**Injunction**") are essential to the Plan and are necessary to implement the Plan and to preserve and enforce the Debtor Release, the Third-Party Release, and the Exculpation. The Injunction is appropriately tailored to achieve those purposes and is, therefore, approved.

### 9. Additional Plan Provisions

41. The other discretionary provisions in the Plan, including the Plan Supplement, are appropriate and consistent with applicable provisions of the Bankruptcy Code, including, without limitation, the retention of Court jurisdiction.

### 2. Section 1129(a)(2): Compliance of the Debtors and Others with the Applicable Provisions of the Bankruptcy Code

42. The Debtors, as proponents of the Plan, have complied with all applicable provisions of the Bankruptcy Code as required by section 1129(a)(2) of the Bankruptcy Code, including sections 1122, 1123, 1124, 1125, 1126, 1128, and 1129, and with Bankruptcy Rules 2002, 3017, 3018, and 3019. The Debtors and their respective Professionals and their agents transmitted the Solicitation Materials and related documents and solicited and tabulated votes with respect to the Plan fairly, in good faith, and in compliance with the Disclosure Statement Order, the Solicitation Procedures, the Bankruptcy Code, the Bankruptcy Rules, the Bankruptcy Local Rules, and the Complex Case Procedures, including, but not limited to, sections 1125 and 1126(b) of the Bankruptcy Code.

### 3. Section 1129(a)(3): Proposal of Plan in Good Faith

43. The Plan is the product of the open, honest, and good faith process through which the Debtors and their respective Professionals have conducted the Chapter 11 Cases and reflects extensive, good faith, arm's length negotiations among the Debtors, the Committee, and the

Debtors' key economic stakeholders. The Plan itself and the process leading to its formulation provide independent evidence of the good faith of the Debtors and their respective Professionals, serve the public interest, and assure fair treatment of Holders of Claims. In addition to achieving a result consistent with the objectives of the Bankruptcy Code, the Plan allows the Debtors' economic stakeholders to realize the highest possible recoveries under the circumstances. Consistent with the overriding purpose of the Bankruptcy Code, the Chapter 11 Cases were filed and the Plan was proposed with the legitimate and honest purpose of maximizing the value of the Debtors' Estates. Accordingly, the Plan is fair, reasonable, and consistent with sections 1122, 1123, and 1129 of the Bankruptcy Code. Based on the foregoing, as well as the facts and record of the Chapter 11 Cases, including, but not limited to, the Combined Hearing, the Plan has been proposed in good faith and not by any means forbidden by law, thereby satisfying section 1129(a)(3) of the Bankruptcy Code.

4. **Section 1129(a)(4): Court Approval of Certain Payments as Reasonable**

44. All payments made or to be made by the Debtors for services or for costs and expenses in connection with the Chapter 11 Cases, or in connection with the Plan and incident to the Chapter 11 Cases, have been authorized by, approved by, or are subject to the approval of, the Court as reasonable, thereby satisfying section 1129(a)(4) of the Bankruptcy Code.

5. **Section 1129(a)(5): Service of Certain Individuals**

45. The Plan provides that, on the Effective Date, the authority, power, and incumbency of the persons acting as directors and officers of each of the Debtors shall be deemed to have been terminated and such persons shall be deemed to have resigned, solely in their capacities as such, and the Plan Administrator shall be appointed by each Debtor as the sole director and the sole officer of the Debtors and shall succeed to the powers of such Debtor's directors and officers. The Plan further provides for the appointment of the Plan Administrator to administer the Plan Trust

22

in accordance with the Plan and the Plan Trust Agreement. The Plan Administrator was designated by Brookfield and the Committee.

46.      The Plan Administrator was selected in a manner consistent with the interests of Holders of Claims and Interests and with public policy. The Debtors adequately disclosed the identity of the Plan Administrator in the Plan Supplement. Accordingly, the Plan satisfies the requirements of section 1129(a)(5) of the Bankruptcy Code.

**6.         Section 1129(a)(6): Rate Changes**

47.      The Plan does not provide for any rate changes over which a governmental regulatory commission has jurisdiction, and, accordingly, section 1129(a)(6) of the Bankruptcy Code is inapplicable to the Plan.

**7.         Section 1129(a)(7): Best Interests of Holders of Claims and Interests**

48.      Each Holder of a Claim or Interest either (a) has voted to accept the Plan, (b) is Unimpaired and deemed to have accepted the Plan, or (c) shall receive or retain under the Plan, on account of such Claim or Interest, property of a value, as of the Effective Date of the Plan, that is not less than the amount that such Holder would receive or retain if the Debtors were to be liquidated under chapter 7 of the Bankruptcy Code. In addition, the liquidation analysis attached as Exhibit A to the Plan and Disclosure Statement (the "**Liquidation Analysis**"), as well as the other evidence related thereto in support of the Plan that was proffered or adduced at or prior to the Combined Hearing, (a) is reasonable, persuasive, credible, and accurate as of the dates such analysis or evidence was proffered, adduced, and/or presented, (b) utilizes reasonable and appropriate methodologies and assumptions, (c) has not been controverted by other evidence, and (d) establishes that, with respect to each Impaired Class of Claims or Interests, each Holder of an Allowed Claim or Interest in such Class, unless otherwise agreed to by such Holder, shall receive under the Plan on account of such Allowed Claim or Interest property of a value, as of the Effective

Date, that is not less than the amount such Holder would receive if the Debtors were liquidated on the Effective Date under chapter 7 of the Bankruptcy Code.

49.    Accordingly, the Debtors have satisfied the requirements of section 1129(a)(7) of the Bankruptcy Code.

**8.    Section 1129(a)(8): Acceptance by Certain Classes**

50.    The Presumed Accepting Classes are Unimpaired under the Plan and are deemed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. The Voting Classes are Impaired under the Plan and have either voted to accept, or abstained from voting and are thus deemed to accept, the Plan at each Debtor entity. Accordingly, section 1129(a)(8) of the Bankruptcy Code has been satisfied with respect to the Presumed Accepting Classes and the Voting Classes.

51.    Claims and Interests in Classes 9-A, 10-A, 11-A, 8-B, 9-B, and 10-B are Impaired under the Plan and deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code (the "**Deemed Rejecting Classes**"). Although section 1129(a)(8) of the Bankruptcy Code has not been satisfied with respect to the Deemed Rejecting Classes, the Plan is confirmable because the Plan does not discriminate unfairly and is fair and equitable with respect to the Deemed Rejecting Classes and, thus, satisfies section 1129(b) of the Bankruptcy Code with respect to such Class as described further below.

**9.    Section 1129(a)(9): Treatment of Claims Entitled to Priority Pursuant to Section 507(a) of the Bankruptcy Code**

52.    The treatment of Administrative Claims, Professional Fee Claims, and Priority Tax Claims under the Plan satisfies the requirements of and complies in all respects with section 1129(a)(9) of the Bankruptcy Code.

**10.     Section 1129(a)(10): Acceptance by Impaired Class**

53.     As evidenced by the Voting Report, without including any acceptance of the Plan by any insider (as defined in the Bankruptcy Code), Holders of Claims in each of the Voting Classes voted to accept, or abstained from voting and are thus deemed to accept, the Plan at each Debtor entity in accordance with section 1126(c) of the Bankruptcy Code. As such, with respect to each Debtor's Plan, there is at least one Impaired Class of Claims that has accepted the Plan and, therefore, section 1129(a)(10) of the Bankruptcy Code has been satisfied.

**11.     Section 1129(a)(11): Feasibility of the Plan**

54.     The evidence supporting the Plan proffered or adduced by the Debtors at or before the Combined Hearing: (a) is reasonable, persuasive, credible, and accurate as of the dates such evidence was prepared, presented, or proffered; (b) has not been controverted by other persuasive evidence; (c) establishes that the Plan is feasible and confirmation of the Plan is not likely to be followed by liquidation (other than as contemplated by the Plan) or the need for further financial reorganization; and (d) establishes that the Debtors will have sufficient funds available to meet their obligations under the Plan. Accordingly, the Plan satisfies section 1129(a)(11) of the Bankruptcy Code.

**12.     Section 1129(a)(12): Payment of Statutory Fees**

55.     The Plan provides for the payment of all fees payable under section 1930 of title 28 of the United States Code in accordance with section 1129(a)(12) of the Bankruptcy Code.

**13.     Sections 1129(a)(13), (14), (15), and (16): Inapplicable Provisions**

56.     Section 1129(a)(13) is inapplicable because the Debtors do not maintain any retirement benefits as defined in section 1114 of the Bankruptcy Code. Section 1129(a)(14) is inapplicable because the Debtors are not required to pay domestic support obligations pursuant to a judicial or administrative order or statute. Section 1129(a)(15) is inapplicable because the

25

Debtors are not individuals under the Bankruptcy Code. Section 1129(a)(16) of the Bankruptcy Code is inapplicable because the Debtors are not nonprofit entities or trusts.

**14.      Section 1129(b): No Unfair Discrimination; Fair and Equitable**

57.      Based upon the record before the Court and the treatment provided on account of such Interests, (a) the Plan does not discriminate unfairly against, and is fair and equitable with respect to, such Class of Interests and (b) the Plan satisfies all the requirements for confirmation set forth in section 1129(a) of the Bankruptcy Code, except for section 1129(a)(8) of the Bankruptcy Code. The evidence in support of confirmation of the Plan proffered or adduced by the Debtors at, or prior to, or in declarations filed in connection with, the Combined Hearing regarding the Debtors' classification and treatment of Claims and Interests and the requirements for confirmation of the Plan under section 1129(b) of the Bankruptcy Code (x) is reasonable, persuasive, credible, and accurate, (y) utilizes reasonable and appropriate methodologies and assumptions, and (z) has not been controverted by other credible evidence. Accordingly, the Plan satisfies section 1129(b) of the Bankruptcy Code with respect to the Deemed Rejecting Classes.

**15.      Section 1129(c): Only One Plan**

58.      The Plan is the only plan filed in the Chapter 11 Cases and, accordingly, satisfies section 1129(c) of the Bankruptcy Code.

**16.      Section 1129(d): Principal Purpose of the Plan Is Not Avoidance of Taxes or Section 5 of the Securities Act**

59.      The principal purpose of the Plan is not the avoidance of taxes or the avoidance of the application of section 5 of the Securities Act, thereby satisfying the requirements of section 1129(d) of the Bankruptcy Code.

**17.      Section 1129(e): Not Small Business Cases**

60.      The Chapter 11 Cases are not small business cases and, accordingly, section 1129(e) of the Bankruptcy Code is inapplicable to the Chapter 11 Cases.

**P.      Good Faith**

61.      The Debtors, the Committee, each Committee Member, the Exculpated Parties, Brookfield, the DIP Lenders, the Purchasers, the Owner 3 Parties, their respective officers (including the Debtors' Co-Chief Restructuring Officers), directors, employees, attorneys, accountants, investment bankers, financial advisors, consultants, and other Professionals have acted in "good faith" within the meaning of section 1125(e) of the Bankruptcy Code and in compliance with the applicable provisions of the Bankruptcy Code, the Bankruptcy Rules, the Bankruptcy Local Rules, and the Complex Case Procedures in connection with all of their respective activities relating to support and consummation of the Plan, including the solicitation of acceptances of the Plan, their participation in the Chapter 11 Cases, and the activities described in section 1125 of the Bankruptcy Code, and are entitled to the protections afforded by section 1125(e) of the Bankruptcy Code.

**Q.      Implementation**

62.      All documents and agreements necessary to implement the transactions contemplated by the Plan, including those contained or summarized in the Plan Supplement, and all other relevant and necessary documents have been negotiated in good faith and at arm's length, are in the best interests of the Debtors, the Estates, and Holders of Claims and Interests, and shall, upon completion of documentation and execution, be valid, binding, and enforceable documents and agreements not in conflict with any federal, state, or local law. Such documents and agreements are essential elements of the Plan, and entry into and consummation of the transactions contemplated by each such document or agreement is in the best interests of the Debtors, their

Estates, and Holders of Claims and Interests. The Debtors have exercised reasonable business judgment in determining which documents and agreements to enter into and have provided sufficient and adequate notice of such documents and agreements. The Debtors and the Plan Administrator, as applicable, are authorized to take any action reasonably necessary or appropriate to implement, effectuate and consummate the Plan, the documents and agreements necessary to implement the Plan, this Order and the transactions contemplated thereby or hereby, and including performance under the Plan Trust Agreement and Sale Documents.

## ORDER

**BASED ON THE FOREGOING FINDINGS OF FACT AND CONCLUSIONS OF LAW, IT IS THEREFORE ORDERED, ADJUDGED, AND DECREED THAT:**

**A.** **Findings of Fact and Conclusions Law**

63.     The above-referenced findings of fact and conclusions of law are hereby incorporated by reference as though fully set forth herein and constitute findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052, made applicable by Bankruptcy Rule 9014. To the extent that any finding of fact is determined to be a conclusion of law, it is deemed so, and vice versa.

**B.** **Approval of the Disclosure Statement**

64.     The Disclosure Statement is approved on a final basis as containing adequate information pursuant to section 1125 of the Bankruptcy Code and sufficient information of a kind necessary to satisfy the disclosure requirements of any applicable non-bankruptcy laws, rules, and regulations.

**C.** **Confirmation of the Plan**

65.     The Plan, attached hereto as **Exhibit A**, including (a) all modifications to the Plan filed with the Court prior to or during the Combined Hearing and (b) all documents incorporated

into the Plan through the Plan Supplement, is approved in its entirety, as modified herein, and confirmed pursuant to section 1129 of the Bankruptcy Code. All terms of the Plan and the Plan Supplement are incorporated herein by reference and are an integral part of this Order. The failure to specifically include or refer to any particular article, section, or provision of the Plan, the Plan Supplement, or any related document in this Order does not diminish or impair the effectiveness or enforceability of such article, section, or provision.

## D.     Objections Overruled

66.     All objections, responses, statements, reservation of rights, and comments in opposition, if any, to final approval of the Disclosure Statement or confirmation of the Plan that have not been withdrawn, waived, settled, resolved prior to the Combined Hearing, or otherwise resolved on the record of the Combined Hearing or in this Order are hereby overruled and denied on the merits, with prejudice. All objections to the entry of this Order or to the relief granted herein that were not timely filed and served prior to the Plan and Disclosure Statement Objection Deadline are deemed waived and forever barred.

## E.     Plan Transactions

67.     All of the transactions contemplated by the Plan and the Plan Supplement are hereby approved. The Debtors and the Plan Administrator are authorized to and may issue, execute, deliver, file, or record such contracts, instruments, releases, and other agreements or documents and take such actions as may be necessary or appropriate to effectuate, implement and evidence the terms and conditions of the Plan, including the Plan Supplement, in each case, in the name of and on behalf of the Debtors and the Plan Trust Beneficiaries, as applicable, without the need for any approvals, authorization or consents except those expressly required pursuant to the Plan.

29

68.     The entry of this Order shall constitute authorization for the Debtors and the Plan Administrator, as applicable, to take or cause to be taken all corporate actions necessary or appropriate to implement all provisions of, and to consummate, the Plan, including the Plan Supplement, prior to, on and after the Effective Date and all such actions taken or caused to be taken shall be deemed to have been authorized and approved by this Court without the need for further approval, act or action under any applicable law, order, rule or regulation. Notwithstanding any requirement under non-bankruptcy law, all matters provided for in the Plan, including the Plan Supplement, or deemed necessary or desirable by the Debtors or the Plan Administrator, as applicable, before, on, or after the Effective Date involving the corporate structure of the Debtors, including the dissolution of the Debtors and any non-Debtor subsidiaries, and all actions authorized to be taken pursuant to the Plan shall be deemed to have occurred and shall be in effect on the Effective Date or as otherwise provided under the Plan, without any requirement of or further action by the equity holders, directors, managers, members, or officers of the Debtors and without further application to, or order of, the Court.

## F.     Recourse Solely to Plan Trust Assets

69.     As of the Effective Date, each Claim against the Debtors shall be deemed satisfied, settled, and released as to the Debtors as provided with respect to each such Claim under the Plan and, except as otherwise set forth in the Plan or other Final Orders of the Bankruptcy Court, any Holder of an Allowed or Disputed Claim against the Debtors will have recourse solely to the Plan Trust Assets for the payment of any such Claim that is Allowed or becomes Allowed in accordance with the Plan and the Plan Trust Agreement; *provided*, *however*, the recovery provided to any Holder of a Claim that is Allowed or becomes Allowed shall be limited to and consistent with the terms of the Plan.

**G.      Corporate Existence**

70.      On and after the Effective Date, except as otherwise provided in the Plan and subject to the Plan Trust Agreement, the Plan Trust (or the Plan Administrator) may operate its business in accordance with applicable Law and may use, acquire, or dispose of property and compromise or settle any Claims, Interests, or Causes of Action without supervision or approval by the Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules.

**H.      Dissolution of Certain Debtors**

71.      One or more of the Debtors shall continue in existence after the Effective Date for purposes including (1) contributing the Retained Estate Claims and Causes of Action to the Plan Trust; (2) transferring the Debtors' books and records to the Plan Trust and preserving all financial books and records, emails, and other financial documents relating to the Debtors' business that are in the Debtors' possession; (3) winding down the Debtors' remaining businesses and affairs as expeditiously as reasonably possible and liquidating any assets held by the Debtors after the Effective Date; and (4) facilitating the administration of the Plan in an efficacious manner. As of the Effective Date, any ownership interests of the Debtors in subsidiaries that were not purchased by the Purchaser pursuant to the Sale Transaction and not considered as Plan Trust Assets shall be deemed abandoned by the Estates for purposes of the Plan and shall not constitute Plan Trust Assets, provided that nothing herein shall impair, modify, or otherwise affect the rights and remedies of any secured party with respect to such interests.

72.      Except as otherwise provided in the Plan or the Plan Supplement, or any agreement, instrument, or other document incorporated therein, each Debtor shall continue to exist after the Effective Date as a separate corporate entity, limited liability company, partnership, or other form, as the case may be, with all the powers of a corporation, limited liability company, partnership, or other form, as the case may be, pursuant to the applicable law in the jurisdiction in which each

applicable Debtor is incorporated or formed and pursuant to the respective certificate of incorporation and bylaws (or other formation documents) in effect prior to the Effective Date, except to the extent such certificate of incorporation and bylaws (or other formation documents) are amended under the Plan or otherwise, and to the extent such documents are amended, such documents are deemed to be amended pursuant to the Plan and require no further action or approval (other than any requisite filings required under applicable state, provincial, or federal law).

73.     After the Effective Date, one or more of the Debtors or non-Debtor subsidiaries of the Debtors (other than Backleverage Holdco and its subsidiaries without Brookfield's consent) may be disposed of, dissolved, wound down, or liquidated without supervision or approval by the Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules.

**I.      Debtors' Directors and Officers; Plan Administrator**

74.     The appointment of the Plan Administrator in accordance with the Plan Trust Agreement is approved in all respects and the Plan Administrator is authorized to carry out all rights and duties set forth in the Plan and the Plan Trust Agreement as of the Effective Date. On the Effective Date, other than the Plan Administrator and any other personnel retained by the Plan Administrator, all directors, managers, members, officers, and employees of the Debtors shall be deemed to have resigned. On and after the Effective Date, except as otherwise provided in the Plan and the Plan Trust Agreement, the Plan Administrator shall serve as the Debtors' sole director, manager, officer, and member, as applicable, and shall have sole authority to act on behalf of the Debtors with respect to winding down the Debtors and their Estates and liquidating the Plan Trust Assets and distributing the proceeds thereof to the Plan Trust Beneficiaries in accordance with the terms of the Plan and Plan Trust Agreement. The certificates of formation, operating agreements, articles of incorporation, and other organizational or governing documents of the Debtors shall be deemed amended by the Plan (a) to permit and authorize the appointment of the Plan Administrator

32

in accordance with the Plan and (b) to provide the Plan Administrator with the same rights as any member, employee, officer or manager of the applicable Debtor as of immediately prior to the Effective Date under its organizational or governing documents.

75.     The Plan Administrator shall administer the distributions to the Plan Trust Beneficiaries and shall serve as a representative of the Estates under section 1123(b) of the Bankruptcy Code for purposes including (1) enforcing Retained Estate Claims and Causes of Action belonging to the Estates that are not released, waived, settled, compromised, or transferred pursuant to the Plan and subject to the limitations set forth in the Plan; (2) resolving any Disputed claims; (3) filing appropriate tax returns; and (4) winding down the Estates.

**J.      Exemption from Transfer Tax and Recording Fees**

76.     Pursuant to section 1146(a) of the Bankruptcy Code, any transfer of property pursuant to or in connection with the Plan, shall not be subject to any stamp, real estate transfer, mortgage recording, sales, use or other similar tax or assessment. This Order hereby directs the appropriate federal, state, or local governmental officials or agents to forego the collection of any such tax or governmental assessment and to accept for filing and recordation any of the instruments or documents filed or recorded pursuant to the Plan without payment of any such tax or governmental assessment.

**K.      Preservation of Retained Estate Claims and Causes of Action**

77.     Except as provided in the Plan, this Order, or in any contract, instrument, release, or other agreement entered into or delivered in connection with the Plan, in accordance with section 1123(b) of the Bankruptcy Code, the Plan Administrator will retain and may enforce any Retained Estate Claim and Causes of Action that any Estate may hold against any Entity. The Plan Administrator may pursue any such Retained Estate Claim and Causes of Action in accordance with the Plan and the Plan Trust Agreement. The Debtors' or the Plan Administrator's inclusion

33

or failure to include or describe with sufficient specificity any Retained Estate Claim and Causes of Action on the Schedule of Retained Estate Claim and Causes of Action shall not be deemed an admission, denial or waiver of any Retained Estate Claim and Causes of Action that the Debtors, the Plan Trust, or the Estates may hold. No preclusion doctrine, including, without limitation, the doctrines of *res judicata*, collateral estoppel, issue preclusion, claim preclusion, waiver, estoppel (judicial, equitable or otherwise) or laches will apply to the Retained Estate Claim and Causes of Action upon or after the entry of this Order or the Effective Date of the Plan based on the Plan or this Order.

**L.      Cancellation of Notes, Instruments, Certificates, and Other Documents**

78.      Except as provided in (a) the Plan, (b) this Order, (c) any contract, instrument or other agreement or document entered into or delivered in connection with the Plan, (d) the Transaction Approval Orders, or (e) any agreement, instrument, or other document entered into in connection with or pursuant to the Plan, on the Effective Date, all notes, instruments, certificates, and other documents evidencing Claims against or Interests in the Debtors shall be deemed canceled and surrendered and of no further force and effect against the Debtors.

**M.      Treatment of Executory Contracts and Unexpired Leases**

79.      On the Effective Date, except as otherwise provided in the Plan, each Executory Contract and Unexpired Lease not previously rejected, assumed, or assumed and assigned, including any employee benefit plans, severance plans, and other Executory Contracts under which employee obligations arise, shall be deemed automatically rejected pursuant to sections 365 and 1123 of the Bankruptcy Code effective as of the Effective Date, unless such Executory Contract or Unexpired Lease: (a) is subject to a motion (or a notice issued pursuant to a motion) to reject, assume, or assume and assign pending as of the Effective Date; (b) is a contract, instrument, release, or other agreement or document entered into in connection with the Plan; (c) is an

Insurance Policy; (d) is a Sale Document; or (e) is subject to post-Effective Date assumption in accordance with the terms and conditions of the Sale Documents with the consent of the applicable non-Debtor counterparty or as otherwise permitted by the Asset Purchase Agreement (provided that, for the avoidance of doubt, in the absence of assumption of any such Executory Contract or Unexpired Lease in accordance with the terms and conditions of the Sale Documents, such Executory Contract or Unexpired Lease shall be deemed rejected as of the Effective Date, except as otherwise provided in the Plan).

**N.      Insurance Policies**

80.      Notwithstanding anything to the contrary in the Plan and Disclosure Statement, this Order, the Plan Trust Agreement, any bar date notice or claim objection, any other document related to any of the foregoing or any other order of the Court (including, without limitation, any other provision that purports to be preemptory or supervening, grants an injunction, discharge, or release, confers Court jurisdiction, or requires a party to opt out of any releases):

a.      on the Effective Date, the D&O Liability Insurance Policies shall be deemed to be and treated as Executory Contracts that have been assumed by the applicable Debtors and shall continue in full force and effect thereafter in accordance with their respective terms and vest in the Plan Trust;

b.      on and after the Effective Date, all members, managers, directors, and officers of the Debtors who served in such capacity at any time prior to the Effective Date shall be entitled to the full benefits of any such D&O Liability Insurance Policies for the full term of such policy, subject to and in accordance with the terms and conditions of such D&O Liability Insurance Policies in all respects, and the Plan Administrator's management of the D&O Liability Insurance Policies shall not affect the rights of (i) Entities covered by the D&O Liability Insurance Policies to pursue coverage under such policies, or (ii) Entities eligible to recover from the D&O Liability Insurance Policies to pursue recovery from such policies;

c.      the terms and conditions thereof and all legal, equitable or contractual rights, obligations, and defenses of the Insurers, the Debtors, and any other individual or entity, as applicable, under any Insurance Policies, whether arising before or after the Effective Date, shall survive and shall not be amended, modified, waived, released, discharged or impaired in any respect, and all such rights and obligations shall be determined under the

Insurance Policies and applicable non-bankruptcy law as if the Chapter 11 Cases had not occurred;

d.        nothing shall permit or otherwise effectuate a sale, assignment or other transfer of any Insurance Policy and/or any rights, benefits, claims, proceeds, rights to payment, or recoveries under and/or relating to any Insurance Policy without the prior express written consent of the applicable Insurer; and

e.        the automatic stay of section 362(a) of the Bankruptcy Code and the injunctions set forth in Article XII.E of the Plan and Disclosure Statement, if and to the extent applicable, shall be deemed lifted without further order of this Court, solely to permit: (i) the Insurers to administer, handle, defend, settle, and/or pay, in the ordinary course of business and without further order of this Court, (A) claims where a claimant has been granted relief to proceed with their claims pursuant to the Plan and Disclosure Statement, this Order, or by any other order of the Court and (B) all costs in relation to each of the foregoing; and (ii) Insurers to take other actions relating to the Insurance Policies in the ordinary course of business (including effectuating a setoff) permitted under the Insurance Policies and/or applicable non-bankruptcy law; *provided*, *however*, that each applicable Insurer is prohibited from, and this Order shall be deemed an injunction against, denying, refusing, altering, or delaying coverage on any basis regarding or related to the Chapter 11 Cases, the Plan or any provision within the Plan, including the treatment or means of liquidation set out within the Plan for any insured Claim or Causes of Action.

## O.    Settlement and Compromise

81.    Pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, and in consideration for the classification, Distributions, releases, and other benefits provided under the Plan, on the Effective Date, the provisions of the Plan shall constitute a good-faith compromise and settlement of all Claims, Interests, Causes of Action, and controversies released, settled, compromised, or otherwise resolved pursuant to the Plan. The Plan shall be deemed a motion to approve the good-faith compromise and settlement of all such Claims, Interests, Causes of Action, and controversies pursuant to Bankruptcy Rule 9019, and the entry of this Order shall constitute the Court's approval of such compromise and settlement, under section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, as well as a finding by the Court that such settlement and compromise is fair, equitable, reasonable, and in the best interests of the Debtors and their Estates because, among other things, (a) each such settlement reflects a reasonable balance between the

36

possible success of litigation with respect to each of the settled claims and disputes, on the one hand, and the benefits of fully and finally resolving such claims and disputes and allowing the Debtors to expeditiously consummate the Plan, on the other hand; (b) absent such settlements, there is a likelihood of complex and protracted litigation involving the attendance expense, inconvenience, and delay that have a possibility to detail the Debtors' chapter 11 objectives and efforts; (c) each of the parties supporting such settlements is represented by counsel that is recognized as being knowledgeable, competent, and experienced; (d) such settlements are the product of arm's-length bargaining and good faith negotiations between sophisticated parties; and (e) such settlements are fair, equitable, reasonable, and in the best interests of the Debtors, the Estates, and other parties in interest and are essential to the successful implementation of the Plan. Subject to the terms of the Plan, all Distributions made to Holders of Allowed Claims in any Class are intended to be and shall be final.

**P.      The Releases, Injunction, Exculpation, and Related Provisions Under the Plan**

82.      The releases, exculpations, injunction and related provisions set forth in Article XII, including Articles XII.B, XII.C, XII.D, XII.E, and XII.G, of the Plan are incorporated herein in their entirety, are hereby approved and authorized in all respects, are so ordered, and shall be immediately effective on the Effective Date without further order or action on the part of this Court or any other party.

**1.      Releases by the Debtors (Article XII.B)**

83.      **Except as otherwise specifically provided in the Plan, as of the Effective Date, pursuant to section 1123(b) of the Bankruptcy Code, for good and valuable consideration, the adequacy of which is hereby confirmed, each Released Party and each Debtor Released Party is, and is deemed to be, hereby conclusively, absolutely, unconditionally, irrevocably, and forever released and discharged by the Debtors and their Estates, and any and all other**

37

**Entities who may purport to assert any Claims or Causes of Action, directly or derivatively, by, through, for, or because of the Debtors or their Estates, from any and all Claims, Interests, obligations, rights, suits, damages, Causes of Action, remedies, and liabilities whatsoever, including any derivative claims, asserted or assertable on behalf of the Debtors or their Estates, as applicable, whether known or unknown, foreseen or unforeseen, matured or unmatured, existing or hereafter arising, contingent or noncontingent, in law, equity, contract, tort or otherwise, that the Debtors or their Estates would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the Holder of any Claim against, or Interest in, a Debtor, the Estates, or other Entity, based on or relating to, or in any manner arising from, in whole or in part, the Debtors (including management, ownership, or operation thereof), the Debtors' in- or out-of-court restructuring efforts, the Debtors' current and former subsidiaries (whether directly or indirectly owned and whether fully or partially owned), intercompany transactions, the Chapter 11 Cases, the formulation, preparation, dissemination, negotiation, filing, pursuit, performance, or consummation of the Chapter 11 Cases (including, without limitation, any payments, distributions or transfers in connection therewith), the Plan and Disclosure Statement, the Settlement, the Transitions, the DIP Facility, the DIP Loan Documents, the DIP Credit Bid, the Sale Transaction, the Sale Documents, or any contract, instrument, release, or other Plan Document entered into in connection with the Plan and Disclosure Statement, the Settlement, the Transitions, the DIP Facility, the DIP Loan Documents, the DIP Credit Bid, the Chapter 11 Cases, the Sale Transaction, Confirmation, or Consummation, the administration and implementation of the Plan, including the distribution of property under the Plan or any other related agreement, any payments,**

38

distributions or transfers made by the Debtors during the Chapter 11 Cases, any settlement or agreement in the Chapter 11 Cases or upon the negotiations regarding or concerning any of the foregoing or any other act or omission, transaction, agreement, event, or other occurrence relating to the foregoing taking place on or before the Effective Date. Notwithstanding anything to the contrary in the foregoing, the releases set forth in Article XII.B of the Plan do not release: (a) any Released Party or any Debtor Released Party from any Causes of Action arising from or related to any act or omission by such Released Party or Debtor Released Party that is determined in a Final Order to have constituted actual fraud, willful misconduct, a criminal act or gross negligence provided that, notwithstanding this clause (a), all Purchaser Retained/Released Causes of Action arising under Chapter 5 of the Bankruptcy Code and state law equivalents shall be acquired or released as set forth in the Plan or the applicable Transaction Approval Orders); (b) any post-Effective Date obligations of any party or Entity under the Plan or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan; or (c) any rights or obligations under any Sale Document; or (d) any Claim or Cause of Action included in the Schedule of Retained Estate Claims and Causes of Action.

2.      **Third-Party Release (Article XII.C)**

84.      **Except as otherwise specifically provided in the Plan, as of the Effective Date, for good and valuable consideration, the adequacy of which is hereby confirmed, each Released Party is, and is deemed to be, hereby conclusively, absolutely, unconditionally, irrevocably, and forever released and discharged by the Releasing Parties, and any and all other Entities who may purport to assert any Claims or Causes of Action, directly or derivatively, by, through, for, or because of the Releasing Parties, from any and all Claims, Interests, obligations, rights, suits, damages, Causes of Action, remedies, and liabilities**

whatsoever, whether known or unknown, foreseen or unforeseen, matured or unmatured, existing or hereafter arising, contingent or noncontingent, in law, equity, contract, tort or otherwise, including any derivative claims, asserted or assertable on behalf of the Debtors or their Estates, as applicable, that such Entity would have been legally entitled to assert, based on or relating to, or in any manner arising from, in whole or in part, the Debtors (including management, ownership, or operation thereof), the Debtors' in- or out-of-court restructuring efforts, the Debtors' current and former subsidiaries (whether directly or indirectly owned and whether fully or partially owned), intercompany transactions, the Chapter 11 Cases, the formulation, preparation, dissemination, negotiation, filing, pursuit, performance, or consummation of the Chapter 11 Cases (including, without limitation, any payments, distributions or transfers in connection therewith), the Plan and Disclosure Statement, the Settlement, the Transitions, the DIP Facility, the DIP Loan Documents, the DIP Credit Bid, the Sale Transaction, the Sale Documents, or any contract, instrument, release, or other Plan Document entered into in connection with the Plan and Disclosure Statement, the Settlement, the Transitions, the DIP Facility, the DIP Loan Documents, the DIP Credit Bid, the Chapter 11 Cases, Confirmation, or Consummation, the administration and implementation of the Plan, including the distribution of property under the Plan or any other related agreement, any payments, distributions or transfers made by the Debtors during the Chapter 11 Cases, any settlement or agreement in the Chapter 11 Cases or upon the negotiations regarding or concerning any of the foregoing or any other act or omission, transaction, agreement, event, or other occurrence relating to the foregoing taking place on or before the Effective Date; provided that, with respect to Claims against the Debtors, Article XII.C of the Plan shall only apply to Claims arising from any act or omission,

transaction, agreement, event, or other occurrence taking place from and including the Petition Date through the Effective Date. Notwithstanding anything to the contrary in the foregoing, the releases set forth in Article XII.C of the Plan do not release: (a) any Released Party from any Causes of Action arising from or related to any act or omission by such Released Party that is determined in a Final Order to have constituted actual fraud, willful misconduct, a criminal act or gross negligence provided that, notwithstanding this clause (a), all Purchaser Retained/Released Causes of Action arising under Chapter 5 of the Bankruptcy Code and state law equivalents shall be acquired or released as set forth in the Plan or the applicable Transaction Approval Orders; (b) any post-Effective Date obligations of any party or Entity under the Plan or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan; or (c) any rights or obligations under any Sale Document; (d) any rights or obligations under the Transition, the Transaction Procedures, or the Settlement; or (e) any Claim or Cause of Action included in the Schedule of Retained Estate Claims and Causes of Action. Notwithstanding anything to the contrary in the Plan or this Order, nothing in Article XII.C of the Plan will be deemed to discharge, release or otherwise affect any claims, rights and remedies (including any right to indemnification that any member may have in respect of their limited liability company interests) of any Project Company against its members, of any Project Company's members against such Project Company, or of any Project Company's member against another member of such Project Company, in each case arising under such Project Company's limited liability agreement.

3.      **Exculpation (Article XII.D)**

85.      **Except as otherwise specifically provided in the Plan, to the fullest extent permissible under applicable law, no Exculpated Party shall have or incur, and each**

41

**Exculpated Party is exculpated from any Cause of Action for any claim related to any act or omission occurring on or after the Petition Date and before the Effective Date in connection with, relating to, or arising out of, in whole or in part, the Chapter 11 Cases before the Effective Date, the Debtors (including management, ownership, or operation thereof), the Debtors' restructuring efforts, intercompany transactions, the formulation, preparation, dissemination, negotiation, filing, pursuit, performance, or consummation of the Chapter 11 Cases (including, without limitation, any payments, distributions or transfers in connection therewith), the Plan and Disclosure Statement, the Sale Transaction, or any contract, instrument, release or other Plan Document, agreement, or document created or entered into in connection with the Plan and Disclosure Statement, the Chapter 11 Cases, Confirmation, or Consummation, the administration and implementation of the Plan, including the distribution of property under the Plan or any other related agreement, any payments, distributions or transfers made by the Debtors during the Chapter 11 Cases, any settlement or agreement in the Chapter 11 Cases or upon the negotiations regarding or concerning any of the foregoing or any other act or omission, transaction, agreement, event, or other occurrence relating to the foregoing taking place on or after the Petition Date and before the Effective Date, except for claims related to any act or omission that is determined in a Final Order to have constituted actual fraud, willful misconduct, a criminal act or gross negligence, but in all respects such Entities shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities pursuant to the Plan. The Exculpated Parties have, and upon completion of the Plan shall be deemed to have, participated in good faith and in compliance with the applicable laws with regard to the solicitation of votes and Distribution of consideration pursuant to the Plan and, therefore,**

are not, and on account of such Distributions shall not be, liable at any time for the violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan or such distributions made pursuant to the Plan. Notwithstanding anything to the contrary in the foregoing, the exculpation set forth above does not exculpate any obligations arising on or after the Effective Date of any party or Entity under the Plan, this Order, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan.

> 4.      **Injunction (Article XII. E)**

86.      **Except as otherwise expressly provided in the Plan or for obligations issued or required to be paid pursuant to the Plan or this Order, all Entities who have held, hold, or may hold Claims, Interests, or Causes of Action that have been released or are subject to exculpation are permanently enjoined, from and after the Effective Date, from taking any of the following actions against, as applicable, the Debtors, the Plan Administrator, the Released Parties, or the Exculpated Parties: (a) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such Claims, Interests, or Causes of Action; (b) enforcing, attaching, collecting, or recovering by any manner or means any judgment, award, decree, or order against such Entities or the property or the estates of such Entities on account of or in connection with or with respect to any such Claims, Interests, or Causes of Action; (c) creating, perfecting, or enforcing any encumbrance of any kind against such Entities or the property or the estates of such Entities on account of or in connection with or with respect to any such Claims, Interests, or Causes of Action; (d) asserting any right of setoff or subrogation of any kind against any obligation due from such Entities or against the property of such Entities on account of or in connection with or with respect to any such Claims,**

Interests, or Causes of Action unless (i) such Holder has filed a motion requesting the right to perform such setoff on or before the Confirmation Date, and notwithstanding an indication of a claim or interest or otherwise that such Holder asserts, has, or intends to preserve any right of setoff pursuant to applicable law or otherwise or (ii) the Plan Administrator brings a Retained Estate Claim or Cause of Action, including but not limited to, a Plan Trust Contributed Cause of Action, against such Holder; and (e) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such Claims, Interests, or Causes of Action released or settled pursuant to the Plan. Notwithstanding anything to the contrary in the Plan or this Order, nothing in Article XII.E of the Plan will be deemed to affect or otherwise enjoin any claims, rights and remedies (including any right to indemnification that any member may have in respect of their limited liability company interests) of any Project Company against its members, of any Project Company's members against such Project Company, or of any Project Company's member against another member of such Project Company, in each case arising under such Project Company's limited liability agreement.

5.     **Release of Liens (Article XII.G)**

87.     **Except (a) with respect to Liens securing an Allowed Secured Claim, to the extent elected by the Debtors or the Plan Administrator, as applicable, and (b) as otherwise provided in the Plan, or in any contract, instrument, release, or other agreement or document created pursuant to the Plan, on the Effective Date, (i) all mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the Estates shall be fully released and discharged, (ii) each of the Debtors, the Plan Administrator, or their delegates are authorized to file such documents as may be necessary to effectuate, or reflect in the public record, the release and discharge such Liens and interests, (iii) the Holders of**

44

**any such mortgages, deeds of trust, Liens, pledges, or other security interests shall execute such documents as may be reasonably requested by the Debtors or the Plan Administrator, as applicable, to reflect or effectuate such releases and discharges, and (iv) all of the right, title, and interest of any Holder of such mortgages, deeds of trust, Liens, pledges, or other security interests to be released shall revert to the Plan Administrator. The Holder (and any other Person) of any mortgages, deeds of trust, Liens, pledges, or other security interests that are to be released is entitled to rely on Article XII.G of the Plan for the purpose of executing and delivering any documentation related to, or otherwise assisting with, the release or discharge of any such mortgages, deeds of trust, Liens, pledges, or other security interests.**

Q.     **Post-Confirmation Notices**

88.     In accordance with Bankruptcy Rules 2002 and 3020(c), no later than ten (10) Business Days after the Effective Date, the Plan Administrator must cause notice of confirmation and the occurrence of the Effective Date (the "**Notice of Confirmation**") to be filed on the docket and be served by United States mail, first-class postage prepaid, by hand, by overnight courier service, or by electronic mail service to all parties served with the Combined Hearing Notice and Notices of Non-Voting Status and Disputed Claims; *provided*, that no notice or service of any kind shall be required to be mailed or made upon any Entity to whom the Debtors mailed a Combined Hearing Notice or Notice of Non-Voting Status and Disputed Claims but received such notice returned marked as "undeliverable as addressed," "moved, left no forwarding address," "forwarding order expired," or similar language, unless such Entity has informed the Debtors in writing of or the Debtors are otherwise aware of such Entity's new address. For those parties receiving electronic service, filing on the docket is deemed sufficient to satisfy such service and notice requirements.

**R.      Administrative Claims**

89.      Except as otherwise provided in the Plan or this Order, requests for payment of Administrative Claims must be filed no later than the Administrative Claims Bar Date. **HOLDERS OF ADMINISTRATIVE CLAIMS THAT ARE REQUIRED TO FILE AND SERVE A REQUEST FOR PAYMENT OF SUCH ADMINISTRATIVE CLAIMS THAT DO NOT FILE AND SERVE SUCH A REQUEST ON OR BEFORE THE ADMINISTRATIVE CLAIM BAR DATE SHALL BE FOREVER BARRED, ESTOPPED, AND ENJOINED FROM ASSERTING SUCH ADMINISTRATIVE CLAIMS AGAINST THE DEBTORS, THE ESTATES, THE PLAN ADMINISTRATOR, OR THEIR RESPECTIVE PROPERTY, AND SUCH ADMINISTRATIVE CLAIMS SHALL BE DEEMED COMPROMISED, SETTLED, AND RELEASED AS OF THE EFFECTIVE DATE. IF FOR ANY REASON ANY SUCH ADMINISTRATIVE CLAIM IS INCAPABLE OF BEING FOREVER BARRED AND DISALLOWED, THEN THE HOLDER OF SUCH CLAIM SHALL IN NO EVENT HAVE RECOURSE TO ANY PROPERTY TO BE DISTRIBUTED PURSUANT TO THE PLAN.** Objections to an Administrative Claim must be filed and served on the requesting party by the later of (a) thirty (30) days after the filing of the applicable request for payment of administrative claims, subject to extensions sought by motion filed within such period and as such period may be extended from time to time, or (b) such other period of limitation as may be specifically fixed by a Final Order for objecting to such Administrative Claims.

**S.      Sale Documents**

90.      The Debtors' rights and obligations under the Sale Documents shall be deemed to vest and be assumed by the Plan Trust on the Effective Date.

**T.      Notice of Subsequent Pleadings**

91.      Except as otherwise provided in the Plan or in this Order, notice of all subsequent pleadings in the Chapter 11 Cases after the Effective Date will be limited to the following parties: (a) the Debtors and their counsel; (b) the U.S. Trustee; (c) the Plan Administrator; (d) Brookfield, (e) any party known to be directly affected by the relief sought by such pleadings; and (f) any party that specifically requests additional notice in writing to the Plan Administrator, or files a request for notice under Bankruptcy Rule 2002 after the Effective Date. The Claims and Noticing Agent shall not be required to file updated service lists.

**U.      Reports**

92.      After entry of this Order, the Debtors shall have no obligation to file with the Court, serve on any parties, or otherwise provide any party with any other report that the Debtors were obligated to provide under the Bankruptcy Code or an order of the Court, including obligations to provide (a) any reports to any parties otherwise required under the "first" and "second" day orders entered in the Chapter 11 Cases, (b) monthly operating reports (even for those periods for which a monthly operating report was not filed before the Confirmation Date), (c) ordinary course professional reports, and (d) monthly or quarterly reports for Professionals; *provided*, that after the Effective Date, the Plan Administrator shall file quarterly reports if and when they become due, in a form reasonably acceptable to the U.S. Trustee. Except as set forth in the Plan Trust Agreement, the Plan Administrator shall have no obligation to file quarterly reports with respect to a Debtor once such Debtor's case is closed, converted, dismissed or a final decree has been entered by the Court.

**V.      Binding Effect**

93.      On the date of and after entry of this Order and subject to the occurrence of the Effective Date, the terms of the Plan, and the final versions of the documents contained in the Plan

Supplement and this Order shall be immediately effective and enforceable and deemed binding upon the Debtors, any and all Holders of Claims or Interests (irrespective of whether the Holders of such Claims or Interests accepted or rejected the Plan), all Entities that are parties to or are subject to the settlements, compromises, releases, and injunction described in the Plan, all non-Debtor parties to Executory Contracts and Unexpired Leases with the Debtors, and all other parties in interest. All Claims against and Interests in the Debtors shall be as fixed, adjusted, or compromised, as applicable, pursuant to the Plan regardless of whether any Holder of a Claim or Interest has voted on the Plan.

94.     Pursuant to section 1141 of the Bankruptcy Code, subject to the occurrence of the Effective Date and subject to the terms of the Plan and this Order, all prior orders entered in the Chapter 11 Cases, all documents and agreements executed by the Debtors as authorized and directed under such prior orders, and all motions or requests for relief by the Debtors pending before this Court as of the Effective Date shall be binding upon and shall inure to the benefit of the Debtors and each of their respective successors and assigns.

95.     The Plan, all documents and agreements executed by the Debtors in connection therewith, this Order, and all prior orders of the Court in the Chapter 11 Cases shall be binding against and binding upon and shall not be subject to rejection or avoidance by any chapter 7 or chapter 11 trustee appointed in any of the Chapter 11 Cases or any successor case or the Plan Administrator.

## W.     Professional Compensation and Reimbursement Claims and Administrative Expense Escrow Account

96.     Pursuant to the Plan and the DIP Order, the Debtors established the Administrative Expense Escrow Account in accordance with the Administrative Expense Procedures. As soon as reasonably practicable after the Confirmation Date and no later than the Effective Date

(the "**Professional Fee Funding Date**"), the Debtors shall, subject to the Approved Budget (as defined in the DIP Order), fund the Administrative Expense Escrow Account with Cash equal to the Professional Fee Amount, less the amount funded and held in the Administrative Expense Escrow Account for Debtor Professional Fees as of the Professional Fee Funding Date, such that the Administrative Expense Escrow Account holds at least the Professional Fee Amount. The Professional Fee Amounts shall be paid subject to the DIP Order.

97.     The Administrative Expense Escrow Account shall be maintained in trust solely for the Professionals and Bankruptcy Fees incurred prior to the Effective Date, to the extent deposited therein and not paid, and for no other Entity, until all Professional Fee Claims Allowed by the Court have been irrevocably paid in full pursuant to one or more Final Orders of the Court or the Cash in the Administrative Expense Escrow Account has been exhausted. No Liens, claims, or interests shall encumber the Administrative Expense Escrow Account or the Cash held therein in any way, and such funds shall not constitute property of the Estates or the Plan Administrator; provided, however, that the Plan Administrator shall be authorized to release funds from the Administrative Expense Escrow Account in accordance with the Plan and the governing escrow agreement.

98.     Allowed Professional Fee Claims shall be paid in Cash by the Debtors or the Plan Administrator, as applicable, from the funds held in the Administrative Expense Escrow Account as soon as reasonably practicable after such Professional Fee Claims are Allowed by the Court; provided that the Debtors' and the Plan Administrator's obligations to pay Allowed Professional Fee Claims shall not be limited to funds held in the Administrative Expense Escrow Account and shall be subject to the DIP Order and the Approved Budget.

### X.    Termination of Debtor Professionals

99.    On the Effective Date: (a) the retention and employment of all Debtor Professionals, including White & Case LLP, FTI Consulting, Inc., and the Debtors' Co-Chief Restructuring Officers, shall automatically terminate; (b) the Debtor Professionals shall be released and discharged of and from all further authority, duties, responsibilities, and obligations related to and arising from and in connection with the Chapter 11 Cases and the Plan (which authority, duties, responsibilities, and obligations shall be assumed by the Plan Administrator and counsel to the Plan Trust), except with respect to the matters set forth in clause (c) of this paragraph; and (c) the Debtor Professionals shall be entitled to assert Professional Fee Claims for any services rendered or expenses incurred after the Effective Date in their capacity as Professionals for the Debtors to the extent necessary to (i) participate with respect to any appeals of this Order, (ii) prepare, file, and, if necessary, litigate final applications for compensation, and (iii) object to final fee applications filed by other Professionals. Nothing in this Order shall prejudice the rights of any Debtor Professional to seek allowance and payment of compensation and reimbursement of expenses incurred prior to the Effective Date.

### Y.    Nonseverability of Plan Provisions

100.    Each term and provision of the Plan, as may have been altered or interpreted by the Court prior to the entry of this Order in accordance with the Plan, is (a) valid and enforceable pursuant to its terms, (b) integral to the Plan and may not be deleted or modified except in accordance with the Plan, and (c) nonseverable and mutually dependent.

### Z.    Waiver or Estoppel

101.    Except as otherwise set forth in the Plan or this Order, each Holder of a Claim or an Interest shall be deemed to have waived any right to assert any argument, including the right to argue that its Claim or Interest should be Allowed in a certain amount, in a certain priority, secured

50

or not subordinated by virtue of an agreement made with the Debtors or their counsel, or any other Entity, if such agreement was not disclosed in the Plan or papers filed with the Court before the Confirmation Date.

## AA.   Authorization to Consummate

102.   The Debtors are authorized to consummate the Plan at any time after the entry of this Order subject to satisfaction or waiver, in accordance with the terms of the Plan, of the conditions precedent to Consummation set forth in Article XIV of the Plan. The substantial consummation of the Plan, within the meaning of sections 1101(2) and 1127 of the Bankruptcy Code, shall be deemed to occur on the Effective Date.

## BB.   Injunctions and Automatic Stay

103.   Unless otherwise provided in the Plan or in this Order, all injunctions or stays in effect in the Chapter 11 Cases pursuant to sections 105 or 362 of the Bankruptcy Code or any order of the Court, and existing on the Confirmation Date (excluding any injunctions or stays contained in the Plan or this Order) shall remain in full force and effect until the Effective Date. All injunctions or stays contained in the Plan or this Order shall remain in full force and effect in accordance with their terms.

## CC.   Third-Party Release Opt-Out

104.   For the avoidance of doubt and notwithstanding anything to the contrary contained herein or in the Plan, any party in interest that properly submitted an Opt-Out Form to the Claims and Noticing Agent by the Plan and Disclosure Statement Objection Deadline shall not be considered a Releasing Party pursuant to the Plan, irrespective of whether such party submitted a Ballot or otherwise voted on the Plan.

**DD.     Third-Party Release Affirmative Consent**

105.     For the avoidance of doubt and notwithstanding anything to the contrary contained herein or in the Plan, Holders of Claims and Interests in Classes 9-A, 10-A, 11-A, 8-B, 9-B, and 10-B shall not constitute Releasing Parties or Released Parties and shall neither be bound by nor entitled to the benefit of the Third-Party Release in their capacities as such. Within three (3) Business Days following entry of this Order, the Debtors shall serve notice (the "**Affirmative Consent Notice**") on Holders of Claims and Interests in such Classes describing the procedures and deadline for submitting a Notice of Consent. Any Holder of a Claim or Interest in such Classes that affirmatively elects to grant and receive the Third-Party Release must file a Notice of Consent with the Court no later than ten (10) Business Days after service of the Affirmative Consent Notice. Any Holder in such Classes that does not timely file a Notice of Consent shall not constitute a Releasing Party or Released Party and shall neither grant nor receive the Third-Party Release in its capacity as such.

**EE.     Dissolution of Creditors' Committee**

106.     Upon the Effective Date: (a) the Committee shall be dissolved except with respect to the matters set forth in clause (c) of this sentence; (b) the current and former members of the Committee and their respective representatives shall be released and discharged of and from all further authority, duties, responsibilities, and obligations related to and arising from and in connection with the Chapter 11 Cases except with respect to the matters set forth in clause (c) of this sentence; and (c) the Professionals retained by the Committee will not be entitled to assert any Professional Fee Claims for any services rendered or expenses incurred after the Effective Date in their capacity as Professionals for the Committee, except to the extent necessary to (i) participate with respect to any appeals of this Order, (ii) prepare, file and, if necessary, litigate final applications for compensation, and (iii) object to final fee applications filed by other Professionals.

52

**FF.     Effectiveness of the Plan**

107.     The provisions governing the conditions precedent to the Effective Date set forth in Article XIV.B of the Plan are hereby approved in their entirety. The Debtors are authorized to consummate the Plan at any time after the entry of this Order, provided that the Plan shall not become effective unless and until such conditions have been satisfied or waived in accordance with Article XIV.C of the Plan.

**GG.     Effect of Non-Occurrence of Conditions to the Effective Date**

108.     Notwithstanding the entry of this Order, if the Effective Date does not occur and circumstances make clear that the Effective Date will not occur, then (a) the Plan will be null and void in all respects; (b) any settlement or compromise embodied in the Plan, assumption or rejection of Executory Contracts or Unexpired Leases effected by the Plan, and any document or agreement executed pursuant to the Plan will be null and void in all respects; and (c) nothing contained in the Plan shall (i) constitute a waiver or release of any Claims, Interests, or Causes of Action, (ii) prejudice in any manner the rights of any Debtor or any other Entity, or (iii) constitute an admission, acknowledgement, offer, or undertaking of any sort by any Debtor or any other Entity.

**HH.     Effect of Conflict Between Plan, the Plan Supplement, and this Order**

109.     If there is any inconsistency between the terms of the Plan (including the Plan Supplement) and the terms of this Order, the terms of this Order shall govern and control. Except as set forth in the Plan, in the event of any inconsistency among the any document or agreement filed in the Plan Supplement and the Plan, the terms of the relevant provision in the Plan Supplement shall control (unless stated otherwise in such Plan Supplement document or in this Order).

## II.     Implementing Documents

110.    Each federal, state, commonwealth, local, foreign, or other governmental agency is authorized and directed to accept any and all documents necessary or appropriate to effectuate, implement, or consummated the Plan, including the Wind-Down Transactions, and this Order.

## JJ.    Actions Post-Confirmation Through the Effective Date

111.    During the period from entry of this Order through and until the Effective Date, each of the Debtors shall continue to operate their business as a debtor in possession, subject to the oversight of this Bankruptcy Court as provided under the Bankruptcy Code, the Bankruptcy Rules, and this Order and any order of this Bankruptcy Court that is in full force and effect. During such period, the Debtors and all other parties in interest under the Plan are authorized to execute such documents, agreements, or filings that are contemplated by the Plan, the Plan Supplement, or the transactions contemplated thereby without any further order of this Bankruptcy Court or corporate action, and to take any actions necessary or advisable or appropriate to implement the documents, agreements, or filings that are contemplated by the Plan, the Plan Supplement, or the transactions contemplated thereby, in each case subject to the terms and conditions of the Plan.

## KK.    Claims of the United States Government

112.    Nothing in this Order or the Plan shall effect a release of any Claim by the United States Government or any of its agencies or any state and local authority whatsoever, including without limitation any Claim arising under the Internal Revenue Code, the environmental laws or any criminal laws of the United States or any state and local authority against any party or Person, nor shall anything in this Order or the Plan enjoin the United States or any state or local authority from bringing any claim, suit, action, or other proceedings against any party or Person for any liability of such Persons whatsoever, including without limitation, any claim, suit or action arising under the Internal Revenue Code, the environmental laws or any criminal laws of the United States

or any state and local authority against such Persons, nor shall anything in this Order or the Plan exculpate any party or Person from any liability to the United States Government or any of its agencies or any state and local authority whatsoever, including any liabilities arising under the Internal Revenue Code, the environmental laws or any criminal laws of the United States or any state and local authority against any party or Person.

**LL.     Retention of Jurisdiction**

113.    Notwithstanding entry of this Order and the occurrence of the Effective Date, on and after the Effective Date, this Court retains exclusive jurisdiction over the Chapter 11 Cases, all matters arising out of or related to the Chapter 11 Cases and the Plan, including the matters set forth in Article XVI of the Plan (except as otherwise provided in the Plan or Plan Trust Agreement).

**MM.   Waiver of 14-Day Stay**

114.    For good cause shown, notwithstanding Bankruptcy Rule 3020(e), and, to the extent applicable, Bankruptcy Rules 6004(h), 6006(d), 7062, and 9014 and any other Bankruptcy Rule, this Order is effective and enforceable immediately upon its entry, its provisions shall be self-executing, and it shall not subject to any stay.

**NN.     Final Order**

115.    This Order is a final order and the period in which an appeal must be filed will commence upon entry of this Order. In the absence of any Person obtaining a stay pending appeal, the Debtors are authorized to consummate the Plan.

Signed:  February 24, 2026

_____

Christopher Lopez

United States Bankruptcy Judge

**Exhibit A**

Plan

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| | ) | |
| In re: | ) | Chapter 11 |
| | ) | |
| POSIGEN, PBC, *et al.*,[1] | ) | Case No. 25-90787 (CML) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |

**SECOND AMENDED COMBINED DISCLOSURE STATEMENT AND**
**JOINT CHAPTER 11 PLAN OF POSIGEN, PBC AND ITS AFFILIATED DEBTORS**

**WHITE & CASE LLP**
Charles R. Koster (Texas Bar No. 24128278)
609 Main Street, Suite 2900
Houston, Texas 77002
Telephone:     (713) 496-9700
Email:          charles.koster@whitecase.com

- and -

**WHITE & CASE LLP**
Aaron Colodny (admitted *pro hac vice*)
555 South Flower Street, Suite 2700
Los Angeles, California 90071
Telephone:     (213) 620-7700
Email:          aaron.colodny@whitecase.com

**WHITE & CASE LLP**
Thomas E Lauria (Texas Bar No. 11998025)
Michael C. Shepherd (admitted *pro hac vice*)
Fan B. He (admitted *pro hac vice*)
Andrea Kropp (admitted *pro hac vice*)
Southeast Financial Center
200 South Biscayne Boulevard, Suite 4900
Miami, Florida 33131
Telephone:     (305) 371-2700
Email:          tlauria@whitecase.com
                 mshepherd@whitecase.com
                 fhe@whitecase.com
                 andrea.kropp@whitecase.com

- and –

**WHITE & CASE LLP**
Andrea Amulic (admitted *pro hac vice*)
1221 Avenue of the Americas
New York, New York 10020
Telephone:     (212) 819-8200
Email:          andrea.amulic@whitecase.com

*Counsel to the Debtors and Debtors in Possession*

Dated: February 22, 2026

---

[1]     The last four digits of PosiGen, PBC's tax identification number are 9706.  A complete list of each of the Debtors in these chapter 11 cases and the last four digits of their federal tax identification numbers may be obtained on the website of the Debtors' claims and noticing agent at https://cases.ra.kroll.com/PosiGen.  The Debtors' service address in these chapter 11 cases is 1000 Elmwood Park Boulevard, Suite A, Harahan, LA 70123.

i

**TABLE OF CONTENTS**

ARTICLE I. DEFINED TERMS, RULES OF INTERPRETATION, COMPUTATION OF TIME, GOVERNING LAW, AND OTHER REFERENCES ...................................................... 6
    A.    Defined Terms ................................................................................................... 6
    B.    Rules of Interpretation ..................................................................................... 25
    C.    Computation of Time ....................................................................................... 26
    D.    Governing Law ................................................................................................ 26
    E.    Reference to Monetary Figures ....................................................................... 26
    F.    Controlling Document ..................................................................................... 26

ARTICLE II. THE DEBTORS' CORPORATE HISTORY, STRUCTURE, AND BUSINESS OVERVIEW ...................................................................................................... 27
    A.    The Debtors' Corporate History ...................................................................... 27
    B.    The Debtors' Business Operations ................................................................... 27
    C.    The Debtors' Corporate and Capital Structure ............................................... 32

ARTICLE III. EVENTS LEADING TO THE CHAPTER 11 FILINGS ................................... 35

ARTICLE IV. MATERIAL DEVELOPMENTS AND EVENTS OF THE CHAPTER 11 CASES ......... 39
    A.    First Day Relief ............................................................................................... 39
    B.    Appointment of Creditors' Committee ........................................................... 40
    C.    Schedules and Statements ................................................................................ 40
    D.    Bar Dates ......................................................................................................... 40
    E.    Adversary Proceedings .................................................................................... 40
    F.    Key Employee Retention Program Relief ....................................................... 42
    G.    Trustee Motions .............................................................................................. 42
    H.    Transaction Approval Motion .......................................................................... 42
    I.    Rejection Procedures Order ............................................................................. 45

ARTICLE V. SUMMARY OF TREATMENT OF CLAIMS AND ESTIMATED RECOVERIES ......... 45
    A.    Deemed Substantive Consolidation for Limited Purposes ............................. 45
    B.    Summary of Estimated Recoveries .................................................................. 45

ARTICLE VI. ADMINISTRATIVE PROFESSIONAL AND PRIORITY TAX CLAIMS ............... 48
    A.    Administrative Claims ..................................................................................... 49
    B.    DIP Claims ...................................................................................................... 49
    C.    Statutory Fees .................................................................................................. 50
    D.    Professional Fee Claims .................................................................................. 50
    E.    Priority Tax Claims .......................................................................................... 51

ARTICLE VII. CLASSIFICATION, TREATMENT, AND VOTING OF CLAIMS AND INTERESTS ........................................................................................................ 52
    A.    Classification of Claims and Interests ............................................................. 52
    B.    Treatment of Claims and Interests .................................................................. 52
    C.    Reservation of Rights Regarding Claims ........................................................ 60
    D.    Elimination of Vacant Classes ........................................................................ 60
    E.    Voting Classes Where No Valid Votes Are Received ....................................... 60
    F.    Subordinated Claims ....................................................................................... 60
    G.    Controversy Concerning Impairment .............................................................. 61
    H.    Confirmation Pursuant to Section 1129(b) of the Bankruptcy Code .............. 61

ARTICLE VIII. MEANS FOR IMPLEMENTATION OF THE PLAN ...................................... 61
    A.    Deemed Substantive Consolidation of the Consolidated Debtors .................. 61
    B.    Transition Procedures ...................................................................................... 62

C. Sources of Consideration for Plan Distributions.................................................................. 62
D. Corporate Action.................................................................................................................. 62
E. Cancellation of Notes, Instruments, Certificates, and Other Documents ........................... 62
F. Effectuating Documents; Further Transactions ................................................................... 62
G. Section 1146(a) Exemption.................................................................................................. 63
H. Preservation of Rights of Action......................................................................................... 63
I. Access to Books and Records and Personnel....................................................................... 64
J. WARN Action Settlement .................................................................................................... 64

ARTICLE IX. TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES............ 65
A. Rejection of Executory Contracts and Unexpired Leases.................................................... 65
B. Claims Arising from the Rejection of Executory Contracts and Unexpired Leases ......... 66
C. Contracts and Leases Entered Into After the Petition Date ................................................. 66
D. Insurance Policies ................................................................................................................ 66
E. Reservation of Rights........................................................................................................... 67

ARTICLE X. PROVISIONS GOVERNING DISTRIBUTIONS ....................................................... 67
A. Distributions on Account of Claims Allowed as of the Effective Date ............................... 67
B. Distribution Agent ............................................................................................................... 67
C. Disputed Claims Reserves ................................................................................................... 67
D. Special Rules for Distributions to Holders of Disputed Claims ......................................... 68
E. Delivery of Distributions ..................................................................................................... 68
F. Undeliverable and Unclaimed Distributions Held by Distribution Agent .......................... 68
G. Time Bar to Cash Payments................................................................................................. 69
H. Manner of Payment.............................................................................................................. 69
I. Fractional Distributions ....................................................................................................... 69
J. Foreign Currency Exchange Rate ........................................................................................ 69
K. *De Minimis* Distributions................................................................................................. 69
L. No Postpetition Interest on Claims ...................................................................................... 69
M. Allocation Between Principal and Accrued Interest ............................................................ 70
N. Single Satisfaction ............................................................................................................... 70
O. Compliance with Tax Requirements.................................................................................... 70
P. Claims Paid or Payable by Third Parties ............................................................................. 70
Q. Setoffs and Recoupments..................................................................................................... 71
R. Securities Law Matters ........................................................................................................ 72
S. Administration of Taxes ....................................................................................................... 72

ARTICLE XI. PROCEDURES FOR RESOLVING DISPUTED CLAIMS AND INTERESTS .............. 72
A. Allowance of Claims ........................................................................................................... 72
B. Prosecution and Settlement of Disputed Claims.................................................................. 72
C. Pending Objections............................................................................................................... 73
D. Claims Assumed by Purchaser............................................................................................. 73
E. Adjustment to Claims Without Objection............................................................................. 73
F. Estimation of Claims ........................................................................................................... 73
G. Disallowance of Claims and Interests.................................................................................. 73

ARTICLE XII. RELEASE, INJUNCTION, AND RELATED PROVISIONS....................................... 74
A. General Settlement of Claims and Interests......................................................................... 74
B. Releases by the Debtors........................................................................................................ 74
C. Releases by the Releasing Parties......................................................................................... 75
D. Exculpation .......................................................................................................................... 76
E. Injunction.............................................................................................................................. 76
F. Reimbursement or Contribution .......................................................................................... 77

iii

G.     Release of Liens.................................................................................................... 77

ARTICLE XIII. THE PLAN TRUST AND WIND DOWN ...................................................... 78
A.     Creation and Governance of Plan Trust................................................................ 78
B.     Purpose of Plan Trust........................................................................................... 79
C.     Plan Trust Agreement and Funding of Plan Trust ................................................ 79
D.     Plan Trust Professionals; Plan Trust Fees and Expenses..................................... 80
E.     Plan Trust Board; Oversight ................................................................................ 80
F.     Plan Trust Claim Reconciliation Process............................................................. 81
G.     Plan Trust Proceeds Allocation............................................................................ 81
H.     Wind Down.......................................................................................................... 81
I.     Plan Trust Interests ............................................................................................. 83
J.     Cooperation of the Debtors.................................................................................. 83
K.     Tax Treatment of the Plan Trust .......................................................................... 83
L.     Fiduciary Duties.................................................................................................. 84
M.     Withholding ......................................................................................................... 84
N.     Dissolution of Plan Trust .................................................................................... 85
O.     Transferred Privileges.......................................................................................... 86

ARTICLE XIV. CONDITIONS TO CONFIRMATION AND EFFECTIVE DATE .............................. 86
A.     Conditions Precedent to Confirmation.................................................................. 86
B.     Conditions Precedent to the Effective Date ......................................................... 86
C.     Waiver of Conditions Precedent .......................................................................... 87
D.     Effect of Non-Occurrence of Conditions to Consummation ................................ 87

ARTICLE XV. MODIFICATION, REVOCATION OR WITHDRAWAL OF THE PLAN ................... 88
A.     Modification of the Plan ...................................................................................... 88
B.     Revocation and Withdrawal of the Plan ............................................................... 88
C.     Effect of Confirmation on Modifications ............................................................. 88

ARTICLE XVI. RETENTION OF JURISDICTION ................................................................ 88

ARTICLE XVII. MISCELLANEOUS PROVISIONS................................................................. 90
A.     Immediate Binding Effect.................................................................................... 90
B.     Additional Documents ......................................................................................... 90
C.     Dissolution of Official Committee........................................................................ 91
D.     Reservation of Rights........................................................................................... 91
E.     Successors and Assigns ....................................................................................... 91
F.     Service of Documents.......................................................................................... 91
G.     Term of Injunctions or Stays................................................................................ 92
H.     Entire Agreement................................................................................................ 92
I.     Plan Supplement Exhibits.................................................................................... 92
J.     Non-Severability.................................................................................................. 92
K.     Votes Solicited in Good Faith.............................................................................. 93
L.     Waiver or Estoppel ............................................................................................. 93
M.     No Waiver............................................................................................................ 93

ARTICLE XVIII. CONFIRMATION OF THE PLAN .............................................................. 93
A.     Voting Procedures and Acceptance ...................................................................... 93
B.     Statutory Requirements for Confirmation of the Plan .......................................... 94
C.     The Best Interests of Creditors Test...................................................................... 95
D.     Feasibility............................................................................................................ 96
E.     Eligibility to Vote on the Plan ............................................................................. 96
F.     Confirmation Without Acceptance by All Impaired Classes.................................. 96

ARTICLE XIX. PLAN-RELATED RISK FACTORS ............................................................... 98
    A.    General Bankruptcy Law and Plan Related Considerations ............................... 98
    B.    Financial Information Disclaimer .................................................................... 101
    C.    Disclosure Statement Disclaimer ..................................................................... 101
    D.    Alternatives to Confirmation and Consummation of the Plan ......................... 103
ARTICLE XX. CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN ........ 104
    A.    General Tax Considerations ............................................................................. 104
    B.    U.S. Federal Income Tax Consequences to the Debtors ................................. 104
    C.    U.S. Federal Income Tax Consequences to Holders of Claims and Interests ................. 105
    D.    Information Reporting and Backup Withholding .......................................... 108
    E.    Reservation of Rights ...................................................................................... 109

**TABLE OF EXHIBITS**

Exhibit A        Liquidation Analysis

Exhibit B        Organizational Chart

Exhibit C        Proposed Form of WARN Action Final Settlement Order

**Introduction**[2]

PosiGen, PBC and its affiliated debtors (collectively, the "**Debtors**"), propose this *Combined Disclosure Statement and Joint Chapter 11 Plan of PosiGen, PBC and Its Affiliated Debtors* (the "**Disclosure Statement**," "**Plan and Disclosure Statement**," or "**Plan**").  The Bankruptcy Court entered the Transaction Approval Orders, which authorize (a) the Settlement among the Debtors and their key stakeholders, (b) the DIP Facility, (c) the DIP Credit Bid; (d) the Sale Transaction, (e) the Transitions, and (f) the Channel Partner Settlement Procedures.  The Settlement Parties include Brookfield, the Committee, the Project Companies, G-I, GAF, M&T, DFO, SunStrong, ECI 2024-2025 LLC, and the Owner 3 Parties.

The Plan is a liquidating plan.  Upon entry of the Transaction Approval Orders, the Consolidated Debtors will consummate the Transitions, pursuant to which they will transition their servicing operations to each of the Project Companies (and/or their designees), and provide transition services to them, as needed in accordance with the procedures set forth in this Plan and the Settlement Order.  The Debtors also intend to sell the Sale Assets, which represent substantially all of their assets, which primarily include (1) inventory, (2) "work in progress" Solar Systems, and (3) certain Causes of Action, as set forth herein.  The Transaction Approval Orders contemplate that the DIP Lenders will credit bid their DIP Claims (subject to the terms and conditions of a mutually acceptable Asset Purchase Agreement) in exchange for the Sale Assets, subject to the Debtors' ability to pursue any higher and better alternative offer made that would provide for the repayment of the DIP Claims in full in cash.

The proposed Settlement and this Plan provide for the creation of the Plan Trust and appointment of an independent trustee as Plan Administrator selected by Brookfield and the Committee to oversee the distribution of proceeds from the sale and monetization of the remaining assets of the Debtors as of the Effective Date.  Upon the occurrence of the Effective Date, the Plan Trust will be funded with at least $2,000,000 of proceeds from the DIP Facility, as well as any other Cash on hand of the Debtors as of the Effective Date (other than the funds held in the Administrative Expense Escrow Account), and the DIP Lenders will receive the DIP Lender Plan Trust Interests as partial consideration therefore.  Additionally, the proposed Settlement provides that upon the occurrence of the Effective Date and the distribution of the DIP Lender Plan Trust Interests, the Project Companies will make the Project Company Waiver.  On the Effective Date, the Purchasers will also make the Plan Trust Claim Contribution.  The Plan Trust Contributed Causes of Action shall be prosecuted or otherwise resolved by the Plan Administrator, and the proceeds thereof shall be distributed in accordance with this Plan.  The Plan Trust will also maintain the Debtors' information and, subject to the terms of the Transition Procedures, provide specified transition services to the Project Companies.

**THE DEBTORS BELIEVE THAT HOLDERS OF ALLOWED CLAIMS ENTITLED TO VOTE ON THE PLAN, INCLUDING GENERAL UNSECURED CLAIMS, WILL RECEIVE HIGHER RECOVERIES UNDER THE PLAN THAN THEY WOULD RECEIVE UNDER AN ALTERNATIVE CHAPTER 7 LIQUIDATION.  The Plan provides for a value-maximizing Sale Transaction, an orderly transition of services, the potential to complete "work in progress" Solar Systems to return value to financing counterparties, Channel Partners, and unsecured creditors, and, upon the Effective Date, the Plan Trust Contributions.  Additionally, in the event these Chapter 11 Cases are converted to cases administered under chapter 7 of the Bankruptcy Code, there will likely be (1) litigation, additional costs, expenses, and time incurred in replacing existing management and professionals in a chapter 7 case, (2) a disruption in service to the Debtors' customers, and (3) an increase in customer payment defaults, which would further diminish Estate assets, delay distributions, and cause a loss of value to creditors.**

---

[2]   Capitalized terms used and not otherwise defined in this Introduction shall have the meanings ascribed to such terms elsewhere in the Plan.

**For these and other reasons, it is the Debtors' opinion that confirmation and implementation of the Plan is in the best interest of, and will maximize recoveries to, the Debtors' Estates, creditors, and other stakeholders.  THE DEBTORS RECOMMEND THAT ALL HOLDERS OF CLAIMS ENTITLED TO VOTE ON THE PLAN CAST A VOTE TO ACCEPT THE PLAN.**

## Disclaimer

This Plan and Disclosure Statement describes certain statutory provisions, events in the Chapter 11 Cases, and certain documents and agreements that may be attached or incorporated by reference.  Although the Debtors believe that this information is fair and accurate, this information is qualified in its entirety to the extent that it does not set forth the entire text of such documents or statutory provisions.  The information contained herein or attached hereto is made only as of the date of this Plan and Disclosure Statement.  There can be no assurances that the statements contained herein will be correct at any time after such date.

This Plan and Disclosure Statement has been prepared in accordance with sections 1123 and 1125 of the Bankruptcy Code and Bankruptcy Rule 3016 and not necessarily in accordance with federal or state securities laws or other non-bankruptcy laws.  This Plan and Disclosure Statement has not been approved or disapproved by the United States Securities and Exchange Commission (the "**SEC**"), any state securities commission or any securities exchange or association, nor has the SEC, any state securities commission, or any securities exchange or association reviewed or commented on the accuracy or adequacy of the statements contained herein.  Other than the Bankruptcy Court, no other governmental or other regulatory agency approvals have been sought or obtained as of the date of the mailing of this Plan and Disclosure Statement.

The Debtors submit this Plan and Disclosure Statement, as may be amended from time to time, under section 1125 of the Bankruptcy Code and Bankruptcy Rule 3016 to all of the Debtors' known Holders of Claims entitled to vote on the Plan.  The purpose of this Plan and Disclosure Statement is to provide adequate information to enable Holders of Claims who are entitled to vote on the Plan to make an informed decision in exercising their respective rights to vote on the Plan.  Every effort has been made to provide adequate information to Holders of Claims on how various aspects of the Plan affect their respective interests.

In preparing this Plan and Disclosure Statement, the Debtors relied on financial data derived from their books and records or that was otherwise made available to them at the time of such preparation and on various assumptions.  The information that is provided is based on the current books and records of the Debtors.  The Debtors believe any assumptions regarding future events reflect reasonable business judgments and the Debtors make no representations or warranties as to the accuracy of the financial information contained herein or assumptions regarding the Debtors' financial condition and their future results and operations.  The financial information contained in this Plan and Disclosure Statement and in its exhibits has not been audited by a certified public accountant and has not been prepared in accordance with generally accepted accounting principles in the United States or any other jurisdiction.

This Plan and Disclosure Statement does not constitute, and may not be construed as, an admission of fact, liability, stipulation, or waiver.  A party with standing may object to Claims after the Confirmation or Effective Date of the Plan irrespective of whether this Plan and Disclosure Statement identifies any such objections to Claims.

The Debtors are making the statements and providing the financial information contained in this Plan and Disclosure Statement as of the date hereof, unless otherwise specifically noted.  Although the Debtors may subsequently update the information in this Plan and Disclosure Statement, the Debtors do not have an affirmative duty to do so, and expressly disclaim any duty to publicly update any forward-

2

looking statements, whether as a result of new information, future events or otherwise.  Holders of Claims and Interests reviewing this Plan and Disclosure Statement should not infer that, at the time of their review, the facts set forth herein have not changed since this Plan and Disclosure Statement was filed.  Information contained herein is subject to completion or amendment.  The Debtors reserve the right to file an amended plan and disclosure statement.

Confirmation and effectiveness of the Plan are subject to certain conditions precedent described in Article XIV of the Plan.  There is no assurance that the Plan will be confirmed or, if it is confirmed, that such conditions precedent will be satisfied or waived.  You are encouraged to read this Plan and Disclosure Statement in its entirety, including, but not limited to, Article XIX of this Plan and Disclosure Statement entitled "Plan-Related Risk Factors," before submitting your ballot to vote to accept or reject the Plan.  Even after the Effective Date, Distributions under the Plan may be subject to delay so that Disputed Claims can be resolved.

The Debtors have not authorized any entity to give any information about or concerning the Plan and Disclosure Statement other than that which is contained in this Plan and Disclosure Statement.  The Debtors have not authorized any representations concerning the Debtors or the value of their property other than as set forth in this Plan and Disclosure Statement.

If the Plan is confirmed by the Bankruptcy Court and the Effective Date occurs, all Holders of Claims and Interests (including those Holders of Claims or Interests who are not entitled to vote on the Plan) will be bound by the terms of the Plan and any transactions contemplated hereby.

The contents of this Plan and Disclosure Statement should not be construed as legal, business, financial, or tax advice.  Each Holder of a Claim or Interest should consult his, her, or its own legal counsel, accountant, or other advisors as to legal, business, financial, tax, and other matters concerning his, her, or its Claim or Interest, the solicitation, or the transactions contemplated by the Plan and Disclosure Statement.  This Plan and Disclosure Statement may not be relied upon for any purpose other than to determine how to vote on the Plan or object to Confirmation of the Plan.

Nothing contained herein shall constitute an admission of any fact or liability by any party or be deemed evidence of the tax or other legal effects of the Plan on the Debtors or on Holders of Claims or Interests.

### **Solicitation of the Plan**

This Plan and Disclosure Statement is submitted by the Debtors to be used in connection with the solicitation of votes on the Plan and to describe and provide the terms of the plan of liquidation of the Debtors.  The Debtors will only solicit votes with respect to the Plan once the Disclosure Statement has been conditionally approved and the procedures and ballots to solicit votes to accept or reject the Plan have been approved by the Bankruptcy Court.

The Debtors requested that the Bankruptcy Court hold a hearing on conditional approval of this Plan and Disclosure Statement to determine whether this Plan and Disclosure Statement contains "adequate information" in accordance with section 1125 of the Bankruptcy Code.  The Bankruptcy Court entered the Disclosure Statement Order conditionally approving the Disclosure Statement as containing adequate information on January 30, 2026.  Pursuant to section 1125(a)(1), "adequate information" is defined as "information of a kind, and in sufficient detail, as far as reasonably practicable in light of the nature and history of the Debtors and the condition of the Debtors' books and records . . . that would enable a hypothetical reasonable investor typical of Holders of claims or interests of the relevant Class to make an informed judgment about the plan . . . ."

All Holders of Claims are encouraged to read and carefully consider this Plan and Disclosure Statement in its entirety before voting to accept or reject the Plan. In making a decision to accept or reject the Plan, each Holder of a Claim must rely on its own examination and evaluation of the Debtors as described in this Plan and Disclosure Statement, including the merits and risks involved with respect to such Plan and Disclosure Statement.

A hearing to consider the final approval of the Disclosure Statement and Confirmation of the Plan has been set for February 23, 2026, at 2:00 p.m. (prevailing Central Time). Objections to final approval of the Disclosure Statement and objections to Confirmation of the Plan must be made in writing and must be filed with the Bankruptcy Court and served on counsel for the Debtors on or before 5:00 p.m. (prevailing Central Time) on February 18, 2026. Bankruptcy Rule 3007 and the Disclosure Statement Order govern the form of any such objection.

## NOTICE OF OBJECTION BY THE U.S. TRUSTEE

THE U.S. TRUSTEE ASSERTS THAT THE PLAN'S OPT-OUT PROVISIONS ARE AN IMPERMISSIBLE METHOD OF OBTAINING CREDITORS' APPROVAL FOR THIRD-PARTY RELEASES BECAUSE FAILURE TO ACT CANNOT BE CONSIDERED CONSENT TO THOSE RELEASES. THE U.S. TRUSTEE PREVIOUSLY FILED AN OBJECTION [DOCKET NO. 439] RAISING THIS ISSUE, AMONG OTHER PLAN CONFIRMATION OBJECTIONS. THE U.S. TRUSTEE'S OBJECTION CAN BE OBTAINED FREE OF CHARGE FROM THE DOCKET MAINTAINED ON THE CLAIMS AND NOTICING AGENT'S WEBSITE, AVAILABLE AT HTTPS://CASES.RA.KROLL.COM/POSIGEN.

**<u>Answers to Commonly Asked Questions</u>**

**What is chapter 11 of the Bankruptcy Code?**

Chapter 11 is the principal reorganization chapter of the Bankruptcy Code that allows financially distressed businesses to reorganize their debts or liquidate their assets in a controlled and value-maximizing fashion. The commencement of a chapter 11 case creates an "estate" containing all of the legal and equitable interests of the debtor in property as of the date the bankruptcy case is filed. During a chapter 11 bankruptcy case, the debtor remains in possession of its assets unless the bankruptcy court orders the appointment of a trustee. No trustee has been appointed in the Chapter 11 Cases. The Plan is being proposed by the Debtors. The Debtors have worked to propose a plan of liquidation in an effort to minimize the overall administrative costs associated with the Chapter 11 Cases, maximize value to Holders of Allowed Claims and Interests, and minimize the potential disruption to customers.

**How do I determine how my Claim or Interest is classified?**

Under the Plan, Administrative Claims are unclassified and will be treated in accordance with <u>Article VI</u> of the Plan. All other Claims and Interests are classified in a series of Classes, as described in <u>Article V</u> and <u>Article VII</u> of the Plan. You may review such Articles to determine how your Claim or Interest is classified.

**How do I determine what I am likely to recover on account of my Claim or Interest?**

After you determine the classification of your Claim or Interest, you can determine the likelihood and range of potential recovery under the Plan with respect to your Claim or Interest by referring to the chart included in <u>Article V</u> of the Plan and qualified by <u>Article VII</u> of the Plan. The chart provides an estimate of Claims against each Debtor estate and recoveries under the Plan and may be compared to the estimated recoveries that such Classes would receive in the hypothetical chapter 7 liquidation attached as **<u>Exhibit A</u>**.

**What is necessary to confirm the Plan?**

Under applicable provisions of the Bankruptcy Code, Confirmation of the Plan requires that, among other things, at least one Class of Impaired Claims votes to accept the Plan. Acceptance by a Class of Claims means that at least two-thirds in the total dollar amount and more than one-half in number of the Allowed Claims actually voting in the Class vote in favor of the Plan. Because only those Holders of Claims who vote on the Plan will be counted for purposes of determining acceptance or rejection of the Plan by an Impaired Class, the Plan can be approved with the affirmative vote of members of an Impaired Class who own less than two-thirds in amount and one-half in number of the total Claims in that Class. In addition to acceptance of the Plan by a Class of Impaired Claims, the Bankruptcy Court must find that the Plan satisfies a number of statutory requirements before it may confirm the Plan.

If one or more Classes vote to reject the Plan, the Debtors may still request that the Bankruptcy Court confirm the Plan under section 1129(b) of the Bankruptcy Code. In such case, the Debtors will be required to demonstrate that the Plan does not discriminate unfairly and is fair and equitable with respect to each Class of Impaired Claims or Interests that has rejected the Plan. This method of confirming a plan is commonly called a "cramdown." In addition to the statutory requirements imposed by the Bankruptcy Code, the Plan itself also provides for certain conditions that must be satisfied for the Plan to be confirmed and go effective.

**Is there an official committee of unsecured creditors in this case?**

Yes.  An official committee of unsecured creditors (the "**Committee**") was appointed on December 5, 2025 [Docket No. 95].  The members of the Committee are (1) SolarEdge Technologies, Inc., (2) Alex Ruperto, (3) EMT Renewables, LLC, (4) Capgemini America, Inc., (5) Consolidated Electrical Distributors, and (6) Dataplatr Corp.

**When is the deadline for returning my ballot?**

**THE BANKRUPTCY COURT HAS DIRECTED THAT, TO BE COUNTED FOR VOTING PURPOSES, YOUR BALLOT MUST BE RECEIVED BY THE CLAIMS AND NOTICING AGENT NOT LATER THAN FEBRUARY 18, 2026 AT 5:00 P.M. (PREVAILING CENTRAL TIME).**

**It is important that all Holders of Impaired Claims vote on the Plan.  The Debtors believe that the Plan provides the best possible recovery to Holders of Claims and Interests.  The Debtors believe that acceptance of the Plan is in the best interest of Holders of Claims and Interests and recommend that Holders of Impaired Claims vote to accept the Plan.**

If you would like to obtain additional copies of this Plan and Disclosure Statement or any of the documents attached or referenced herein, or have questions about the solicitation and voting process or the Chapter 11 Cases generally, please contact Kroll Restructuring Administration LLC, the Debtors' claims and noticing agent, by either (a) visiting the Debtors' restructuring website at https://cases.ra.kroll.com/PosiGen; (b) calling 877.346.8882 (Toll Free) or +1 646.825.3847 (International), or (c) emailing PosiGenInfo@ra.Kroll.com and referencing "PosiGen Solicitation" in the subject line.

## ARTICLE I.
## DEFINED TERMS, RULES OF INTERPRETATION, COMPUTATION OF TIME, GOVERNING LAW, AND OTHER REFERENCES

**A.      Defined Terms**

1.      "*1L Backleverage Agent*" means BID Administrator, LLC.

2.      "*2L Credit Agreement*" has the meaning set forth in Article II.B of the Plan.

3.      "*2L Facility*" has the meaning set forth in Article II.B of the Plan.

4.      "*Administrative Claim*" means a Claim against any of the Debtors for costs and expenses of administration of the Debtors' Estates pursuant to sections 503(b), 507(a)(2), 507(b), or 1114(e)(2) of the Bankruptcy Code, all fees and charges assessed against the Debtors' Estates under 28 U.S.C. § 1930, and all Claims that are entitled to be treated as Administrative Claims pursuant to a Final Order of the Bankruptcy Court.

5.      "*Administrative Claims Bar Date*" means the first Business Day that is thirty (30) days following the Effective Date, except as specifically set forth in the Plan or a Final Order of the Bankruptcy Court.

6.      "*Administrative Expense Escrow Account*" has the meaning set forth in the Final Cash Management Order or the DIP Order, as applicable.

6

7.     "*Affiliate*" has the meaning set forth in section 101(2) of the Bankruptcy Code.  With respect to any Person that is not a Debtor, the term "Affiliate" shall apply to such Person as if the Person were a Debtor.

8.     "*Allowed*" means, with respect to any Claim or Interest, except as otherwise provided herein, such Claim or Interest (or any portion thereof) (a) that is evidenced by a Proof of Claim filed by the Claims Bar Date, the Administrative Claims Bar Date, or such other date fixed by the Bankruptcy Court, as applicable (or for which Claim or Interest a Proof of Claim is not or shall not be required to be filed under the Plan, the Bankruptcy Code, or a Final Order of the Bankruptcy Court); (b) that is listed in the Schedules as not contingent, not unliquidated, and not disputed, and for which no Proof of Claim has been timely filed; (c) that has been expressly Allowed under the Plan, any stipulation approved by the Bankruptcy Court, or a Final Order of the Bankruptcy Court; or (d) is compromised, settled, or otherwise resolved by the Debtors and the Holder of such Claim or Interest; *provided*, that with respect to a Claim described in clauses (a) and (b) above, such Claim shall be considered Allowed only if and to the extent that no objection to the allowance thereof or request for estimation thereof is interposed within the applicable period of time fixed by the Plan, the Bankruptcy Code, the Bankruptcy Rules, or the Bankruptcy Court, or such an objection is so interposed and the Claim has been Allowed by a Final Order of the Bankruptcy Court; *provided*, *further*, that except as otherwise expressly provided herein, the amount of any Allowed Claim or Allowed Interest shall be determined in accordance with the Bankruptcy Code, including sections 502(b), 503(b) and 506 of the Bankruptcy Code.  Except as otherwise expressly specified in the Plan or any Final Order of the Bankruptcy Court, and except to the extent such interest is Allowed pursuant to section 506(b) of the Bankruptcy Code, the amount of an Allowed Claim shall not include interest or any premium on such Claim from and after the Petition Date.  For purposes of determining the amount of an Allowed Claim, there shall be deducted therefrom an amount equal to the amount of any Claim that the Debtors may hold against the holder thereof, to the extent such Claim may be offset, recouped, or otherwise reduced under applicable law.  Any Claim that has been or is hereafter listed in the Schedules as contingent, unliquidated, or disputed, and for which no Proof of Claim or Interest is or has been timely filed, is not considered Allowed and shall be expunged without further action by the Debtors and without further notice to any party or action, approval, or order of the Bankruptcy Court.  Notwithstanding anything to the contrary herein, no Claim of any Entity subject to section 502(d) of the Bankruptcy Code shall be deemed Allowed unless and until such Entity pays in full the amount that it owes.  For the avoidance of doubt, (x) a Proof of Claim filed after the Claims Bar Date or a request for payment of an Administrative Claim filed after the Administrative Claims Bar Date, as applicable, shall not be Allowed for any purposes whatsoever absent entry of a Final Order allowing such late-filed Claim and (y) a Claim or Interest that has been disallowed by a Final Order or settlement shall not be Allowed for any purposes whatsoever.  "Allow," "Allowance," and "Allowing" shall have correlative meanings.

9.     "*Amended Schedules Bar Date*" means the later of (a) the Claims Bar Date or the Governmental Bar Date, as applicable, and (b) 11:59 p.m. **(**prevailing Central Time**)**, on the date that is thirty (30) days following the date on which the Debtors mail notice of an amendment to the Schedules.

10.     "*Avoidance Actions*" means any and all Causes of Action to avoid a transfer of property or an obligation incurred by any of the Debtors arising under sections 542, 544, 545, and 547 through and including 553 of the Bankruptcy Code or other similar or related state, federal, or foreign statutes and common law.

11.     "*Backleverage Credit Agreement*" has the meaning set forth in Article II.B of the Plan.

12.     "*Backleverage Entities*" means, collectively, PosiGen Backleverage LLC and its subsidiaries (including the Project Companies).

7

13.     "*Backleverage Facility*" has the meaning set forth in <u>Article II.B</u> of the Plan.

14.     "*Ballot*" means the applicable form or forms of ballot(s) distributed to each Holder of an Impaired Claim entitled to vote on the Plan on which the Holder indicates either acceptance or rejection of the Plan and (when applicable) any election for treatment of such Claim under the Plan.

15.     "*Bankruptcy Code*" means title 11 of the United States Code, 11 U.S.C. §§ 101–1532, as now in effect or as may be amended hereafter and applicable to the Chapter 11 Cases.

16.     "*Bankruptcy Court*" means (a) the United States Bankruptcy Court for the Southern District of Texas having jurisdiction over the Chapter 11 Cases; (b) to the extent any reference made under section 157 of title 28 of the United States Code is withdrawn or the Bankruptcy Court is determined not to have authority to enter a Final Order on an issue, the unit of such District Court having jurisdiction over the Chapter 11 Cases under section 151 of title 28 of the United States Code; or (c) such other court as may have jurisdiction over the Chapter 11 Cases or any aspect thereof to the extent of such jurisdiction.

17.     "*Bankruptcy Fees*" means all fees required to be paid to the Clerk of the Court and to the United States Trustee under section 1930(a) of title 28 of the United States Code, plus interest at the statutory rate.

18.     "*Bankruptcy Rules*" means the Federal Rules of Bankruptcy Procedure promulgated by the United States Supreme Court pursuant to 28 U.S.C. § 2075 and the general, local, and chambers rules of the Bankruptcy Court, in each case, as amended from time to time and applicable to the Chapter 11 Cases.

19.     "*Bar Date Order*" means the *Order (I) Setting Bar Dates for Filing Proofs of Claim, Including Requests for Payment Under Section 503(b)(9), (II) Establishing Amended Schedules Bar Date and Rejection Damages Bar Date, (III) Approving the Form and Manner for Filing Proofs of Claim, Including Section 503(b)(9) Requests, (IV) Approving Notice of Bar Dates, and (V) Granting Related Relief* [Docket No. 422].

20.     "*Battery Collateral*" means the collateral pledged to secure the Battery Revolving Credit Facility, to the extent such security interest was properly perfected prior to the Petition Date.

21.     "*Battery Revolving Credit Agreement*" has the meaning set forth in <u>Article II.C</u> of the Plan.

22.     "*Battery Revolving Credit Facility*" has the meaning set forth in <u>Article II.C</u> of the Plan.

23.     "*Brookfield*" means (i) BID Administrator, LLC, in its capacity as the administrative and collateral agent under the Secured Promissory Note Agreement and the Backleverage Credit Agreement, and (ii) BID PosiGen Lender LP, BII BID Aggregator A LP, and the other lenders under the Secured Promissory Note Agreement and the Backleverage Credit Agreement.

24.     "*Business Day*" means any day other than a Saturday, Sunday, "legal holiday" (as defined in Bankruptcy Rule 9006(a)), or day on which commercial banks in New York, New York are required or authorized by law to remain closed.

25.     "*Cash*" means legal tender of the United States of America and equivalents thereof.

26.     "*Causes of Action*" means any claims, interests, damages, remedies, causes of action, demands, rights, actions, suits, obligations, liabilities, accounts, defenses, offsets, powers, privileges, licenses, liens, indemnities, guaranties, and franchises of any kind or character whatsoever, whether known

8

or unknown, foreseen or unforeseen, contingent or non-contingent, liquidated or unliquidated, secured or unsecured, assertable directly or derivatively, matured or unmatured, suspected or unsuspected, whether arising before, on, or after the Petition Date, in contract or in tort, in law, or in equity or pursuant to any other theory of state, federal, or other law. For the avoidance of doubt, "Causes of Action" includes: (a) all rights of setoff, counterclaim, or recoupment and claims under contracts or for breaches of duties imposed by law or in equity; (b) the right to object to or to otherwise contest, recharacterize, reclassify, subordinate, or disallow any Claims or Interests; (c) claims pursuant to sections 362, 510, 542, 543, 544 through 550, or 553 of the Bankruptcy Code; (d) claims for breach of statutory, equitable, or constructive trusts created under applicable law or in equity or the misappropriation of funds held in trust or other causes of action or claims related thereto; and (e) such claims and defenses as fraud, mistake, duress, and usury, and any other defenses set forth in section 558 of the Bankruptcy Code.

27.    "*Chapter 11 Cases*" means (a) when used with reference to a particular Debtor, the case pending for that Debtor under chapter 11 of the Bankruptcy Code in the Bankruptcy Court; and (b) when used with reference to all of the Debtors, the procedurally consolidated and jointly administered chapter 11 cases pending for the Debtors in the Bankruptcy Court.

28.    "*Channel Partner*" means a third-party installer that is party to a Channel Partner Agreement.

29.    "*Channel Partner Agreement*" means a channel partner agreement, engineering, procurement, and construction agreement, program agreement, or similar agreement entered into between a Channel Partner and one or more Debtors prior to the Petition Date.

30.    "*Claim*" means any "claim," as such term is defined in section 101(5) of the Bankruptcy Code, against any of the Debtors.

31.    "*Claims and Noticing Agent*" means Kroll Restructuring Administration LLC, the claims, noticing, and solicitation agent retained by the Debtors in the Chapter 11 Cases by order of the Bankruptcy Court [Docket No. 15].

32.    "*Claims Bar Date*" means February 17, 2026 at 11:59 p.m. (prevailing Central Time), as stated in the Bar Date Order.

33.    "*Claims Objection Deadline*" means the date that is 365 days after the Effective Date or such later date as may be approved by the Bankruptcy Court.

34.    "*Claims Register*" means the official register of Claims against and Interests in the Debtors maintained by the Claims and Noticing Agent.

35.    "*Class*" means a category of holders of Claims or Interests pursuant to section 1122(a) of the Bankruptcy Code.

36.    "*Committee*" means the official committee of unsecured creditors appointed in the Chapter 11 Cases on December 5, 2025, as reconstituted from time to time.

37.    "*Committee Members*" means, each member or the Committee solely in its capacity as a former or current member of the Committee.

38.    "*Confirmation*" means the entry of the Confirmation Order on the docket of the Chapter 11 Cases.

9

39. "*Confirmation Date*" means the date upon which the Bankruptcy Court enters the Confirmation Order on the docket of the Chapter 11 Cases.

40. "*Confirmation Hearing*" means the hearing held by the Bankruptcy Court under section 1128 of the Bankruptcy Code at which the Debtors seek entry of the Confirmation Order, as such hearing may be continued from time to time.

41. "*Confirmation Order*" means the order of the Bankruptcy Court approving the Disclosure Statement as containing "adequate information" pursuant to section 1125 of the Bankruptcy Code and confirming the Plan pursuant to section 1129 of the Bankruptcy Code.

42. "*Consolidated Debtors*" means (1) PosiGen, LLC, (2) PosiGen Operations, LLC, (3) Developer, (4) Provider, (5) PosiGen Holdings, LLC, (6) PosiGen Rampart Holdco, LLC, (7) PosiGen Rampart, LLC, (8) Owner 2, and (9) Owner 3.

43. "*Consolidated Debtors Plan Trust Assets*" means all assets held by the Consolidated Debtors as of the date immediately prior to the Effective Date that are not purchased in the Sale Transaction (other than the funds held in the Administrative Expense Escrow Account), which shall be contributed by the Consolidated Debtors on the Effective Date to the Plan Trust, any Plan Trust Contributed Causes of Action that previously belonged to any of the Consolidated Debtors, and the applicable portion of the Plan Trust Cash Distribution.

44. "*Consolidated Debtors Plan Trust Interests*" means beneficial interests in the Plan Trust that entitle holders to (i) until the WARN Action QSF receives $2.55 million in the aggregate on account of the WARN Action Plan Trust Interests, 15% of the Consolidated Debtors Plan Trust Net Litigation Proceeds, and (ii) thereafter, 40% of the Consolidated Debtors Plan Trust Net Litigation Proceeds, to be issued in accordance with the Plan and the Plan Trust Agreement on account of certain Allowed Claims against the Consolidated Debtors, which shall be nontransferable except to the extent both (a) agreed by the Plan Administrator and the Plan Trust Board in their reasonable discretion and (b) permitted by applicable law.

45. "*Consolidated Debtors Plan Trust Net Litigation Proceeds*" means the proceeds of the Plan Trust Contributed Causes of Action less the fees and expenses incurred in prosecuting such Plan Trust Contributed Causes of Action.

46. "*Consummation*" means the occurrence of the Effective Date.

47. "*Cure*" means a Claim (unless waived or modified by the applicable counterparty) for cure of a Debtor's defaults under an Executory Contract or an Unexpired Lease assumed by such Debtor pursuant to section 365 of the Bankruptcy Code, other than a default that is not required to be cured pursuant to section 365(b)(2) of the Bankruptcy Code.

48. "*D&O Liability Insurance Policies*" means, collectively, all insurance policies (including any "tail policy") issued at any time, whether expired or unexpired, to any Debtor's or an Affiliate of any Debtor for certain liabilities of one or more Debtors and/or their current or former directors, managers, and officers, and all agreements, documents, or instruments related thereto.

49. "*DCGB 3L Credit Agreement*" has the meaning set forth in Article II.B of the Plan.

50. "*DCGB 3L Facility*" has the meaning set forth in Article II.B of the Plan.

10

51.     "*Debtor Professional Fees*" means all fees and expenses incurred during the Chapter 11 Cases by the Debtor Professionals.

52.     "*Debtor Professionals*" means any persons or firms retained by the Debtors in connection with the Chapter 11 Cases.

53.     "*Debtor Released Parties*" means the Persons or Entities listed on the Schedule of Debtor Released Parties, if any.

54.     "*Debtors*" means, collectively, (1) PosiGen, PBC, (2) Developer, (3) Provider, (4) PosiGen, LLC, (5) PosiGen Operations, LLC, (6) PosiGen Holdings, LLC, (7) PosiGen Rampart Holdco, LLC, (8) PosiGen Rampart, LLC, (9) Owner 2, and (10) Owner 3.

55.     "*Decatur 1*" means PosiGen Decatur Project Company, LLC.

56.     "*Decatur 2*" means PosiGen Decatur 2 Project Company, LLC.

57.     "*Decatur/Bienville ProjectCos*" means, collectively, (1) Decatur 1, (2) Decatur 2, and (3) PosiGen Bienville Project Company, LLC.

58.     "*Decatur/Bienville Transition*" has the meaning set forth in Article IV.H.3 of the Plan.

59.     "*Decatur/Bienville Transition Procedures*" has the meaning set forth in Article IV.H.3 of the Plan.

60.     "*Deficiency Claim*" means, with respect to any Allowed Secured Claim, the difference between the total amount of such Allowed Secured Claim (without regard to the application of section 506(a) of the Bankruptcy Code) and the distributable value of the collateral securing such Allowed Secured Claim.

61.     "*Developer*" means PosiGen Developer, LLC.

62.     "*DFO*" means DFO Private Investments, L.P.

63.     "*DIP Agent*" means BID Administrator, LLC.

64.     "*DIP Claims*" means the Claims arising under the DIP Facility.

65.     "*DIP Credit Agreement*" means that certain credit agreement documenting the DIP Facility, by and among the Debtors, the DIP Lenders, and the DIP Agent.

66.     "*DIP Facility*" means an up to $43,929,000 multi-draw debtor-in-possession financing facility from the DIP Lenders pursuant to the terms and conditions of the DIP Credit Agreement and the other DIP Loan Documents.

67.     "*DIP Lender Plan Trust Interests*" means all beneficial interests in the Plan Trust to be issued in accordance with the Plan and the Plan Trust Agreement, which shall: (i) be distributed in accordance with Annex V of the Settlement Term Sheet (or as otherwise agreed among Brookfield and G-I prior to the Effective Date) on the Effective Date as consideration for their Plan Trust Cash Contribution; and (ii) entitle such holders of DIP Lender Plan Trust Interests to 60% of the proceeds of the PBC Plan Trust Net Litigation Proceeds and 60% of the Consolidated Debtors Plan Trust Net Litigation Proceeds,

11

*provided* that the DIP Lender Plan Trust Interests shall be subject to the DIP Lender WARN Action Settlement Contribution.

68.     "*DIP Lender WARN Action Settlement Contribution*" means the first PBC Plan Trust Net Litigation Proceeds and Consolidated Debtors Plan Trust Net Litigation Proceeds that would otherwise be distributable by the Plan Trust to the holders of DIP Lender Plan Trust Interests in accordance with the terms and conditions of the Plan Trust Agreement, in an amount equal to (a) $250,000 *less* (b) an amount equal to the aggregate of the per capita shares of the DIP Lender WARN Action Settlement Contribution (without taking into account the effect of this clause (b)) of any members of the WARN Action Settlement Proposed Class that do not grant a release of the WARN Action Released Claims against the WARN Action Released Parties.   The Plan Administrator will distribute the DIP Lender WARN Action Settlement Contribution to the WARN Action QSF or through WARN Action Equivalent Settlement Payments in accordance with the Plan and the Plan Trust Agreement.

69.     "*DIP Lenders*" means, collectively, the lenders under the DIP Facility

70.     "*DIP Loan Documents*" means the security and ancillary documents related to the DIP Credit Agreement.

71.     "*DIP Loans*" means, collectively, Project Proceeds DIP Loans and the New-Money DIP Loans.

72.     "*DIP Obligations*" means all obligations arising under the DIP Loan Documents.

73.     "*DIP Order*" means the *Order (I) Authorizing the Debtors to Obtain Postpetition Financing, (II) Granting Liens and Providing Superpriority Administrative Expense Claims, (III) Authorizing the Use of Cash Collateral, (IV) Granting Adequate Protection to the Prepetition Secured Note Parties, (V) Modifying the Automatic Stay, and (VI) Granting Related Relief* [Docket No. 538].

74.     "*Disclosure Statement*" has the same meaning as Plan and Disclosure Statement.

75.     "*Disclosure Statement Order*" means an order of the Bankruptcy Court conditionally approving the Disclosure Statement as containing "adequate information" in accordance with section 1125 of the Bankruptcy Code.

76.     "*Disputed*" means, with respect to any Claim or Interest, a Claim or Interest (or any portion thereof) that is (a) not yet Allowed, and (b) not disallowed under the Plan, the Bankruptcy Code, or a Final Order or settlement, as applicable.

77.     "*Disputed Claims Reserve*" means an appropriate reserve in an amount to be determined by the Plan Administrator for distribution on account of Disputed Claims that are subsequently Allowed after the Effective Date in accordance with Article X of the Plan.

78.     "*Distributable Cash*" means the Debtors' Cash on hand as of the Effective Date but excluding, for the avoidance of any doubt, any Cash necessary to (x) satisfy Allowed Administrative Claims, including the cash in the Administrative Expense Escrow Account, Allowed Priority Tax Claims, Allowed Other Priority Claims, and Allowed Professional Fee Claims in full; and (y) fund the Plan Trust Cash Contribution and the reasonable expenses of the Plan Administrator.

79. "*Distribution*" means Cash, property, interests in property, or other value distribution to Holders of Allowed Claims, or their designated agent, as applicable under this Plan and/or the Plan Trust Agreement.

80. "*Distribution Agent*" means, prior the Effective Date, the Debtors and, following the Effective Date, the Plan Administrator or any entity designated by the Debtors or the Plan Administrator, as applicable, to make or to facilitate Distributions that are to be made pursuant to the Plan or the Plan Trust Agreement.

81. "*Distribution Date*" means a date selected by the Debtors or the Plan Administrator, on or after the Effective Date, upon which the Distribution Agent shall make Distributions to Holders of Allowed Claims entitled to receive Distributions under the Plan.

82. "*Effective Date*" means, with respect to the Plan, the first date that is a Business Day on which (a) no stay of the Confirmation Order is in effect; (b) all conditions precedent to the occurrence of the Effective Date set forth in Article XIV of the Plan have been satisfied or waived in accordance with the Plan; and (c) the Plan is declared effective by the Debtors. Without limiting the foregoing, any action to be taken on the Effective Date may be taken on or as soon as reasonably practicable after the Effective Date.

83. "*Entity*" has the meaning set for in section 101(15) of the Bankruptcy Code.

84. "*Estate*" means the estate of any Debtor created under sections 301 and 541 of the Bankruptcy Code upon the commencement of the applicable Debtor's Chapter 11 Case.

85. "*Excluded Assets*" means (i) the collateral pledged to secure the June Bridge Loan Facility; (ii) the collateral pledged to secure the Battery Revolving Credit Facility; (iii) certain forklifts subject to the liens of Wells Fargo Bank, N.A.; (iv) certain equipment subject to the liens of HYG Financial Services, Inc.; (v) the equity of Owner 3; (vi) any inventory that is subject to being reclaimed; (vii) property subject to purchase money security interests; and (viii) the Debtors' cash on hand as of the date of consummation of the Sale Transaction (in the case of clauses (i) through (vii), solely to the extent such assets are subject to valid, perfected, and unavoidable liens as of the Petition Date); *provided* that the Purchasers shall be entitled to acquire Excluded Assets, in their sole and absolute discretion, subject to either (a) obtaining the consent of the party or parties with valid, perfected, and unavoidable liens that exist as of the Petition Date on such Excluded Assets or (b) satisfying in cash any valid, perfected, and unavoidable liens that exist as of the Petition Date on such Excluded Assets.

86. "*Exculpated Party*" means each of the following in its capacity as such: (a) the Debtors; (b) the Committee, and (c) each Committee Member.

87. "*Executory Contract*" means a contract to which one or more of the Debtors is a party that is subject to rejection, assumption, or assumption and assignment under section 365 of the Bankruptcy Code.

88. "*Existing Equity Interest*" means an Interest in a Debtor existing as of the Petition Date or created after the Petition Date and prior to the Effective Date.

89. "*Final Cash Management Order*" means the *Final Order (I) Authorizing the Debtors to (A) Continue to Operate Their Existing Cash Management System, (B) Maintain Existing Bank Accounts, Business Forms, and Books and Records, (C) Pay Related Prepetition Obligations, (D) Maintain Fuel Card*

13

*Program, and (E) Continue Intercompany Transactions, (II) Granting Administrative Expense Status to Intercompany Claims Among the Debtors; and (III) Granting Related Relief* [Docket No. 513].

90. "*Final Order*" means an order or judgment of the Bankruptcy Court, or court of competent jurisdiction with respect to the subject matter, as entered on the docket in any Chapter 11 Case or the docket of any court of competent jurisdiction, and as to which the time to appeal, or seek certiorari or move for a new trial, reargument, or rehearing has expired and no appeal or petition for certiorari or other proceedings for a new trial, reargument, or rehearing has been timely taken, or as to which any appeal that has been taken or any petition for certiorari that has been or may be timely filed has been withdrawn or resolved by the highest court to which the order or judgment was appealed or from which certiorari was sought or the new trial, reargument, or rehearing will have been denied, resulted in no stay pending appeal of such order, or has otherwise been dismissed with prejudice; *provided*, that the possibility that a motion under Rule 60 of the Federal Rules of Civil Procedure, or any analogous rule under the Bankruptcy Rules, may be filed with respect to such order will not preclude such order from being a Final Order.

91. "*GAF*" means GAF Energy LLC.

92. "*General Unsecured Claim*" means any Claim against the Debtors that is not an Administrative Claim, a Priority Tax Claim, an Other Priority Claim (including a WARN Action Claim), an Other Secured Claim, a Prepetition Secured Promissory Note Claim, a Prepetition Secured Convertible Note Claim, a Prepetition Battery Loan Claim, a Prepetition June Bridge Loan Claim, a Prepetition July Bridge Loan Claim, a Section 510 Claim, or an Intercompany Claim.  For the avoidance of doubt, General Unsecured Claims excludes Interest and any Claim on account of an obligation that is assumed by a Purchaser under any purchase agreement approved in these Chapter 11 Cases.

93. "*Governmental Bar Date*" means May 23, 2026 at 11:59 p.m. (prevailing Central Time), as stated in the Bar Date Order.

94. "*Governmental Unit*" has the meaning set forth in section 101(27) of the Bankruptcy Code.

95. "*Holder*" means an Entity holding a Claim or an Interest, as applicable, in each case solely in its capacity as such.

96. "*Impaired*" means, when used in reference to a Class of Claims or Interests, a Class of Claims or Interests that is impaired within the meaning of section 1124 of the Bankruptcy Code.

97. "*Insurance Coverage Rights*" means any direct or derivative rights, interests, claims, entitlements, or Causes of Action of any Debtor under any of the Insurance Policies, including the rights of any Debtor to proceeds, indemnification, reimbursement, contribution, benefits, or other payment arising out of or under the Insurance Policies.

98. "*Insurance Policies*" means the D&O Liability Insurance Policies and any and all known and unknown insurance policies or contracts, whether expired or unexpired, that have been issued at any time to, or that provide coverage to, any Debtor or any Affiliate of any Debtor, and all agreements, documents or instruments related thereto, including but not limited to, any agreements with third-party administrators.

99. "*Insurer*" means any company or other entity that issued any Insurance Policies, any third-party administrators of claims against the Debtors or asserted under the Insurance Policies, and any respective predecessors and/or affiliates thereof.

100.　"*Intercompany Claim*" means a Claim held by a Debtor against another Debtor, other than any Administrative Claim.

101.　"*Interest*" means any equity security (as defined in section 101(16) of the Bankruptcy Code) in any Debtor (including all issued, unissued, authorized, or outstanding shares of capital stock of the Debtors and any other rights, options, warrants, stock appreciation rights, phantom stock rights, restricted stock units, redemption rights, repurchase rights, convertible, exercisable, or exchangeable securities, or other agreements, arrangements, or commitments of any character relating to, or whose value is related to, or to obtain any such interest or other ownership interest in any Debtor), whether or not arising under or in connection with any employment agreement and whether or not certificated, transferrable, preferred, common, voting, or denominated "stock" or a similar security.

102.　"*July Bridge Loan Facility*" has the meaning set forth in <u>Article II.C</u> of the Plan.

103.　"*July Bridge Loan Credit Agreement*" has the meaning set forth in <u>Article II.C</u> of the Plan.

104.　"*June Bridge Loan Facility*" has the meaning set forth in <u>Article II.C</u> of the Plan.

105.　"*June Bridge Loan Note*" has the meaning set forth in <u>Article II.C</u> of the Plan.

106.　"*KERP Participants*" means those certain key, non-Insider Employees identified by the Debtors as the beneficiaries of the Non-Insider KERP, as further set forth in the Wage Motion.

107.　"*Law*" means any federal, state, local, or foreign law (including common law), statute, code, ordinance, rule, regulation, order, ruling, or judgment, in each case, that is validly adopted, promulgated, issued, or entered by a governmental authority of competent jurisdiction (including the Bankruptcy Court).

108.　"*Legalist*" means List Government Receivables Fund, LLC, in its capacity as the collateral agent and initial lender under the Owner 3 Credit Agreement.

109.　"*Lien*" has the meaning set forth in section 101(37) of the Bankruptcy Code.

110.　"*M&T*" means M&T Community & Environmental Development LLC.

111.　"*New-Money DIP Loans*" means the $15.023 million of new-money DIP Loans provided by Brookfield, G-I, and Decatur 1, inclusive of the $2 million delayed draw DIP loan to be funded into the Plan Trust on the Effective Date in accordance with the DIP Credit Agreement and Settlement Term Sheet.

112.　"*New Service Co*" has the meaning set forth in <u>Section VII.C</u> of the Plan.

113.　"*Non-Insider KERP*" means the Debtors' non-Insider key employee retention plan, as further set forth in the Wage Motion.

114.　"*Omnidian*" means Omnidian, Inc.

115.　"*Other Priority Claim*" means any Claim other than an Administrative Claim or a Priority Tax Claim entitled to priority in right of payment under section 507(a) of the Bankruptcy Code; *provided*, *however*, that, for purposes of distributions under this Plan, a WARN Action Claim shall be treated as an Other Priority Claim regardless of whether, and the extent to which, such Claim is entitled to such priority in right of payment or is an unsecured claim.

15

116.   "*Other Secured Claim*" means any Secured Claim against the Debtors, as applicable, that is not a Prepetition Secured Promissory Note Claim, a Prepetition Secured Convertible Note Claim, a Prepetition Battery Loan Claim, a Prepetition June Bridge Loan Claim, or a Prepetition July Bridge Loan Claim.

117.   "*Owner 2*" means PosiGen Owner 2, LLC.

118.   "*Owner 2 Collateral*" means the assets of Owner 2 pledged to secure the June Bridge Loan Facility, to the extent such security interest was properly perfected prior to the Petition Date.

119.   "*Owner 3*" means PosiGen Owner 3, LLC.

120.   "*Owner 3 Collateral*" means the assets of Owner 3, PosiGen Rampart, LLC, and any other Debtor pledged to secure the July Bridge Loan Facility to the extent such security interests were properly perfected or were otherwise enforceable against the applicable Debtor(s) and all third parties as a matter of law prior to the Petition Date.

121.   "*Owner 3 Credit Agreement*" means that certain Credit Agreement, dated as of July 31, 2025, among Owner 3, as borrower, PosiGen Rampart LLC, as guarantor and pledgor, Legalist, and the other parties thereto.

122.   "*Owner 3 Parties*" means (1) Legalist, (2) any other lenders under the Owner 3 Credit Agreement, and (3) any successors, assigns or participants of any of the foregoing.

123.   "*PBC Plan Trust Assets*" means all assets held by PosiGen, PBC as of the date immediately prior to the Effective Date that are not purchased in the Sale Transaction (other than the funds held in the Administrative Expense Escrow Account), which shall be contributed by PosiGen, PBC on the Effective Date to the Plan Trust, any Plan Trust Contributed Causes of Action that previously belonged to PosiGen, PBC, and the applicable portion of the Plan Trust Cash Distribution.

124.   "*PBC Plan Trust Interests*" means beneficial interests in the Plan Trust that entitle holders to (i) until the WARN Action QSF receives $2.55 million in the aggregate on account of the WARN Action Plan Trust Interests, 15% of the PBC Plan Trust Net Litigation Proceeds and (ii) thereafter, 40% of the PBC Plan Trust Net Litigation Proceeds, to be issued in accordance with the Plan and the Plan Trust Agreement on account of certain Allowed Claims against PosiGen, PBC, which shall be nontransferable except to the extent both (a) agreed by the Plan Administrator and the Plan Trust Board in their reasonable discretion and (b) permitted by applicable law.

125.   "*PBC Plan Trust Net Litigation Proceeds*" means the proceeds of the Plan Trust Contributed Causes of Action less the fees and expenses incurred in prosecuting such Plan Trust Contributed Causes of Action.

126.   "*Person*" has the meaning set forth in section 101(41) of the Bankruptcy Code.

127.   "*Petition Date*" means November 24, 2025.

128.   "*Plan*" has the same meaning as Plan and Disclosure Statement.

129.   "*Plan Administrator*" means the Person or Entity selected by Brookfield and the Committee to serve as the trustee of the Plan Trust and identified and disclosed in the Plan Supplement,

16

and any successor thereto appointed pursuant to the Plan Trust Agreement, in each case who shall have all powers and authorities set forth in Article XIII of the Plan and the Plan Trust Agreement.

130.     "*Plan and Disclosure Statement*" means this plan and disclosure statement, including the Plan Supplement and any exhibits, appendices, schedules, ballots, and related documents hereto, as amended, supplemented or modified in accordance with applicable law, and any procedures related to the solicitation of votes to accept or reject the Plan, as the same may be amended, modified, supplemented, or amended and restated from time to time, in accordance with the terms hereof.

131.     "*Plan Documents*" means the compilation of documents and forms of documents, schedules and exhibits to the Plan that aid in effectuating the Plan as specifically identified as such herein and filed with the Bankruptcy Court, including, without limitation, the Plan Supplement, the Plan Trust Agreement, and the Confirmation Order.

132.     "*Plan Supplement*" means the documents and forms of documents, schedules, and Plan exhibits, as may be amended, modified, or supplemented from time to time in accordance with the terms thereof, to be filed in a supplement to the Plan that includes the necessary documentation to effectuate the Plan, including (a) the Plan Trust Agreement, (b) the Restructuring Transactions Memorandum, if any, (c) Schedule of Retained Estate Claims and Causes of Action, (d) the Schedule of Debtor Released Parties, (e) the Schedule of Third-party Released Parties, and (f) the Schedule of Assumed and Assigned Contracts, each of which shall be in form and substance acceptable to Brookfield, the Committee, and, solely to the extent that the interests of the Owner 3 Parties are affected, the Owner 3 Parties.

133.     "*Plan Trust*" means a trust to be established on the Effective Date pursuant to the terms of the Plan Trust Agreement and the Plan.

134.     "*Plan Trust Agreement*" means a trust or similar agreement entered into by the Debtors and the Plan Administrator that establishes the Plan Trust and governs the powers, duties, and responsibilities of the Plan Trust and the Plan Administrator, which shall be included in the Plan Supplement and be in form and substance reasonably acceptable to Brookfield, the Committee, and, solely to the extent (i) that the interests of the Owner 3 Parties are affected, the Owner 3 Parties and (ii) such agreement materially, adversely, and disproportionately affect G-I's interests, G-I.

135.     "*Plan Trust Assets*" means the PBC Plan Trust Assets and the Consolidated Debtors Plan Trust Assets.

136.     "*Plan Trust Beneficiaries*" means, collectively, the holders of DIP Lender Plan Trust Interests, holders of the PBC Plan Trust Interests, holders of Consolidated Debtors Plan Trust Interests, and the settlement administrator of the WARN Action QSF (in respect of the WARN Action Plan Trust Interests).

137.     "*Plan Trust Board*" means the board that shall oversee the Plan Trust in accordance with the Plan Trust Agreement and the Plan.

138.     "*Plan Trust Cash Contribution*" means the $2,000,000 of New-Money DIP Loans to be funded as a delayed draw loan on the Effective Date in accordance with the DIP Credit Agreement and Settlement Term Sheet, which shall be transferred to the Plan Trust.

139.     "*Plan Trust Claim Contribution*" means assignment by the Purchasers to the Plan Trust of the Causes of Action that they acquired in the Sale Transaction, other than the Purchaser Retained/Released Causes of Action.

17

140.   "*Plan Trust Claim Reconciliation Process*" means the reconciliation process for all Claims, the Holders of which are to receive Plan Trust Interests (other than DIP Lender Plan Trust Interests) conducted by the Plan Administrator, who shall have authority to object to, settle, compromise, withdraw, assign, or litigate to judgment any and all such Claims and objections to such Claims, subject to the terms and conditions of the Plan Trust Agreement.

141.   "*Plan Trust Contributed Causes of Action*" means the Causes of Action contributed by the Purchasers to the Plan Trust pursuant to the Plan Trust Claim Contribution.

142.   "*Plan Trust Contributions*" means, collectively, the Plan Trust Cash Contribution, the Project Company Waiver, and the Plan Trust Claim Contribution.

143.   "*Plan Trust Fees and Expenses*" means expenses incurred by the Plan Trust (including, but not limited to, any taxes imposed on or payable by the Plan Trust or in respect of the Plan Trust Assets and professional fees) and any additional amount determined to be necessary or appropriate by the Plan Administrator, in accordance with the terms and conditions of the Plan Trust Agreement, to adequately reserve for the operating expenses of the Plan Trust that shall be paid out of the Plan Trust Assets or proceeds thereof (or from the proceeds of any financing authorized hereunder, pursuant to the Confirmation Order or the Plan Trust Agreement); *provided* that, there shall be no other funding for the Plan Trust from the Debtors.

144.   "*Plan Trust Interests*" means the DIP Lender Plan Trust Interests, PBC Plan Trust Interests, and Consolidated Debtors Plan Trust Interests, and WARN Action Plan Trust Interests.

145.   "*Prepetition Battery Loan Claims*" means all Claims derived from, based upon, related to, on account of, or arising under the Battery Revolving Credit Facility and the Battery Revolving Credit Agreement.

146.   "*Prepetition July Bridge Loan Claims*" means all Claims derived from, based upon, related to, on account of, or arising under the July Bridge Loan Facility and the July Bridge Loan Credit Agreement.

147.   "*Prepetition June Bridge Loan Claims*" means all Claims derived from, based upon, related to, on account of, or arising under the June Bridge Loan Facility and the June Bridge Loan Note.

148.   "*Prepetition Secured Convertible Note Claims*" means all Claims derived from, based upon, related to, on account of, or arising under the Secured Convertible Notes and the Secured Note Purchase Agreement.

149.   "*Prepetition Secured Promissory Note Claims*" means all Claims derived from, based upon, related to, on account of, or arising under the Promissory Note and the Secured Promissory Note Agreement.

150.   "*Prepetition Unsecured Convertible Note Claims*" means all Claims derived from, based upon, related to, on account of, or arising under the Unsecured Convertible Notes and the Unsecured Note Purchase Agreement.

151.   "*Priority Tax Claim*" means any Claim of a Governmental Unit of the kind specified in section 507(a)(8) of the Bankruptcy Code.

152.   "*Pro Rata*" means the proportion that an Allowed Claim or an Allowed Interest in a particular Class bears to the aggregate amount of Allowed Claims or Allowed Interests entitled to the same

treatment in that respective Class, or the proportion that Allowed Claims or Allowed Interests in a particular Class bear to the aggregate amount of Allowed Claims or Allowed Interests in a particular Class and other Classes entitled to share in the same recovery or consideration (*e.g.*, PBC Plan Trust Interests and Consolidated Debtors Plan Trust Interests) as such Allowed Claim or Allowed Interest under the Plan, as applicable.

153.    "*Professional*" means any Entity: (a) employed in the Chapter 11 Cases pursuant to a Final Order in accordance with sections 327, 363 and 1103 of the Bankruptcy Code and to be compensated for services rendered prior to or on the Effective Date pursuant to sections 327, 328, 329, 330, 331, or 363 of the Bankruptcy Code; or (b) for which compensation and reimbursement has been Allowed by the Bankruptcy Court pursuant to section 503(b)(4) of the Bankruptcy Code.

154.    "*Professional Fee Amount*" means, subject to the Approved Budget, the aggregate amount of Professional Fee Claims and other unpaid fees and expenses that the Professionals estimate they have incurred or will incur in rendering services to the Debtors and the Committee as set forth in Article VI of the Plan.

155.    "*Professional Fee Claim*" means (1) any Administrative Claim for the compensation of Professionals and the reimbursement of expenses incurred by such Professionals through and including the Confirmation Date to the extent such fees and expenses have not been paid pursuant to an order of the Bankruptcy Court, and (2) fees incurred after the Confirmation Date relating to Plan implementation or prosecution of final fee applications by the Debtors' or Committee's Professionals. To the extent the Bankruptcy Court denies or reduces by a Final Order any amount of a Professional's requested fees and expenses, then the amount by which such fees or expenses are reduced or denied shall reduce the applicable Professional Fee Claim.

156.    "*Professional Fee Funding Date*" has the meaning set forth in Article VI of the Plan.

157.    "*Project*" means a Solar System and all related customer leases and power purchase agreements, batteries, renewable energy credits, incentives, and similar environmental allowances and credits, and rights, and all investment tax credits or proceeds thereof associated therewith.

158.    "*Project Companies*" means, collectively, (1) Rooftop Solar I, LLC, (2) Rooftop Solar II, LLC, (3) Rooftop Solar III, LLC, (4) Rooftop Solar IV, LLC, (5) Rooftop Solar V, LLC, (6) PosiGen Marengo Project Company, LLC, (7) PosiGen Bienville Project Company, LLC, (8) Decatur 1, (9) Decatur 2, and (10) PosiGen Owner, LLC.

159.    "*Project Company Waiver*" means the waiver by each of the Project Companies except for Decatur 2 (which is not providing any waiver) of distributions of Plan Trust Interests on account of their General Unsecured Claims against the Debtors upon the occurrence of the Effective Date and the distribution of the DIP Lender Plan Trust Interests pursuant to the Settlement.

160.    "*Project Proceeds*" means all cash, revenues, receipts, proceeds, payments, receivables, or other amounts arising from a Project Company's Projects.

161.    "*Project Proceeds DIP Loans*" means the Project Proceeds held or received by the Debtors at any time from the Petition Date to Project Proceeds Outside Date.

162.    "*Project Proceeds DIP Loan Cap*" means $20.906 million.

163.    "*Project Proceeds Outside Date*" means February 25, 2026.

19

164.     "*Promissory Note*" has the meaning set forth in <u>Article II.C</u> of the Plan.

165.     "*Proof of Claim*" means a proof of Claim filed against any of the Debtors in the Chapter 11 Cases.

166.     "*Provider*" means PosiGen Provider, LLC.

167.     "*Purchaser*" means any purchaser of all or substantially all of the Debtors' assets pursuant to the Sale Transaction.

168.     "*Purchaser Retained/Released Causes of Action*" means the following, which shall be either released or acquired by the Purchasers in their sole discretion:  (i) any and all Causes of Action of any Debtor or its Estate against the Backleverage Entities, the DIP Lenders, Brookfield, M&T, DFO, SunStrong, or the Purchasers, their current or former Affiliates (other than the Debtors and the Debtors' current and former directors and officers), and their Related Parties; (ii) the Debtors' Avoidance Actions against ordinary course trade vendors (which shall be released by the Purchaser); (iii) any other Causes of Action mutually agreed among the Debtors, the Committee, the Owner 3 Parties, and the Purchasers; and (iv) Causes of Action of any Debtor or its Estate relating to the ongoing business or commercial operations of the Project Companies, which shall not include Causes of Action against the Debtors.

169.     "*Reinstated*" or "*Reinstatement*" means, with respect to Claims and Interests, that the Claim or Interest shall be rendered unimpaired in accordance with section 1124 of the Bankruptcy Code, notwithstanding any contractual provision or applicable non-bankruptcy law that entitles the Holder to demand or receive payment of such Claim prior to the stated maturity of such Claim from and after the occurrence of a default.

170.     "*Rejection Damages Bar Date*" means the later of (a) the Claims Bar Date or the Governmental Bar Date, as applicable, and (b) 11:59 p.m. **(**prevailing Central Time**)** on the date that is thirty (30) days following entry of the order approving the Debtors' rejection of the applicable executory contract or unexpired lease.

171.     "*Related Party*" means with respect to any Entity (but excluding, for the avoidance of doubt, any Debtor), each of, and in each case solely in its capacity as such, such Entity's current and former Affiliates, and such Entity's and its current and former Affiliates' current and former directors, managers, officers, equity holders (regardless of whether such interests are held directly or indirectly), affiliated investment funds or investment vehicles, predecessors, participants, successors, assigns, subsidiaries, affiliates, managed accounts or funds, partners, limited partners, general partners, principals, members, management companies, fund advisors or managers, employees, agents, advisory board members, financial advisors, attorneys, accountants, investment bankers, consultants, representatives, heirs, executors, and assigns, and other professionals, together with their respective past and present directors, officers, shareholders, partners, members, employees, agents, attorneys, representatives, heirs, executors and assigns, in each case solely in their capacities as such.  Notwithstanding the foregoing, "Related Party" shall not include any Debtor, any Debtor's current or former directors, managers, officers, equity holders (regardless of whether such interests are held directly or indirectly), partners, limited partners, general partners, principals, members, management companies, employees, advisory board members, financial advisors, attorneys, accountants, investment bankers, consultants, and other professionals.

172.     "*Released Party*" means each of the following in its capacity as such: (a) each Third-party Released Party, if any; (b) Brookfield, (c) the DIP Lenders; (d) the DIP Agent; (e) the Project Companies; (f) Backleverage; (g) G-I; (h) GAF; (i) Vision Ridge; (j) M&T; (k) DFO; (l) the Owner 3 Parties; (m) SunStrong; (n) the Committee; (o) the Committee Members; (p) the Purchasers; and (q) each Related Party

20

of each Entity in clauses (b) through (p); provided that any holder of a Claim or Interest that opts out of the releases shall not be a "Released Party."

173. "*Releasing Party*" means each of the following, solely in its capacity as such: (a) each Debtor; (b) each Debtor Released Party; (c) Brookfield, (d) the DIP Lenders; (e) the DIP Agent; (f) the Project Companies; (g) Backleverage; (h) G-I; (i) GAF; (j) Vision Ridge; (k) M&T; (l) DFO; (m) the Owner 3 Parties; (n) the Committee; (o) each Committee Member; (p) the Purchasers; (q) any holder of a Claim or Interest that does not opt out of granting releases; (r) each current and former Affiliate of each Entity in clauses (a) through (d); and (s) each Related Party of each Entity in clauses (c) through (r).

174. "*Restructuring Transactions Memorandum*" means the summary of certain steps to implement the Plan that shall be filed with the Plan Supplement in the discretion of the Settlement Parties.

175. "*Retained Estate Claims and Causes of Action*" means Claims and Causes of Action vesting in the Plan Administrator pursuant to Article XII of the Plan, including, but not limited to, but subject to the occurrence of the Effective Date, all of the Plan Trust Contributed Causes of Action , which shall be listed or described in the Schedule of Retained Estate Claims and Causes of Action. Notwithstanding the foregoing and regardless of the Schedule of Retained Estate Claims and Causes of Action, "Retained Estate Claims and Causes of Action" do not include (i) Professional Fee Claims, (ii) any Purchaser Retained/Released Causes of Action, and (iii) any Claims or any Causes of Action released under the Plan or a Final Order, including Claims or Causes of Action that are released pursuant to the Plan under Article XII. Unless otherwise released by the Plan, the Debtors and the Plan Administrator reserve all Causes of Action (including all defenses) against or related to all Persons or Entities that are party to or that may in the future become party to litigation, arbitration, or any other type of adversarial proceeding or dispute resolution proceeding against the Debtors or the Plan Administrator or to which any Debtor is or may in the future become a party, whether formal or informal or judicial or non-judicial.

176. "*Rooftop/Marengo ProjectCos*" means, collectively, (1) PosiGen Owner, LLC, (2) Rooftop Solar I, LLC, (3) Rooftop Solar II, LLC, (4) Rooftop Solar III, LLC, (5) Rooftop Solar IV, LLC, (6) Rooftop Solar V, LLC, and (7) PosiGen Marengo Project Company, LLC.

177. "*Rooftop/Marengo Transition*" has the meaning set forth in Article IV.H.3 of the Plan.

178. "*Rooftop/Marengo Transition Procedures*" has the meaning set forth in Article IV.H.3 of the Plan.

179. "*Sale Assets*" means all of the Debtors' assets, including all of the Debtors' inventory, work-in-progress Projects, and Causes of Action, other than the Excluded Assets.

180. "*Sale Documents*" means the definitive documents governing the Sale Transaction, including but not limited to, the Settlement Order and the Asset Purchase Agreement.

181. "*Sale Transaction*" has the meaning given to such term in the Settlement Term Sheet.

182. "*Schedule of Debtor Released Parties*" means the schedule of Debtor Released Parties that shall be filed with the Plan Supplement, which shall be in form and substance acceptable to Brookfield, G-I, M&T, DFO, SunStrong, the Decatur/Bienville ProjectCos, the Committee, and the Owner 3 Parties.

183. "*Schedule of Retained Estate Claims and Causes of Action*" means the schedule of Retained Estate Claims and Causes of Action, as the same may be amended, modified, or supplemented from time to time, which will be included in the Plan Supplement.

21

184. "*Schedule of Third-party Released Parties*" means the schedule of Third-party Released Parties that shall be served in accordance with the Disclosure Statement Order by not later than the Solicitation and Notice Deadline (as defined in the Disclosure Statement Order), which schedule shall be in form and substance acceptable to Brookfield, G-I, M&T, DFO, SunStrong, the Decatur/Bienville ProjectCos, the Committee, and the Owner 3 Parties.

185. "*Schedules*" means, collectively, the schedules of assets and liabilities, schedules of Executory Contracts and Unexpired Leases, and statements of financial affairs filed by the Debtors pursuant to section 521 of the Bankruptcy Code, as such schedules and statements may be amended, modified, or supplemented from time to time.

186. "*Section 510 Claim*" means any Claim subject to subordination under section 510 of the Bankruptcy Code.

187. "*Secured Claim*" means any Claim (a) secured by a Lien on property in which the Estate has an interest, which Lien is valid, perfected, and enforceable pursuant to applicable law or by reason of a Final Order entered by the Bankruptcy Court to the extent of the value of the creditor's interest in the Estate's interest in such property or (b) subject to setoff pursuant to section 553 of the Bankruptcy Code to the extent of the amount subject to setoff, in each case as determined pursuant to section 506(a) of the Bankruptcy Code.

188. "*Secured Convertible Notes*" has the meaning set forth in Article II.C of the Plan.

189. "*Secured Note Purchase Agreement*" has the meaning set forth in Article II.C of the Plan.

190. "*Secured Promissory Note*" has the meaning set forth in Article II.C of the Plan.

191. "*Secured Promissory Note Agreement*" has the meaning set forth in Article II.C of the Plan.

192. "*Securities Act*" means the Securities Act of 1933, as amended, 15 U.S.C. §§ 77a–77aa, and the rules and regulations promulgated thereunder.

193. "*Service Agreement*" means a maintenance services agreement or administrative services agreement by and among Provider and one or more of the Project Companies.

194. "*Settlement*" means the "Global Settlement" under and as defined in the Settlement Term Sheet.

195. "*Settlement Order*" means the *Order (I) Approving (A) the Global Settlement, (B) the Transition Procedures and the Transitions, (C) the Channel Partner Settlement Procedures, and (D) the Sale Transaction, the Asset Purchase Agreement, and the Sale Notice and (II) Granting Related Relief* [Docket No. 542].

196. "*Settlement Parties*" means the parties to the Settlement.

197. "*Settlement Term Sheet*" means that certain term sheet that sets forth the principal terms of the Settlement, and attached to the Settlement Order as Exhibit C.

198. "*SunStrong*" means SunStrong Management LLC, in its capacity as Managing Member of the Decatur/Bienville ProjectCos.

199.     "*Third-party Released Parties*" means the Persons or Entities listed on the Schedule of Third-party Released Parties.

200.     "*Transaction Approval Motion*" means the Debtors' motion [Docket No. 310] seeking entry of the Transaction Approval Orders.

201.     "*Transaction Approval Orders*" means, collectively, the DIP Order and the Settlement Order, which shall be in form and substance reasonably acceptable to Brookfield, G-I, the Rooftop/Marengo ProjectCos, and solely to the extent that the interests of the Owner 3 Parties are affected, the Owner 3 Parties.

202.     "*Transition Effective Date*" means a date promptly following the entry of the Transaction Approval Orders mutually agreed by (1) with respect to the Rooftop/Marengo Transition, the Debtors, the Rooftop/Marengo ProjectCos, G-I, and Brookfield, and (2) with respect to the Decatur/Bienville Transition, the Debtors, M&T, SunStrong, and Brookfield, on which the Debtors shall consummate the Sale Transaction and the Transitions (together with any outstanding Transitions steps).

203.     "*Transfer*" means to sell, resell, reallocate, use, pledge, assign, transfer, hypothecate, participate, donate, or otherwise encumber or dispose of, directly or indirectly (including through derivatives, options, swaps, pledges, forward sales, or other transactions).

204.     "*Transition Procedures*" means, collectively, the Rooftop/Marengo Transition Procedures and the Decatur/Bienville Transition Procedures.

205.     "*Transitions*" means, collectively, the Rooftop/Marengo Transition, which in the case of the Rooftop/Marengo ProjectCos, shall be reasonably acceptable to Brookfield and GAF in all respects, and the Decatur/Bienville Transition, which, in the case of the Decatur/Bienville ProjectCos, shall be reasonably acceptable to such Project Companies in all respects.

206.     "*U.S. Trustee*" means the Office of the United States Trustee for the Southern District of Texas.

207.     "*Unexpired Lease*" means a lease to which one or more of the Debtors is a party that is subject to assumption or rejection under sections 365 of the Bankruptcy Code.

208.     "*Unimpaired*" means, when used in reference to a Class, a Class of Claims or Interests that is not Impaired.

209.     "*United States Trustee*" means the United States Trustee for the jurisdiction in which the Chapter 11 Cases are commenced.

210.     "*Unsecured Convertible Notes*" has the meaning set forth in Article II.C of the Plan.

211.     "*Unsecured Note Purchase Agreement*" has the meaning set forth in Article II.C of the Plan.

212.     "*Wage Motion*" means the *Debtors' Emergency Motion for Entry of Orders (I) Authorizing the Debtors to (A) Pay Prepetition Wages, Other Compensation, Reimbursable Expenses, and Certain Severance Obligations and (B) Continue Employee Benefits Programs, (II) Authorizing and Approving the Debtors' Non-Insider Key Employee Retention Plan, (III) Authorizing and Approving the Debtors' Key Employee Incentive Plan for Certain Officers, and (IV) Granting Related Relief* [Docket No. 6].

213.    "*WARN Action Claim*" means any Other Priority Claim and any unsecured claim arising from WARN Actions.

214.    "*WARN Action Class Counsel*" means, collectively, The Gardner Firm, PC, Lankenau & Miller, LLP, and Siri | Glimstad.

215.    "*WARN Action Equivalent Settlement Payment*" means one or more distributions by the Plan Trust to the Holder of an Allowed WARN Action Claim in an amount equal to the aggregate distributions of the WARN Action Settlement Amount such Holder would have received from the WARN Action QSF if (i) the WARN Action Final Settlement Order had been entered by the Bankruptcy Court (if not entered), (ii) all members of the WARN Action Settlement Proposed Class were members of the WARN Action Settlement Class, and (iii) such Holder was a member of the WARN Action Settlement Class, which amount shall be determined, from time to time, by agreement of the Plan Administrator and the settlement administrator of the WARN Action QSF and, if not so agreed, by order of the Bankruptcy Court.

216.    "*WARN Action Estimation Motion*" means the Debtors' *Motion Pursuant to 11 U.S.C. §§ 105(a), 502(c) and 28 U.S.C. § 157(b)(2)(b) for (I) Entry of an Order Estimating the WARN Claims, Vacation Claims, and Commission Claims, and (II) Granting Related Relief* [Docket No. 469].

217.    "*WARN Action Final Settlement Order*" means the "final" order approving the WARN Action Settlement as entered by the Bankruptcy Court and which has become a Final Order, the proposed form of which is attached hereto as **Exhibit C**.

218.    "*WARN Action Plan Trust Interests*" means beneficial interests that entitle the WARN Action QSF, on behalf of the members of the WARN Action Settlement Class, to 25% of the PBC Plan Trust Net Litigation Proceeds and 25% of the Consolidated Debtors Plan Trust Net Litigation Proceeds, to be issued in accordance with the Plan and Plan Trust Agreement on account of WARN Action Claims, which shall be nontransferable except to the extent both (a) agreed by the Plan Administrator and the Plan Trust Board in their reasonable discretion and (b) permitted by applicable law; *provided*, *however*, that in no event shall the WARN Action QSF receive more than $2.55 million in the aggregate on account of such interests.

219.    "*WARN Action QSF*" means a fund, account, or trust intended to be treated as a "qualified settlement fund" (within the meaning of Treasury Regulations section 1.468B-1 for U.S. federal income tax purposes) and expressly established pursuant to the WARN Action Final Settlement Order entered by (and subject to the continuing jurisdiction of) the Bankruptcy Court, the assets of which shall be segregated from other assets of the Debtors, the Plan Trust, and the Plan Administrator.

220.    "*WARN Action Release*" means a release by a Holder of an Allowed WARN Action Claim of the WARN Action Released Claims against the WARN Action Released Parties.

221.    "*WARN Action Released Claims*" means any and all Claims, obligations, rights, suits, damages, Causes of Action, remedies, and liabilities whatsoever, whether known or unknown, foreseen or unforeseen, matured or unmatured, existing or hereafter arising, contingent or noncontingent, in law, equity, contract, tort or otherwise, that a Holder of a WARN Action Claim would have been legally entitled to assert, based on or relating to, or in any manner arising from, in whole or in part, any of the facts alleged in the WARN Action Complaint, the WARN Action Answer, or the WARN Action Estimation Motion against a WARN Action Released Party.

24

222. "*WARN Action Released Party*" means (a) Brookfield, (b) the Backleverage Entities, (c) each Related Party of each of entity in clause (a) and (b); and (d) each Related Party of each Debtor (that is not itself a Debtor).

223. "*WARN Action Representative Claimants*" means Alex Ruperto, Tanisha Smith, Leandro Espinosa, Donald Giamboy, and Robert McGregor, on behalf of themselves and on behalf of the WARN Action Plaintiffs.

224. "*WARN Action Residual Funds*" has the meaning set forth in Article VIII.J of the Plan.

225. "*WARN Action Settlement*" has the meaning set forth in Article VIII.J of the Plan.

226. "*WARN Action Settlement Amount*" means the aggregate of (a) the WARN Action Settlement Funds and (b) the distributions, if any, by the Plan Trust to the WARN Action QSF, on behalf of the members of the WARN Action Settlement Class, on account of the WARN Action Plan Trust Interests; *less* the aggregate of the WARN Action Equivalent Settlement Payments required to be paid by the Plan Trust to Holders of Allowed WARN Action Claims that are not members of the WARN Action Settlement Class.

227. "*WARN Action Settlement Class*" means a settlement class consisting of approximately 470 former employees of the Debtors, as identified by WARN Action Class Counsel, from the Debtors' books and records, who were involuntarily separated from employment on or about August 24, 2025, but excluding any persons who timely elect to opt out of the WARN Action Settlement.

228. "*WARN Action Settlement Funds*" means the following amounts: (a) $200,000 of Cash that would otherwise be distributable from the Administrative Expense Escrow Account to Debtor Professionals; and (b) the DIP Lender WARN Action Settlement Contribution.

229. "*WARN Action Settlement Payment*" means one or more distributions (which, for the avoidance of doubt, shall be net of the amounts described in clauses (j) and (k) of Article VIII.J of the Plan) by the WARN Action QSF of the WARN Action Settlement Amount to each member of the WARN Action Settlement Class ***on a per-person basis*** and otherwise in accordance with the Plan and the WARN Action Final Settlement Order.

230. "*WARN Action Settlement Proposed Class*" means a proposed settlement class consisting of approximately 470 former employees of the Debtors, as identified by WARN Action Class Counsel, from the Debtors' books and records, who were involuntarily separated from employment on or about August 24, 2025.

231. "*WARN Actions*" means causes of action for violation of the WARN Act or any state law equivalent thereof or otherwise seeking a recovery on account of Claims of the types alleged in the WARN Action Complaint, including but not limited to, those causes of action asserted by the WARN Action Complaint.

232. "*WIP Projects*" means Projects with uncompleted Solar Systems.

## B.    Rules of Interpretation

For purposes of this Plan and Disclosure Statement:  (a) in the appropriate context, each term, whether stated in the singular or the plural, shall include both the singular and the plural, and pronouns stated in the masculine, feminine, or neuter gender shall include the masculine, feminine, and the neuter

25

gender; (b) unless otherwise specified, any reference herein to a contract, lease, instrument, release, indenture, or other agreement or document being in a particular form or on particular terms and conditions means that such document shall be substantially in such form or substantially on such terms and conditions; (c) unless otherwise specified, any reference herein to an existing document, schedule, or exhibit, shall mean such document, schedule, or exhibit, as it may have been or may be amended, modified, or supplemented; (d) unless otherwise specified, all references herein to "Articles" and "Sections" are references to Articles and Sections, respectively, hereof or hereto; (e) the words "herein," "hereof," and "hereto" refer to the Plan and Disclosure Statement in its entirety rather than to any particular portion of the Plan and Disclosure Statement; (f) captions and headings to Articles and Sections are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation of the Plan; (g) unless otherwise specified herein, the rules of construction set forth in section 102 of the Bankruptcy Code shall apply; (h) any term used in capitalized form herein that is not otherwise defined but that is used in the Bankruptcy Code or the Bankruptcy Rules shall have the meaning assigned to such term in the Bankruptcy Code or the Bankruptcy Rules, as applicable; (i) references to docket numbers of documents filed in the Chapter 11 Cases are references to the docket numbers under the Bankruptcy Court's CM/ECF system; (j) references to "shareholders," "directors," and/or "officers" shall also include "members" and/or "managers," as applicable, as such terms are defined under the applicable state limited liability company laws; (k) the words "include" and "including," and variations thereof, shall not be deemed to be terms of limitation, and shall be deemed to be followed by the words "without limitation;" and (l) any immaterial effectuating provisions may be interpreted by the Debtors or the Plan Administrator, as applicable, in such a manner that is consistent with the overall purpose and intent of the Plan all without any further notice to or action, order, or approval of the Bankruptcy Court or any other Entity.

## C.     Computation of Time

Unless otherwise specifically stated herein, the provisions of Bankruptcy Rule 9006(a) shall apply in computing any period of time prescribed or allowed herein. If the date on which a transaction may or shall occur pursuant to the Plan is not a Business Day, then such transaction shall instead occur on the next succeeding Business Day.

## D.     Governing Law

Unless a rule of law or procedure is supplied by federal law (including the Bankruptcy Code and Bankruptcy Rules) or unless otherwise specifically stated, the laws of the State of New York, without giving effect to the principles of conflict of laws, shall govern the rights, obligations, construction, and implementation of the Plan and any agreements, documents, instruments, or contracts executed or entered into in connection with the Plan (except as otherwise set forth in those agreements, in which case the governing law of such agreement shall control); *provided*, *however*, that corporate governance matters relating to the Debtors or the Plan Administrator, as applicable, shall be governed by the laws of the state of incorporation or formation of the relevant Debtor or the Plan Trust.

## E.     Reference to Monetary Figures

All references in the Plan to monetary figures shall refer to currency of the United States of America, unless otherwise expressly provided.

## F.     Controlling Document

In the event of any inconsistency between this Plan and Disclosure Statement or any exhibit or schedule hereto, the provisions of this Plan and Disclosure Statement shall govern. In the event of any inconsistency between this Plan and Disclosure Statement and any document or agreement filed in the Plan

26

Supplement, the terms of the relevant provision in such document or agreement shall control (unless stated otherwise in such document or agreement or in the Confirmation Order).  In the event of any inconsistency among this Plan and Disclosure Statement or any document or agreement filed in the Plan Supplement and the Confirmation Order, the Confirmation Order shall control.

**ARTICLE II.**
**THE DEBTORS' CORPORATE HISTORY, STRUCTURE, AND BUSINESS OVERVIEW**

**A.      The Debtors' Corporate History**

The Debtors, together with their non-debtor affiliates (collectively, "**PosiGen**" or the "**Company**") are a leading provider of affordable solar and energy efficiency to working-class families in the United States.  As of the end of 2024, the Company has offered solar energy to over 40,000 customers across 15 states, resulting in approximately $170 million in cumulative savings for its customers.

**B.      The Debtors' Business Operations**

In its initial years, the Company focused on growing its operational capacity and customer base throughout Louisiana.  In 2014, PosiGen expanded into Connecticut to provide solar and energy efficiency to underserved communities across the state.  From Connecticut, the Company continued to expand throughout New England and the mid-Atlantic region.  The Company expanded its operations and sales teams to serve New Jersey in 2018.  In 2021, the Company started operating in Mississippi and Pennsylvania and launched operations in Massachusetts, West Virginia, Rhode Island, and New Hampshire in 2024.

**1.      PosiGen's Solar System Development Business**

At its outset, the Company primarily developed and installed its own photovoltaic systems that convert solar radiation into electrical energy usable by standard electrical appliances (the "**Solar Systems**"). Solar Systems include the following components: (a) solar photovoltaic panels that turn sunlight into direct current electricity; (b) inverters that convert solar-generated direct current electricity into alternating current electricity; (c) racking systems that attach the solar photovoltaic panels to the roof or ground; (d) remote monitoring systems that measure and monitor the system; and (e) in certain cases, battery energy storage systems.

The Company then expanded to develop relationships and work with local, independent Channel Partners to market, sell, and install products and services, including Solar Systems, leases for the use of Solar Systems ("**Solar Leases**"), and power purchase agreements to customers ("**PPA**s" and, together with the Solar Leases, the "**Customer Agreements**") using PosiGen's financing platform, described in greater detail below.  The Company's business with Channel Partners grew as it expanded.  Working with Channel Partners provided PosiGen with the ability to enter new markets without the fixed costs associated with operating in those markets directly.  The Channel Partner program also enabled the Company to leverage the Channel Partners' specialized knowledge, connections, technical oversight, expertise, and experience in local markets, while providing the Channel Partners with access to high-quality products at competitive prices.  Prior to the Petition Date, the Company had more than 60 Channel Partners.  The Company's development business with Channel Partners was shuttered when it encountered liquidity issues in August 2025, and it ceased developing new Solar Systems.

PosiGen (through Developer) and/or its Channel Partners (through Channel Partner Agreements) are generally responsible for:  (a) marketing, sourcing, verifying, and originating customers for Solar Systems in compliance with PosiGen's underwriting standards; (b) designing, engineering, and procuring

27

Solar Systems  and other products from a list of manufacturers pre-approved by PosiGen; and (c) installing, commissioning, and connecting the Solar Systems to the local electrical grid pursuant to PosiGen's procedures and applicable regulatory requirements.

PosiGen's customers enter into long-term Customer Agreements with respect to the Solar Systems installed on their roofs.  Under Solar Leases, customers lease Solar Systems from the Company for existing (also referred to as retrofit) or new homes in exchange for fixed monthly rates, without upfront payments.  Under the PPAs, customers purchase power generated by the Solar Systems from the Company at a fixed rate.

Certain of the Solar Leases include performance guarantees, under which Developer (on behalf of the Project Companies) would credit or provide a refund to a customer if a Solar System failed to meet a guaranteed minimum level of electricity output for each year of the initial term of the Solar Lease.  The PPAs do not include performance guarantees as they provide that customers are billed based on power generation.  Many of the Solar Leases also include savings guarantees, under which Developer (on behalf of the Project Companies) would credit a customer or offer additional services at no additional cost if the customer's electricity costs in the first year of the Solar Lease were greater than they would have been without the Solar System.

Solar System projects typically progress in accordance with certain milestones:  (a) a customer's execution of a Customer Agreement, either through a Channel Partner or directly with Developer; (b) submission of permitting requests to relevant authorities having jurisdiction, based on a final design proposal ("**Permit Submission**"); (c) physical installation of the Solar System ("**Mechanical Completion**"); (d) completion and submission of all documentation required to commission the Solar System ("**Substantial Completion**"); and (e) Developer's final inspection of the Solar System, the Solar System's connection to the local power grid, and the Solar System's placement in service ("**Final Completion**").

PosiGen grew dramatically in 2024, increasing its year-over-year installations by 35% and deploying 71 megawatts of solar power capacity across 8,771 Solar Systems.  PosiGen's Solar Systems resulted in cumulative savings of approximately $45 million for its customers in 2024 and approximately $170 million since it was founded.

### 2.  Financing the Business

Under PosiGen's Customer Agreements, customers are required to make monthly payments (after making no upfront payments).  But the installation of Solar Systems often requires significant up-front cash investments from the Company.  To finance its development operations, PosiGen ultimately sold the Customer Agreements and associated Solar Systems, through Developer, to financing vehicles which are generally referred to as "**Tax Equity Partnerships**" or "**TEPs**."  The use of TEPs allowed the Company and the TEPs to finance the cost of construction and receive and monetize the federal income tax attributes generated by the Solar Systems.  The Company also raised structurally junior warehouse financing through the $600 million Backleverage Facility, which also provided a portion of the financing used to purchase Solar Systems from Developer.

#### a.  Tax Equity Partnerships

A TEP is an LLC jointly owned by a third-party TEP investor, which receives class A membership interests on account of its capital contribution (the "**Class A Member**"), and PosiGen, which retains class B membership interests through a non-Debtor special purpose "TEP Manager" entity (the "**Class B Member**").  The Class A Member provided up-front capital contributions used by the TEPs to purchase

28

Solar Systems from Developer, in exchange for entitlements to cash flows, solar Investment Tax Credits ("**ITCs**"), and other tax attributes (*e.g.*, depreciation deductions and net operating losses) that such Solar Systems generated.

The non-Debtor Class B Members of the PosiGen TEPs are (1) Rooftop Solar I Manager, LLC ("**Rooftop Manager**"), (2) PosiGen Bienville Manager, LLC ("**Bienville Manager**"), (3) PosiGen Decatur Manager, LLC ("**Decatur Manager**"), and (4) PosiGen Marengo Manager, LLC ("**Marengo Manager**" and, together with Rooftop Manager, Bienville Manager, and Decatur Manager, the "**Managers**"). Each Class B Member is a subsidiary of non-Debtor PosiGen Backleverage, LLC ("**Backleverage**"), Rooftop Manager, in partnership with its Class A Member, G-I Energy Investments, LLC ("**G-I**"), owns five non-Debtor Project Companies Rooftop Solar I, LLC, Rooftop Solar II, LLC, Rooftop Solar III, LLC, Rooftop Solar IV, LLC, and Rooftop Solar V, LLC. Bienville Manager, in partnership with its Class A Member, DFO, owns Project Company PosiGen Bienville Project Company, LLC. Decatur Manager, in partnership with its Class A Member, M&T, owns Project Companies Decatur 1 and Decatur 2. Finally, Marengo Manager, in partnership with its Class A Member, SAF PGN, LLC ("**Vision Ridge**" and, together with G-I, DFO, and M&T, the "**Class A TEP Investors**"), owns Project Company PosiGen Marengo Project Company, LLC. The Class A TEP Investors have collectively invested over $400 million into the TEPs.

Prior to the Petition Date, Developer (directly or through the relevant Channel Partner) entered into a Customer Agreement with a homeowner, and either designed and installed the Solar System or approved a Channel Partner's design and installation. The Solar System was then sold by Developer to a Project Company through a development and purchase agreement (a "**TEP Purchase Agreement**"), with each of the applicable Class A Members and Class B Members contributing its portion of the purchase price. The Project Company generally paid the purchase price in two installments – it paid 45-55% at the Permit Submission milestone and the balance at Final Completion. In some cases, the Class A Member (or Class A TEP Investor) provided all of the value associated with the tax attributes of the Solar Systems; in other cases, the Class A Member (or Class A TEP Investor) funded only a portion, and the Project Company would sell ITCs to third parties. The Class B Member financed a significant portion of its obligation with debt financing, including under the Backleverage Facility. Backleverage would advance 75% of the remaining purchase price to fund work-in-progress Solar Systems and 83.3% of the remaining purchase price to fund installed Solar Systems.

Each TEP Purchase Agreement imposed an outside date by which all Solar Systems must be completed. Failure to meet the outside date would require Developer to repurchase the unfinished Solar Systems from the Project Company by either (a) providing the Project Company with a credit against future capital contributions or (b) requiring Developer to transfer to the Project Company commensurate conforming Solar Systems. Prior to the Petition Date, the Company used the purchase price payments from the Project Companies to pay Channel Partner account payables and fund working capital.

Once the Solar Systems are in service, they generate cash flows from the associated Customer Agreements, as well as Solar Renewable Energy Certificates ("**SRECs**"), ITCs, and other tax attributes. The distribution of these cash flows and tax attributes is governed by the Limited Liability Company Agreements of the Project Companies (collectively, the "**Project Company LLCAs**"), all of which utilize one variation of a "partnership flip" structure. Each Project Company LLCA provides for different ratios but the structure generally provides that, until an agreed date (such date, the "**Flip Date**"), substantially all the tax attributes of the TEP are allocated to the Class A Member, with the remainder allocated or distributed to the Class B Member. After the Flip Date, this is generally reversed. Under the Rooftop Project Company LLCAs, cash is shared between the Class A Member and the Class B Member in fixed ratios regardless of whether the Flip Date has occurred; the majority of cash is distributed to the Class B Member, ranging from 88.7% on the high end to 76% on the low end. Under the other four Project Company LLCAs, sharing of cash flows between the Class A Member and the Class B Member changes

29

after the Flip Date; the Class B Member is entitled to the majority of the cash prior to the Flip Date, and more after the Flip Date, subject in certain cases to a "priority" distribution paid to the Class A Member. As of the Petition Date, all TEPs that utilize the partnership flip structure are pre-Flip Date.

The payment flows relating to Customer Agreements owned by Project Companies were contemplated to be ultimately monetized through asset-backed securitization financings. PosiGen was in the process of beginning its first asset-backed securitization process when it became unable to pay its obligations and stopped the process.

### b. The Non-Debtor Facilities

On April 21, 2023, Backleverage entered into that certain Credit Agreement (as amended, amended and restated, supplemented, or otherwise modified from time to time prior to the Petition Date, the "**Backleverage Credit Agreement**" and the facility issued thereunder, the "**Backleverage Facility**"), with PosiGen, PBC, as Sponsor, PosiGen Backleverage Holdco, LLC ("**Backleverage Holdco**"), as Pledgor, each of the Managers, the lenders from time to time party thereto, and BID Administrator LLC, as administrative agent and collateral agent (in such capacities, the "**Backleverage Agent**"). Proceeds of the Backleverage Facility were used to, among other things, refinance prior debt, fund purchase prices of Solar Systems by Backleverage, any Manager, or any Project Company, and fund the development of Solar Systems by Developer. As of the Petition Date, the aggregate principal amount outstanding under the Backleverage Facility was approximately $600,000,000.

The Backleverage Facility is secured by first priority liens and security interests in, among other things: (i) all of Backleverage's limited liability company interests in and rights of (including economic interests and voting rights) each Manager, as well as Backleverage's right to receive payments or distributions from the Managers in accordance with the applicable organizational documents of each Manager and (ii) all of Backleverage Holdco's limited liability company interests in and rights of (including economic interests and voting rights) Backleverage. The Backleverage Agent also has perfected liens on cash in the account held by Backleverage at First Horizon Bank (the "**Backleverage Account**") and cash that was used to repay the debt service obligations under the Backleverage Facility was directed to an account (the "**Backleverage Debt Service Account**") held by Backleverage at Computershare Trust Company, National Association ("**Computershare**").

PosiGen, PBC, and Developer also entered into a Negative Pledge Agreement, dated as of April 9, 2024, under which PosiGen, PBC, and Developer agreed that, until the Backleverage Facility had been discharged, neither entity would create or permit its affiliates to create a lien on any asset owned or thereafter acquired by Developer, any other affiliate of PosiGen, PBC carrying on the business of developing residential solar photovoltaic projects and/or energy storage, or the equity interests in any Project Company. And, under a Cash Diversion Guaranty, dated as of April 21, 2023, made by PosiGen, PBC, in favor of the Backleverage Agent (the "**Cash Diversion Guaranty**"), PosiGen, PBC, provided a limited guarantee in connection with the Backleverage Facility. The Cash Diversion Guaranty provides that, in the event that any Guaranteed Obligations (as defined therein) are paid to any Class A Member, otherwise diverted or escrowed and/or not paid to the Class B Member, or paid by any Class B Member to any Class A Member, then, in each such instance, PosiGen, PBC, shall pay the same to or for the benefit of the Backleverage Agent for application pursuant to the Loan Documents (as defined in the Backleverage Credit Agreement).

On December 12, 2018, Backleverage entered into a Second Lien Credit Agreement (as amended, amended and restated, supplemented, or otherwise modified prior to the Petition Date, the "**2L Credit Agreement**" and the facility issued thereunder, the "**2L Facility**") with the lenders party to that agreement and Connecticut Green Bank, as administrative agent and collateral agent for the lenders (in such capacities,

and any successor thereto, the "**2L Agent**").  The proceeds of the 2L Facility were used to, among other things, fund purchase prices for the Project Companies to purchase Solar Systems.  As of the Petition Date, the aggregate principal amount outstanding under the 2L Facility was approximately $32,793,000. The 2L Facility is secured by second priority liens and security interests in the same collateral that secures the Backleverage Facility.  And, under a Guaranty, dated as of December 18, 2018, made by PosiGen, PBC in favor of the 2L Agent, PosiGen, PBC provided a limited guarantee in connection with the 2L Facility similar to the Cash Diversion Guaranty.

On May 18, 2022, Backleverage entered into a Solar Loan Agreement (as amended, amended and restated, supplemented, or otherwise modified prior to the Petition Date, the "**DCGB 3L Credit Agreement**" and the facility issued thereunder, the "**DCGB 3L Facility**") with Green Finance Authority, commonly referred to as DC Green Bank ("**DCGB**"), as lender.  The proceeds of the DCGB 3L Facility were used to, among other things, fund purchase prices for the Project Companies to purchase Solar Systems.  As of the Petition Date, the aggregate principal amount outstanding under the DCGB 3L Facility was approximately $6,605,000.  The DCBG 3L Facility is secured by third-priority liens and security interests in all of Backleverage's limited liability company interests in and rights of (including economic interests and voting rights) each Manager, as well as Backleverage's right to receive payments or distributions from the Managers in accordance with the applicable organizational documents of each Manager.

### c.        The Debtors' Management and Servicing Business

The Company services the Solar Systems and Customer Agreements it sells to the Project Companies in exchange for fees paid under the Service Agreements.

Under the Service Agreements, Provider provides (i) operational, maintenance, collection, and other management services to keep the Solar Systems owned by the Project Companies productive and in good condition to satisfy both the performance guarantees to customers and the production requirements under the Project Company LLCAs ("**O&M Services**," and the related fees, "**O&M Fees**") and (ii) services related to the administration of the Solar Systems and Customer Agreements, including billing, collections, customer support, administration, dispute resolution, and reporting ("**Asset Administration Services**," and the related fees, "**Asset Administration Fees**").  O&M Fees and Asset Administration Fees are paid through proceeds of Customer Agreements prior to distributions to Class A Members and Class B Members of each TEP.

Debtor PosiGen, LLC and each of the non-Debtor Project Companies are also party to a Servicing Agreement (as amended, amended and restated, modified or otherwise supplemented prior to the Petition Date, the "**Genpact Servicing Agreement**") with Genpact (UK) Limited ("**Genpact**"), under which PosiGen, LLC engaged Genpact to provide certain services in connection with the management of its consumer energy finance portfolio.  Genpact's services, as described more fully in the Genpact Servicing Agreement, include IT services, account monitoring and management, account on-boarding and setup, invoicing, payment processing, account maintenance, sales tax administration, account closing, reporting, control, financial reconciliations, and file maintenance (collectively, the "**Genpact Services**").  Among other things, Genpact is responsible for invoicing the customers and monitoring the collection of lease receipts.  Although Genpact invoices the customers, customer payments under Customer Agreements have been deposited directly into an account owned by PosiGen, PBC held at KeyBank (the "**Lease Revenue Account**") since such Lease Revenue Account was opened.  Debtor PosiGen, LLC pays invoiced fees and expenses of Genpact in accordance with the Genpact Servicing Agreement.  In the event PosiGen, LLC defaults in making such payments, the applicable non-Debtor party to the Genpact Servicing Agreement is responsible for making the payment.

PosiGen, PBC, Backleverage, and Computershare are also party to a Master Backup Services and Manager Transition Agreement dated as of April 21, 2023 (as amended, amended and restated, supplemented, or otherwise modified from time to time prior to the Petition Date, the "**MBUSA**"). The MBUSA provides that, upon the occurrence of a transition event (which includes, among other things, a material breach by any Manager of its obligations under the agreements governing its respective TEP), Computershare will perform O&M Services and Asset Administration Services in respect of the non-Debtor Project Companies, unless a replacement operator or replacement manager is appointed, in each case with the consent of the Backleverage Agent.

### d. PosiGen's Business Related to Government Incentives

In recent years, federal, state, and local governments in the United States have established incentives and financial mechanisms to reduce the cost and accelerate the adoption of solar energy. These incentives include rebates, tax credits, and other financial incentives, such as payments for renewable energy credits associated with renewable energy generation, exclusion of solar energy systems and energy storage systems from property tax assessments, and net metering programs. Incentives make Solar Systems more affordable to some homeowners, enable PosiGen to charge lower prices for Customer Agreements, and attract sophisticated institutional investors to invest in the TEPs.

The majority of U.S. states and the District of Columbia have implemented a renewable portfolio standard ("**RPS**"), which requires regulated electric utilities to generate or procure a specified percentage of total electricity delivered to customers in the state or territory from eligible renewable energy sources—such as solar energy systems—by specified dates. Roughly one-third of states with RPS policies require a minimum portion of the RPS to be met by electricity generation from solar energy systems, with substantial penalties for non-compliance. Electric utilities can meet their solar RPS requirements by purchasing SRECs, which are minted through the production of each megawatt-hour of electricity generated by an eligible solar system. SRECs are economically severable from the Solar Systems that generate them and, in certain jurisdictions, may be sold through established markets. PosiGen's TEPs mint SRECs based on the energy generated by the TEP's Solar Systems and PosiGen monetizes those SRECs.

Separately, the U.S. federal government provides ITCs for owners of solar energy projects. Depending on certain project specifications, ITC percentages can range between 6 and 60 percent of eligible project costs.

### C. The Debtors' Corporate and Capital Structure

PosiGen, PBC is a holding company that was organized in 2011 under the laws of the State of Delaware and incorporated as a public benefit corporation in 2023 under the laws of the State of Delaware. PosiGen, PBC is the direct or indirect parent company of each of the Debtors. PosiGen, PBC has one class of voting common equity. As of the Petition Date, there were approximately 11.8 million shares of Class A common stock (one vote per share) issued and outstanding.

An organizational chart depicting the Company's corporate structure, including Debtors and non-Debtors, is attached as **Exhibit B**.

1.        **Prepetition Capital Structure**

As of the Petition Date, the Debtors have approximately $208 million in principal amount of funded debt obligations, approximately 56% of which is secured and 44% of which is unsecured.

| Funded Debt Obligations (as of November 24, 2025)[3] | | |
|---|---|---|
| Debt Instrument | Issuer / Borrower | Principal Amount |
| Secured Convertible Notes | PosiGen, PBC | $73,200,000 |
| Unsecured Convertible Notes | PosiGen, PBC | $90,700,000 |
| Battery Revolving Credit Facility | PosiGen, PBC | $2,000,000 |
| Promissory Note | PosiGen, PBC | $7,294,984.39 |
| June Bridge Loan Facility | PosiGen Owner 2, LLC | $9,350,000 |
| July Bridge Loan Facility | PosiGen Owner 3, LLC | $25,000,000 |
| **Total** | | **$207,544,984.39** |

a.        **Secured Funded Debt Obligations**

As of the Petition Date, the Debtors have approximately $121 million of secured funded debt obligations, as summarized below.

Secured Convertible Notes.   On June 13, 2023, PosiGen, PBC issued secured convertible promissory notes due 2026 (the "**Secured Convertible Notes**") in the aggregate principal amount of $61,500,000 under a Note Purchase Agreement (as amended, amended and restated, supplemented, or otherwise modified prior to the Petition Date, the "**Secured Note Purchase Agreement**").  The Secured Convertible Notes are guaranteed by Debtors PosiGen, LLC, Developer, and PosiGen Operations, LLC (the "**Guarantors/Grantors**") and secured by a lien on substantially all of the assets of PosiGen, PBC, PosiGen, LLC, and PosiGen Operations, LLC.  The UCC-1 financing statement at Developer was released in April 2024 (excluding any collateral that is subject to an agreement preventing the granting of a lien thereon).  As of the Petition Date, an aggregate principal amount of approximately $73,200,000 remains outstanding under the Secured Note Purchase Agreement.

Battery Revolving Credit Facility.   On September 30, 2022, PosiGen, PBC issued secured revolving loans due 2025 (the "**Battery Revolving Credit Facility**") in the aggregate principal amount of $2,000,000 under a Revolving Credit Agreement by and among Connecticut Green Bank ("**CGB**" and any successor thereto, the "**Battery Revolving Credit Facility Lender**") and PosiGen, PBC (as amended, amended and restated, supplemented, or otherwise modified prior to the Petition Date, the "**Battery Revolving Credit Agreement**").  The Battery Revolving Credit Facility is secured by battery inventory prior to installation at a qualifying residence.  CGB sent a notice of acceleration of the Battery Revolving Credit Facility on August 25, 2025.  As of the Petition Date, an aggregate principal amount of approximately $2,000,000 remains outstanding under the Battery Revolving Credit Agreement.

June Bridge Loan Facility.   On June 13, 2025, Owner 2 issued secured term loans due 2025 (the "**June Bridge Loan Facility**") in the aggregate principal amount of $9,350,000 under a Secured Note, Loan and Security Agreement (the "**June Bridge Loan Note**") by and among Owner 2 and certain holders of Convertible Notes (as defined below). The June Bridge Loan Facility is secured by a limited number of

---

[3]    The descriptions herein of the Debtors' debt, including any security in respect of such debt, are provided for the convenience of the Bankruptcy Court and parties in interest.  In certain cases, amounts stated are approximate.  The descriptions are not intended to be comprehensive nor should they be construed as an admission with respect to the terms, amount, validity or enforceability of any debt, any lien or security, or any other right or obligation.  These descriptions are qualified in their entirety by the operative relevant debt and related documents.  The Debtors and their advisors are continuing to review their debt obligations and related matters and expressly reserve all rights relating thereto.

33

fully installed and certain work-in-progress residential Solar Systems owned by Owner 2.  Only one of the six lenders under the June Bridge Loan Facility, ECI 2024-2025 LLC, filed (for itself and not on behalf of the other five lenders) a UCC-1 financing statement in respect of the June Bridge Loan Facility.  As of the Petition Date, an aggregate principal amount of approximately $9,350,000 remains outstanding under the June Bridge Loan Note, $4,000,000 of which is owed to ECI 2024-2025 LLC.

July Bridge Loan Facility.  On July 31, 2025, Owner 3 entered into a Credit Agreement (the "**July Bridge Loan Credit Agreement**") by and among Owner 3, PosiGen Rampart, LLC, PosiGen, PBC, and the collateral agent and lenders party thereto for the issuance of a multi-draw secured term loan facility due 2026 (the "**July Bridge Loan Facility**") in the aggregate principal amount of up to $50,000,000.  The first installment of the July Bridge Loan Facility was advanced in two installments on August 4, 2025, and August 8, 2025, in the aggregate amount of $25,000,000.  The July Bridge Loan Facility is purportedly secured by (i) all of Owner 3's assets including, among other things, Solar Systems owned by Owner 3, (ii) 100% of the limited liability company interests of Owner 3 held by PosiGen Rampart, LLC, (iii) cash in certain pledged accounts of Owner 3 (totaling $2,337.08 as of the Petition Date), and (iv) the proceeds of the sale of certain tax credits by non-Debtor Rooftop Solar V, LLC ("**Rooftop V**") to JSHC, LLC, pursuant to that certain Tax Credit Purchase Agreement, dated as of June 18, 2025, which proceeds were purportedly to have been paid over by Rooftop V to Owner 3 (a) in exchange for the transfer of certain Solar Systems by Owner 3 to Developer and the further transfer of such Solar Systems by Developer to Rooftop V and (b) for application to Owner 3's obligations under the July Bridge Loan Facility.  The July Bridge Loan Facility is also guaranteed by PosiGen Rampart, LLC and PosiGen, PBC.  No bill of sale transferring the applicable Solar Systems by Developer to Owner 3 was ever executed or delivered, despite Developer having been authorized, empowered, and directed to incur and perform all of its obligations under, and consummate all transactions contemplated by, the June Bridge Credit Agreement and related loan documentation.  Pursuant to the Settlement, Owner 3 shall be deemed to own 1,623 Solar Systems of the more than 4,600 Solar Systems that were to have been conveyed by Developer to Owner 3 and to have secured the July Bridge Loan Facility.  Of those more than 4,600 Solar Systems, 419 of those more than 4,600 Solar Systems that were intended to have been subject to such bill of sale are purportedly owned by Owner 2 and pledged as collateral for the June Bridge Loan Facility.  As of the Petition Date, an aggregate principal amount of approximately $25,000,000, plus interest, fees, and expenses, remains outstanding under the July Bridge Loan Credit Agreement.

Promissory Note.  On October 28, 2025, PosiGen, PBC issued a secured promissory note due 2026 (the "**Secured Promissory Note**") in the initial aggregate principal amount of $1,135,311.61 to BID Administrator, LLC, as administrative and collateral agent for the lenders thereunder (in such capacities, the "**Promissory Note Agent**")  (as amended, amended and restated, supplemented, or otherwise modified prior to the Petition Date, the "**Secured Promissory Note Agreement**").  The Secured Promissory Note Agreement provided that PosiGen could request additional extensions of credit.  PosiGen borrowed additional amounts on October 31, 2025 ($1,270,200), November 7, 2025 ($1,831,908.80), November 14, 2025 ($1,206,730), and November 21 ($1,341,882.22).  The Secured Promissory Note is secured by an all-assets lien over PosiGen, PBC's, PosiGen, LLC's, PosiGen Operations, LLC's, Developer's, Provider's, PosiGen Holdings, LLC's, PosiGen Rampart Holdco, LLC's, and PosiGen Rampart, LLC's assets and property, which does not include, among other exclusions, collateral securing the Battery Revolving Credit Facility or cash held in the Lease Revenue Account or the SREC Account.  As of the Petition Date, an aggregate principal amount of approximately $7,294,984.39 remains outstanding under the Secured Promissory Note Agreement.

b.  **Unsecured Funded Debt Obligations**

Unsecured Convertible Notes.  On February 2, 2023, PosiGen, PBC issued unsecured convertible promissory notes due 2026 (the "**Unsecured Convertible Notes**") in the aggregate principal amount of

$54,000,000 under a Note Purchase Agreement (as amended, amended and restated, supplemented, or otherwise modified prior to the Petition Date, the "**Unsecured Note Purchase Agreement**").  As of the Petition Date, an aggregate principal amount of approximately $90,700,000 remains outstanding under the Unsecured Note Purchase Agreement.

### c.        Other Unsecured Obligations

Guarantees.  PosiGen, PBC (and in certain instances, PosiGen, LLC) provided the limited Cash Diversion Guaranty in connection with the Backleverage Facility, a similar guaranty in respect of the 2L Facility, and certain conditional and limited indemnities and other guarantees in respect of the Backleverage Facility, the 2L Facility, the June Bridge Loan Facility, the July Bridge Loan Facility, and the Crown Facility (as defined and discussed below).  To the extent those indemnities and guarantees give rise to claims, the guaranteed or indemnified amounts would constitute prepetition unsecured obligations of PosiGen, PBC (and PosiGen, LLC, as applicable).  PosiGen, PBC also guarantees Developer's, PosiGen, LLC's, and the applicable Manager's indemnity and payment obligations to the Class A TEP Investors pursuant to sponsor guarantees or indemnification obligations in the governing documents of the TEPs and the Project Companies, as well as the obligations of certain subsidiaries of Backleverage in connection with tax credit transfer agreements.

Channel Partners.  Developer is party to Channel Partner Agreements with over 60 Channel Partners.  Developer estimates that approximately $19 million remains outstanding to Channel Partners as of the Petition Date.

Vendor Payables.  The Debtors estimate that they have approximately $25 million of other unsecured obligations, including to vendors and suppliers.

## ARTICLE III.
## EVENTS LEADING TO THE CHAPTER 11 FILINGS

The residential solar business requires a developer to make a significant initial outlay of cash to purchase and construct Solar Systems, and the revenue streams from those Solar Systems are not sufficient to repay that initial cost for a long period of time.  In addition, while the developer is bringing in-progress Solar Systems to completion so that they can become profitable, it is also seeking to originate new business, which requires further cash investments.  While it is typical to operate a business in this way in the residential solar market, the cost structure associated with such operations is complicated and impacted by many variables, including macroeconomic factors, government incentives, customer default rates, and the costs of goods used to develop Solar Systems, which are often impacted by tariffs.

### 1.        PosiGen's Vulnerability to Market Pressures

The residential solar market has faced significant macroeconomic pressures and regulatory uncertainty in recent years.  Such factors have led to chapter 11 filings by several major players—including Solar Mosaic, LLC, SunPower Corporation, and Sunnova Energy International, Inc.—in 2024 and 2025, as well as the liquidations of several other industry participants.

PosiGen's strategy focused on scaling the capacity of Developer to develop Solar Systems, which allowed the Company to further its goals of making clean energy available to the communities it serves and expand its business rapidly.  But PosiGen's financing structure was complex and vulnerable to market pressures, and the business was affected by legislative and regulatory challenges to solar and other renewable energy policy in the United States.  The Company's business model, like that of many solar companies, relied on incentives from federal, state, and local governments.  But the current presidential

35

administration has deprioritized subsidization of the solar industry, including by modifying renewable energy tax credits and imposing steep tariffs on imported materials that are necessary to construct solar projects, including solar modules, inverters, racking, and structural steel. The tax equity and asset financing markets for solar and renewable energy have accordingly stalled and government-backed financing programs have been constrained and impounded, all of which have limited PosiGen's access to alternative capital.

The lack of alternative providers offering solar energy to low- or middle-income homeowners, along with the recent exit of major players in the residential solar market due to the above-referenced changes in the market, presented PosiGen, in furtherance of the public interest, with an opportunity to grow its business and make clean energy available to more customers. Prior to the Petition Date, PosiGen took advantage of that opportunity to further grow its business and entered into new installation contracts and channel partner agreements. But the Backleverage Facility did not offer sufficient financing to progress or complete those projects. PosiGen requested an increase of the commitments under the Backleverage Facility to develop these Solar Systems. Brookfield did not agree to provide any additional financing. Brookfield instead encouraged PosiGen to focus on completing the Solar Systems in Brookfield's portfolio and commencing the securitization associated with those assets. PosiGen had to use its working capital to finance its new Solar Systems and quickly found itself in a precarious liquidity position.

### 2. The 2025 Bridge Financings

PosiGen attempted to bridge its cash needs with small bridge financing facilities, with the goal of securing additional long-term financing. In the summer of 2025, PosiGen raised additional short-term financing to address its liquidity needs while it progressed toward securitization. The Company raised certain non-Debtor financings as well as the June Bridge Loan Facility (which was provided by certain of PosiGen, PBC's equity investors) and the July Bridge Loan Facility (which was provided by a third-party lender). The Debtors also entered into a factoring facility (the "**Crown Facility**") between non-Debtor Rooftop V and Crown Financial, LLC ("**Crown**") in the aggregate principal amount of approximately $7,000,000. The Crown Facility was guaranteed by PBC.

PosiGen also began discussions with a large third-party investor regarding a longer-term financing in (the "**Third-Party Bridge Financing**") and another party regarding an asset sale transaction (the "**Third-Party Asset Sale**") during the summer of 2025.

### 3. Acceleration of the Backleverage Facility

On July 31, 2025, the Company elected not to make an interest payment under the Backleverage Facility to preserve capital to make payments to Channel Partners and pay operating expenses. Having seen the rapid unraveling of its competitors' businesses following their failure to pay Channel Partners and, in light of how integral Channel Partners were to its business and ability to make clean energy available to its customers, the Company chose to prioritize those payments. At the time, the Company expected that proceeds of the Third-Party Bridge Financing and the Third-Party Asset Sale would be available in the very near term and that it would be able to catch up on the missed interest payment quickly. The Company believed that the business would not survive without making current payments to its Channel Partners and believed that delaying the interest payment and preserving the Channel Partner relationships was in the best interests of the Company and all of its stakeholders. The Company recognized that it needed restructuring advice and engaged White & Case LLP and FTI Consulting, Inc. after the grace period expired with respect to the missed interest payment to the Backleverage Facility.

On August 6, 2025, Brookfield exercised control over and froze a significant amount of cash held in the Backleverage Account pursuant to a deposit account control agreement. Discussions regarding a

36

longer-term financing continued, but PosiGen no longer had access to the revenue it relied on to operate its business in the ordinary course. Brookfield requested substantial diligence and, with the help of White & Case and FTI, PosiGen began to produce materials responsive to Brookfield's requests. On the evening of August 12, 2025, Brookfield sent a notice of default under the Backleverage Facility. Following in-person meetings with the Company's senior management team, on August 15, 2025, Brookfield accelerated the Backleverage Facility and exercised its proxy to appoint Neal Goldman as independent manager of Backleverage. Mr. Goldman assumed all responsibilities of Backleverage's officers at that entity.

The Company's prospective financing commitments were terminated and, by the end of August, it became apparent to the Company that, without an immediate cash infusion, it would not be able to pay operating expenses, repay the missed interest payment to Brookfield, pay Channel Partners, and continue to make payroll for very long. The Company tried to raise capital from its equity investors but, although certain investors put together financing proposals, those proposals would not have provided a comprehensive solution, and the Company could not satisfy the conditions necessary to close the contemplated transactions.

4.      **The Company's Past Practices**

As the Company's advisors performed diligence on the June Bridge Loan Facility and the July Bridge Loan Facility, they discovered issues with the ownership of and security interests in the Solar Systems that were intended to secure those facilities. In several instances the Debtors did not cancel a Project prior to executing a subsequent bill of sale. Accordingly, that Project was recorded in the Debtors and applicable Project Companies' books and records as being owned by two or (in certain instances) three entities. The Debtors believe that approximately 7,200 Projects were at one point recorded as having been sold by Developer to more than one entity, without any cancellation of the sale of such Projects to the first transferee prior to the purported sale to a subsequent transferee. With respect to the Solar Systems that are owned by a Debtor and pledged as collateral for the June Bridge Loan Facility or purportedly pledged as collateral for the July Bridge Loan Facility, there is likely dispute regarding which Entities own which systems and, correspondingly, which creditors are entitled to recover against which assets and obligors.

For instance, the June Bridge Loan Facility was purportedly secured by all work-in-progress and installed residential Solar Systems owned by Owner 2. The Master Project List (as defined in the June Bridge Loan Note) for the June Bridge Loan Facility purported that approximately 4,755 WIP Solar Systems would be sold to Owner 2 and serve as collateral for the June Bridge Loan Facility. But, based on PosiGen's books and records and applying the methodology set forth in the previous paragraph, the Debtors now believe that approximately 1,622 Solar Systems are owned by Owner 2 and were encumbered by ECI 2024-2025 LLC's perfected security interest granted pursuant to the June Bridge Loan Facility, as set forth on the Backleverage project Schedule.

Additionally, as part of the July Bridge Loan Facility, Developer committed to sell more than 4,600 uncompleted but installed Solar Systems to Owner 3 to secure the July Bridge Loan Facility. Developer never executed a bill of sale in connection with that transaction. Those systems that were scheduled to be sold to Owner 3 are instead owned by Developer and Owner 2 and several of the non-Debtor Project Companies.

The advisors further found that between 4,502 and 4,515 Solar Systems that were in the borrowing base of the Backleverage Facility (*i.e.*, were purportedly owned by Project Companies that were indirectly owned by Backleverage) had purportedly been sold to Owner 3 to secure the July Bridge Loan Facility. The advisors also found that similar issues existed with respect to Solar Systems having been transferred or tranched to multiple Project Companies.

In addition to the collateral and ownership issues, the advisors also found that other terms of the Company's bridge financing facilities violated the terms of the Company's other financings or the governing documents of the TEPs. For instance, the Crown Facility was not permitted without the consent of the Class A Member of Rooftop V, which was not received.

The foregoing facts were immediately disclosed to PosiGen's board of directors, lenders (including Brookfield), and equity investors, none of whom had known these facts prior to that disclosure.

PosiGen's advisors also learned that PosiGen's cash management system and practices did not conform with the various governing and financing documents under its complicated financing structure. Specifically, lease revenues from all Project Companies' Solar Systems were deposited in the Lease Revenue Account, a single account at KeyBank. In the past, the Company had used cash from its lease revenue accounts, including the Lease Revenue Account, and debt service reserve accounts to fund its operating accounts.

The advisors also learned that the Company also was in breach of certain of the tax credit transfer agreements that were entered into by the non-Debtor Project Companies. Generally, Debtor PosiGen, PBC indemnifies the tax credit purchaser from certain damages it may incur with respect to the sale of tax credits.

### 5.  The TSA and Promissory Note

Following the acceleration of the Backleverage Facility, Brookfield was the only party willing to provide PosiGen with money to continue to operate and needed to do so to protect its investment in the Backleverage Facility. Brookfield has, since the date of the missed interest payment, indirectly or directly contributed approximately $23 million to the Company, including by consenting to the release of cash in the Backleverage Account and the Backleverage Debt Service Account in connection with the TSA (as defined below), purchasing certain inventory from the Company, and lending funds under the Secured Promissory Note.[4]

Initially, PosiGen's servicing, operations, and management functions were funded on a week-to-week basis through a transition services agreement originally dated as of August 24, 2025 (the "**TSA**"). Backleverage, at Brookfield's request, engaged Omnidian to take over servicing from Provider. The Company began providing Omnidian and Backleverage with access to its information and systems to plan a transition of its servicing functions, so that it could ensure its customers would still receive service and mitigate damages to its many counterparties. PosiGen also continued to maintain its operations and perform its servicing, maintenance, customer care, and administration responsibilities to the best of its ability. On August 24, 2025, PosiGen made the difficult decision to terminate the employment of approximately 470 employees (over 70% of its workforce) that were not involved in servicing or other limited daily operations.

It became apparent that the transition would take much longer than Brookfield expected. But the Company remained on a week-to-week budget. Each week for the first two months after entry into the TSA, the parties would agree to extend the TSA for another week and negotiate and agree on a budget, and cash would be released from the Backleverage Account or the Backleverage Debt Service Account each Friday or Monday.

When the cash in the Backleverage Account and the Backleverage Debt Service Account was exhausted, Brookfield purchased inventory from PosiGen and PosiGen used the proceeds of that sale to meet its funding needs for the following week. After that, Brookfield began to fund the Company's working

---

[4]   Specifically, Brookfield: (i) agreed to release $15,116,061 of cash in the Backleverage Account; (ii) paid $1,417,274 to purchase certain inventory assets; and (iii) funded $6,107,429 under the Promissory Note.

capital needs on a weekly basis under the Promissory Note issued by PosiGen.  The Battery Revolving Credit Agreement provided CGB with a consent right over the incurrence of any additional indebtedness by PosiGen or any of its subsidiaries.  CGB did not deliver that consent in connection with the Promissory Note and initiated a lawsuit in the United States District Court for the District of Connecticut to enjoin PosiGen from taking on the additional debt.  CGB's motion for a TRO was denied, although the matter remains pending as of the Petition Date and is currently stayed with respect to the Debtor entities.

During this time, PosiGen continued to service its customers' Solar Systems to the best of its ability and provided regular information to its lenders and other financing counterparties, including primarily Brookfield.  PosiGen also made efforts to back up and store its data in the event it was forced to cease operating.  While the weekly funding structure was far from ideal, the Company elected to accept funding under the Promissory Note for a time because it determined that the situation was the best available option at the time.

### 6.      The Proposed Transition Plan and Foreclosure Notices

Although the Company believed that its week-to-week funding structure was temporary and that, once Brookfield reached deals with the Project Companies, it would fund a debtor-in-possession facility in a chapter 11 case and a collective resolution of the Debtors' financial issues, that turned out to not be the case.

Brookfield engaged with the Class A Members of the TEPs to negotiate the terms of a deal in September of 2025 but did not provide the Company with the specifics of these negotiations for several weeks.  In mid-October, the Company learned from Brookfield that, at some point, Brookfield's negotiations with M&T and DFO had broken down.  Although the Company made attempts to engage with those two Class A TEP Investors, including at Brookfield's request, such attempts were unsuccessful.  On October 31, 2025, M&T removed Decatur Manager as the Class B Managing Member of Decatur 1 and Decatur 2.  On December 3, 2025, M&T and DFO appointed SunStrong as the Managing Member of Decatur 1, Decatur 2, and PosiGen Bienville Project Company, LLC.

Then, on November 14, 2025, the Debtors received a proposed transition plan, along with notices of Brookfield's intent to foreclose on the Class B membership interests in Project Companies held by two of the four TEPs pledged in connection with the Backleverage Facility.

The transition plan provided that the Debtors' servicing, customer care, operations and maintenance, and other operating businesses would be transitioned to Omnidian and provided no plan for the rest of the business, approximately 10,000 customers, Decatur Manager, Decatur 1, Decatur 2, Bienville Manager, PosiGen Bienville Project Company, LLC, Owner 2, Owner 3, or other creditors.  The Company's management team and directors expressed serious concerns with the proposal and reiterated that an organized process in chapter 11 would provide the greatest potential to maximize value for everyone through a collective process.

### ARTICLE IV.
### MATERIAL DEVELOPMENTS AND EVENTS OF THE CHAPTER 11 CASES

**A.      First Day Relief**

On November 24, 2025, the Debtors filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code in the Bankruptcy Court.  On November 24 and 25, 2025, the Debtors filed several motions (the "**First Day Motions**") designed to facilitate the administration of the Chapter 11 Cases and minimize disruption to the Debtors' operations, by, among other things, easing the strain on the Debtors'

39

relationships with employees and service providers and permitting the Debtors to continue to use their cash management system and pay insurance policies and taxes following the commencement of the Chapter 11 Cases.  At hearings on November 25, 2025, the Bankruptcy Court granted the relief requested in the First Day Motions on an interim or final basis.

The First Day Motions and all orders for relief granted in the Chapter 11 Cases can be viewed free of charge at https://cases.ra.kroll.com/PosiGen/.  A brief description of each of the First Day Motions and the evidence in support thereof is also set forth in the *Declaration of Robert Del Genio in Support of Debtors' Petitions and Requests for First Day Relief* [Docket No. 12].

## B.      Appointment of Creditors' Committee

On December 5, 2025, the United States Trustee appointed the Committee, which was initially composed of:   (1) SolarEdge Technologies, Inc.; (2) Alex Ruperto; (3) EMT Solar and Roofing; (4) Capgemini America, Inc.; (5) Greentech Renewables; (6) GAF Energy, LLC; and (7) Dataplatr Corp. On December 18, 2025, the United States Trustee reconstituted the Committee to remove GAF Energy, LLC as a member.

## C.      Schedules and Statements

On December 4, 2025, the Debtors filed a motion seeking an extension of the statutory deadline to file their Schedules to December 29, 2025 [Docket No. 93].  The Debtors filed their Schedules on December 23, 2025 [Docket Nos. 253–272].

## D.      Bar Dates

Pursuant to the Bar Date Order, the Bankruptcy Court established (i) February 17, 2026 at 11:59 p.m. (prevailing Central Time) as the Claims Bar Date; (ii) May 23, 2026, at 11:59 p.m. (prevailing Central Time) as the Governmental Bar Date; (iii) the Amended Schedules Bar Date as the later of (a) the Claims Bar Date or the Governmental Bar Date, as applicable, and (b) 11:59 p.m. (prevailing Central Time), on the date that is thirty (30) days following the date on which the Debtors mail notice of an amendment to the Schedules; and (iv) the Rejection Damages Bar Date as the later of (a) the Claims Bar Date or the Governmental Bar Date, as applicable, and (b) 11:59 p.m. (prevailing Central Time) on the date that is thirty (30) days following entry of the order approving the Debtors' rejection of the applicable executory contract or unexpired lease (collectively, the "**Bar Dates**").

## E.      Adversary Proceedings

Three adversary proceedings have been filed against the Debtors, each as described in more detail below.

### 1.      WARN Action Adversary Proceeding

On November 25, 2025, Alex Ruperto and Tanisha Smith, on behalf of themselves and others similarly situated (collectively, the "**WARN Action Plaintiffs**") filed a complaint commencing a class action adversary proceeding against the Debtors [Adv. No. 25-03833, Docket No. 1] (the "**WARN Action Complaint**"). The WARN Action Complaint alleges that the Debtors violated the Worker Adjustment and Retraining Notification Act of 1988, 29 U.S.C. §§ 2101-2109 et. seq. (the "**WARN Act**") by failing to give the WARN Action Plaintiffs at least 60 days' advance written notice of termination, as required by the WARN Act.  The WARN Action Complaint seeks to recover from the Debtors, among other things, the

WARN Action Plaintiffs' wages and benefits for 60 days following their termination, as required under the WARN Act.

On January 12, 2026, the Debtors filed an answer to the WARN Action Complaint (the "**WARN Action Answer**"). In the WARN Action Answer, the Debtors asserted numerous defenses, including, among other things, that the number of employees terminated at certain facilities fell below the applicable threshold to trigger the WARN Act, and that under the "unforeseeable business circumstances" exception to the WARN Act and, to the extent of any plant closings, the "faltering company" exception to the WARN Act, the Debtors were permitted to give reduced or no notice.

As of the date of the filing of this Plan and Disclosure Statement, this adversary proceeding is still pending. In connection with the confirmation of the Plan, the Debtors sought to estimate the Claims of the WARN Action Plaintiffs pursuant to section 502(c) of the Bankruptcy Code and/or 28 U.S.C. § 157(b)(2)(B), including any portion of such Claims that is allegedly entitled to priority under section 507(a) of the Bankruptcy Code.

### 2. Plaintiff Project Companies Adversary Proceeding

On December 8, 2025, Rooftop Solar I, LLC, Rooftop Solar II, LLC, Rooftop Solar III, LLC, Rooftop Solar IV, LLC, Rooftop V, PosiGen Marengo Project Company, LLC, and PosiGen Owner, LLC (collectively, the "**Plaintiff Project Companies**") filed a complaint commencing an adversary proceeding (the "**Plaintiff Project Companies Adversary Proceeding**") against the Debtors [Adv. No. 25-03845, Docket No. 1] (the "**Plaintiff Project Companies Complaint**"). The Plaintiff Project Companies Complaint alleges that the Debtors diverted and misappropriated cash allegedly belonging to the Plaintiff Project Companies by depositing collections relating to the Plaintiff Project Companies' operations in the Lease Revenue Account. The Plaintiff Project Companies Complaint seeks relief, including but not limited to: (a) specific performance; (b) declaratory judgment that the Debtors were unjustly enriched at the expense of the Plaintiff Project Companies; (c) imposition of a constructive trust upon the Debtors' accounts with respect to the funds at issue; (d) an equitable accounting; (e) declaratory judgment that the Debtors cannot claim that the money held in the Lease Revenue Account as of the Petition Date is unencumbered; (f) declaratory judgment that all future proceeds from the Plaintiff Project Companies' leases be directed into accounts segregated by each Project Company; (g) compensatory and consequential damages plus pre- and post-judgment interest; and (h) an award of pre- and post-judgment interest. Following entry of the Transaction Approval Orders, the complaint in the Plaintiff Project Companies Adversary Proceeding shall be dismissed with prejudice as part of the Settlement, subject to the terms and conditions thereof.

### 3. Legalist Adversary Proceeding

On December 29, 2025, Legalist filed a complaint commencing an adversary proceeding (the "**Legalist Adversary Proceeding**") against the Debtors [Adv. No. 25-03860, Docket No.1] (the "**Legalist Complaint**"). The Legalist Complaint alleges that the Debtors fraudulently induced the Bridge Lenders into providing the Debtors with an up to $50 million Bridge Loan, $25 million of which was actually funded, and then used the funds to pay unauthorized expenses and siphon $13.4 million into a non-Debtor bank account. The Legalist Complaint seeks relief, including but not limited to: (a) declaratory judgment that the Debtors own the relevant Projects. (b) declaratory judgment that such Projects are collateral of the Bridge Loan, (c) declaratory judgment that the $13.4 million is not unencumbered cash and that the Bridge Lender has an interest in these funds, and (d) unspecified damages for breach of contract, conversion, unjust enrichment, and fraudulent inducement. Following entry of the Transaction Approval Orders, the complaint in the Legalist Adversary Proceeding shall be dismissed with prejudice as part of the Settlement, subject to the terms and conditions thereof.

41

F.        **Key Employee Retention Program Relief**

On February 9, 2026, the Bankruptcy Court entered a final order approving the Debtors' Non-Insider KERP (as further set forth in the Wage Motion) [Docket No. 522].

G.        **Trustee Motions**

On December 15, 2025, Connecticut Green Bank filed a motion seeking the appointment of a chapter 11 trustee [Docket Nos. 192 & 195] (the "**CGB Trustee Motion**").  The CGB Trustee Motion asserts the appointment of a trustee is warranted under section 1104(a) of the Bankruptcy Code.

On December 22, 2025, Legalist filed a motion seeking the appointment of a chapter 11 trustee [Docket No. 239] (the "**Legalist Trustee Motion**").  Following entry of the Transaction Approval Orders, the Legalist Trustee Motion shall be dismissed with prejudice as part of the Settlement, subject to the terms and conditions thereof.

H.        **Transaction Approval Motion**

On December 24, 2025, the Debtors filed the Transaction Approval Motion seeking approval of, and authorization to enter into, (1) a settlement of disputes with respect to the Debtors' ownership and use of cash and the Debtors' and the Project Companies' ownership of certain Solar Systems, (2) an up to $43.929 million debtor-in-possession financing facility to fund the Chapter 11 Cases and implementation of the settlement transactions, (3) detailed steps and requirements governing the transition of the Debtors' servicing, operations, maintenance, fund administration, and customer care functions for the majority of the Debtors' and the Project Companies' customers to certain third parties, (4) the sale of substantially all of the Debtors' assets to the DIP Lenders through a proposed credit bid of the entire amount of the DIP Loans, (5) procedures for certain non-Debtor entities to negotiate and enter into settlement agreements with the Debtors' Channel Partners who are responsible for completing "work-in-progress" Solar Systems, and (6) funding for the Plan Trust to provide treatment of unsecured Claims under this Plan (collectively, the "**Transactions**").

On December 30, 2025, the Bankruptcy Court held a status conference to determine when it would hold a hearing on the Transaction Approval Motion, Bar Date Motion, and Final Cash Management Order. Ultimately, the Bankruptcy Court determined it would not be able to hear these items until February 5, 2026, and urged the Debtors and other parties in interest to continue negotiating a potential consensual resolution to these chapter 11 cases. The Debtors spent most of January 2026 negotiating with the parties in interest on the terms of a path forward that would allow for the implementation of the Transactions, confirmation of this Plan, and a swift and orderly exit from chapter 11.

At a hearing held on February 5, 2026, the Bankruptcy Court approved the Transaction Approval Motion, the Bar Date Motion, and the Final Cash Management Order.  Although the Transaction Approval Motion was approved independently of this Plan, the transactions contemplated therein provide the framework for, and consideration available for distribution to creditors under this Plan.

1.        **The Settlement**

Since the inception of the Chapter 11 Cases, the Debtors and several of their largest stakeholders have disputed the ownership of the Debtors' limited funds, jeopardizing the orderly transition of Solar Systems to relevant stakeholders and recoveries for unsecured creditors.  To mitigate these harms, the Debtors reached an agreement with Brookfield, the Project Companies, G-I, and the Committee that will chart a path forward and potential exit from chapter 11.  Under the Settlement, the Debtors will implement

42

the Transition, the Sale Transaction, and the Channel Partner Settlements (as defined below). The Settlement seeks to resolve the disputes regarding the ownership of Solar Systems owned by and associated with the Debtors and with respect to the Debtors' use of certain of the cash in its bank accounts, as well as resolve the claims and causes of action asserted in the adversary proceedings initiated by the Plaintiff Project Companies and Legalist.

### 2.     The Sale Transaction

Under the Settlement Order, the Debtors are authorized to sell substantially all of their assets, subject to certain exclusions, to the DIP Lenders or, in the event a bidder submits a higher or otherwise better offer for the Sale Assets that would pay off the DIP Obligations in full, such other bidder.  Taken together, the Sale Transaction, the Transition, and the Channel Partner Settlements will enable the Debtors to transition their business to a third party in an orderly manner that preserves continuity of service for customers and repay the DIP Obligations, either through consummation of the Sale Transaction in accordance with the DIP Credit Bid (as defined below) or, if the DIP Lenders are not the highest or otherwise best bidders, in cash.  As part of the Settlement, each of the DIP Lenders has agreed, subject to entry of the Transaction Approval Orders, to credit bid the entire amount of its DIP Claims in exchange for the Sale Assets (the "**DIP Credit Bid**"), subject to the terms and conditions of a mutually acceptable asset purchase agreement (the "**Asset Purchase Agreement**").  The Debtors invited all interested parties to submit offers for the Sale Assets, as they have the ability to pursue any higher and better alternative offer, subject to the terms and conditions of the DIP Credit Agreement and/or the Asset Purchase Agreement, but have not received any actionable offers for the Sale Assets as of the date hereof.  On January 21, 2026, the Debtors filed the *Notice of Sale and Transaction Approval Hearing* at Docket No. 419 (the "**Sale Notice**").

### 3.     The Transition Procedures

Pursuant to the Settlement, the Debtors will transition their servicing operations (subject to approval of the Bankruptcy Court) to certain third party servicers.

The Settlement Order contains procedures for the Debtors' transition of servicing operations with respect to the Rooftop/Marengo ProjectCos to Omnidian and any other servicers designated by Backleverage (provided that Omnidian will provide O&M servicing) and the taking of any other actions necessary or reasonably desirable to facilitate the independent operation of the Rooftop/Marengo ProjectCos (such procedures, the "**Rooftop/Marengo Transition Procedures**" and such transition, the "**Rooftop/Marengo Transition**").

The Settlement Order also contains procedures for the Debtors' transition of servicing operations with respect to the Decatur/Bienville ProjectCos to SunStrong (such procedures, the "**Decatur/Bienville Transition Procedures**" and such transition, the "**Decatur/Bienville Transition**").  Any discussions herein are subject to and qualified by the terms of such agreements and the relevant provisions of the Settlement Order.

### 4.     The Channel Partner Settlements

The Debtors' Channel Partners market, sell and install Solar Systems for the Debtors.  In connection with the Settlement and the transactions contemplated thereby, the Bankruptcy Court also approved procedures governing settlements with Channel Partners (the "**Channel Partner Settlement Procedures**") pursuant to the Transaction Approval Motion.  The Channel Partner Settlement Procedures provide for a streamlined approach to reaching settlements with Channel Partners which could include the resolution of claims with respect to certain Projects and the completion of "work-in-progress" Solar Systems in exchange for settlement payments.  The Channel Partner Settlement Procedures provide that, except as otherwise

43

provided in this Plan or the Confirmation Order, all Channel Partner Agreements shall be rejected as of the Effective Date unless a Channel Partner accepts the terms of a settlement agreement with the Debtors in accordance with the Channel Partner Settlement Procedures.

With respect to Non-Debtor Settlement Agreements (as defined in the Transaction Approval Motion), the Channel Partner Settlement Procedures contemplate that the non-Debtor Project Owner (as defined in the Transaction Approval Motion) and the applicable Channel Partner will be authorized to negotiate, execute, and consummate a Non-Debtor Settlement Agreement provided the agreement satisfies specific criteria. With respect to Channel Partner Settlement Agreements that involve the settlement or transfer of any right, claim, or cause of action of any of the Debtors, the assumption and assignment of any Channel Partner Agreement between a Channel Partner and a Debtor, or a Project owner by a Debtor (each such Project, a "**Debtor Project**" and each such settlement agreement, a "**Debtor Project Settlement Agreement**"), the Channel Partner Settlement Procedures provide for Court approval on an expedited basis.

For the avoidance of doubt, upon the sale of any Project to a non-Debtor purchaser, such Project shall no longer constitute a Debtor Project and any subsequent or contemporaneous settlement regarding such Project shall not constitute a Debtor Project Settlement Agreement requiring a Channel Partner Settlement Notice solely as a result of the inclusion of such Project in the settlement terms.

Nothing in the Channel Partner Settlement Procedures or the Channel Partner Settlements contemplated thereby shall permit any Channel Partner to obtain an administrative expense claim against the Debtors' Estates for work commenced or continued after the Petition Date without the prior written consent of the Debtors' Chief Restructuring Officer.

### 5.    DIP Facility

To obtain working capital and liquidity sufficient to administer the Chapter 11 Cases and wind up the Debtors' Estates, the Debtors and the DIP Lenders have negotiated an up to $43.929 million DIP Facility consisting of: (1) all of the Project Proceeds DIP Loans in an amount up to the Project Proceeds DIP Loan Cap, (2) with respect to Brookfield, G-I and Decatur 1, on the Transition Effective Date, their respective allocations of the New-Money DIP Loans in an amount equal to $15,023,000, of which $2,000,000 shall be funded as a delayed draw term loan on the Effective Date and reserved for the Plan Trust Cash Contribution, and (3) a roll-up of $8,000,000 of Brookfield's Secured Promissory Note Claims, in the case of each of the foregoing, subject to the terms and conditions set forth in the Transaction Approval Orders and the DIP Credit Agreement.

The Debtors will be prohibited from making disbursements (including the escrowing of cash for the satisfaction of estate professional fees) in excess of the Approved Budget (as defined in the Transaction Approval Motion). The DIP Facility includes customary carve-outs with separate Approved Budget-limited carve-outs for each professional.

The proceeds of the DIP Facility will be used to finance the Chapter 11 Cases, the Transition, and distributions under the Plan, in each case subject to the Approved Budget. The liquidity provided by the Project Proceeds DIP Loans pursuant to both the DIP Facility and the Settlement is necessary to ensure adequate working capital and funding for other administrative expenses associated with the Chapter 11 Cases. The proceeds of the New-Money DIP Loans will be used to execute an orderly wind-down of the Estates following the Sale Transaction and fund the Plan Trust Cash Contribution. Failure to see these transactions through would decimate any value left in the Estates.

**I.       Rejection Procedures Order**

On February 9, 2026, the Bankruptcy Court entered an *Order (I) Authorizing and Approving Procedures to Reject Executory Contracts and Unexpired Leases, (II) Authorizing Rejection of Certain Executory Contracts and Unexpired Leases Effective as of the Effective Date, and (III) Granting Related Relief* [Docket No. 521] (the "**Rejection Procedures Order**"), pursuant to sections 105(a) and 365(a) of the Bankruptcy Code.  Under the Rejection Procedures Order, the Bankruptcy Court approved the: (i) procedures to reject Executory Contracts and Unexpired Leases; and (ii) rejection of certain office space and equipment leases as of the filing date of the motion.  Under the Debtors' business judgement, the rejection of the office space lease and equipment leases is vital to release the Estates from burdensome obligations that impede a successful restructuring.

**ARTICLE V.**
**SUMMARY OF TREATMENT OF CLAIMS AND ESTIMATED RECOVERIES**

**A.       Deemed Substantive Consolidation for Limited Purposes**

As set forth in Article VIII.A herein, the Plan contemplates and is predicated upon entry of an order substantively consolidating the Consolidated Debtors' Estates and Chapter 11 Cases for purposes of voting and distribution only.  The substantive consolidation of the Estates is part of the Settlement.  In function, substantive consolidation treats separate legal entities as if they were deemed merged into a single survivor left with all cumulative assets and liabilities of those entities (except for inter-entity liabilities, which are erased).  The result is that claims of creditors against separate debtors are deemed converted into claims against a single consolidated debtor solely for purposes of voting and distributions under the chapter 11 plan.  If substantive consolidation for the limited purposes of voting and distribution is authorized by this Court through the Confirmation Order, on the Effective Date: (a) all assets and liabilities of the Consolidated Debtors will be deemed merged or treated as if they were a single pool of assets for the limited purposes of voting and distribution under the Plan; (b) any guarantee of an obligation of a Consolidated Debtor by another Consolidated Debtor will be deemed eliminated; (c) each Claim scheduled, filed, or to be filed against any Consolidated Debtor will be deemed filed only against PosiGen, LLC and will be deemed a single Claim against and a single obligation of PosiGen, LLC; and (d) any joint or several liability of the Debtors will be deemed one obligation of PosiGen, LLC.  On the Effective Date, and in accordance with the terms of the Plan and the consolidation of the assets and liabilities of the Consolidated Debtors, all Claims based upon guarantees of collection, payment, or performance made by one Consolidated Debtor as to the obligations of another Consolidated Debtor will be deemed released and of no further force and effect.

The Debtors believe that substantive consolidation for the limited purposes described herein is an appropriate remedy here and will further establish the need for its application in their pleadings in support of confirmation of the Plan.  For the avoidance of doubt, except as otherwise provided herein, after the Effective Date, each Debtor shall continue to exist as a separate entity, pursuant to the applicable law in the jurisdiction in which each applicable Debtor is incorporated or formed and pursuant to the respective formation documents in effect before the Effective Date.

**B.       Summary of Estimated Recoveries**

The Plan classifies Claims and Interests into twenty-two different Classes.  The following chart provides a summary of the Debtors' estimate of the anticipated recoveries of each Class of Claims and

45

Interests.[5]  **The estimated recoveries in this chart do not include projected proceeds of or the costs of prosecuting the Retained Estate Claims and Causes of Action, which the Debtors do not believe is can be estimated at this time and could increase the ultimate recoveries of the Class of General Unsecured Claims and for Holders of Deficiency Claims**.  The treatment provided in this chart is for informational purposes only and is qualified in its entirety by Article VII of this Plan and Disclosure Statement.

| Class No. | Type of Claim or Interest | Status | Voting Rights | Estimated Allowed Claims or Interests | Estimated Recoveries of Allowed Claims or Interests |
|---|---|---|---|---|---|
| **Classified Claims Against and Interests in PosiGen, PBC** | | | | | |
| **Class 1-A** | **Other Secured Claims Against PosiGen, PBC** | Unimpaired | Not Entitled to Vote (Deemed to Accept) | $0 | N/A |
| **Class 2-A** | **Other Priority Claims Against PosiGen, PBC** | Unimpaired | Not Entitled to Vote (Deemed to Accept) | $0 | N/A |
| **Class 3-A** | **Prepetition Secured Promissory Note Claims Against PosiGen, PBC** | Impaired | Entitled to Vote | $8,151,513 | 98% |
| **Class 4-A** | **Prepetition Secured Convertible Note Claims Against PosiGen, PBC** | Impaired | Entitled to Vote | $73,162,382 | <1% |
| **Class 5-A** | **Prepetition Battery Loan Claims Against PosiGen, PBC** | Impaired | Entitled to Vote | $2,018,880 | 43-64% |
| **Class 6-A** | **Prepetition June Bridge Loan Claims Against PosiGen, PBC** | Impaired | Entitled to Vote | $9,654,977 | <1% |

---

[5]  The amounts contained in this Article V represent the Debtors' estimate of the Claims that they believe will ultimately be Allowed based on their review of the filed Proofs of Claim and their books and records, and do not represent amounts actually asserted by Holders of Claims in Proofs of Claim or otherwise.  The Debtors have not completed their analysis of Claims in the Chapter 11 Cases and such Claims remain subject to objections as necessary or appropriate.  Therefore, there can be no assurances of the exact amount of the Allowed Claims at this time.  The actual amount of the Allowed Claims may be greater or lower than estimated.  *See* Art. XVIII.

| | | | | | |
|---|---|---|---|---|---|
| Class 7-A | Prepetition July Bridge Loan Claims Against PosiGen, PBC | Impaired | Entitled to Vote | $26,228,767 | <1% |
| Class 8-A | General Unsecured Claims Against PosiGen, PBC[6] | Impaired | Entitled to Vote | $200,081,919 | <1% |
| Class 9-A | Intercompany Claims Against PosiGen, PBC | Impaired | Not Entitled to Vote (Deemed to Reject) | $6,558,387 | 0% |
| Class 10-A | Section 510 Claims Against PosiGen, PBC | Impaired | Not Entitled to Vote (Deemed to Reject) | N/A | 0% |
| Class 11-A | Existing Equity Interests in PosiGen, PBC | Impaired | Not Entitled to Vote (Deemed to Reject) | $249,415,351 | 0% |
| Classified Claims Against and Interests in the Consolidated Debtors | | | | | |
| Class 1-B | Other Secured Claims Against the Consolidated Debtors | Unimpaired | Not Entitled to Vote (Deemed to Accept) | $1,067 | N/A |
| Class 2-B | Other Priority Claims Against the Consolidated Debtors | Unimpaired | Not Entitled to Vote (Deemed to Accept) | None | N/A |
| Class 3-B | Prepetition Secured Promissory Note Claims Against the Consolidated Debtors | Impaired | Entitled to Vote | $8,151,513 | 98% |
| Class 4-B | Prepetition Secured Convertible Note Claims Against the Consolidated Debtors | Impaired | Entitled to Vote | $73,162,382 | <1% |

---

[6] Excludes certain indemnity/guaranty claims that may exist but are presently unliquidated. All claims will require reconciliation.

| | | | | | |
|---|---|---|---|---|---|
| **Class 5-B-1** | **Prepetition June Bridge Loan Claims Against the Consolidated Debtors That Are Secured Claims** | Impaired | Entitled to Vote | $0 to $4,130,471 | 33-44% |
| **Class 5-B-2** | **Prepetition June Bridge Loan Claims Against the Consolidated Debtors That Are Not Secured Claims** | Impaired | Entitled to Vote | $9,654,977, less the amount of Claims in Class 5-B-1 | <1% |
| **Class 6-B** | **Prepetition July Bridge Loan Claims Against the Consolidated Debtors** | Impaired | Entitled to Vote | $26,228,767 | 18-23% |
| **Class 7-B** | **General Unsecured Claims Against the Consolidated Debtors[7]** | Impaired | Entitled to Vote | $70,765,510 | <1% |
| **Class 8-B** | **Intercompany Claims Against the Consolidated Debtors** | Impaired | Not Entitled to Vote (Deemed to Reject) | $8,145,829 | 0% |
| **Class 9-B** | **Section 510 Claims Against the Consolidated Debtors** | Impaired | Not Entitled to Vote (Deemed to Reject) | None | 0% |
| **Class 10-B** | **Existing Equity Interests in the Consolidated Debtors** | Impaired | Not Entitled to Vote (Deemed to Reject) | N/A | 0% |

## ARTICLE VI.
## ADMINISTRATIVE PROFESSIONAL AND PRIORITY TAX CLAIMS

Administrative Claims, Professional Fee Claims, and Priority Tax Claims are treated in accordance with section 1129(a)(9) of the Bankruptcy Code. In accordance with section 1123(a)(1) of the Bankruptcy Code, such Claims are not designated as Classes of Claims.

---

[7] Excludes certain indemnity/guaranty claims that may exist but are presently unliquidated. All claims will require reconciliation.

A.    **Administrative Claims**

1.    **Filing of Administrative Claims**

The Holder of an Administrative Claim, other than a Professional Fee Claim, or an Administrative Claim that has been Allowed on or before the Effective Date, must file with the Bankruptcy Court and serve on the Debtors and the Plan Administrator, as applicable, notice of such Administrative Claim by no later than the Administrative Claims Bar Date.  Such notice must include, at a minimum, (a) the name of the Holder of the Claim, (b) the amount of the Claim, and (c) the basis of the Claim (including the date on which services or goods were provided) and evidence thereof.

**HOLDERS WHO ARE REQUIRED BUT FAIL TO FILE AND SERVE A REQUEST FOR PAYMENT OF AN ADMINISTRATIVE CLAIM (OTHER THAN A PROFESSIONAL FEE CLAIM) BY THE ADMINISTRATIVE CLAIMS BAR DATE SHALL BE FOREVER BARRED FROM ASSERTING SUCH ADMINISTRATIVE CLAIM AGAINST THE DEBTORS, THE ESTATES, THE PLAN ADMINISTRATOR OR THEIR RESPECTIVE PROPERTY, AND SUCH ADMINISTRATIVE CLAIM WILL BE DEEMED DISCHARGED AS OF THE EFFECTIVE DATE. OBJECTIONS TO AN ADMINISTRATIVE CLAIM MUST BE FILED AND SERVED ON THE REQUESTING PARTY BY THE LATER OF (I) NINETY (90) DAYS AFTER THE FILING OF THE APPLICABLE REQUEST FOR PAYMENT OF ADMINISTRATIVE CLAIMS, SUBJECT TO EXTENSIONS SOUGHT BY MOTION FILED WITHIN SUCH PERIOD AND AS SUCH PERIOD MAY BE EXTENDED FROM TIME TO TIME, OR (II) SUCH OTHER PERIOD OF LIMITATION AS MAY BE SPECIFICALLY FIXED BY A FINAL ORDER OF THE BANKRUPTCY COURT FOR OBJECTING TO SUCH ADMINISTRATIVE CLAIMS.**

2.    **Payment of Allowed Administrative Claims**

Unless otherwise agreed to by the Holder of an Allowed Administrative Claim and the Debtors (with the consent of Brookfield) or otherwise assumed pursuant to the Sale Documents, each Holder of an Allowed Administrative Claim (other than Holders of Professional Fee Claims and Claims for fees and expenses pursuant to 28 U.S.C. § 1930) will receive, in full and final satisfaction, settlement, release, and discharge of, and in exchange for, such Administrative Claim, treatment as is consistent with the provisions of section 1129(a)(9) of the Bankruptcy Code or an amount of Cash equal to the unpaid amount of such Allowed Administrative Claims in accordance with the following:  (a) if an Administrative Claim is Allowed as of the Effective Date, on the Effective Date or as soon as reasonably practicable thereafter (or, if not then due, when such Allowed Administrative Claim is due or as soon as reasonably practicable thereafter); (b) if such Administrative Claim is not Allowed as of the Effective Date, no later than sixty (60) days after the date on which an order Allowing such Administrative Claim becomes a Final Order, or as soon as reasonably practicable thereafter; (c) if such Allowed Administrative Claim is based on liabilities incurred by the Debtors in the ordinary course of their business after the Petition Date (other than Administrative Claims assumed by the Purchaser) in accordance with the terms and conditions of the particular transaction giving rise to such Allowed Administrative Claim without any further action by the Holder of such Allowed Administrative Claim, when such Allowed Administrative Claim is due or as soon as reasonably practicable thereafter; or (d) at such time and upon such terms as set forth in a Final Order of the Bankruptcy Court.

B.    **DIP Claims**

Subject to entry of the Transaction Approval Orders, and upon the consummation of the Sale Transaction, and pursuant to the Sale Documents and DIP Loan Documents, the DIP Claims will be either (a) deemed satisfied by the consummation of the DIP Credit Bid or (b) in the case of a Sale Transaction

49

that is not the DIP Credit Bid, paid in full, in Cash, by the Purchaser, in each case, in full and final satisfaction, compromise, settlement, release, and discharge of, and in exchange for, each DIP Claim as of consummation of the Sale Transaction, and the Debtors have no further obligation to the DIP Lenders or any other party with respect to the DIP Claims, except to the extent otherwise set forth herein or in the Transaction Approval Orders. Pursuant to the Transaction Approval Orders, all Liens and security interests granted to secure the DIP Claims will be terminated and of no further force and effect without any further notice to or action, order, or approval of the Bankruptcy Court; *provided* that, in partial consideration for the Plan Trust Cash Contribution, the DIP Lenders making such Plan Trust Cash Contribution shall be entitled to the DIP Lender Plan Trust Interests in the allocations set forth on Annex V to the Settlement Term Sheet.  For the avoidance of doubt, notwithstanding the consummation of the DIP Credit Bid and Transitions prior to Project Proceeds Outside Date, the Project Companies will, subject to the earlier occurrence of any Event of Default pursuant to the DIP Loan Documents and the acceleration of the DIP Facility by the DIP Lenders, continue to advance to the Debtors their respective Project Proceeds through the Project Proceeds Outside Date, which Project Proceeds shall be deemed to be Project Proceeds DIP Loans and deemed fully satisfied and extinguished by the consummation of the DIP Credit Bid.

## C. Statutory Fees

On or before the Effective Date, all fees due and payable pursuant to section 1930(a) of the Judicial Code, including fees and expenses payable to the United States Trustee, as determined by the Bankruptcy Court at a hearing pursuant to section 1128 of the Bankruptcy Code, shall be paid by each applicable Debtor for each quarter (including any fraction thereof).  After the Effective Date, all fees due and payable pursuant to 28 U.S.C. § 1930 will be paid by the Plan Administrator from the Plan Trust Assets until the applicable Chapter 11 Case is converted, dismissed, or closed, whichever occurs first.  Each of the Debtors shall file all monthly reports due prior to the Effective Date when they become due, in a form reasonably acceptable to the United States Trustee.  After the Effective Date, the Plan Administrator shall file quarterly reports if and when they become due, in a form reasonably acceptable to the United States Trustee.  The United States Trustee shall not be required to file any Administrative Claim in the Chapter 11 Cases and shall not be treated as providing any release under the Plan in connection therewith.

## D. Professional Fee Claims

### 1. Administrative Expense Escrow Account

Pursuant to the Final Cash Management Order and the DIP Order, the Debtors established the Administrative Expense Escrow Account in accordance with the Administrative Expense Procedures (as defined in the Final Cash Management Order or the DIP Order, as applicable).  In accordance with the Administrative Expense Procedures and the Approved Budget, the Debtors fund the Administrative Expense Escrow Account weekly with funds sufficient to ensure payment of certain administrative expenses accruing during the pendency of the Chapter 11 Cases, namely, the Bankruptcy Fees and the Debtor Professional Fees.

No later than five (5) Business Days prior to the Effective Date, the Professionals shall provide the Debtors' Chief Restructuring Officer with their respective Professional Fee Amounts.

As soon as is reasonably practicable after the Confirmation Date and no later than the Effective Date (the "**Professional Fee Funding Date**"), the Debtors shall fund the Administrative Expense Escrow Account with Cash equal to the Professional Fee Amount less the amount funded and held in the Administrative Expense Escrow Account for the Debtor Professional Fees as of the Professional Fee Funding Date such that the Administrative Expense Escrow Amount shall hold at least the Professional Fee Amount.

The Administrative Expense Amount shall be maintained in trust solely for the Professionals and Bankruptcy Fees incurred prior to the Effective Date, to the extent such amounts have been deposited in the Administrative Expense Escrow Account and not paid, and for no other Entities until all Professional Fee Claims Allowed by the Bankruptcy Court have been irrevocably paid in full to the Professionals pursuant to one or more Final Orders of the Bankruptcy Court or the Cash in the Administrative Expense Escrow Account has been exhausted. No Liens, claims, or interests shall encumber the Administrative Expense Escrow Account or Cash held in the Administrative Expense Escrow Account in any way. Funds held in the Administrative Expense Escrow Account shall not be considered property of the Estates or the Plan Administrator; *provided* that the Plan Administrator shall be the designated Entity authorized to release funds from the Administrative Expense Escrow Account in accordance with the governing escrow agreement.

The amount of Professional Fee Claims owing to the Professionals shall be paid in Cash to such Professionals by the Debtors or the Plan Administrator, as applicable, from the funds held in the Administrative Expense Escrow Account as soon as reasonably practicable after such Professional Fee Claims are Allowed by an order of the Bankruptcy Court; *provided* that the Plan Administrator shall be obligated to pay all Professional Fee Claims Allowed by the Bankruptcy Court and the Debtors' and the Plan Administrator's obligations to pay Allowed Professional Fee Claims shall not be limited nor be deemed limited to funds held in the Administrative Expense Escrow Account; *provided*, *further*, that the Professional Fee Amounts shall be subject to the Approved Budget (as defined in the DIP Order).

### 2. Final Fee Applications and Payment of Professional Fee Claims

All final requests for payment of Professional Fee Claims for services rendered and reimbursement of expenses incurred prior to the Confirmation Date must be filed and served no later than thirty (30) days after the Effective Date. Holders of Professional Fee Claims who fail to timely file and serve final fee application shall be forever barred from asserting such Professional Fee Claims against the Debtors, the Estates, or their respective property, and such Professional Fee Claims will be deemed discharged as of the Effective Date. The Bankruptcy Court shall determine the Allowed amounts of such Professional Fee Claims in accordance with the procedures established by the Bankruptcy Code, the Bankruptcy Rules, and prior applicable orders of the Bankruptcy Court.

### 3. Post-Confirmation Date Fees and Expenses

Except as otherwise specifically provided in this Plan, from and after the Confirmation Date, the Debtors and, subject to the terms of the Plan Trust Agreement, the Plan Administrator may employ and pay any professional for services rendered or expenses incurred after the Confirmation Date in the ordinary course of business without any further notice to any party or action, order or approval of the Bankruptcy Court and any requirement that professionals comply with sections 327 through 331 and 1103 of the Bankruptcy Code or any prior order of the Bankruptcy Court governing compensation of Professionals in seeking retention or compensation for services rendered after such date shall terminate.

### E. Priority Tax Claims

Pursuant to section 1129(a)(9)(C) of the Bankruptcy Code, unless otherwise agreed to by the Holder of an Allowed Priority Tax Claim and the Debtors, with the consent of Brookfield, or the Plan Administrator, as applicable, each Holder of an Allowed Priority Tax Claim will receive, at the option of the Debtors or the Plan Administrator, as applicable, in full and final satisfaction, settlement, release, and discharge of, and in exchange for, its Allowed Priority Tax Claim, (a) Cash in an amount equal to the amount of such Allowed Priority Tax Claim or (b) Cash in an aggregate amount of such Allowed Priority Tax Claim payable in installment payments over a period of time not to exceed five (5) years after the

Petition Date, pursuant to section 1129(a)(9)(C) of the Bankruptcy Code. A Priority Tax Claim that becomes Allowed after the Effective Date shall receive such treatment in accordance with the Plan as soon as reasonably practicable after such Priority Tax Claim becomes Allowed.

## ARTICLE VII.
## CLASSIFICATION, TREATMENT, AND VOTING OF CLAIMS AND INTERESTS

### A.     Classification of Claims and Interests

This Plan constitutes a separate Plan proposed by Debtor PosiGen, PBC and a substantively consolidated Plan proposed by the Consolidated Debtors. Accordingly, the Plan shall serve as a motion for entry of an order by the Bankruptcy Court approving the deemed substantive consolidation of the Consolidated Debtors. Except for the Claims addressed in Article VI of the Plan, all Claims and Interests are classified in the Classes set forth below in accordance with section 1122 of the Bankruptcy Code. A Claim or an Interest is classified in a particular Class only to the extent that the Claim or Interest qualifies within the description of that Class and is classified in other Classes to the extent that any portion of the Claim or Interest qualifies within the description of such other Classes. A Claim or an Interest also is classified in a particular Class for the purpose of receiving Distributions under the Plan only to the extent that such Claim or Interest is an Allowed Claim or Interest in that Class and has not been paid, released, or otherwise satisfied prior to the Effective Date.

### B.     Treatment of Claims and Interests

Each Holder of an Allowed Claim or Allowed Interest, as applicable, shall receive under the Plan the treatment described below in full and final satisfaction, settlement, release, and discharge of and in exchange for such Holder's Allowed Claim or Allowed Interest, except to the extent different or less favorable treatment is agreed to by the Debtors, prior to the Effective Date, or the Plan Administrator, on or after the Effective Date, and the Holder of such Allowed Claim or Allowed Interest, as applicable. Unless otherwise indicated, (a) the Holder of an Allowed Claim or Allowed Interest, as applicable, shall receive such treatment on the Effective Date or as soon as reasonably practicable thereafter, and (b) the Holder of a Claim or Interest that is not Allowed as of the Effective Date shall receive such treatment as soon as reasonably practicable after such Claim or Interest becomes Allowed.

#### *Claims Against and Interests in PosiGen, PBC*

1.     Class 1-A – Other Secured Claims Against PosiGen, PBC

   a.     *Classification*: Class 1-A consists of any Other Secured Claims against PosiGen, PBC.

   b.     *Treatment*: On the Effective Date, each Holder of an Allowed Other Secured Claim against PosiGen, PBC shall receive such treatment rendering its Allowed Other Secured Claim Against PosiGen, PBC Unimpaired in accordance with section 1124 of the Bankruptcy Code.

   c.     *Voting*: Class 1-A is Unimpaired under the Plan. Holders of Allowed Other Secured Claims against PosiGen, PBC are conclusively presumed to have accepted the Plan under section 1126(f) of the Bankruptcy Code. Holders of Allowed Other Secured Claims against PosiGen, PBC, are not entitled to vote to accept or reject the Plan.

52

2.      Class 2-A – Other Priority Claims Against PosiGen, PBC

     a.      *Classification*:  Class 2-A consists of any Other Priority Claims against PosiGen, PBC.

     b.      *Treatment*: On the Effective Date, except to the extent that a Holder of an Allowed Other Priority Claim against PosiGen, PBC has agreed to less favorable treatment, each Holder of an Allowed Other Priority Claim against PosiGen, PBC shall receive treatment in a manner consistent with section 1129(a)(9) of the Bankruptcy Code; *provided*, *however*, that, (i) if the Bankruptcy Court enters the WARN Action Final Settlement Order and such order becomes a Final Order, each Holder of a WARN Action Claim against PosiGen, PBC that is a member of the WARN Action Settlement Class shall receive, in full and final satisfaction of such Claim, a WARN Action Settlement Payment from the WARN Action QSF, and (ii) if the Bankruptcy Court declines to enter the WARN Action Final Settlement Order (such that there is no WARN Action Settlement Class) or a Holder of a WARN Action Claim against PosiGen, PBC timely elects to opt out of the WARN Action Settlement, each Holder of an Allowed WARN Action Claim against PosiGen, PBC that is not a member of the WARN Action Settlement Class shall receive, in full and final satisfaction of such Claim and subject to his or her delivery of a WARN Action Release, a WARN Action Equivalent Settlement Payment from the Plan Trust.

     c.      *Voting*: Class 2-A is Unimpaired under the Plan.  Holders of Allowed Other Priority Claims against PosiGen, PBC, are conclusively presumed to have accepted the Plan under section 1126(f) of the Bankruptcy Code.  Holders of Allowed Other Priority Claims against PosiGen, PBC are not entitled to vote to accept or reject the Plan.

3.      Class 3-A – Prepetition Secured Promissory Note Claims Against PosiGen, PBC

     a.      *Allowance*:  On the earlier of (1) the Effective Date or (2) entry of the DIP Order, the Prepetition Secured Promissory Note Claims against PosiGen, PBC shall be Allowed in the aggregate principal amount of not less than \$7,294,984.39, *plus* any accrued and unpaid interest, fees, and other amounts payable under the Prepetition Secured Promissory Note.

     b.      *Classification*: Class 3-A consists of any Prepetition Secured Promissory Note Claims against PosiGen, PBC.

     c.      *Treatment*:  On the Effective Date, each Holder of an Allowed Prepetition Secured Promissory Note Claim against PosiGen, PBC shall receive its Pro Rata share of: (1) on account of its Allowed Secured Claim, if any, the proceeds of the sale of assets in which it has a first-priority security interest, if any, and (2) on account of its Allowed Deficiency Claim, if any, the PBC Plan Trust Interests.

     d.      *Voting*: Class 3-A is Impaired under the Plan.  Holders of Allowed Prepetition Secured Promissory Note Claims against PosiGen, PBC are entitled to vote to accept or reject the Plan.

4.  Class 4-A – Prepetition Secured Convertible Note Claims Against PosiGen, PBC

    a.  *Classification*: Class 4-A consists of any Prepetition Secured Convertible Note Claims against PosiGen, PBC.

    b.  *Treatment*:  On the Effective Date, each Holder of an Allowed Prepetition Secured Convertible Note Claim against PosiGen, PBC shall receive its Pro Rata share of: (1) on account of its Allowed Secured Claim, if any, the proceeds of the sale of assets in which it has a first-priority security interest, if any, and (2) on account of its Allowed Deficiency Claim, if any, the PBC Plan Trust Interests.

    c.  *Voting*: Class 4-A is Impaired under the Plan.  Holders of Prepetition Secured Convertible Note Claims against PosiGen, PBC are entitled to vote to accept or reject the Plan.

5.  Class 5-A – Prepetition Battery Loan Claims Against PosiGen, PBC

    a.  *Allowance*: On the Effective Date, the Prepetition Battery Loan Claims Against PosiGen, PBC shall be Allowed in the aggregate principal amount of $2,000,000, *plus* any accrued and unpaid interest, fees, and other amounts payable under the Battery Revolving Credit Agreement.

    b.  *Classification*: Class 5-A consists of any Prepetition Battery Loan Claims against PosiGen, PBC.

    c.  *Treatment*:  On the Effective Date, each Holder of an Allowed Prepetition Battery Loan Claim against PosiGen, PBC shall receive:  (1) on account of its Allowed Secured Claim, if any, the Battery Collateral and an assignment of the leases securing the Battery Revolving Credit Facility, and (2) on account of its Allowed Deficiency Claim, if any, its Pro Rata share of the PBC Plan Trust Interests.

    d.  *Voting*: Class 5-A is Impaired under the Plan.  Holders of Prepetition Battery Loan Claims against PosiGen, PBC are entitled to vote to accept or reject the Plan.

6.  Class 6-A – Prepetition June Bridge Loan Claims Against PosiGen, PBC

    a.  *Classification*: Class 6-A consists of any Prepetition June Bridge Loan Claims against PosiGen, PBC.

    b.  *Treatment*: On the Effective Date, each Holder of an Allowed Prepetition June Bridge Loan Claim against PosiGen, PBC shall receive on account of such Allowed Claim its Pro Rata share of the PBC Plan Trust Interests.

    c.  *Voting*: Class 6-A is Impaired under the Plan.  Holders of Prepetition June Bridge Loan Claims against PosiGen, PBC are entitled to vote to accept or reject the Plan.

7.  Class 7-A – Prepetition July Bridge Loan Claims Against PosiGen, PBC

    a.  *Allowance*: On the Effective Date, the Prepetition July Bridge Loan Claims against PosiGen, PBC shall be Allowed in the aggregate principal amount of not less than

54

$26,228,767, plus any accrued and unpaid interest, fees, and other amounts payable under the Prepetition July Bridge Loan.

b. *Classification*: Class 7-A consists of any Prepetition July Bridge Loan Claims against PosiGen, PBC.

c. *Treatment*:  On the Effective Date, each Holder of an Allowed Prepetition July Bridge Loan Claim against PosiGen, PBC shall receive (1) on account of its Allowed Secured Claim, if any, the proceeds of the sale of assets in which it has a first-priority perfected security interest, if any, and (2) on account if its Allowed Deficiency Claim, if any, its Pro Rata Share of the PBC Plan Trust Interests.[8]

d. *Voting*: Class 7-A is Impaired under the Plan.  Holders of Prepetition July Bridge Loan Claims against PosiGen, PBC are entitled to vote to accept or reject the Plan.

8. Class 8-A – General Unsecured Claims Against PosiGen, PBC

a. *Classification*: Class 8-A consists of any General Unsecured Claims against PosiGen, PBC.

b. *Treatment*: On the Effective Date, each Holder of an Allowed General Unsecured Claim against PosiGen, PBC shall receive its Pro Rata share of the PBC Plan Trust Interests.

c. *Voting*: Class 8-A is Impaired under the Plan.  Holders of General Unsecured Claims against PosiGen, PBC are entitled to vote to accept or reject the Plan.

9. Class 9-A – Intercompany Claims Against PosiGen, PBC

a. *Classification*: Class 9-A consists of any Intercompany Claims against PosiGen, PBC.

b. *Treatment*: On the Effective Date, each Holder of an Allowed Intercompany Claim against PosiGen, PBC shall have its Claim cancelled, released, and extinguished.

c. *Voting*: Class 9-A is Impaired under the Plan.  Holders of Intercompany Claims against PosiGen, PBC are conclusively deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code.  Therefore, Holders of Intercompany Claims against PosiGen, PBC are not entitled to vote to accept or reject the Plan.

10. Class 10-A – Section 510 Claims Against PosiGen, PBC

a. *Classification*: Class 10-A consists of any Section 510 Claims against PosiGen, PBC.

b. *Treatment*: On the Effective Date, all Section 510 Claims against PosiGen, PBC shall be cancelled, released, and extinguished.

---

[8] Upon entry of a Final Order of the Bankruptcy Court approving the Settlement, the treatment of the Prepetition July Bridge Loan Claims against PosiGen, PBC shall be governed by the terms of the Settlement.

c. *Voting*: Class 10-A is Impaired under the Plan.  Holders of Section 510 Claims against PosiGen, PBC are conclusively deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code.  Therefore, Holders of Section 510 Claims against PosiGen, PBC are not entitled to vote to accept or reject the Plan.

11. Class 11-A – Existing Equity Interests in PosiGen, PBC

a. *Classification*: Class 11-A consists of any Existing Equity Interests in PosiGen, PBC.

b. *Treatment*: On the Effective Date, all Existing Equity Interests in PosiGen, PBC shall be cancelled, released, and extinguished.

c. *Voting*: Class 11-A is Impaired under the Plan.  Holders of Existing Equity Interests in PosiGen, PBC are conclusively deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code.  Therefore, Holders of Existing Equity Interests in PosiGen, PBC are not entitled to vote to accept or reject the Plan.

### *Claims Against and Interests in the Consolidated Debtors*

1. Class 1-B – Other Secured Claims Against the Consolidated Debtors

a. *Classification*: Class 1-B consists of any Other Secured Claims against the Consolidated Debtors.

b. *Treatment*: On the Effective Date, each Holder of an Allowed Other Secured Claim against the Consolidated Debtors shall receive such treatment rendering its Allowed Other Secured Claim against the Consolidated Debtors Unimpaired in accordance with section 1124 of the Bankruptcy Code.

c. *Voting*: Class 1-B is Unimpaired under the Plan.  Holders of Allowed Other Secured Claims against the Consolidated Debtors are conclusively presumed to have accepted the Plan under section 1126(f) of the Bankruptcy Code.  Holders of Allowed Other Secured Claims against the Consolidated Debtors are not entitled to vote to accept or reject the Plan.

2. Class 2-B – Other Priority Claims Against the Consolidated Debtors

a. *Classification*: Class 2-B consists of any Other Priority Claims against the Consolidated Debtors.

b. *Treatment*: On the Effective Date, except to the extent that a Holder of an Allowed Other Priority Claim against the Consolidated Debtors has agreed to less favorable treatment, each Holder of an Allowed Other Priority Claim against the Consolidated Debtors shall receive treatment in a manner consistent with section 1129(a)(9) of the Bankruptcy Code; *provided*, *however*, that, (i) if the Bankruptcy Court enters the WARN Action Final Settlement Order and such order becomes a Final Order, each Holder of a WARN Action Claim against the Consolidated Debtors that is a member of the WARN Action Settlement Class shall receive, in full and final satisfaction of such Claim, a WARN Action

56

Settlement Payment from the WARN Action QSF, and (ii) if the Bankruptcy Court declines to enter the WARN Action Final Settlement Order (such that there is no WARN Action Settlement Class) or a Holder of a WARN Action Claim against the Consolidated Debtors timely elects to opt out of the WARN Action Settlement, each Holder of an Allowed WARN Action Claim against the Consolidated Debtors that is not a member of the WARN Action Settlement Class shall receive, in full and final satisfaction of such Claim and subject to his or her delivery of a WARN Action Release, a WARN Action Equivalent Settlement Payment from the Plan Trust.

c. *Voting*: Class 2-B is Unimpaired under the Plan.  Holders of Allowed Other Priority Claims against the Consolidated Debtors are conclusively presumed to have accepted the Plan under section 1126(f) of the Bankruptcy Code.  Holders of Allowed Other Priority Claims against the Consolidated Debtors are not entitled to vote to accept or reject the Plan.

3. Class 3-B – Prepetition Secured Promissory Note Claims Against the Consolidated Debtors

a. *Allowance*:  On the earlier of (1) the Effective Date or (2) entry of the DIP Order, the Prepetition Secured Promissory Note Claims against the Consolidated Debtors shall be Allowed in the aggregate principal amount of not less than $7,294,984.39, *plus* any accrued and unpaid interest, fees, and other amounts payable under the Prepetition Secured Promissory Note.

b. *Classification*: Class 3-B consists of any Prepetition Secured Promissory Note Claims against the Consolidated Debtors.

c. *Treatment*:  On the Effective Date, each Holder of an Allowed Prepetition Secured Promissory Note Claim against the Consolidated Debtors shall receive its Pro Rata share of:  (1) on account of its Allowed Secured Claim, if any, the proceeds of the sale of assets in which it has a first-priority security interest, if any, and (2) on account of its Allowed Deficiency Claim, if any, the Consolidated Debtors Plan Trust Interests.

d. *Voting*: Class 3-B is Impaired under the Plan.  Holders of Prepetition Secured Promissory Note Claims against the Consolidated Debtors are entitled to vote to accept or reject the Plan.

4. Class 4-B – Prepetition Secured Convertible Note Claims Against the Consolidated Debtors

a. *Classification*: Class 4-B consists of any Prepetition Secured Convertible Note Claims against the Consolidated Debtors.

b. *Treatment*:  On the Effective Date, each Holder of an Allowed Prepetition Secured Convertible Note Claim against the Consolidated Debtors shall receive its Pro Rata share of:  (1) on account of its Allowed Secured Claim, if any, the proceeds of the sale of assets in which it has a first-priority security interest, if any, and (2) on account of its Allowed Deficiency Claim, if any, the Consolidated Debtors Plan Trust Interests.

c.    *Voting*: Class 4-B is Impaired under the Plan. Holders of Prepetition Secured Convertible Note Claims against the Consolidated Debtors are entitled to vote to accept or reject the Plan.

5.    Classes 5-B-1 and 5-B-2 – Prepetition June Bridge Loan Claims Against the Consolidated Debtors

a.    *Classification*: (1) Class 5-B-1 consists of any Prepetition June Bridge Loan Claims against the Consolidated Debtors that are Secured Claims, and (2) Class 5-B-2 consists of any Prepetition June Bridge Loan Claims against the Consolidated Debtors that are not Secured Claims, including Deficiency Claims. For the avoidance of doubt, Class 5-B-1 and Class 5-B-2 shall be treated as separate Classes for voting and distribution purposes under this Plan.

b.    *Treatment*: (1) On the Effective Date, ECI 2024-2025 LLC, or any successor thereto, as the only Holder of an Allowed Prepetition June Bridge Loan Claim against the Consolidated Debtors that is a Secured Claim, shall receive on account of such Allowed Claim either: (A) an assignment of the Owner 2 Collateral to the extent such assets are (i) not sold in the Chapter 11 Cases, or (ii) sold to ECI 2024-2025 LLC pursuant to its credit bid, if any, in the Chapter 11 Cases or (B) the cash proceeds of the sale of the Owner 2 Collateral to the extent such assets are sold to a party other than ECI 2024-2025 LLC in the Chapter 11 Cases,[9] and (2) on the Effective Date, each Holder of an Allowed Prepetition June Bridge Loan Claim against the Consolidated Debtors that is not a Secured Claim, including a Deficiency Claim, shall receive on account of such Allowed Claim its Pro Rata share of the Consolidated Debtors Plan Trust Interests.

c.    *Voting*: (1) Class 5-B-1 is Impaired under the Plan, and (2) Class 5-B-2 is Impaired under the Plan. Holders of Prepetition June Bridge Loan Claims against the Consolidated Debtors are entitled to vote to accept or reject the Plan.

6.    Class 6-B – Prepetition July Bridge Loan Claims Against the Consolidated Debtors

a.    *Allowance*: On the Effective Date, the Prepetition July Bridge Loan Claims against the Consolidated Debtors shall be Allowed in the aggregate principal amount of not less than $26,228,767, plus any accrued and unpaid interest, fees, and other amounts payable under the Prepetition July Bridge Loan.

b.    *Classification*: Class 6-B consists of any Prepetition July Bridge Loan Claims against the Consolidated Debtors.

c.    *Treatment*: On the Effective Date, each Holder of an Allowed Prepetition July Bridge Loan Claim against the Consolidated Debtors shall receive (1) on account of its Allowed Secured Claim, if any, the proceeds of the sale of assets in which it has a first-priority perfected security interest, if any, and (2) on account of its

---

[9]    Upon entry of a Final Order of the Bankruptcy Court approving the Settlement, including the sale of the Owner 2 Collateral to Brookfield, the treatment of the Prepetition June Bridge Loan Claims against the Consolidated Debtors shall be governed by the terms of the Settlement.

Allowed Deficiency Claim, if any, its Pro Rata Share of the Consolidated Debtors Plan Trust Interests.[10]

    d.    *Voting*: Class 6-B is Impaired under the Plan. Holders of Prepetition July Bridge Loan Claims against the Consolidated Debtors are entitled to vote to accept or reject the Plan.

7.    Class 7-B – General Unsecured Claims Against the Consolidated Debtors

    a.    *Classification*: Class 7-B consists of any General Unsecured Claims against the Consolidated Debtors.

    b.    *Treatment*: On the Effective Date, each Holder of an Allowed General Unsecured Claim against the Consolidated Debtors shall receive its Pro Rata share of the Consolidated Debtors Plan Trust Interests.

    c.    *Voting*: Class 7-B is Impaired under the Plan. Holders of General Unsecured Claims against the Consolidated Debtors are entitled to vote to accept or reject the Plan.

8.    Class 8-B – Intercompany Claims Against the Consolidated Debtors

    a.    *Classification*: Class 8-B consists of any Intercompany Claims against the Consolidated Debtors.

    b.    *Treatment*: On the Effective Date, each Holder of an Allowed Intercompany Claim against the Consolidated Debtors shall have its Claim cancelled, released, and extinguished.

    c.    *Voting*: Class 8-B is Impaired under the Plan. Holders of Intercompany Claims against the Consolidated Debtors are conclusively deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code. Therefore, Holders of Intercompany Claims Against the Consolidated Debtors are not entitled to vote to accept or reject the Plan.

9.    Class 9-B – Section 510 Claims Against the Consolidated Debtors

    a.    *Classification*: Class 9-B consists of any Section 510 Claims against the Consolidated Debtors.

    b.    *Treatment*: On the Effective Date, each holder of an Allowed Section 510 Claim against the Consolidated Debtors shall have its Claims cancelled, released, and extinguished.

    c.    *Voting*: Class 9-B is Impaired under the Plan. Holders of Section 510 Claims against the Consolidated Debtors are conclusively deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code. Therefore, Holders of

---

[10]    Upon entry of a Final Order of the Bankruptcy Court approving the Settlement, the treatment of the Prepetition July Bridge Loan Claims against the Consolidated Debtors shall be governed by the terms of the Settlement.

59

Section 510 Claims against the Consolidated Debtors are not entitled to vote to accept or reject the Plan.

10. Class 10-B – Existing Equity Interests in the Consolidated Debtors

    a. *Classification*:  Class 10-B consists of any Existing Equity Interests in the Consolidated Debtors.

    b. *Treatment*:  On the Effective Date, all Existing Equity Interests in the Consolidated Debtors shall be cancelled, released, and extinguished, except to the extent otherwise provided in the Restructuring Transactions Memorandum, if any; *provided* that, for the avoidance of doubt, no Holder of an Existing Equity Interests in the Consolidated Debtors shall receive Plan Trust Interests or any other distribution under this Plan on account of such Existing Equity Interests.

    c. *Voting*:  Class 10-B is Impaired under the Plan.  Holders of Existing Equity Interests in the Consolidated Debtors are conclusively deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code.  Therefore, Holders of Existing Equity Interests in the Consolidated Debtors are not entitled to vote to accept or reject the Plan.

**C.	Reservation of Rights Regarding Claims**

Except as otherwise provided in this Plan, nothing herein shall be deemed to affect, diminish, waive, relinquish, or impair the Debtors' or the Plan Administrator's Causes of Action, including any legal or equitable rights or defenses, with respect to any Claim or Interest, including any Impaired, Reinstated, or Unimpaired Claim or Interest.

**D.	Elimination of Vacant Classes**

Any Class of Claims or Interests that does not have a Holder of an Allowed Claim or Allowed Interest or a Claim or Interest temporarily Allowed by the Bankruptcy Court or otherwise entitled to vote under the solicitation and voting procedures approved by the Bankruptcy Court as of the date of the Confirmation Hearing shall be deemed eliminated from the Plan for purposes of voting to accept or reject the Plan and for purposes of determining acceptance or rejection of the Plan by such Class pursuant to section 1129(a)(8) of the Bankruptcy Code.

**E.	Voting Classes Where No Valid Votes Are Received**

If a Class contains Claims or Interests eligible to vote and no Holders of Claims or Interests eligible to vote in such Class vote to accept or reject the Plan, then such Class shall be deemed to have accepted the Plan.

**F.	Subordinated Claims**

The allowance, classification, and treatment of all Allowed Claims and Allowed Interests and the respective Distributions and treatments under the Plan take into account and conform to the relative priority and rights of the Claims and Interests in each Class in connection with any contractual, legal, and equitable subordination rights relating thereto, whether arising under general principles of equitable subordination, section 510(b) of the Bankruptcy Code, or otherwise.  Pursuant to section 510 of the Bankruptcy Code, the

Debtors and the Plan Administrator, as applicable, reserve the right to re-classify any Allowed Claim or Allowed Interest in accordance with any contractual, legal, or equitable subordination relating thereto.

**G.      Controversy Concerning Impairment**

If a controversy arises as to whether any Claims or Interests, or any Class of Claims or Interests, are Impaired, the Bankruptcy Court shall, after notice and a hearing, which may be on shortened notice, determine such controversy on or before the Confirmation Date.

**H.      Confirmation Pursuant to Section 1129(b) of the Bankruptcy Code**

The Debtors request Confirmation of the Plan pursuant to section 1129(b) of the Bankruptcy Code with respect to any rejecting Class of Claims or Interests.  The Debtors reserve the right to modify the Plan in accordance with Article XIV of the Plan to the extent, if any, that Confirmation pursuant to section 1129(b) of the Bankruptcy Code requires modification, including by modifying the treatment applicable to a Class of Claims or Interests to render such Class of Claims or Interests Unimpaired to the extent permitted by the Bankruptcy Code and the Bankruptcy Rules.

**ARTICLE VIII.**
**MEANS FOR IMPLEMENTATION OF THE PLAN**

**A.      Deemed Substantive Consolidation of the Consolidated Debtors**

On the Effective Date, (i) any obligation of a Consolidated Debtor and any guarantee thereof by any other Consolidated Debtor shall be deemed to be one obligation, and any such guarantee shall be eliminated, (ii) each Claim filed or to be filed against more than one Consolidated Debtor shall be deemed filed only against PosiGen, LLC and shall be deemed a single Claim against and a single obligation of PosiGen, LLC, and (iii) any joint or several liability of the Consolidated Debtors shall be deemed one obligation of PosiGen, LLC. On the Effective Date, and in accordance with the terms of the Plan and the consolidation of the assets and liabilities of the Consolidated Debtors, all Claims based upon guarantees of collection, payment performance made by one Consolidated Debtor as to the obligations of another Consolidated Debtor shall be released and of no further force and effect.

In the event the Bankruptcy Court authorizes the Debtors to substantively consolidate fewer than all of the Consolidated Debtors' Estates: (a) the Plan shall be treated as a separate plan for each Debtor not substantively consolidated and (b) the Debtors shall not be required to resolicit votes with respect to the Plan.

The Plan shall serve as, and shall be deemed to be, in connection with the Settlement, a motion for entry of an order substantively consolidating the Chapter 11 Cases of the Consolidated Debtors for the limited purposes of voting and distribution. If no objection to deemed substantive consolidation is timely filed and served by any holder of an Impaired Claim on or before the deadline to object to the confirmation of the Plan, or such other date as may be fixed by the Bankruptcy Court and the Debtors meet their burden of introducing evidence to establish that deemed substantive consolidation is merited under the standards of applicable bankruptcy law, the Confirmation Order, which shall be deemed to substantively consolidate the Consolidated Debtors for the limited purposes of voting and distribution, may be entered by the Bankruptcy Court. If any such objections are timely filed and served, a hearing with respect to the deemed substantive consolidation and the objections thereto shall be scheduled by the Bankruptcy Court, which hearing shall coincide with the Confirmation Hearing.

**B.**     **Transition Procedures**

The Debtors shall, subject to entry of the Settlement Order, consummate the Transitions pursuant to the Transition Procedures.  The Debtors, the Plan Trust, and the Plan Administrator shall comply with the Transition Procedures, the Sale Documentation, and all ancillary documentation, and the Debtors' rights and obligations thereunder shall be deemed to be assigned to and vest in the Plan Trust upon the Effective Date.

**C.**     **Sources of Consideration for Plan Distributions**

Distributions under the Plan shall be funded by (i) the proceeds of the DIP Facility or the Sale Transaction (if to a Purchaser other than the DIP Lenders), and (ii) the Plan Administrator from the Plan Trust Assets; *provided, however*, that Allowed Professional Fee Claims shall be paid from the Administrative Expense Escrow Account or Distributable Cash, as applicable.  The Plan Trust Assets shall be used to satisfy payment of Allowed Claims and Interests as set forth in the Plan.

**D.**     **Corporate Action**

Upon the Effective Date, all actions contemplated under the Plan, regardless of whether taken before, on, or after the Effective Date, shall be deemed authorized and approved in all respects.

All matters provided for in the Plan involving the corporate structure of the Debtors or the Plan Trust, and any corporate, partnership, limited liability company, or other governance action required by the Debtors or the Plan Administrator, as applicable, in connection with the Plan shall be deemed to have occurred and shall be in effect, without any requirement of further action by the equity holders, members, directors, managers, or officers of the Debtors or the Plan Administrator, as applicable.  On or (as applicable) prior to the Effective Date, the appropriate officers of the Debtors or the Plan Administrator, as applicable, shall be authorized and (as applicable) directed to issue, execute, and deliver the agreements, documents, securities, and instruments contemplated under the Plan (or necessary or desirable to effect the transactions contemplated under the Plan) in the name and on behalf of the Debtors.  The authorizations and approvals contemplated by this Article VIII shall be effective notwithstanding any requirements under non-bankruptcy law.

**E.**     **Cancellation of Notes, Instruments, Certificates, and Other Documents**

On the later of the Effective Date and the date on which all Distributions have been made pursuant to the Plan (if not made on the Effective Date), except for the purpose of evidencing a right to and allowing Holders of Claims and Interests to receive a Distribution under the Plan or to the extent otherwise specifically provided for in the Plan, the Confirmation Order, or any agreement, instrument, or other document entered into in connection with or pursuant to the Plan (including, without limitation, the Plan Trust Agreement and the Sale Documents), all notes, bonds, indentures, certificates, securities, shares, purchase rights, options, warrants, collateral agreements, subordination agreements, intercreditor agreements, or other instruments or documents directly or indirectly evidencing, creating, or relating to any indebtedness or obligations of, or ownership interest in, the Debtors, giving rise to any Claims against or Interests in the Debtors or to any rights or obligations relating to any Claims against or Interests in the Debtors shall be deemed cancelled without any need for a Holder to take further action with respect thereto.

**F.**     **Effectuating Documents; Further Transactions**

On and after the Effective Date, the Debtors, and the directors, managers, partners, officers, authorized persons, and members thereof, and the Plan Administrator, as applicable, are authorized to and

62

may issue, execute, deliver, file, or record such contracts, securities, instruments, releases, and other agreements or documents and take such actions as may be necessary or appropriate to effectuate, implement, and further evidence the terms and conditions of the Plan, the Plan Trust Agreement, and the Sale Documents in the name of and on behalf of the Debtors, without the need for any approvals, authorizations, or consents except for those expressly required under the Plan.

## G.     Section 1146(a) Exemption

To the fullest extent permitted by section 1146(a) of the Bankruptcy Code, any transfers (whether from a Debtor to the Plan Trust or to any other Entity) of property under the Plan, the Plan Trust Agreement, or the Sale Documents or pursuant to: (1) the issuance, distribution, transfer, or exchange of any debt, equity security, or other interest in the Debtors or the Plan Trust; (2) the creation, modification, consolidation, termination, refinancing, and/or recording of any mortgage, deed of trust, or other security interest, or the securing of additional indebtedness by such or other means; (3) the making, assignment, or recording of any lease or sublease; or (4) the making, delivery, or recording of any deed or other instrument of transfer under, in furtherance of, or in connection with, the Plan, including any deeds, bills of sale, assignments, or other instrument of transfer executed in connection with any transaction arising out of, contemplated by, or in any way related to the Plan, including the Sale Documents, shall not be subject to any document recording tax, stamp tax, conveyance fee, intangibles or similar tax, mortgage tax, real estate transfer tax, mortgage recording tax, sales or use tax, Uniform Commercial Code filing or recording fee, regulatory filing or recording fee, or other similar tax or governmental assessment, and upon entry of the Confirmation Order, the appropriate state or local governmental officials or agents shall forgo the collection of any such tax or governmental assessment and accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax, recordation fee, or governmental assessment. All filing or recording officers (or any other Person with authority over any of the foregoing), wherever located and by whomever appointed, shall comply with the requirements of section 1146(a) of the Bankruptcy Code, shall forgo the collection of any such tax or governmental assessment, and shall accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax or governmental assessment.

## H.     Preservation of Rights of Action

In accordance with section 1123(b) of the Bankruptcy Code, the Plan Administrator shall retain and may enforce all rights to commence and pursue any Retained Estate Claims and Causes of Action, whether arising before or after the Petition Date, as set forth in the Schedule of Retained Estate Claims and Causes of Action. The rights of the Plan Administrator to commence, prosecute, or settle the Retained Estate Claims and Causes of Action shall be preserved notwithstanding the occurrence of the Effective Date.

The Plan Administrator may pursue the Retained Estate Claims and Causes of Action, as appropriate, in accordance with the best interests of the Plan Trust Beneficiaries and in accordance with the Plan Trust Agreement and the Plan. To the extent standing to pursue any of the Retained Estate Claims and Causes of Action was transferred to any other Entity during the Chapter 11 Cases, such standing shall be transferred fully to, and vest in, the Plan Trust as of the Effective Date.

In accordance with section 1123(b)(3) of the Bankruptcy Code, any Retained Estate Claims and Causes of Action that a Debtor may hold against any Entity shall vest in the Plan Trust. The Plan Administrator, through its authorized agents or representatives, shall retain and may exclusively enforce all Retained Estate Claims and Causes of Action. The Plan Administrator shall have the right, authority, and discretion to determine and to initiate, file, prosecute, enforce, abandon, settle, compromise, release,

withdraw, or litigate to judgment any Retained Estate Claims and Causes of Action, or to decline to do any of the foregoing, in accordance with the terms and conditions of the Plan and Plan Trust Agreement.

For the avoidance of doubt, the Retained Estate Claims and Causes of Action under the Plan Administrator's purview pursuant to this Plan shall not include any Purchaser Retained/Released Causes of Action.

**I.     Access to Books and Records and Personnel**

On and after the Effective Date, the Plan Administrator shall provide access to relevant documents, information, and personnel as reasonably necessary to implement the Transition Procedures and the Debtors' obligations under the Sale Documents and in connection with carrying out their responsibilities under the Plan and Plan Trust Agreement.

**J.     WARN Action Settlement**

As a compromise and settlement pursuant to Bankruptcy Rule 9019 of WARN Action Claims, the WARN Actions, the Debtors' defenses asserted by the WARN Action Answer, and the WARN Action Estimation Motion, the Debtors, Brookfield, the Committee, and the WARN Action Representative Claimants, shall jointly support a motion (the form of which such parties shall use good faith efforts to agree upon, and which shall be filed, prior to the commencement of the Confirmation Hearing) for approval of such settlement on the following terms and as set forth in the WARN Action Final Settlement Order (the "**WARN Action Settlement**"):

(a)     each of the Debtors, Brookfield, the Committee, and the WARN Action Representative Claimants agrees to the terms of the WARN Action Settlement and the treatment of Holders of WARN Action Claims as described herein;

(b)     the WARN Action Settlement Class shall be certified for purposes of settlement pursuant to Bankruptcy Rule 7023 and Federal Rule of Civil Procedure 23;

(c)     the WARN Action Representative Claimants shall be appointed as class representatives pursuant to Bankruptcy Rule 7023 and Federal Rule of Civil Procedure 23;

(d)     the WARN Action Class Counsel shall be appointed as class counsel pursuant to Bankruptcy Rule 7023 and Federal Rule of Civil Procedure 23(g);

(e)     the treatment of WARN Action Claims under the WARN Action Settlement shall be in full and final satisfaction of the WARN Action Claims of the WARN Action Representative Claimants and all other members of the WARN Action Settlement Class;

(f)     each of the WARN Action Representative Claimants and all other members of the WARN Action Settlement Class shall release all WARN Action Released Claims against each of the WARN Action Released Parties;

(g)     distributions of the WARN Action Settlement Amount shall be made by the Debtors or the Plan Administrator, as applicable, to the WARN Action QSF according to wiring instructions to be provided by WARN Action Class Counsel;

(h)     the WARN Action QSF shall be established by a settlement administrator chosen by WARN Action Class Counsel;

64

(i)　　the Debtors or the Plan Administrator shall provide to such settlement administrator, contemporaneously with the first payment of WARN Action Settlement Funds to the WARN Action QSF, a tax identification number for each proposed member of the WARN Action Settlement Class, who by not opting-out of the WARN Action Settlement Class, shall be deemed to consent to the provision of such information to the settlement administrator of the WARN Action QSF;

(j)　　the WARN Action Representative Claimants shall receive, in addition to their respective WARN Action Settlement Payments, a combined payment from the WARN Action QSF of $25,000 from the WARN Action Settlement Amount, which shall be allocated equally among the five WARN Action Representative Claimants (*i.e.*, $5,000 each);

(k)　　WARN Action Class Counsel shall receive payment from the WARN Action QSF in the amount of one-third (1/3) of the aggregate distributions of the WARN Action Settlement Amount to the WARN Action QSF, plus reasonable litigation costs and expenses related to the WARN Action Claims, including without limitation, costs and expenses related to class noticing and administration of the WARN Action Settlement, which payments shall constitute payment in full for WARN Action Class Counsel's work and expenses incurred in connection therewith;

(l)　　any distributions from the WARN Action QSF to members of the WARN Action Settlement Class that are not deposited or presented for payment within 180 days of such distribution shall be deemed residual funds (the "**WARN Action Residual Funds**") on the 181st day following the distribution and treated as follows: (i) first, used to make distributions by the WARN Action QSF to additional members of the WARN Action Settlement Class, if any, that may be identified after the initial distribution of the WARN Action Settlement Amount and who qualify as members of the WARN Action Settlement Class but who were not identified by WARN Action Class Counsel; (ii) second, distributed in a supplemental distribution to all members of the WARN Action Settlement Class who cashed or negotiated their initial distribution check, so long as WARN Action Class Counsel determines that such distribution is feasible; and (iii) if any WARN Action Residual Funds remain after distributions to additional members of the WARN Action Settlement Class, if any, or as a supplemental distribution, if any, then last, such WARN Action Residual Funds shall be donated to the Impact Fund, a non-profit section 501(c)(3) charitable organization which advocates on behalf of employees' rights; and

(m)　　no WARN Action Residual Funds shall revert to Debtors, the DIP Lenders, the Committee, or the Plan Trust.

## ARTICLE IX.
## TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES

**A.　Rejection of Executory Contracts and Unexpired Leases**

On the Effective Date, except as otherwise provided herein, each Executory Contract and Unexpired Lease not previously rejected, assumed, or assumed and assigned, including any employee benefit plans, severance plans, and other Executory Contracts under which employee obligations arise, shall be deemed automatically rejected pursuant to sections 365 and 1123 of the Bankruptcy Code effective as of the Effective Date, unless such Executory Contract or Unexpired Lease: (a) is subject to a motion (or a notice issued pursuant to a motion) to reject, assume, or assume and assign pending as of the Effective Date; (b) is a contract, instrument, release, or other agreement or document entered into in connection with the Plan; (c) is an Insurance Policy;  (d) is a Sale Document; or (e) is subject to post-Effective Date assumption in accordance with the terms and conditions of the Sale Documents with the consent of the applicable non-

Debtor counterparty or as otherwise permitted by the Sale Order or the Asset Purchase Agreement (provided that, for the avoidance of doubt, in the absence of assumption of any such Executory Contract or Unexpired Lease in accordance with the terms and conditions of the Sale Documents, such Executory Contract or Unexpired Lease shall be deemed rejected as of the Effective Date, except as otherwise provided in the Sale Documents).

**B.      Claims Arising from the Rejection of Executory Contracts and Unexpired Leases**

Proofs of Claim with respect to Claims arising from the rejection of Executory Contracts or Unexpired Leases pursuant to the Plan, if any, must be filed on or before the later of (i) the Claims Bar Date or the Governmental Bar Date, as applicable, and (ii) 11:59 p.m. (prevailing Central Time) on the date that is thirty (30) days following entry of the order approving the Debtors' rejection of the applicable executory contract or unexpired lease.  **Any Claims arising from the rejection of an Executory Contract or Unexpired Lease pursuant to this Plan not filed within such time shall be disallowed, forever barred, estopped, and enjoined from assertion, and shall not be enforceable against, as applicable, the Debtors, the Estates, the Plan Administrator, or property of any of the foregoing, without the need for any objection by the Debtors or the Plan Administrator or further notice to, or action, order, or approval of the Bankruptcy Court or any other Entity, and any Claim arising out of the rejection of the Executory Contract or Unexpired Lease shall be deemed fully satisfied, and released, notwithstanding anything in the Schedules, if any, or in the Proof of Claim to the contrary**.  All Allowed Claims arising from the rejection of any Executory Contract and Unexpired Leases shall constitute and be treated as General Unsecured Claims.  Nothing herein shall constitute an extension of any Claims Bar Date otherwise applicable to a Claim arising from an Executory Contract or Unexpired Lease that was previously rejected by the Debtors.

**C.      Contracts and Leases Entered Into After the Petition Date**

Contracts and leases entered into or assumed by the Debtors after the Petition Date that are not assigned to the Purchaser (or have not otherwise previously been assigned pursuant to a Final Order prior to the Effective Date) shall be considered repudiated by the Debtors as of the Effective Date, and the counterparties to such contracts, if they believe that such repudiation constitutes a breach of such contract or lease, must file a proof of Claim within thirty (30) days of the Effective Date in accordance with this Plan or have their rights deemed forever satisfied, settled, released, and discharged.

**D.      Insurance Policies**

As of the Effective Date, the D&O Liability Insurance Policies shall be deemed to be and treated as Executory Contracts that have been assumed by the applicable Debtors and shall continue in full force and effect thereafter in accordance with their respective terms and vest in the Plan Trust.  Prior to the Petition Date, the Debtors obtained the D&O Liability Insurance Policies for their current and former directors, officers, and managers.  After the Effective Date, all members, managers, directors, and officers of the Debtors who served in such capacity at any time prior to the Effective Date shall be entitled to the full benefits of any such D&O Liability Insurance Policies for the full term of such policy, subject to and in accordance with the terms and conditions of such D&O Liability Insurance Policies in all respects, and the Plan Administrator's management of the D&O Liability Insurance Policies shall not affect the rights of (i) Entities covered by the D&O Liability Insurance Policies to pursue coverage under such policies, or (ii) Entities eligible to recover from the D&O Liability Insurance Policies to pursue recovery from such policies.  All such Entities' respective rights and priorities are undisturbed by this Plan.

**E.**     **Reservation of Rights**

Nothing contained in the Plan or the Plan Supplement shall constitute an admission by the Debtors or any other party that any contract or lease is in fact an Executory Contract or Unexpired Lease or that any Debtor or the Plan Administrator has any liability thereunder.  If there is a dispute regarding whether a contract or lease is or was executory or unexpired at the time of assumption or rejection, the Plan Administrator shall have forty-five (45) days following entry of a Final Order of the Bankruptcy Court resolving such dispute to alter the treatment of such contract or lease.

**ARTICLE X.**
**PROVISIONS GOVERNING DISTRIBUTIONS**

**A.**     **Distributions on Account of Claims Allowed as of the Effective Date**

Except as otherwise provided in this Article X, Distributions to be made on the Effective Date to Holders of Allowed Claims shall be deemed made on the Effective Date if made on the Effective Date or as promptly thereafter as practicable (such date on which a Distribution is made, a "**Distribution Date**"). In the event a Distribution shall be due on a day other than a Business Day, such Distribution shall instead be made on the immediately succeeding Business Day, but shall be deemed to have been made on the date otherwise due.  Except as otherwise provided in the Plan, Holders of Claims shall not be entitled to interest, dividends, or accruals on Distributions, regardless of whether such Distributions are delivered on or at any time after the Effective Date.

**B.**     **Distribution Agent**

All Distributions shall be made by the Distribution Agent.  The Distribution Agent may serve without bond.  The Distribution Agent shall be empowered to: (a) make all Distributions contemplated in this Plan; (b) effectuate all actions and execute all agreements, instruments and other documents necessary to perform its duties under this Plan; (c) employ or contract with other entities to assist in or make the Distributions; and (d) exercise such other powers as may be vested in the Distribution Agent by order of the Bankruptcy Court, pursuant to this Plan, the Plan Trust Agreement, or as deemed by the Distribution Agent to be necessary and proper to implement the provisions hereof.

Except as otherwise ordered by the Bankruptcy Court, the amount of any reasonable fees and out-of-pocket expenses incurred by the Distribution Agent on or after the Effective Date (including taxes) and any reasonable compensation to the Distribution Agent for services rendered shall be paid in Cash by the Plan Administrator from the Plan Trust Assets.

Except on account of gross negligence or willful misconduct, the Distribution Agent shall have no (a) liability to any party for actions taken in accordance with this Plan or in reliance upon information provided to it in accordance with this Plan, or (b) obligation or liability to any party who does not hold a Claim against the Debtors or who does not otherwise comply with the terms of this Plan.

**C.**     **Disputed Claims Reserves**

The Plan Administrator shall be empowered to establish and maintain one or more Disputed Claims Reserves in its sole discretion.  To the extent that the property placed in a Disputed Claims Reserve consists of Cash, that Cash shall be deposited in an interest-bearing account.  Property in the Disputed Claims Reserves shall be held in trust for the benefit of the Holders of Claims ultimately determined to be Allowed in each applicable Class.  Each Disputed Claims Reserve shall be closed by the Plan Administrator when all Distributions required to be made under this Plan to the Holders of Claims in the applicable Class have

67

been made in accordance with the terms of this Plan. Upon closure of a Disputed Claims Reserve, all Cash (including any investment yield on the Cash) and other property held in that Disputed Claims Reserve shall be distributed in accordance with this Plan or the Plan Trust Agreement, as applicable.

**D.      Special Rules for Distributions to Holders of Disputed Claims**

Notwithstanding any provision otherwise in the Plan and except as otherwise agreed by the relevant parties, no partial payments and no partial Distributions shall be made with respect to a Disputed Claim until all disputes in connection with such Disputed Claim have been resolved by settlement or Final Order. When a Disputed Claim becomes an Allowed Claim, the Holder of such Allowed Claim shall thereupon become entitled to receive the Distributions in respect of such Claim, the same as though such Claim had been an Allowed Claim on the Effective Date.

**E.      Delivery of Distributions**

Distributions to a Holder of an Allowed Claim will be made by the Distribution Agent: (a) at the address set forth on the Proof of Claim filed by the Holders of such Claim or request for payment of Administrative Claim, as applicable; (b) at the address for a Claim transferee set forth in a valid and timely notice of transfer of Claim filed with the Bankruptcy Court; (c) at the address set forth in any written notice of address change filed with the Bankruptcy Court or delivered to the Distribution Agent after the date of filing of any related Proof of Claim; (d) at the address reflected in the Debtors' Schedules or otherwise in the Debtors' books and records if no Proof of Claim has been filed and the Distribution Agent has not received a written notice of a change of address; or (e) if clauses (a) through (d) are not applicable, at the last address directed by such Holder in writing after such Claim becomes an Allowed Claim.

**F.      Undeliverable and Unclaimed Distributions Held by Distribution Agent**

**1.      Holding of Undeliverable Distributions**

If any Distribution to a Holder of an Allowed Claim is returned to the Distribution Agent as undeliverable, no further Distributions will be made to such Holder unless and until the Distribution Agent is notified by written certification of such Holder's then-current address. Nothing contained in the Plan shall require the Distribution Agent to attempt to locate any Holder of an Allowed Claim.

**2.      After Distributions Become Deliverable**

On each Distribution Date, the Distribution Agent will make all Distributions that became deliverable to Holders of Allowed Claims after the most recent Distribution Date; *provided*, *however*, that the Distribution Agent, in its sole discretion, may establish a record date prior to each Distribution Date, such that only Claims Allowed as of such record date will participate in such periodic Distribution. Notwithstanding the foregoing, the applicable Distribution Agent reserves the right to postpone a Distribution Date, if it determines a Distribution on any Distribution Date is uneconomical or unfeasible, or is otherwise unadvisable.

**3.      Failure to Claim Undeliverable Distributions**

Any Holder of an Allowed Claim that does not assert its right to an undeliverable Distribution prior to the date that is 90 days after the applicable Distribution Date will be forever barred from asserting any such Claim against the Debtors, the Estates, the Plan Administrator, and their respective property. In such cases, (a) the undeliverable Distributions shall be deemed to be unclaimed property under section 347(b) of the Bankruptcy Code and vest in the Plan Trust, (b) the Allowed Claims with respect to such

68

Distributions shall be automatically cancelled, (c) the right of the Holders entitled to those Distributions shall be discharged and forever barred, and (d) the undeliverable Distributions shall be reserved or distributed in accordance with the Plan and the Plan Trust Agreement.

### G.  Time Bar to Cash Payments

Checks issued in respect of Allowed Claims shall be null and void if not negotiated within 90 days after the date of issuance thereof.  Requests for reissuance of any voided check shall be made directly to the Plan Administrator by the holder of the Allowed Claim to whom such check was originally issued.  If any Holder of an Allowed Claim holding an un-negotiated check does not request reissuance of that check within 90 days after the date the check was mailed or otherwise delivered to the Holder, the entitlement of the Holder regarding such un-negotiated check and the funds represented thereby shall be released and the Holder thereof shall be forever barred, estopped and enjoined from asserting any claim with respect to such un-negotiated check and the funds represented thereby against any of the Debtors or the Plan Administrator. In such cases, any Cash held for payment on account of such un-negotiated check shall be deemed to be unclaimed property under section 347(b) of the Bankruptcy Code and shall vest in the Plan Trust and be deemed to be a Plan Trust Asset.

### H.  Manner of Payment

Unless a Holder of an Allowed Claim and the Distribution Agent otherwise agree, any Distribution to be made in Cash shall be made, at the election of the Distribution Agent, by check drawn on a domestic bank or by wire transfer from a domestic bank.  Cash payments to foreign creditors may, in addition to the foregoing, be made at the option of the Distribution Agent in such funds and by such means as are necessary or customary in a particular foreign jurisdiction.

### I.  Fractional Distributions

Whenever any payment of Cash of a fraction of a dollar pursuant to the Plan would otherwise be required, the actual payment shall reflect a rounding of such fraction to the nearest whole dollar (up or down), with half dollars or less being rounded down.

### J.  Foreign Currency Exchange Rate

Except as otherwise provided in a Bankruptcy Court order, as of the Effective Date, any Claim asserted in currency other than U.S. dollars shall be automatically deemed converted to the equivalent U.S. dollar value using the exchange rate for the applicable currency as published in *The Wall Street Journal, National Edition*, on the Petition Date.

### K.  *De Minimis* Distributions

No distributions shall be made to a Holder of an Allowed Claim if such Distribution is less than $100.00 in the aggregate.

### L.  No Postpetition Interest on Claims

Unless otherwise specifically provided for in the Plan or the Confirmation Order, or required by applicable bankruptcy and non-bankruptcy law, postpetition interest shall not accrue or be paid on any Claims, including any Disputed Claims, against the Debtors, and no Holder of a Claim against the Debtors shall be entitled to interest accruing on or after the Petition Date on any such Claim.

**M.      Allocation Between Principal and Accrued Interest**

To the extent that any Allowed Claim entitled to a Distribution from Plan Trust Assets consists of indebtedness and other amounts (such as accrued but unpaid interest thereon), such Distribution shall be allocated first to the principal amount of the Claim (as determined for federal income tax purposes) and then, to the extent the consideration exceeds the principal amount of the Claim, to such other amounts, if any.

**N.      Single Satisfaction**

In no case shall the aggregate value of all property received or retained under the Plan on account of any Allowed Claim exceed 100 percent of the underlying Allowed Claim plus applicable interest, if any.

**O.      Compliance with Tax Requirements**

In connection with this Plan, to the extent applicable, the Distribution Agent shall comply with all tax withholding and reporting requirements imposed on it by any Governmental Unit, and all Distributions shall be subject to such withholding and reporting requirements. Notwithstanding any provision in this Plan to the contrary, the Distribution Agent shall be authorized to take all actions necessary or appropriate to comply with such withholding and reporting requirements, including liquidating a portion of the Distribution to generate sufficient funds to pay applicable withholding taxes, withholding Distributions pending receipt of information necessary to facilitate such Distributions or establishing any other mechanisms the Distribution Agent believes are reasonable and appropriate. The Distribution Agent shall have the right to allocate all Distributions in compliance with applicable wage garnishments, alimony, child support and other spousal awards, liens and encumbrances.

The Distribution Agent may require, as a condition to receipt of a Distribution, that the Holder of an Allowed Claim provide any information necessary to allow the Distribution Agent to comply with any such withholding and reporting requirements imposed by any federal, state, local, or foreign taxing authority. If the Distribution Agent makes such a request and the Holder fails to comply before the date that is 90 days after the request is made or such later date agreed to by the Distribution Agent in writing in its discretion, then the Distribution Agent, in its sole discretion, may (a) make a Distribution net of any applicable withholding, or (b) determine that such Holder shall be deemed to have forfeited the right to receive any Distribution, in which case, any such Distribution shall revert to the Debtors or the Plan Trust, as applicable, for Distribution on account of other Allowed Claims and the Claim of the Holder originally entitled to such Distribution shall be waived, discharged, and forever barred without further order of the Bankruptcy Court. Any amounts withheld pursuant to the Plan shall be deemed to have been distributed to and received by the applicable recipient for all purposes of the Plan. Notwithstanding the above, each Holder of an Allowed Claim that is to receive a Distribution shall have the sole and exclusive responsibility for the satisfaction and payment of any tax obligations imposed on such Holder by any Governmental Unit, including income, withholding, and other tax obligations, on account of such Distribution.

**P.      Claims Paid or Payable by Third Parties**

      **1.      Claims Paid by Third Parties**

To the extent that the Holder of an Allowed Claim receives payment on account of such Claim by an Entity other than the Distribution Agent (including the Purchaser), the Plan Administrator shall be authorized to reduce, for the purposes of Distribution, the Allowed amount of such Claim by the amount of such third-party payment, and such Claim shall be disallowed or deemed satisfied, as applicable, to the extent of such third-party payment without an objection having to be filed and without any further notice

to or action, order or approval of the Bankruptcy Court. Any Holder of a Claim that receives full or partial payment on account of such Claim from an Entity that is not the Distribution Agent shall provide notice of the date and amount of such payment to the Plan Administrator within five (5) Business Days of receipt of such payment. Such Holder shall repay, return, or deliver to the Plan Administrator any Distribution received on account of the portion of its Claim that was satisfied by such third-party payment.

### 2.     Claims Payable by Insurance Carriers

Except as otherwise set forth herein, no Distribution shall be made on account of an Allowed Claim that is payable pursuant to one of the Insurance Policies until the Holder of such Allowed Claim has exhausted all remedies with respect to such Insurance Policy. To the extent that one or more of the Insurers agrees to satisfy in full or in part a Claim, then, immediately upon such Insurers' agreement, such Claim may be expunged to the extent of any agreed-upon satisfaction on the Claims Register by the Claims and Noticing Agent without a Claims objection having to be filed and without any further notice to or action, order, or approval of the Bankruptcy Court.

### 3.     Applicability of Insurance Policies

Except as otherwise provided herein, payments on account of Claims covered by Insurance Policies shall be in accordance with the provisions of any applicable Insurance Policy and applicable law. Except as otherwise expressly provided herein, nothing contained in the Plan shall constitute or be deemed a waiver of any Cause of Action that the Debtors, the Plan Trust, or any Entity may hold against any other Entity, including Insurers, under any Insurance Policy, nor shall anything contained herein constitute or be deemed a waiver by such Insurers of any defenses, including coverage defenses, held by such Insurers.

To the extent that any creditor or party-in-interest has a Claim against the Debtors that may be covered by an Insurance Policy, and to the extent that such Insurance Policy has a self-insured retention or deductible amount, in the sole discretion of the Plan Administrator, in full and final satisfaction of such Claim, the creditor shall have a General Unsecured Claim, against the Estates up to the amount of such self-insured retention. Nothing herein relieves any creditor from being required to file a Claim by the applicable Bar Date to receive a payment or distribution from the Estates. Nothing herein waives the rights of any Insurer under any Insurance Policy or is a determination that insurance coverage under any Insurance Policy is available.

## Q.     Setoffs and Recoupments

Except as otherwise expressly provided herein, the Debtors and the Plan Administrator may, but shall not be required to, set off against or recoup from any Claims of any nature whatsoever that the Debtors or the Plan Trust may have against the Holder, but neither the failure to do so nor the Allowance of any Claim hereunder shall constitute a waiver or release by the Debtors or the Plan Administrator of any such Claim they may have against the Holder of such Claim. In no event shall any Holder of Claims be entitled to set off any such Claim against any claim, right, or Cause of Action of the Debtor or the Plan, as applicable, unless (a) the Debtors, prior to the Effective Date, or the Plan Administrator, on or after the Effective Date, have consented or, (b) notwithstanding any indication in any Proof of Claim or otherwise that such Holder asserts, has, or intends to preserve any right of setoff pursuant to section 553 of the Bankruptcy Code or otherwise, such Holder has filed a motion with the Bankruptcy Court requesting the authority to perform such setoff on or before the Confirmation Date and a Final Order granting such Motion has been entered; *provided*, *however*, that the Plan Administrator's bringing of a Retained Estate Claim or Cause of Action, including but not limited to, a Plan Trust Contributed Cause of Action, against an Entity shall constitute the Plan Administrator's consent to such Entity's assertion of set off or recoupment rights (subject to any applicable defenses of the Debtors, their Estates, or the Plan Trust, including under the Bar Date Order).

71

**R.** **Securities Law Matters**

The offering, issuance, or distribution of the Plan Trust Assets or any units or other beneficial interests in the Plan Trust in accordance with the Plan is exempt from the provisions of Section 5 of the Securities Act and any state or local law requiring registration for the offer, issuance, or distribution of a security by reason of section 1145(a) of the Bankruptcy Code and/or Section 4(a)(2) of the Securities Act of 1933.

**S.** **Administration of Taxes**

The Plan Administrator shall prepare and file (or cause to be prepared and filed) on behalf of the Debtors all tax returns, reports, certificates, forms, or similar statements or documents (collectively, "**Tax Returns**") required to be filed or that the Plan Administrator otherwise deems appropriate, including the filing of amended tax returns or requests for refunds, for all taxable periods ending on, prior to, or after the Effective Date.

Subject to the Plan Trust Agreement, the Plan Administrator shall have the sole right, at its expense, to control, conduct, compromise, and settle any tax contest, audit, or administrative or court proceeding relating to any liability for taxes of the Debtors and shall be authorized to respond to any tax inquiries relating to the Debtors.

## ARTICLE XI.
## PROCEDURES FOR RESOLVING DISPUTED CLAIMS AND INTERESTS

**A.** **Allowance of Claims**

After the Effective Date, the Plan Administrator shall have any and all rights and defenses that the Debtors had with respect to any Claim immediately before the Effective Date, except with respect to any Claim deemed Allowed or satisfied, settled, released, and discharged under this Plan. All settled Claims approved prior to the Effective Date pursuant to a Final Order of the Bankruptcy Court pursuant to Bankruptcy Rule 9019 or otherwise shall be binding on all parties.

Any Claim that has been listed in the Schedules as disputed, contingent or unliquidated, and for which no proof of Claim has been timely filed by the applicable Bar Date, is not considered Allowed and shall be expunged without further action and without any further notice to or action, order or approval of the Bankruptcy Court.

**B.** **Prosecution and Settlement of Disputed Claims**

Except as otherwise specifically provided in this Plan, the Debtors, before the Effective Date, and the Plan Administrator with the consent of the Plan Trust Board, after the Effective Date, subject to the Plan Trust Agreement, shall have the sole authority to: (a) file, withdraw or litigate to judgment, objections to Claims; (b) settle or compromise any Disputed Claim without any further notice to or action, order or approval by the Bankruptcy Court (other than a Professional Fee Claim); and (c) direct the Claims and Noticing Agent to adjust the claims register to reflect any such resolutions without any further notice to or action, order, or approval by the Bankruptcy Court.

Objections to Claims and Interests must be filed and served by no later than the Claims Objection Deadline (subject to such being extended by an order of the Bankruptcy Court). For the avoidance of doubt, the Claims Objection Deadline may be extended on multiple occasions.

72

**C.  Pending Objections**

To the extent the Debtors have filed objections to Claims that remain pending as of the Effective Date, the Plan Administrator shall be substituted as the objecting party without further action of the parties or order of the Bankruptcy Court.

**D.  Claims Assumed by Purchaser**

Any Proof of Claim or request for payment of any claim, including an Administrative Claim, that has been filed with respect to a Claim that is assumed by the Purchaser pursuant to the Sale Documents shall be deemed to be an asserted obligation of the Purchaser and disallowed as against the Debtors, the Estates and the Plan Administrator without further action of the parties or the Bankruptcy Court. Notwithstanding anything to the contrary in this Plan, the Purchaser shall have (a) any and all rights and defenses that the Debtors had with respect to any such claim immediately prior to the closing date of the Sale Transaction or other applicable sale, and (b) the sole authority to (i) file, withdraw or litigate to judgment objections to such claims; *provided*, that the Debtors and the Plan Administrator, as applicable, shall be authorized to file objections to any claims that are assumed by the Purchaser pursuant to the Sale Documents on the basis that such liabilities are not obligations of the Debtors or the Plan Administrator and (ii) settle or compromise any claims that are assumed by the Purchaser pursuant to the Sale Documents without any further notice to or action, order or approval by the Bankruptcy Court.

**E.  Adjustment to Claims Without Objection**

Any duplicate Claim or Interest or any Claim or Interest that has been paid, satisfied, amended, or superseded may be adjusted or expunged on the Claims Register by the Debtors, prior to the Effective Date, or the Plan Administrator, on or after the Effective Date, without having to file an application, motion, complaint, objection, or any other legal proceeding seeking to object to such Claim or Interest and without any further notice to or action, order, or approval of the Bankruptcy Court.

**F.  Estimation of Claims**

The Debtors, prior to the Effective Date, and the Plan Administrator, on or after the Effective Date, may, at any time, request that the Bankruptcy Court estimate any Disputed Claim pursuant to section 502(c) of the Bankruptcy Code and/or 28 U.S.C. § 157(b)(2)(B) regardless of whether any Party previously objected to such Claim or whether the Bankruptcy Court has ruled on any such objection.  In the event that the Bankruptcy Court estimates any Disputed Claim, that estimated amount will constitute the maximum limitation on such Claim for all purposes under the Plan (including for purposes of Distribution) until the resolution of any such Disputed Claim.  All of the objection, estimation, settlement and resolution procedures set forth in the Plan are cumulative and not necessarily exclusive of one another.  Claims may be estimated and subsequently compromised, settled, withdrawn or resolved by any mechanism approved by the Bankruptcy Court.

**G.  Disallowance of Claims and Interests**

**Except as provided herein or otherwise agreed, any and all Proofs of Claim filed after the applicable Bar Date shall be deemed disallowed and expunged without any further notice to or action, order, or approval of the Bankruptcy Court, and Holders of such Claims may not receive any Distributions on account of such Claims, unless such late filed Claim has been deemed timely filed by a Final Order.**

## ARTICLE XII.
## RELEASE, INJUNCTION, AND RELATED PROVISIONS

### A.      General Settlement of Claims and Interests

Pursuant to section 1123 of the Bankruptcy Code and in consideration for the Distributions and other benefits provided pursuant to the Plan, the Plan is and shall be deemed a good-faith compromise and settlement of all Claims, Interests, and controversies relating to the contractual, legal, and subordination rights that a Holder of a Claim or Interest may have with respect to any Allowed Claim or Interest, or any Distribution to be made on account of such Allowed Claim or Interest.  To the extent required under Bankruptcy Rule 7001, hearings and proceedings in respect of the Plan shall constitute an adversary proceeding.  The entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the compromise or settlement of all such Claims, Interests, and controversies, as well as a finding by the Bankruptcy Court that such compromise or settlement is in the best interests of the Debtors, the Estates, and Holders of Claims and Interests and is fair, equitable, and reasonable.  The compromises, settlements, and releases described herein shall be deemed non-severable from each other and from all other terms of the Plan.  Notwithstanding any other provision of this Plan, the Debtors shall not receive a discharge pursuant to section 1141(d)(3) of the Bankruptcy Code.

### B.      Releases by the Debtors

**Except as otherwise specifically provided in the Plan, as of the Effective Date, pursuant to section 1123(b) of the Bankruptcy Code, for good and valuable consideration, the adequacy of which is hereby confirmed, each Released Party and each Debtor Released Party is, and is deemed to be, hereby conclusively, absolutely, unconditionally, irrevocably, and forever released and discharged by the Debtors and their Estates, and any and all other Entities who may purport to assert any Claims or Causes of Action, directly or derivatively, by, through, for, or because of the Debtors or their Estates, from any and all Claims, Interests, obligations, rights, suits, damages, Causes of Action, remedies, and liabilities whatsoever, including any derivative claims, asserted or assertable on behalf of the Debtors or their Estates, as applicable, whether known or unknown, foreseen or unforeseen, matured or unmatured, existing or hereafter arising, contingent or noncontingent, in law, equity, contract, tort or otherwise, that the Debtors or their Estates would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the Holder of any Claim against, or Interest in, a Debtor, the Estates, or other Entity, based on or relating to, or in any manner arising from, in whole or in part, the Debtors (including management, ownership, or operation thereof), the Debtors' in- or out-of-court restructuring efforts, the Debtors' current and former subsidiaries (whether directly or indirectly owned and whether fully or partially owned), intercompany transactions, the Chapter 11 Cases, the formulation, preparation, dissemination, negotiation, filing, pursuit, performance, or consummation of the Chapter 11 Cases (including, without limitation, any payments, distributions or transfers in connection therewith), the Plan and Disclosure Statement, the Settlement, the Transitions, the DIP Facility, the DIP Loan Documents, the DIP Credit Bid, the Sale Transaction, the Sale Documents, or any contract, instrument, release, or other Plan Document entered into in connection with the Plan and Disclosure Statement, the Settlement, the Transitions, the DIP Facility, the DIP Loan Documents, the DIP Credit Bid, the Chapter 11 Cases, the Sale Transaction, Confirmation, or Consummation, the administration and implementation of the Plan, including the distribution of property under the Plan or any other related agreement, any payments, distributions or transfers made by the Debtors during the Chapter 11 Cases, any settlement or agreement in the Chapter 11 Cases or upon the negotiations regarding or concerning any of the foregoing or any other act or omission, transaction, agreement, event, or other occurrence relating to the foregoing taking place on or before the Effective Date.  Notwithstanding anything to the contrary in the foregoing, the releases set forth in this Article XII.B do not release:**

74

**(a) any Released Party or any Debtor Released Party from any Causes of Action arising from or related to any act or omission by such Released Party or Debtor Released Party that is determined in a Final Order to have constituted actual fraud, willful misconduct, criminal acts or gross negligence provided that, notwithstanding this clause (a), all Purchaser Retained/Released Causes of Action arising under Chapter 5 of the Bankruptcy Code and state law equivalents shall be acquired or released as set forth in this Plan or the applicable Transaction Approval Orders); (b) any post-Effective Date obligations of any party or Entity under the Plan or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan; or (c) any rights or obligations under any Sale Document; or (d) any Claim or Cause of Action included in the Schedule of Retained Estate Claims and Causes of Action.**

**C.      Releases by the Releasing Parties**

**Except as otherwise specifically provided in the Plan, as of the Effective Date, for good and valuable consideration, the adequacy of which is hereby confirmed, each Released Party is, and is deemed to be, hereby conclusively, absolutely, unconditionally, irrevocably, and forever released and discharged by the Releasing Parties, and any and all other Entities who may purport to assert any Claims or Causes of Action, directly or derivatively, by, through, for, or because of the Releasing Parties, from any and all Claims, Interests, obligations, rights, suits, damages, Causes of Action, remedies, and liabilities whatsoever, whether known or unknown, foreseen or unforeseen, matured or unmatured, existing or hereafter arising, contingent or noncontingent, in law, equity, contract, tort or otherwise, including any derivative claims, asserted or assertable on behalf of the Debtors or their Estates, as applicable, that such Entity would have been legally entitled to assert, based on or relating to, or in any manner arising from, in whole or in part, the Debtors (including management, ownership, or operation thereof), the Debtors' in- or out-of-court restructuring efforts, the Debtors' current and former subsidiaries (whether directly or indirectly owned and whether fully or partially owned), intercompany transactions, the Chapter 11 Cases, the formulation, preparation, dissemination, negotiation, filing, pursuit, performance, or consummation of the Chapter 11 Cases (including, without limitation, any payments, distributions or transfers in connection therewith), the Plan and Disclosure Statement, the Settlement, the Transitions, the DIP Facility, the DIP Loan Documents, the DIP Credit Bid, the Sale Transaction, the Sale Documents, or any contract, instrument, release, or other Plan Document entered into in connection with the Plan and Disclosure Statement, the Settlement, the Transitions, the DIP Facility, the DIP Loan Documents, the DIP Credit Bid, the Chapter 11 Cases, Confirmation, or Consummation, the administration and implementation of the Plan, including the distribution of property under the Plan or any other related agreement, any payments, distributions or transfers made by the Debtors during the Chapter 11 Cases, any settlement or agreement in the Chapter 11 Cases or upon the negotiations regarding or concerning any of the foregoing or any other act or omission, transaction, agreement, event, or other occurrence relating to the foregoing taking place on or before the Effective Date; _provided_ that, with respect to Claims against the Debtors, this Article XII.C shall only apply to Claims arising from any act or omission, transaction, agreement, event, or other occurrence taking place from and including the Petition Date through the Effective Date.  Notwithstanding anything to the contrary in the foregoing, the releases set forth in this Article XII.C do not release: (a) any Released Party from any Causes of Action arising from or related to any act or omission by such Released Party that is determined in a Final Order to have constituted actual fraud, willful misconduct, criminal acts or gross negligence provided that, notwithstanding this clause (a), all Purchaser Retained/Released Causes of Action arising under Chapter 5 of the Bankruptcy Code and state law equivalents shall be acquired or released as set forth in this Plan or the applicable Transaction Approval Orders; (b) any post-Effective Date obligations of any party or Entity under the Plan or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan; or (c) any rights or obligations under any Sale Document; (d) any rights or obligations under the**

Transition, the Transaction Procedures, or the Settlement; or (e) any Claim or Cause of Action included in the Schedule of Retained Estate Claims and Causes of Action.

Notwithstanding anything to the contrary in the Plan or Confirmation Order, nothing in this **Article XII.C** of this Plan will be deemed to discharge, release or otherwise affect any claims, rights and remedies (including any right to indemnification that any member may have in respect of their limited liability company interests) of any Project Company against its members, of any Project Company's members against such Project Company, or of any Project Company's member against another member of such Project Company, in each case arising under such Project Company's limited liability agreement.

D.      **Exculpation**

Except as otherwise specifically provided in the Plan, to the fullest extent permissible under applicable law, no Exculpated Party shall have or incur, and each Exculpated Party is exculpated from any Cause of Action for any claim related to any act or omission occurring on or after the Petition Date and before the Effective Date in connection with, relating to, or arising out of, in whole or in part, the Chapter 11 Cases before the Effective Date, the Debtors (including management, ownership, or operation thereof), the Debtors' restructuring efforts, intercompany transactions, the formulation, preparation, dissemination, negotiation, filing, pursuit, performance, or consummation of the Chapter 11 Cases (including, without limitation, any payments, distributions or transfers in connection therewith), the Plan and Disclosure Statement, the Sale Transaction, or any contract, instrument, release or other Plan Document, agreement, or document created or entered into in connection with the Plan and Disclosure Statement, the Chapter 11 Cases, Confirmation, or Consummation, the administration and implementation of the Plan, including the distribution of property under the Plan or any other related agreement, any payments, distributions or transfers made by the Debtors during the Chapter 11 Cases, any settlement or agreement in the Chapter 11 Cases or upon the negotiations regarding or concerning any of the foregoing or any other act or omission, transaction, agreement, event, or other occurrence relating to the foregoing taking place on or after the Petition Date and before the Effective Date, except for claims related to any act or omission that is determined in a Final Order to have constituted actual fraud, willful misconduct, criminal acts or gross negligence, but in all respects such Entities shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities pursuant to the Plan. The Exculpated Parties have, and upon completion of the Plan shall be deemed to have, participated in good faith and in compliance with the applicable laws with regard to the solicitation of votes and Distribution of consideration pursuant to the Plan and, therefore, are not, and on account of such Distributions shall not be, liable at any time for the violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan or such distributions made pursuant to the Plan. Notwithstanding anything to the contrary in the foregoing, the exculpation set forth above does not exculpate any obligations arising on or after the Effective Date of any party or Entity under the Plan, the Confirmation Order, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan.

E.      **Injunction**

Except as otherwise expressly provided in the Plan or for obligations issued or required to be paid pursuant to the Plan or the Confirmation Order, all Entities who have held, hold, or may hold Claims, Interests, or Causes of Action that have been released or are subject to exculpation are permanently enjoined, from and after the Effective Date, from taking any of the following actions against, as applicable, the Debtors, the Plan Administrator, the Released Parties, or the Exculpated Parties: (a) commencing or continuing in any manner any action or other proceeding of any kind on

76

**account of or in connection with or with respect to any such Claims, Interests, or Causes of Action; (b) enforcing, attaching, collecting, or recovering by any manner or means any judgment, award, decree, or order against such Entities or the property or the estates of such Entities on account of or in connection with or with respect to any such Claims, Interests, or Causes of Action; (c) creating, perfecting, or enforcing any encumbrance of any kind against such Entities or the property or the estates of such Entities on account of or in connection with or with respect to any such Claims, Interests, or Causes of Action; (d) asserting any right of setoff or subrogation of any kind against any obligation due from such Entities or against the property of such Entities on account of or in connection with or with respect to any such Claims, Interests, or Causes of Action unless (i) such Holder has filed a motion requesting the right to perform such setoff on or before the Confirmation Date, and notwithstanding an indication of a claim or interest or otherwise that such Holder asserts, has, or intends to preserve any right of setoff pursuant to applicable law or otherwise or (ii) the Plan Administrator brings a Retained Estate Claim or Cause of Action, including but not limited to, a Plan Trust Contributed Cause of Action, against such Holder; and (e) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such Claims, Interests, or Causes of Action released or settled pursuant to the Plan.**

**Notwithstanding anything to the contrary in the Plan or Confirmation Order, nothing in this <u>Article XII.E</u> of this Plan will be deemed to affect or otherwise enjoin any claims, rights and remedies (including any right to indemnification that any member may have in respect of their limited liability company interests) of any Project Company against its members, of any Project Company's members against such Project Company, or of any Project Company's member against another member of such Project Company, in each case arising under such Project Company's limited liability agreement.**

**F.      Reimbursement or Contribution**

If the Bankruptcy Court Allows or disallows a Claim for reimbursement or contribution of an Entity pursuant to section 502(e)(1)(B) of the Bankruptcy Code, then to the extent that such Claim is contingent as of the time of Allowance or disallowance, such Claim shall be forever disallowed and expunged notwithstanding section 502(j) of the Bankruptcy Code, unless prior to the Confirmation Date: (a) such Claim has been adjudicated as non-contingent; or (b) the relevant Holder of a Claim has filed a non-contingent Proof of Claim on account of such Claim and a Final Order has been entered prior to the Confirmation Date determining such Claim as no longer contingent.

**G.      Release of Liens**

**Except (a) with respect to Liens securing an Allowed Secured Claim, to the extent elected by the Debtors or the Plan Administrator, as applicable, and (b) as otherwise provided in the Plan, or in any contract, instrument, release, or other agreement or document created pursuant to the Plan, on the Effective Date, (i) all mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the Estates shall be fully released and discharged, (ii) each of the Debtors, the Plan Administrator, or their delegates are authorized to file such documents as may be necessary to effectuate, or reflect in the public record, the release and discharge such Liens and interests, (iii) the Holders of any such mortgages, deeds of trust, Liens, pledges, or other security interests shall execute such documents as may be reasonably requested by the Debtors or the Plan Administrator, as applicable, to reflect or effectuate such releases and discharges, and (iv) all of the right, title, and interest of any Holder of such mortgages, deeds of trust, Liens, pledges, or other security interests to be released shall revert to the Plan Administrator. The Holder (and any other Person) of any mortgages, deeds of trust, Liens, pledges, or other security interests that are to be released is entitled to rely on this <u>Article XII.G</u> for the purpose of executing and delivering any documentation related**

77

**to, or otherwise assisting with, the release or discharge of any such mortgages, deeds of trust, Liens, pledges, or other security interests.**

## ARTICLE XIII.
## THE PLAN TRUST AND WIND DOWN

**A.        Creation and Governance of Plan Trust**

The Plan Administrator shall be selected by Brookfield and the Committee and identified in the Plan Supplement if known at the time of filing.  The powers, rights, and responsibilities of the Plan Administrator shall be specified herein and/or in the Plan Trust Agreement, as applicable, and shall include the responsibility and requisite power to reconcile Claims, including asserting any objections thereto.

On the Effective Date, the Debtors and the Plan Administrator shall enter into the Plan Trust Agreement, which shall be in form and substance reasonably acceptable to Brookfield, the Committee, and, solely to the extent (i) that the interests of the Owner 3 Parties are affected, the Owner 3 Parties, and (ii) such agreement materially, adversely, and disproportionately affects G-I's interests, G-I, and the Plan Trust Assets shall vest or be deemed to be vested in the Plan Trust automatically without further action by any Person, free and clear of all Claims and Liens, and such transfer shall be exempt from any stamp, real estate transfer, mortgage reporting, sales, use, or other similar tax pursuant to section 1146(a) of the Bankruptcy Code.  Under no circumstance shall the Debtors or any other party be required to contribute any assets to the Plan Trust other than the Plan Trust Assets.  After the Effective Date, neither the Debtors nor any other party shall have any interest in the Plan Trust Assets except as expressly set forth herein.

The Plan Trust shall be administered by the Plan Administrator and governed by the Plan Trust Agreement, and the Plan Administrator shall have the sole power and authority to distribute the proceeds of the Plan Trust Assets to Plan Trust Beneficiaries in accordance with the treatment set forth in the Plan and the terms and conditions of the Plan Trust Agreement  The Plan Administrator shall be the exclusive trustee of the Plan Trust Assets for purposes of 31 U.S.C. § 3713(b) and section 6012(b)(4) of the Tax Code.  The Plan Trust, acting through the Plan Administrator, shall be the sole representative of the Estates under section 1123(b)(3) of the Bankruptcy Code with respect to the Plan Trust Assets (including the Retained Estate Claims and Causes of Action).  The Plan Trust, acting through the Plan Administrator, shall be a party in interest within the meaning of section 1109(b) of the Bankruptcy Code for all purposes in the Chapter 11 Cases.  The Confirmation Order shall contain a finding that the Plan Trust has standing to pursue any claim or Cause of Action that is not released pursuant to Article XII hereof, including any Retained Estate Claims and Causes of Action, on behalf of the Debtors.

To the extent necessary to the performance of the Plan Administrator's duties and responsibilities, and subject to the Plan Trust Agreement, the Debtors shall share communications or documents that are subject to the attorney-client privilege, work product protection, or other applicable privilege with the Plan Trust; the sharing of such information shall not operate as a waiver of any applicable privileges.  The Debtors and Plan Administrator shall agree on how to document the sharing of the attorney-client privilege in accordance with the foregoing such that any privilege is preserved (such as through a common interest agreement), and in the absence of such agreement, the Bankruptcy Court shall decide as set forth in the Confirmation Order or any other order(s).  Notwithstanding the foregoing, in connection with the prosecution of any Retained Estate Claim or Cause of Action, any attorney-client privilege, work-product privilege, joint interest privilege or other privilege or immunity attaching to any prepetition documents or communications relating to such Retained Estate Claim or Cause of Action shall be transferred to and shall vest in the Plan Trust.  The Plan Trust's receipt of such privileges associated with the Retained Estate Claims and Causes of Action shall not operate as a waiver of those privileges possessed or retained by any Debtor, nor shall it operate to eliminate the rights of any codefendant to any applicable joint privilege.  The

78

Plan Trust shall also be vested with each Debtor's rights, as such rights existed prior to the Effective Date, to conduct discovery and oral examinations of any party under Bankruptcy Rule 2004. The Plan Trust, however, shall not be considered a successor of any Debtor and shall not assume any obligations of any Debtor other than expressly provided for by this Plan and the Plan Trust Agreement.

On the Effective Date, the authority, power, and incumbency of the persons acting as directors and officers of each of the Debtors shall be deemed to have been terminated and such persons shall be deemed to have resigned, solely in their capacities as such, and the Plan Administrator shall be appointed by each Debtor as the sole director and the sole officer of the Debtors and shall succeed to the powers of such Debtor's directors and officers.

**B.      Purpose of Plan Trust**

The Plan Trust shall be established for the purpose of winding down the Debtors and their Estates and liquidating the Plan Trust Assets and distributing the proceeds thereof to the Plan Trust Beneficiaries in accordance with the terms of the Plan and Plan Trust Agreement. The Plan Trust is intended to qualify as a liquidation trust pursuant to Treasury Regulations section 301.7701-4(d), with no objective to continue or engage in the conduct of a trade or business, except to the extent reasonably necessary and consistent with the purpose of the Plan Trust.

In furtherance of, and consistent with, the purposes of the Plan Trust and the Plan, the Plan Administrator, as a trustee appointed under this Plan pursuant to chapter 11 of the Bankruptcy Code shall, among other things, (a) have the power and authority to hold, manage, sell, invest, liquidate, monetize, receive and distribute to the Plan Trust Beneficiaries, the Plan Trust Assets, including any proceeds thereof, (b) have the power to hold the Plan Trust Assets for the benefit of the Plan Trust Beneficiaries, (c) have the power and authority to prosecute and resolve objections to Disputed Claims, (d) have the power to form business organizations (single member limited liability companies or otherwise) to hold Plan Trust Assets, including any received following the Effective Date, and (e) have the power and authority to perform such other functions as are provided for herein and the Plan Trust Agreement. For the avoidance of doubt, notwithstanding anything to the contrary in the Plan or the Plan Trust Agreement, the Plan Administrator shall not pursue any Released Claim against any Released Party that is released from such Released Claim.

**C.      Plan Trust Agreement and Funding of Plan Trust**

The Plan Trust will be funded, on the Effective Date, with the $2,000,000 delayed draw New-Money DIP Loans constituting the Plan Trust Cash Contribution, *plus*, to the extent that the Committee's Professional Fees are less than $1,500,000, the difference between $1,500,000 and the actual amount of such fees, *plus*, any additional Cash on hand of the Debtors as of the Effective Date (other than the Administrative Expense Escrow Account). The Plan Trust Agreement provides for, among other things: (i) the payment of the Plan Trust Fees and Expenses; (ii) the retention of, and reliance upon, counsel, accountants, financial advisors, or other professionals by the Plan Trust and the payment of their reasonable compensation (including counsel on a contingency basis); (iii) the orderly liquidation of the Plan Trust Assets; and (iv) the disposition of the Retained Estate Claims and Causes of Action, which may include the prosecution, settlement, abandonment, sale, or dismissal of any such Retained Estate Claims and Causes of Action in accordance with this Plan. The Plan Trust Agreement provides that all post-Effective Date obligations of the Debtors' estates under the Bankruptcy Code shall become obligations of the Plan Trust. The Plan Trust Agreement provides for reasonable and customary indemnification and exculpation of the Plan Administrator and the Plan Trust Board, and their respective agents and professionals, solely from the proceeds of the Plan Trust Assets; *provided* that, for the avoidance of doubt, any such indemnification or exculpation shall be by the Plan Trust and the Plan Administrator alone and shall not implicate the Debtors.

In the event of any conflict between the terms of the Plan and the Plan Trust Agreement, the terms of the Plan Trust Agreement shall govern.

The Plan Administrator is authorized, subject to the Plan Trust Agreement, without any further notice to the Bankruptcy Court, Plan Trust Beneficiaries, or any other Person or Entity, or any further order of the Bankruptcy Court, to (a) retain and rely upon advice of counsel, (b) retain counsel on a contingency basis to pursue Retained Estate Claims and Causes of Action and/or (c) to obtain litigation financing or similar financing in the name of, and on behalf of, the Plan Trust, as may be necessary or appropriate, including, without limitation, to facilitate the pursuit by the Plan Administrator and/or Plan Trust of the Retained Estate Claims and Causes of Action or otherwise to liquidate or monetize the Plan Trust Assets.

The Plan Trust Agreement shall provide that the Plan Administrator shall make available to M&T, DFO, SunStrong and Decatur/Bienville ProjectCos upon request any information that is or was in the Debtors' or Plan Administrator's possession concerning the Decatur/Bienville ProjectCos.

**D.     Plan Trust Professionals; Plan Trust Fees and Expenses**

The Plan Trust Fees and Expenses, including the fees and expenses of counsel retained on a contingency basis, shall be paid from the Plan Trust Assets or the proceeds thereof (or the proceeds of any financing authorized hereunder, under the Confirmation Order or under the Plan Trust Agreement, including any litigation financing or similar financing that provides for a percentage of any litigation proceeds payable to the litigation financer) in accordance with the Plan, Confirmation Order, and the Plan Trust Agreement.  The Plan Administrator, on behalf of the Plan Trust, may employ and rely upon, without further order of the Bankruptcy Court, professionals to assist in carrying out its duties hereunder, and may compensate and reimburse the reasonable expenses of such professionals without further order of the Bankruptcy Court, from the Plan Trust Assets or the proceeds thereof (or the proceeds of any financing authorized hereunder, under the Confirmation Order or under the Plan Trust Agreement, including any litigation financing or similar financing that provides for a percentage of any litigation proceeds payable to the litigation financer) in accordance with the Plan, Confirmation Order, and the Plan Trust Agreement. The Plan Trust shall be reimbursed for any post Effective-Date wind-down obligations in favor of the Purchaser or performed at the Purchaser's request pursuant to further and separate agreement between the Plan Administrator and the Purchaser.

The Plan Administrator and all professionals retained by the Plan Administrator, each in their capacities as such, shall be deemed exculpated and indemnified, except for fraud, willful misconduct, or gross negligence, in all respects by each of the Debtors.  The Plan Administrator may obtain, at the expense of the Plan Trust and with the consent of Brookfield and the Committee, commercially reasonable liability or other appropriate insurance with respect to the indemnification obligations of the Debtors.  The Plan Administrator may rely upon written information previously generated by the Debtors.

The Plan Administrator shall be entitled to reasonably rely upon the advice of counsel with respect to its duties and responsibilities.

**E.     Plan Trust Board; Oversight**

On the Effective Date, the Plan Trust Board shall be formed and shall consist of up to five initial members as follows:  (a) up to three members designated by Brookfield, (b) one member designated by the Committee, and (c) one member designated by the Owner 3 Parties; provided that, if Brookfield designates one member, such member shall have three votes.  In furtherance of and consistent with the purpose of the Plan Trust and to effectuate the provisions of the Plan, the Plan Trust Board shall oversee the activities of the Plan Administrator as set forth in the Plan Trust Agreement.  The Plan Administrator shall report

material matters to, and seek approval for material decisions from, the Plan Trust Board, as and to the extent set forth in the Plan Trust Agreement, and consistent with the Plan and Confirmation Order. In all circumstances, the Plan Trust Board shall act in accordance with the Plan Trust Agreement. Plan Trust Beneficiaries may seek injunctive or other relief from the Bankruptcy Court in the event a member of the Plan Trust Board or the Plan Administrator breaches any duty. The Plan Trust Board shall remain in existence until such time as the final Distributions hereunder have been made. No member of the Plan Trust Board shall be entitled to any compensation for service on the Plan Trust Board. No member of the Plan Trust Board shall be required to incur out of pocket costs responding to any inquiries to the Plan Trust Board. The initial members of the Plan Trust Board will be set forth in the Plan Trust Agreement and the Plan Supplement.

**F.      Plan Trust Claim Reconciliation Process**

The Plan Administrator shall have primary responsibility for the Plan Trust Claim Reconciliation Process. Any Quarterly Fees arising after the Effective Date shall be paid exclusively from the Plan Trust Assets or from the proceeds of any financing authorized hereunder, under the Confirmation Order or under the Plan Trust Agreement. All the Chapter 11 Cases shall be closed as soon as reasonably practicable. The Plan Administrator shall have the right to file a motion to reopen one or more of the Chapter 11 Cases, including for purposes of the Plan Trust Claim Reconciliation Process, and to the extent necessary for the Plan Administrator to make distributions at a later date. After an Estate has been fully administered, the Plan Administrator shall seek authority to close the applicable Chapter 11 Case(s). In connection with the Plan Trust Claim Reconciliation Process, the Plan Administrator's rights to seek to subordinate, reclassify, compromise, or settle all General Unsecured Claims and Deficiency Claims are preserved.

**G.      Plan Trust Proceeds Allocation**

In advance of each Plan Trust Distribution to Plan Trust Beneficiaries, the Plan Administrator shall file a notice of the proposed allocation of Plan Trust Distributions between Holders of PBC Plan Trust Interests, on the one hand, and Holders of Consolidated Debtors Plan Trust Interests, on the other hand, fourteen (14) days prior to such Plan Trust Distribution. The Plan Trust Beneficiaries may object in writing (email to the Plan Administrator and its counsel being sufficient) prior to the expiration of such fourteen (14) day period. Upon the expiration of such period, if no Plan Trust Beneficiary has filed an objection, the Plan Administrator shall be authorized to make such Plan Trust Distribution. If any Plan Trust Beneficiary objects and such objection cannot be resolved consensually, the Plan Trust Beneficiary shall file an objection in the Bankruptcy Court, which may be heard on shortened notice. The Plan Administrator shall not make any disputed Plan Trust Distribution pending resolution of the objection.

**H.      Wind Down**

**1.      Authority of Plan Administrator**

Following the Effective Date, the Plan Administrator shall be the estate representative for each of the Debtors invested with all of the authority and privileges of a trustee in bankruptcy. Further, the Plan Administrator shall be the sole representative of, and shall act for, each Debtor in the same fiduciary capacity as applicable to boards of directors, boards of managers, and officers, subject to the provisions hereof and the Plan Trust Agreement (and all certificates of formation, membership agreements, and related documents are deemed amended by the Plan to permit and authorize the same). For the avoidance of doubt, the foregoing shall not limit the authority of the Plan Administrator, as applicable, with the prior consent of the Plan Trust Board, to continue the employment of any former director or officer, subject to the terms of the Plan Trust Agreement.

The Plan Administrator shall have the power and authority to dissolve the Debtors in accordance with the Plan, the Plan Trust Agreement, and the Restructuring Transactions Memorandum, including, without limitation, to: (1) form business organizations (single member limited liability companies or otherwise) to hold Plan Trust Assets, including any received following the Effective Date;  (2) cause a receiver to be appointed for any non-Debtor subsidiary of the Debtors (provided that no such receiver shall be appointed for Backleverage Holdco or any of its subsidiaries without Brookfield's consent) or cause any such non-Debtor subsidiary to seek the appointment of a receiver, including, without limitation, for purposes of causing any claim held by any such non-Debtor subsidiary to be asserted against any third party; and (3) wind down any non-Debtor subsidiaries of the Debtors (other than Backleverage Holdco and its subsidiaries without Brookfield's consent), to the extent the equity of such non-Debtor subsidiaries are not sold to the Purchaser pursuant to the Sale Transaction.  All Plan Distributions shall be made by the Distribution Agent, which may be the Plan Administrator.  The Plan Administrator shall not be required to give any bond or surety or other security for the performance of its duties.  The Plan Administrator shall be entitled to retain the services of attorneys, accountants, and other professionals that, in the discretion of the Plan Administrator, are necessary to assist the Plan Administrator in the performance of his or her duties.  The reasonable fees and expenses of the Plan Administrator and such professionals shall be paid by the Plan Trust as Plan Trust Fees and Expenses.  The payment of the reasonable fees and expenses of the Plan Administrator and Plan Administrator's retained professionals shall be made in the ordinary course of business and shall not be subject to the approval of the Bankruptcy Court.

### 2.     Debtors' Tax Returns

After the Effective Date, the Plan Administrator shall complete and file all final or otherwise required federal, state, and local tax returns for each of the Debtors and, pursuant to section 505(b) of the Bankruptcy Code, may request an expedited determination of any unpaid tax liability of such Debtor or its Estate for any tax incurred during the administration of such Debtor's Chapter 11 Case, as determined under applicable tax laws.

### 3.     Dissolution of the Debtors

Upon a certification to be filed with the Bankruptcy Court by the Plan Administrator of all Plan Distributions having been made and completion of all its duties under the Plan and entry of a final decree closing the last of the Chapter 11 Cases, each of the Debtors shall be deemed to be dissolved without any further action by such Debtor, including the filing of any documents with the secretary of state for the state in which each such Debtor is formed or any other jurisdiction.  The Plan Administrator, however, shall have authority, but shall not be required, to take all necessary actions to dissolve the Debtors and the non-Debtor subsidiaries (other than Backleverage and its subsidiaries), pursuant to Article XIII.H.1 above, and withdraw the Debtors and their non-Debtor subsidiaries (other than Backleverage and its subsidiaries), as applicable, from applicable states.

To the extent the Debtors have any Cash or other property remaining after the Chapter 11 Cases have been closed and all payments have been made under the Plan (including all payments on account of Allowed Claims and the Plan Administrator's compensation and reimbursement) and the conclusion of all litigation being pursued by the Plan Administrator, such Cash or other property shall be distributed Pro Rata to the Plan Trust Beneficiaries, without any further notice to or action, order, or approval of the Bankruptcy Court or any other Entity; *provided* that if, in the Plan Administrator's reasonable judgment, it is not feasible to distribute such Cash or other property Pro Rata or effectuate such distributions for any other reason, the Plan Administrator may contribute such amounts to the Bankruptcy Court pursuant to chapter 129 of the Judicial Code.

**I.      Plan Trust Interests**

Except as set forth in the Plan Trust Agreement, the Plan Trust Interests shall be passive and shall not have voting, consent, or other shareholder-like control rights with respect to the Plan Trust. The Plan Trust Interests will not be certificated and may not be transferred, sold, pledged, or otherwise disposed of, or offered for sale except in accordance with applicable law. The Plan Trust will operate in compliance with applicable federal and state securities laws and SEC staff guidance, including those regarding liquidating trusts, if applicable.

**J.      Cooperation of the Debtors**

The Debtors shall use reasonable efforts to cooperate with the Plan Trust and the Plan Administrator and any professionals retained by the Plan Trust in effecting the transition from the Debtors to the Plan Trust and of the administration of the Plan Trust Assets. Such cooperation shall include, but not be limited to, using reasonable efforts to identify and make available (i) reasonable access to the Debtors' books and records and information relating to the Retained Estate Claims and Causes of Action and other Plan Trust Assets, including electronic records, documents, or work product related to the foregoing, (ii) any evidence and information the Plan Administrator reasonably requests in connection with the Plan Trust's investigation, prosecution, other pursuit, or defense, as applicable, of the Retained Estate Claims and Causes of Action, to the extent the Debtors have such evidence and/or information and such evidence and/or information has not already been provided to the Plan Trust by the Debtors, (iii) to the extent known by the Debtors, the identity and contact information of the former officers, directors, and employees and professionals of the Debtors who may have knowledge regarding the Retained Estate Claims and Causes of Action; and (iv) current officers, directors, and employees of the Debtors that the Plan Administrator, in consultation with the Debtors, determines may have knowledge regarding the Retained Estate Claims and Causes of Action, subject to (a) consultation and cooperation between the Debtors and the Plan Administrator regarding the reasonable availability of such individuals and (b) counsel for the Debtors and the current officer, director or employee having the right to attend and participate in any meetings, discussions, or communications.

As a section 1123(b)(3) estate representative, in connection with the receipt by the Plan Trust of information from the Debtors in connection with the Plan Trust Assets, including the Retained Estate Claims and Causes of Action, the Debtors shall not assert privileges vis-à-vis the Plan Trust and the Plan Trust's receipt of such documents, information, or communications (1) shall not constitute a waiver of any privilege, and (2) reasonable agreements will be made with the Plan Administrator such that confidential information and privileges are preserved, while permitting the Plan Administrator to use, as necessary to administer the Plan Trust, such information and privilege. Notwithstanding the foregoing, the Plan Administrator shall provide Brookfield and the Owner 3 Parties with access to all documents, data, and other information received or made accessible to the Plan Trust on a common interest basis.

**K.      Tax Treatment of the Plan Trust**

The Debtors shall, unless otherwise required by applicable law, treat the Plan Trust as a "liquidating trust" under section 301.7701-4(d) of the Treasury Regulations and a grantor trust under section 671 of the Tax Code. Assuming such treatment applies, for U.S. federal income tax purposes, the transfer of assets to the Plan Trust shall be deemed to occur as (i) a first-step transfer of the Plan Trust Assets to the Holders of the applicable Claims, and (ii) a second-step transfer by such Holders to the Plan Trust. Thus, such Holders would be treated as the grantors and owners of a grantor trust for federal income tax purposes.

No request for a ruling from the IRS will be sought on the classification of the Plan Trust. Accordingly, there can be no assurance that the IRS would not take a contrary position to the classification

83

of the Plan Trust.  If the IRS were to successfully challenge the classification of the Plan Trust as a grantor trust, the federal income tax consequences to the Plan Trust and the Plan Trust Beneficiaries could vary from those discussed in the Plan (including the potential for an entity-level tax).  For example, the IRS could characterize the Plan Trust as a so-called "complex trust" subject to a separate entity-level tax on its earnings, except to the extent that such earnings are distributed during the taxable year.

As soon as possible after the transfer of the Plan Trust Assets to the Plan Trust, the Plan Administrator shall make a good faith valuation of the Plan Trust Assets.  This valuation will be made available from time to time, as relevant for tax reporting purposes.  Each of the Debtors, the Plan Administrator, and the Holders of Claims receiving Plan Trust Interests shall take consistent positions with respect to the valuation of the Plan Trust Assets, and such valuations shall be utilized for all U.S. federal income tax purposes.

Allocations of taxable income and loss of the Plan Trust among the Plan Trust Beneficiaries shall be determined by reference to the Plan Trust Beneficiaries' economic entitlements in respect of the Plan Trust, as will be further described in the organizational documents of the Plan Trust.

The Plan Trust shall, unless otherwise required by applicable law, file annual information tax returns with the IRS as a grantor trust pursuant to section 1.671-4(a) of the Treasury Regulations that will include information concerning certain items relating to the holding or disposition (or deemed disposition) of the Plan Trust Assets (e.g., income, gain, loss, deduction and credit).  Each Plan Trust Beneficiary holding a Plan Trust Interest will receive a copy of the information returns and must report on its federal income tax return its share of all such items.  The information provided by the Plan Trust will pertain to Plan Trust Beneficiaries who receive their Plan Trust Interests in connection with the Plan.

However, notwithstanding the foregoing, with respect to any of the assets of the Plan Trust that are subject to potential disputed claims of ownership or uncertain distributions, or to the extent "liquidating trust" treatment is otherwise unavailable or not elected to be applied with respect to the Plan Trust, the Debtors anticipate that such assets will be subject to disputed ownership fund treatment under section 1.468B-9 of the Treasury Regulations, that any appropriate elections with respect thereto shall be made, and that such treatment will also be applied to the extent possible for state and local tax purposes. Under such treatment, a separate federal income tax return would be filed with the IRS for any such account. Any taxes (including with respect to interest, if any, earned in the account) imposed on such account would be paid out of the assets of the respective account (and reductions shall be made to amounts disbursed from the account to account for the need to pay such taxes).

## L.  Fiduciary Duties

The Plan Administrator shall owe fiduciary duties to the Plan Trust Beneficiaries of the type that an official committee of unsecured creditors would owe to unsecured creditors, and shall have in place under the Plan Trust Agreement applicable indemnity, limitation of liability, and waiver provisions (payable solely out of Plan Trust Assets or proceeds thereof) to protect the Plan Administrator from being personally liable for any claims or causes of action asserted by any actual or purported Plan Trust Beneficiaries, except for any claims of fraud, bad faith, gross negligence, or willful misconduct.

## M.  Withholding

The Plan Administrator may deduct and withhold and pay to the appropriate taxing authority all amounts required to be deducted or withheld pursuant to the Tax Code or any provision of any state, local, or non-U.S. tax Law with respect to any Plan Trust Beneficiaries, including with respect to any payment or distribution to the Plan Trust Beneficiaries, any amounts received by, collections of, or earnings of the Plan

Trust and any proceeds from the Plan Trust Assets. Notwithstanding the above, each Holder of an Allowed Claim that is to receive a Plan Distribution shall have the sole and exclusive responsibility for the satisfaction and payment of any taxes imposed on such Holder by any governmental authority, including income, withholding, and other tax obligations, on account of such distribution or with respect to its ownership of Plan Trust Interests. All such amounts deducted or withheld and timely paid to the appropriate taxing authority shall be treated as amounts distributed to such Plan Trust Beneficiaries to the extent permitted by applicable law. The Plan Administrator shall be authorized to collect such tax information from the Plan Trust Beneficiaries (including social security numbers or other tax identification numbers) as it reasonably deems necessary to effectuate the Plan, the Confirmation Order, the Restructuring Transactions Memorandum, and the Plan Trust Agreement and to determine whether any deduction or withholding applies with respect to a payment to such Plan Trust Beneficiary and the amount of such deduction or withholding.

As a condition to receiving, or being entitled to receive, Plan Distributions from the Plan Trust, all Plan Trust Beneficiaries may be required to identify themselves to the Plan Administrator and provide tax information and the specifics of their holdings, to the extent requested by the Plan Administrator, including an IRS Form W-9 or, in the case of non-U.S. Persons for U.S. federal income tax purposes, certification of foreign status on an applicable IRS Form W-8, including all applicable supporting documents. If a Plan Trust Beneficiary does not, within ninety days of the Plan Administrator's first written request, provide sufficient documentation that is, in the Plan Administrator's reasonable business judgment, necessary to determine the tax withholding and reporting requirements for such Claim, any current or future distribution on such Claim may, in the discretion of the Plan Administrator, be deemed forfeited, the underlying Claim disallowed and expunged in its entirety, and the funds in respect of such present and future distribution(s) shall revert to the Plan Trust for all purposes including, but not limited to, redistribution to other Plan Trust Beneficiaries in accordance with the Plan, the Confirmation Order, and the Plan Trust Agreement.

## N.      Dissolution of Plan Trust

Subject to the terms of the Plan Trust Agreement, the Plan Administrator and the Plan Trust shall be discharged or dissolved, as the case may be at such time as (1) the Plan Administrator determines, with the consent of the Plan Trust Board, that the pursuit of additional Claims or Causes of Action is not likely to yield sufficient additional proceeds to justify further pursuit of such claims and (2) all Plan Distributions of Plan Trust Assets required to be made by the Plan Administrator have been made, but in no event shall the Plan Trust be dissolved later than five (5) years from the Effective Date unless the Bankruptcy Court, upon *ex parte* motion made by the Plan Administrator within the six (6) month period before such fifth anniversary (and, in the event of further extension, by order of the Bankruptcy Court upon motion made before the end of the preceding extension), determines that a fixed period extension is necessary to facilitate or complete the recovery on, and liquidation of, the Plan Trust Assets.

Upon dissolution of the Plan Trust, any remaining proceeds of Plan Trust Assets shall be distributed to all Holders of Allowed Claims in accordance with the Plan and the Plan Trust Agreement as appropriate; *provided* that if the Plan Administrator reasonably determines, with the consent of the Plan Trust Board, that such remaining proceeds of Plan Trust Assets are insufficient to render a further Plan Distribution practicable, the Plan Administrator may apply to the Bankruptcy Court for authority to (1) reserve any amount necessary to dissolve the Plan Trust, (2) donate any balance to a charitable organization (A) described in section 501(c)(3) of the Internal Revenue Code, (B) exempt from U.S. federal income tax under section 501(a) of the Internal Revenue Code, (C) not a "private foundation" as defined in section 509(a) of the Internal Revenue Code, and (D) that is unrelated to the Debtors, the Plan Trust, and any insider of the Plan Administrator, and (3) dissolve the Plan Trust.

### O.      Transferred Privileges

The Debtors may not make disclosure in a manner that could effectuate a waiver of any Transferred Privilege in respect of records, documents, or information related to the Plan Trust Assets; *provided* that the Debtors shall provide Brookfield, the Owner 3 Parties, M&T, DFO, SunStrong, Omnidian, and the Decatur/Bienville ProjectCos with access to all documents, data, and other information received or made accessible to the Plan Trust on a common interest basis. If the Plan Administrator objects to an action proposed to be taken by the Debtors with regard to records, documents, or information related to the Plan Trust Assets that are covered by the Transferred Privilege (or a disclosure that would result in a waiver), the parties shall be permitted to raise the issue promptly with the Bankruptcy Court. The applicable Debtor may not take its proposed action unless otherwise ordered by the Bankruptcy Court. Each of the parties shall bear its own costs and expenses, including attorneys' fees, incurred in connection with such dispute.

## ARTICLE XIV.
## CONDITIONS TO CONFIRMATION AND EFFECTIVE DATE

### A.      Conditions Precedent to Confirmation

The following are conditions precedent to confirmation of the Plan:

1.      the Bankruptcy Court shall have entered an order or orders, in form and substance reasonably acceptable to the Debtors, Brookfield, and the Owner 3 Parties: (a) approving the Disclosure Statement as containing "adequate information" pursuant to section 1125 of the Bankruptcy Code; (b) authorizing the solicitation of votes with respect to the Plan; (c) determining that all votes are binding and have been properly tabulated as acceptances or rejections of the Plan; (d) confirming and giving effect to the terms and provisions of the Plan; (e) determining that all applicable tests, standards and burdens in connection with confirmation of the Plan have been duly satisfied and met by the Debtors and the Plan; (f) approving the Plan Documents; and (g) authorizing the Debtors to execute, enter into and deliver the Plan Documents, and to execute, implement and to take all actions otherwise necessary or appropriate to give effect to the transactions and transfer of assets contemplated by the Plan and the Plan Documents; and

2.      the Confirmation Order, the Plan Documents and the Plan shall each be in form and substance reasonably acceptable to the Debtors, Brookfield, the Committee, and the Owner 3 Parties, and, solely with respect to any provisions that could reasonably be expected to affect the Transition Procedures or releases, the Decatur/Bienville ProjectCos.

### B.      Conditions Precedent to the Effective Date

It shall be a condition to the Effective Date that the following conditions shall have been satisfied or waived pursuant to Article XIII.C of the Plan:

1.      the Sale Transaction and the Transitions shall have been consummated;

2.      the Bankruptcy Court shall have entered the Transaction Approval Orders, in form and substance reasonably acceptable to the Debtors, Brookfield, M&T, DFO, G-I, the Decatur/Bienville ProjectCos, and, solely to the extent the interests of the Owner 3 Parties are affected, the Owner 3 Parties, and shall be Final Orders;

3.      the Bankruptcy Court shall have entered the Confirmation Order, in form and substance reasonably acceptable to the Debtors, the Committee, Brookfield, and the Decatur/Bienville ProjectCos and the Owner 3 Parties, and such order shall be a Final Order;

86

4.        the final version of each of the Plan, the Plan Documents, and all documents contained in any supplement to the Plan, including the Plan Supplement and any exhibits, schedules, amendments, modifications, or supplements thereto or other documents contained therein, shall have been executed or filed, as applicable, in form and substance reasonably acceptable to the Debtors, the Committee, Brookfield, and the Decatur/Bienville ProjectCos and, solely to the extent the interests of the Owner 3 Parties are affected, the Owner 3 Parties;

5.        the Debtors shall have obtained all authorizations, consents, regulatory approvals, rulings, or documents that are necessary to implement and effectuate the Plan;

6.        the Plan Trust shall have been formed, the Plan Administrator shall have been appointed, and the Plan Trust Board shall have been formed and the members thereof appointed;

7.        the Plan Trust Agreement shall have been duly executed and delivered by all of the parties thereto and the Plan Trust Assets shall have vested or deemed to be vested in the Plan Trust, and all conditions precedent (other than any conditions related to the occurrence of the Plan Effective Date) to the effectiveness thereof shall have been satisfied or duly waived in writing in accordance with the terms thereof;

8.        the Plan Trust Interests shall have been issued;

9.        the Purchaser shall have made the Plan Trust Contributions, and the DIP Lenders shall have funded the Plan Trust Cash Contribution;

10.      the Administrative Expense Escrow Account shall be funded as set forth herein;

11.      all statutory fees and obligations then due and payable to the United States Trustee shall have been paid in full; and

12.      no orders, decisions, or injunctions have been issued by a Governmental Unit prohibiting, modifying, or conditioning any transaction contemplated herein.

**C.        Waiver of Conditions Precedent**

The Debtors, with the prior written consent of Brookfield, the Committee, the Decatur/Bienville ProjectCos and, solely to the extent the interests of the Owner 3 Parties are affected, the Owner 3 Parties, may waive any condition precedent to Confirmation or the occurrence of the Effective Date set forth herein, without notice to any other parties in interest and without any further notice to or action, order, or approval of the Bankruptcy Court and without any formal action other that proceeding to consummate the Plan; *provided* that the prior written consent of G-I shall be required to waive the condition set forth in Article XIV.B.2.

**D.        Effect of Non-Occurrence of Conditions to Consummation**

If the Effective Date does not occur and circumstances make clear that the Effective Date will not occur, then (a) the Plan will be null and void in all respects; (b) any settlement or compromise embodied in the Plan, assumption or rejection of Executory Contracts or Unexpired Leases effected by the Plan, and any document or agreement executed pursuant hereto will be null and void in all respects; and (c) nothing contained in the Plan shall (i) constitute a waiver or release of any Claims, Interests, or Causes of Action, (ii) prejudice in any manner the rights of any Debtor or any other Entity, or (iii) constitute an admission, acknowledgement, offer, or undertaking of any sort by any Debtor or any other Entity.

## ARTICLE XV.
## MODIFICATION, REVOCATION OR WITHDRAWAL OF THE PLAN

### A.      Modification of the Plan

The Debtors reserve the right to, with the consent of Brookfield and, solely to the extent the interests of the Owner 3 Parties are affected, the Owner 3 Parties, modify the Plan and seek Confirmation consistent with the Bankruptcy Code and the Bankruptcy Rules and, as appropriate, not resolicit votes on such modified Plan.  Subject to certain restrictions and requirements set forth in section 1127 of the Bankruptcy Code, Bankruptcy Rule 3019, and those restrictions on modifications set forth in the Plan, the Debtors expressly reserve their rights to alter, amend, or modify materially the Plan one or more times after Confirmation and, to the extent necessary, may initiate proceedings in the Bankruptcy Court to so alter, amend, or modify the Plan, or remedy any defect or omission, or reconcile any inconsistencies in the Plan or the Confirmation Order, in such matters as may be necessary to carry out the purposes and intent of the Plan.  There shall be no material modification of the Plan without notice and a hearing.

### B.      Revocation and Withdrawal of the Plan

The Debtors reserve the right, in consultation with Brookfield, to revoke and withdraw the Plan or to adjourn the Confirmation Hearing with respect to any one or more of the Debtors prior to the occurrence of the Effective Date.  If the Debtors revoke or withdraw the Plan with respect to any one or more of the Debtors, or if the Effective Date does not occur as to any Debtor, then, as to such Debtor, the Plan and all settlements and compromises set forth in the Plan and not otherwise approved by a separate order shall be deemed null and void and nothing contained in the Plan and no acts taken in preparation for Consummation of the Plan shall be deemed to (a) constitute a waiver or release of any Claims, Interests, or Causes of Action, (b) prejudice in any manner the rights of any Debtor or any other Entity, or (c) constitute an admission, acknowledgement, offer, or undertaking of any sort by any Debtor or any other Entity.  If the Plan is revoked or withdrawn, the Debtors, the DIP Lenders and the Committee agree to work in good faith to create an alternative structure that preserves the Committee settlement contained in the Plan to provide the Plan Trust Cash Contribution for the benefit of valid General Unsecured Claims.

In the event that the Debtors choose to adjourn the Confirmation Hearing with respect to any one or more of the Debtors, the Debtors reserve the right to proceed with Confirmation of the Plan with respect to those Debtors in relation to which the Confirmation Hearing has not been adjourned.  With respect to those Debtors with respect to which Confirmation of the Plan has been adjourned, the Debtors reserve the right to amend, modify, revoke or withdraw the Plan and/or submit any new plan of reorganization at such times and in such manner as they consider appropriate, subject to the Bankruptcy Code and the Bankruptcy Rules.  There shall be no revocation of the Plan following Confirmation of the Plan and before the Effective Date without notice and a hearing.

### C.      Effect of Confirmation on Modifications

Entry of the Confirmation Order shall constitute approval of all modifications to the Plan occurring after the solicitation thereof pursuant to section 1127(a) of the Bankruptcy Code and a finding that such modifications to the Plan do not require additional disclosure or resolicitation under Bankruptcy Rule 3019.

## ARTICLE XVI.
## RETENTION OF JURISDICTION

Notwithstanding the entry of the Confirmation Order and the occurrence of the Effective Date, the Bankruptcy Court shall retain exclusive jurisdiction over all matters arising out of, or related to, the

Chapter 11 Cases and the Plan pursuant to sections 105(a) and 1142 of the Bankruptcy Code, including jurisdiction to:

1. allow, disallow, determine, liquidate, classify, estimate, or establish the priority, secured or unsecured status, or amount of any Claim or Interest, including the resolution of any request for payment of any Claim or Interest and the resolution of any and all objections to the secured or unsecured status, priority, amount, or allowance of Claims or Interests, notwithstanding any arbitration or similar provision in any contract to the contrary; *provided* that, in the case of a claim assumed by the Purchaser pursuant to the Sale Documents, the Bankruptcy Court's jurisdiction shall be non-exclusive;

2. decide and resolve all matters related to the granting and denying, in whole or in part, any applications for allowance of compensation or reimbursement of expenses to Professionals authorized pursuant to the Bankruptcy Code or the Plan;

3. resolve any matters related to Executory Contracts or Unexpired Leases, including: (a) the assumption or assumption and assignment of any Executory Contract or Unexpired Lease to which a Debtor is party or with respect to which a Debtor may be liable and to hear, determine, and, if necessary, liquidate, any Cure or Claims arising therefrom, including pursuant to section 365 of the Bankruptcy Code; and (b) any dispute regarding whether a contract or lease is or was executory or expired;

4. ensure that Distributions to Holders of Allowed Claims are accomplished pursuant to the provisions of the Plan and adjudicate any and all disputes arising from or relating to Distributions under the Plan, including the amount of any WARN Action Equivalent Settlement Payment;

5. adjudicate, decide, or resolve any motions, adversary proceedings, contested or litigated matters, and any other matters, and grant or deny any applications involving a Debtor that may be pending on the Effective Date;

6. enter and implement such orders as may be necessary or appropriate to execute, implement, or consummate the provisions of (a) contracts, instruments, releases, indentures, and other agreements or documents approved by Final Order in the Chapter 11 Cases and (b) the Plan, the Confirmation Order, and contracts, instruments, releases, indentures, and other agreements or documents created in connection with the Plan;

7. enforce any order for the sale of property pursuant to sections 363, 1123, or 1146(a) of the Bankruptcy Code;

8. grant any consensual request to extend the deadline for assuming or rejecting Unexpired Leases pursuant to section 365(d)(4) of the Bankruptcy Code;

9. issue injunctions, enter and implement other orders, or take such other actions as may be necessary or appropriate to restrain interference by any Entity with Consummation or enforcement of the Plan;

10. hear, determine, and resolve any adversary proceedings, motions, cases, matters, controversies, suits, disputes, or Causes of Action in connection with or in any way related to the Chapter 11 Cases or the management of the Debtors, including: (a) with respect to the releases, injunctions, and other provisions contained in <u>Article XII</u> of the Plan, including entry of such orders as may be necessary or appropriate to implement such releases, injunctions, and other provisions; (b) that may arise in connection with the Consummation, interpretation, implementation, or enforcement of the Plan, the Confirmation Order, and contracts, instruments, releases, indentures, and other agreements or documents created in

connection with the Plan; (c) related to section 1141 of the Bankruptcy Code; or (d) with respect to Retained Estate Claims and Causes of Action that may be instituted by the Plan Administrator;

11.　hear, determine, and resolve all adversary proceedings, motions, cases, matters, controversies, suits, disputes, or Causes of Action that may relate to, impact upon or arise in connection with the Plan Documents or their interpretation, implementation, enforcement or consummation (including, but not limited to, any disputes concerning the Plan Administrator);

12.　enter and implement such orders as are necessary or appropriate if the Confirmation Order is for any reason modified, stayed, reversed, revoked, or vacated;

13.　consider any modifications of the Plan, to cure any defect or omission, or to reconcile any inconsistency in any Bankruptcy Court order, including the Confirmation Order;

14.　determine requests for the payment of Claims entitled to priority pursuant to section 507 of the Bankruptcy Code;

15.　hear and determine matters concerning state, local, and federal taxes in accordance with sections 346, 505, and 1146 of the Bankruptcy Code;

16.　hear and determine matters concerning exemptions from state and federal registration requirements in accordance with section 1145 of the Bankruptcy Code and/or Section 4(a)(2) of the Securities Act of 1933;

17.　enter an order closing the Chapter 11 Cases;

18.　enforce all orders previously entered by the Bankruptcy Court, including the WARN Action Final Settlement Order; and

19.　hear any other matter not inconsistent with the Bankruptcy Code.

**ARTICLE XVII.**
**MISCELLANEOUS PROVISIONS**

**A.　Immediate Binding Effect**

Subject to <u>Article XIII</u> hereof and notwithstanding Bankruptcy Rules 3020(e), 6004(h), or 7062 or otherwise, upon the occurrence of the Effective Date, the terms of the Plan and the Plan Supplement shall be immediately effective and enforceable and deemed binding upon the Debtors, the Plan Administrator, and any and all Holders of Claims or Interests, parties in interest, Entities, and their respective successors and assigns.

**B.　Additional Documents**

On or before the Effective Date, the Debtors may file with the Bankruptcy Court such agreements and other documents as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan.  The Debtors, the Plan Administrator, and all Holders of Claims receiving Distributions pursuant to the Plan and all other parties in interest shall, from time to time, prepare, execute, and deliver any agreements or documents and take any other actions as may be necessary or advisable to effectuate the provisions and intent of the Plan.

C.      **Dissolution of Official Committee**

Upon the Effective Date: (a) the Committee shall be dissolved except with respect to the matters set forth in clause (c) of this sentence; (b) the current and former members of the Committee and their respective representatives shall be released and discharged of and from all further authority, duties, responsibilities and obligations related to and arising from and in connection with the Chapter 11 Cases except with respect to the matters set forth in clause (c) of this sentence; and (c) the Professionals retained by the Committee will not be entitled to assert any Professional Fee Claims for any services rendered or expenses incurred after the Effective Date in their capacity as Professionals for the Committee, except to the extent necessary to (i) participate with respect to any appeals of the Confirmation Order, (ii) prepare, file and, if necessary, litigate final applications for compensation, and (iii) object to final fee applications filed by other Professionals.

D.      **Reservation of Rights**

Except as expressly set forth herein, the Plan shall have no force or effect unless the Bankruptcy Court shall enter the Confirmation Order.  None of the filing of the Plan, any statement or provision contained in the Plan, or the taking of any action by any Debtor with respect to the Plan and the Disclosure Statement or the Plan Supplement shall be or shall be deemed to be an admission or waiver of any rights of any Debtor with respect to the Holders of Claims or Interests prior to the Effective Date.

E.      **Successors and Assigns**

The rights, benefits, and obligations of any Entity named or referred to in the Plan shall be binding on, and shall inure to the benefit of any heir, executor, administrator, successor or assign, Affiliate, officer, director, agent, representative, attorney, beneficiaries, or guardian, if any, of each Entity.

F.      **Service of Documents**

After the Effective Date, any pleading, notice, or other document required by the Plan to be served on or delivered to the Plan Administrator shall be served on:

| **Counsel to the Debtors** | **White & Case LLP** |
|---|---|
| | Charles R. Koster<br>609 Main Street, Suite 2900<br>Houston, Texas 77002<br>Telephone:      (713) 496-9700<br>Email:          charles.koster@whitecase.com |
| | Aaron Colodny<br>555 South Flower Street, Suite 2700<br>Los Angeles, California 90071<br>Telephone:      (213) 620-7700<br>Email:          aaron.colodny@whitecase.com |
| | Thomas E Lauria<br>Michael C. Shepherd<br>Fan B. He<br>Andrea Kropp<br>200 South Biscayne Boulevard, Suite 4900 |

91

Miami, Florida 33131
Telephone:     (305) 371-2700
Email:         tlauria@whitecase.com
               mshepherd@whitecase.com
               fhe@whitecase.com
               andrea.kropp@whitecase.com

Andrea Amulic
1221 Avenue of the Americas
New York, New York 10020
Telephone:     (212) 819-8200
Email:         andrea.amulic@whitecase.com

**United States Trustee**            Office of the United States Trustee for the
                                     Southern District of Texas
                                     515 Rusk Street, Suite 3401
                                     Houston, Texas 77002

### G.     Term of Injunctions or Stays

**Unless otherwise provided herein or in the Confirmation Order, all injunctions or stays in effect in the Chapter 11 Cases (pursuant to sections 105 or 362 of the Bankruptcy Code or any order of the Bankruptcy Court) and existing on the Confirmation Date (excluding any injunctions or stays contained in the Plan or the Confirmation Order) shall remain in full force and effect until the Effective Date.  All injunctions or stays contained in the Plan or the Confirmation Order shall remain in full force and effect in accordance with their terms.**

### H.     Entire Agreement

Except as otherwise indicated, the Plan supersedes all previous and contemporaneous negotiations, promises, covenants, agreements, understandings, and representations on such subjects, all of which have become merged and integrated into the Plan.

### I.     Plan Supplement Exhibits

All exhibits and documents included in the Plan Supplement are incorporated into and are a part of the Plan as if set forth in full in the Plan.  After the exhibits and documents are filed, copies of such exhibits and documents shall be made available upon written request to Debtors' counsel or by downloading such exhibits and documents from the Debtors' restructuring website at https://cases.ra.kroll.com/PosiGen or the Bankruptcy Court's website, available via PACER.

### J.     Non-Severability

If, prior to Confirmation, any term or provision of the Plan is held by the Bankruptcy Court to be invalid, void, or unenforceable, the Bankruptcy Court shall be prohibited from altering or interpreting such term or provision to make it valid or enforceable; *provided*, that at the request of the Debtors, the Bankruptcy Court shall have the power to alter and interpret such term or provision to make it valid or enforceable, consistent with the original purpose of the term or provision held to be invalid, void or unenforceable, and such terms or provision shall then be applicable as altered or interpreted provided that any such alteration or interpretation shall be acceptable to the Debtors.  The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of the Plan, as it may have

92

been altered or interpreted in accordance with the foregoing, is (a) valid and enforceable pursuant to its terms; (b) integral to the Plan and may not be deleted or modified without consent from the Debtors; and (c) nonseverable and mutually dependent.

### K.      Votes Solicited in Good Faith

Upon entry of the Confirmation Order, the Debtors will be deemed to have solicited votes on the Plan in good faith and in compliance with the Bankruptcy Code, and pursuant to section 1125(e) of the Bankruptcy Code, the Debtors and each of their representatives will be deemed to have participated in good faith and in compliance with the Bankruptcy Code in the offer, issuance, sale, and purchase of securities offered and sold under the Plan and any previous plan, and, therefore, neither any of such parties or individuals will have any liability for the violation of any applicable law, rule, or regulation governing the solicitation of votes on the Plan or the offer, issuance, sale, or purchase of the securities offered and sold under the Plan and any previous plan.

### L.      Waiver or Estoppel

Each Holder of a Claim or an Interest shall be deemed to have waived any right to assert any argument, including the right to argue that its Claim or Interest should be Allowed in a certain amount, in a certain priority, secured or not subordinated by virtue of an agreement made with the Debtors or their counsel, or any other Entity, if such agreement was not disclosed in the Plan and Disclosure Statement or papers filed with the Bankruptcy Court prior to the Confirmation Date.

### M.      No Waiver

**NOTWITHSTANDING ANYTHING TO THE CONTRARY IN THE PLAN, CONFIRMATION OF THE PLAN SHALL NOT RELEASE, NOR BE DEEMED TO RELEASE, ANY CLAIM OR CAUSE OF ACTION (INCLUDING ANY DEFENSES) THAT ANY DEBTOR OR THE PLAN ADMINISTRATOR MAY HOLD AGAINST ANY PERSON OR ENTITY (INCLUDING ANY RELEASED PARTY) RELATED TO, ARISING UNDER, OR IN ANY WAY WITH RESPECT TO ANY OF THE RETAINED ESTATE CLAIMS AND CAUSES OF ACTION.**

### ARTICLE XVIII.
### CONFIRMATION OF THE PLAN

### A.      Voting Procedures and Acceptance

The Debtors are providing copies of this Plan and Disclosure Statement and Ballots to all known Holders of Impaired Claims who are entitled to vote on the Plan.

The Bankruptcy Code requires, as a condition to confirmation, that, except as described in the following section, each class of claims or interests that is impaired under a chapter 11 plan accept the plan. A class that is not "impaired" under a plan is deemed to have accepted the plan and, therefore, solicitation of acceptances with respect to such class is not required.  A class is "impaired" unless the plan: (a) leaves unaltered the legal, equitable and contractual rights to which the claim or the equity interest entitles the holder of such claim or equity interest; or (b) cures any default, reinstates the original terms of such obligation, compensates the holder for certain damages or losses, as applicable, and does not otherwise alter the legal, equitable or contractual rights to which such claim or equity interest entitles the holder of such claim or equity interest, each as more specifically set forth in section 1124 of the Bankruptcy Code.

93

Section 1126(c) of the Bankruptcy Code defines acceptance of a plan by a class of impaired claims as acceptance by holders of at least two-thirds in dollar amount and more than one-half in number of allowed claims in that class, counting only those claims that actually voted to accept or to reject the plan.  Thus, a class of claims will have voted to accept the plan only if two-thirds in amount and a majority in number actually voting cast their ballots in favor of acceptance.

Claims and Interests in Classes 1-A, 2-A,1-B, and 2-B are Unimpaired under the Plan, and, as a result, the Holders of such Claims and Interests are deemed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code and their votes will not be solicited.

Claims in Classes 3-A, 4-A, 5-A, 6-A, 7-A, 8-A, 3-B, 4-B, 5-B-1, 5-B-2, 6-B, and 7-B are Impaired under the Plan.  Such Class (with respect to each applicable Debtor) will have accepted the Plan if the Plan is accepted by at least two-thirds in amount and a majority in number of the Claims in such Class (other than any Claims of creditors designated under section 1126(e) of the Bankruptcy Code) that have voted to accept or reject the Plan.

Interests and Claims in Classes 9-A, 10-A, 11-A, 8-B, 9-B, and 10-B are Impaired and will not receive a Distribution under the Plan.  Pursuant to section 1126(g) of the Bankruptcy Code, the Holders of Interests in Classes 9-A, 10-A, 11-A, 8-B, 9-B and 10-B are deemed to reject the Plan and their votes will not be solicited.

## B.        Statutory Requirements for Confirmation of the Plan

At the Confirmation Hearing, the Bankruptcy Court will determine whether the Plan satisfies the requirements of section 1129 of the Bankruptcy Code.  The Debtors believe that: (a) the Plan satisfies or will satisfy all of the applicable requirements of chapter 11 of the Bankruptcy Code; (b) the Debtors have complied or will have complied with all of the applicable provisions of the Bankruptcy Code; and (c) the Plan has been proposed in good faith.  The confirmation requirements under section 1129 of the Bankruptcy Code include the following:

1.        The Plan complies with the applicable provisions of the Bankruptcy Code.

2.        The Debtors have complied with the applicable provisions of the Bankruptcy Code.

3.        The Plan has been proposed in good faith and not by any means forbidden by law.

4.        Any payment made or promised by the Debtors or by a person issuing securities or acquiring property under the Plan for services or for costs and expenses in, or in connection with, the Chapter 11 Cases, or in connection with the Plan and incident to the Chapter 11 Cases, has been approved by, or is subject to the approval of, the Bankruptcy Court as reasonable.

5.        Each Holder of an Impaired Claim or Interest either has accepted the Plan or will receive or retain under the Plan, on account of the Claims or Interests held by such entity, property of a value, as of the Effective Date, that is not less than the amount that such entity would receive or retain if the Debtors were liquidated on such date under chapter 7 of the Bankruptcy Code.

6.        Each Class of Claims that is entitled to vote on the Plan has either accepted the Plan or is not Impaired under the Plan, or the Plan can be confirmed without the approval of such Class pursuant to section 1129(b) of the Bankruptcy Code.

94

7.      Except to the extent that the holder of a particular Claim has agreed to a different treatment of such Claim, the Plan provides that Administrative Claims will be paid in full, in cash, on the Effective Date, or as soon as reasonably practical thereafter, and Priority Tax Claims will be paid in regular installments over a period ending not later that five (5) years after the Petition Date, of a total value, as of the Effective Date, equal to the Allowed amount of such Priority Tax Claims.

8.      At least one Class of Impaired Claims has accepted the Plan, determined without including any acceptance of the Plan by any insider holding a Claim in that Class.

9.      Confirmation of the Plan is not likely to be followed by the liquidation or the need for further financial reorganization of the Debtors or any successors thereto under the Plan except to the extent contemplated under the Plan.

10.      All fees of the type described in 28 U.S.C. § 1930, including the fees of the United States Trustee, will be paid as of the Effective Date.

## C.     The Best Interests of Creditors Test

Often called the "best interests" test, section 1129(a)(7) of the Bankruptcy Code requires, as a condition to confirmation, that each holder of a claim or an equity interest in an impaired class either (a) vote to accept or (b) receive or retain under the plan property of a value, as of the effective date of the plan, that is not less than the value that such holder would receive or retain if the debtors liquidated under chapter 7 of the Bankruptcy Code.

To calculate the probable distribution to Holders of each Impaired Class of Claims and Interests if the Debtors were liquidated under chapter 7, the Bankruptcy Court must first determine the aggregate dollar amount that would be generated from the Debtors' assets if the Chapter 11 Cases were converted to chapter 7 cases under the Bankruptcy Code.  To make these findings, the Bankruptcy Court must: (a) estimate the cash liquidation proceeds that a chapter 7 trustee would generate if each of the Debtors' Chapter 11 Cases were converted to a chapter 7 case and the assets of such Debtors' Estates were liquidated; (b) determine the liquidation distribution that each non-accepting Holder of an Impaired Claim or Interest would receive from such liquidation proceeds under the priority scheme dictated in chapter 7; and (c) compare such Holder's liquidation distribution to the Distribution under the Plan that such Holder would receive if the Plan were confirmed and consummated.

Costs of liquidation under chapter 7 of the Bankruptcy Code would include the compensation of a trustee, as well as compensation of counsel and other professionals retained by the trustee, asset disposition expenses, all unpaid expenses incurred by the Debtors in their Chapter 11 Cases (such as compensation of attorneys, financial advisors and accountants) that are allowed in the chapter 7 cases, litigation costs, and claims arising from the operations of the Debtors during the pendency of the Chapter 11 Cases.

In these cases, notwithstanding the difficulty in quantifying recoveries to Holders of Allowed Claims, as described below, the Debtors believe that anticipated recoveries to each Class of Impaired Claims under the Plan implies a greater or equal recovery to Holders of Claims in Impaired Classes than the recovery available in a chapter 7 liquidation.  The Plan Administrator will distribute the proceeds from the Plan Trust Assets to the Holders of Allowed Claims in accordance with the priorities set forth in the Plan and the Plan Trust Agreement.  Attached as **Exhibit A** to this Plan and Disclosure Statement is a Liquidation Analysis.  Importantly, due to the difficulty in estimating recoveries from litigation claims, the Liquidation Analysis does not include any amounts that may be recovered from the prosecution of the Retained Estate Claims and Causes of Action or the cost of prosecuting the Retained Estate Claims and Causes of Action.

Because the Plan is a liquidating plan, the "liquidation value" in the hypothetical chapter 7 liquidation analysis for purposes of the "best interests" test is similar to the estimates of the liquidation contemplated by the Plan. However, the Debtors believe this Plan provides at least three benefits that will increase the value realized by unsecured creditors as compared to a chapter 7 liquidation. First, the Debtors anticipate there would be additional costs, expenses, and time that would be incurred replacing existing management and professionals in a chapter 7 case, which would further diminish Estate assets, delay the prosecution of the Retained Estate Claims and Causes of Action, and delay distributions to creditors. Second, the Debtors believe the prosecution of Retained Estate Claims and Causes of Action in a focused and effective manner by the Plan Administrator will maximize the value of the Retained Estate Claims and Causes of Action. Moreover, the Plan Administrator will likely have more flexibility to construct fee arrangements with professionals designed to maximize the value of the Retained Estate Claims and Causes of Action. Notably, because the benefits of the points above are difficult to quantify, the Debtors have not accounted for such benefits or ascribed any value to the Retained Estate Claims and Causes of Action in the Liquidation Analysis attached hereto as **Exhibit A**. Third, the Debtors will endeavor to reach settlements with Channel Partners to enable completion of Solar Systems that had not reached Substantial Completion as of the Petition Date (such Solar Systems, the "**WIP Systems**"). The completion of WIP Solar Systems could result in increased recoveries to certain secured creditors of the Debtors. The completion of WIP Solar Systems could also result in a reduction in Claims against the Estates on account of the Backleverage Facility and by the Project Companies. Accordingly, the Debtors believe that the "best interests" test of section 1129 of the Bankruptcy Code is satisfied.

### D. Feasibility

Section 1129(a)(11) of the Bankruptcy Code requires the Bankruptcy Court to find, as a condition to confirmation, that confirmation is not likely to be followed by the Debtors' liquidation or the need for further financial reorganization, unless that liquidation or reorganization is contemplated by the Plan. The Plan clearly complies with this requirement because all of the Debtors' remaining assets will be distributed pursuant to the terms of the Plan and, provided the Plan is confirmed and consummated, the Debtors' Estates will no longer exist to be subject to future reorganization or liquidation. Since the Plan contemplates a liquidation and provides for a waterfall in accordance with the priority of Allowed Claims, the feasibility requirement is satisfied. The Debtors believe that sufficient funds will exist to make all payments required by the Plan.

### E. Eligibility to Vote on the Plan

Unless otherwise ordered by the Bankruptcy Court, only holders of Allowed Claims in Classes 3-A, 3-B, 4-A, 4-B, 5-A, 6-A, 7-A, 8-A, 5-B-1, 5-B-2, 6-B, and 7-B may vote on the Plan. Further, subject to the tabulation procedures that were approved pursuant to the Disclosure Statement Order, in order to vote on the Plan, you must hold an Allowed Claim in Class 3-A, 3-B, 4-A, 4-B, 5-A, 5-B-1, 5-B-2, 6-A, 7-A, 8-A, 6-B, or 7-B, or be the holder of a Claim that has been temporarily Allowed for voting purposes only pursuant to the approved tabulation procedures or under Bankruptcy Rule 3018(a).

### F. Confirmation Without Acceptance by All Impaired Classes

Section 1129(b) of the Bankruptcy Code allows a bankruptcy court to confirm a plan even if all impaired classes have not accepted it if the plan has been accepted by at least one impaired class. Pursuant to section 1129(b) of the Bankruptcy Code, notwithstanding an impaired class's rejection or deemed rejection of the plan, such plan will be confirmed, at the Debtors' request, in a procedure commonly known as "cramdown," so long as the plan does not "discriminate unfairly" and is "fair and equitable" with respect to each class of claims or equity interests that is impaired under, and has not accepted, the plan.

### 1.        No Unfair Discrimination

This test applies to classes of claims or interests that are of equal priority and are receiving different treatment under a plan.  The test does not require that the treatment be the same or equivalent, but that such treatment be "fair." In general, bankruptcy courts consider whether a plan discriminates unfairly in its treatment of classes of claims of equal rank (*e.g.*, classes of the same legal character).  Bankruptcy courts will take into account a number of factors in determining whether a plan discriminates unfairly, and, accordingly, a plan could treat two classes of unsecured creditors differently without unfairly discriminating against either class.

### 2.        Fair and Equitable Test

This test applies to classes of different priority and status (*e.g.*, secured versus unsecured) and includes the general requirement that no class of claims receive more than 100% of the amount of the allowed claims in such class.  As to the dissenting class, the test sets different standards depending upon the type of claims or equity interests in such class.

*Secured Claims*: The condition that a plan be "fair and equitable" to a non-accepting class of secured claims includes the requirements that: (a) (i) the holders of such secured claims retain the liens securing such claims to the extent of the allowed amount of the claims, whether the property subject to the liens is retained by the debtor or transferred to another entity under the plan; and (ii) each holder of a secured claim in the class receives deferred cash payments totaling at least the allowed amount of such claim with a value, as of the effective date of the plan, at least equivalent to the value of the secured claimant's interest in the debtor's property subject to the liens; or (b) each holder of a secured claim receive the indubitable equivalent of its secured claim.

*Unsecured Claims*: The condition that a plan be "fair and equitable" to a non-accepting class of unsecured claims includes the requirements that either: (a) the plan provides that each holder of a claim of such class receive or retain on account of such claim property of a value, as of the effective date of the plan, equal to the allowed amount of such claim; or (b) the holder of any claim or any equity interest that is junior to the claims of such class will not receive or retain any property under the plan on account of such junior claim or junior equity interest.

*Equity Interests*: The condition that a plan be "fair and equitable" to a non-accepting class of equity interests includes the requirements that either: (a) the plan provides that each holder of an equity interest in such class receives or retains under the plan on account of that equity interest property of a value, as of the effective date of the plan, equal to the greater of (i) the allowed amount of any fixed liquidation preference to which such holder is entitled, (ii) any fixed redemption price to which such holder is entitled, or (iii) the value of such interest; or (b) if the class does not receive the amount as required under (a) hereof, no class of equity interests junior to the non-accepting class may receive a distribution under the plan.

The Debtors believe that the Plan satisfies the foregoing requirements for nonconsensual confirmation of the Plan.  The Debtors reserve the right to alter, amend, modify, revoke or withdraw the Plan and any exhibits thereto or the Plan Supplement, including to amend or modify it to satisfy the requirements of section 1129(b) of the Bankruptcy Code.

## ARTICLE XIX.
## PLAN-RELATED RISK FACTORS

**A.      General Bankruptcy Law and Plan Related Considerations**

**1.      Parties in Interest May Object to the Classification of Claims and Equity Interests**

Section 1122 of the Bankruptcy Code provides that a plan may place a claim or an equity interest in a particular class only if such claim or equity interest is substantially similar to the other claims or equity interests in such class.  The Debtors believe that the classification of Claims and Interests under the Plan complies with the requirements set forth in the Bankruptcy Code because the Debtors created certain Classes of Claims and Interests, each encompassing Claims or Interests, as applicable, that are substantially similar to the other Claims and Interests in each such Class.  Nevertheless, there can be no assurance that the Bankruptcy Court will reach the same conclusion.

**2.      Failure to Satisfy Vote Requirement**

If votes are received in number and amount sufficient to enable the Bankruptcy Court to confirm the Plan, the Debtors intend to seek, as promptly as practicable thereafter, Confirmation of the Plan.  In the event that sufficient votes are not received, the Debtors may seek to confirm an alternative chapter 11 plan or may be forced to liquidate under chapter 7 of the Bankruptcy Code.  The terms of any such alternative chapter 11 plan would likely not provide treatment as favorable to the Holders of Allowed Claims as those proposed in the Plan.

**3.      The Debtors May Not Be Able to Secure Confirmation of the Plan or Confirmation May Be Delayed**

Section 1129 of the Bankruptcy Code sets forth the requirements for confirmation of a chapter 11 plan, and requires, among other things, a finding by the bankruptcy court that: (a) such plan "does not unfairly discriminate" and is "fair and equitable" with respect to any non-accepting classes; (b) confirmation of such plan is not likely to be followed by a liquidation or a need for further financial reorganization unless such liquidation or reorganization is contemplated by the plan; and (c) the value of distributions to non-accepting holders of claims and equity interests within a particular class under such plan will not be less than the value of distributions such holders would receive if the debtors were liquidated under chapter 7 of the Bankruptcy Code.

There can be no assurance that the requisite acceptances to confirm the Plan will be received.  Even if the requisite acceptances are received, there can be no assurance that the Bankruptcy Court will confirm the Plan.  A non-accepting Holder of an Allowed Claim might object to Confirmation or challenge either the adequacy of the Disclosure Statement or whether the solicitation procedures and voting results satisfy the requirements of the Bankruptcy Code or Bankruptcy Rules.  Even if the Bankruptcy Court determined that the Disclosure Statement, the solicitation procedures and voting results were appropriate, the Bankruptcy Court could still decline to confirm the Plan if it found that any of the statutory requirements for Confirmation had not been met.

The Confirmation and Consummation of the Plan also are subject to certain other conditions.  No assurance can be given that these conditions will be satisfied.

If the Plan is not confirmed in a timely manner, it is unclear whether the transactions contemplated thereby could be implemented through an alternative mechanism or plan and what Holders of Claims and Interests would ultimately receive in respect of their Claims and Interests.  Any alternative would likely

98

provide Holders of Claims with less than they would have received pursuant to the Plan. Moreover, an inability to confirm the Plan could result in an extended chapter 11 proceeding with greater administrative costs.

The Debtors, subject to the terms and conditions of the Plan, reserve the right to modify the terms and conditions of the Plan as necessary for Confirmation.

### 4.    Nonconsensual Confirmation – "Cramdown"

In the event that any impaired class of claims or equity interests does not accept a chapter 11 plan, a bankruptcy court may nevertheless confirm such a plan at the Debtors' request if at least one impaired class has accepted the plan (with such acceptance being determined without including the vote of any "insider" in such class), and, as to each impaired class that has not accepted the plan, the bankruptcy court determines that the plan "does not discriminate unfairly" and is "fair and equitable" with respect to the dissenting impaired classes. A non-accepting Holder of an Allowed Claim in such Impaired Class may object to Confirmation on the grounds that the Debtors have not satisfied these requirements.

### 5.    Conversion into Chapter 7 Cases

If no plan can be confirmed, or if the Bankruptcy Court otherwise finds that it would be in the best interest of Holders of Claims and Interests, the Chapter 11 Cases may be converted to cases under chapter 7 of the Bankruptcy Code, pursuant to which a trustee would be appointed or elected to liquidate the Debtors' assets for distribution in accordance with the priorities established by the Bankruptcy Code.

### 6.    Deemed Substantive Consolidation May Not be Approved

Article VIII.A of the Plan seeks substantive consolidation of the Consolidated Debtors' assets and liabilities for the purposes of voting and distribution. However, certain creditors may object to the substantive consolidation of the Consolidated Debtors' Estates for these purposes, which may be sustained by the Bankruptcy Court. If any such objections are sustained, it may render the Plan unable to be confirmed, which may negatively impact creditor recoveries.

### 7.    Releases, Injunctions, and Exculpations Provisions May Not Be Approved

Article XII of the Plan provides for certain releases, injunctions, and exculpations, including a release of liens and third-party releases. The releases, injunctions, and exculpations provided in the Plan are subject to objection by parties in interest and may not be approved. If the releases are not approved, certain Released Parties may withdraw their support for the Plan.

### 8.    Risk of Nonoccurrence of the Sale Transaction

There can be no assurance that the Debtors will locate a purchaser for their inventory and work-in-progress Solar Systems. Further, there can be no assurance that the DIP Lenders or another purchaser will consummate the Sale Transaction as a result of failure to reach agreement on the commercial terms of the Sale Transaction, volatility in the regulatory scheme that could impact the Sale Transaction, failure to obtain governmental or regulatory approvals required to consummate the Sale Transaction, or other reasons.

9. **The Debtors' Liquidity May be Exhausted and No Alternative Financing May be Obtained Before the Effective Date**

In the event the Sale Transaction is not consummated or the Debtors do not obtain debtor-in-possession financing, the Debtors may not be able to satisfy the administrative expenses of the Chapter 11 Cases. Additionally, if the Plan is not confirmed before the Debtors' liquidity is exhausted and the Debtors are unable to obtain additional liquidity, creditor recoveries may be materially adversely affected.

10. **The Settlement Parties May Not Participate in the Transactions**

The Settlement remains subject to definitive documentation. Some or all of the contemplated Settlement Parties ultimately may not agree to participate in the Settlement and/or Transactions as a result of failure to reach agreement on such definitive documentation.

11. **The Debtors May Not be Able to Settle With Channel Partners**

There can be no assurance that some or all of the Channel Partners may agree to settle with the Debtors.

12. **Risk of Non-Confirmation Due to Amount of Allowed Administrative Claims or Allowed Other Priority Claims**

There is a risk that the total amount of Allowed Administrative Claims or Allowed Other Priority Claims, including, in the absence of the WARN Action Settlement, any Allowed amounts of the Claims that the holders of WARN Claims allege are entitled to priority under section 507(a) of the Bankruptcy Code, may exceed the Debtors' available cash or projected recoveries. If the Debtors are unable to satisfy Allowed Administrative Claims or Allowed Other Priority Claims in full on the Effective Date, the Bankruptcy Court may not confirm the Plan.

13. **Risk of Nonoccurrence of the Effective Date**

Although the Debtors believe that the Effective Date may occur quickly after the Confirmation Date, there can be no assurance as to such timing, as to whether all of the conditions precedent to the Effective Date will be satisfied or waived, or as to whether the Effective Date will, in fact, occur.

14. **Risks Affecting Potential Recoveries of Holders of General Unsecured Claims and Deficiency Claims**

The Debtors cannot state with any degree of certainty what recovery will be available to Holders of General Unsecured Claims and Deficiency Claims. Several unknown factors make certainty impossible. First, the Bankruptcy Court has established a Claims Bar Date applicable to Claims on February 17, 2026. The universe of potential General Unsecured Claims and Deficiency Claims will likely not be known until that date has passed and all General Unsecured Claims have been filed and adjudicated. Second, it is possible that the number and amount of Allowed Claims senior to the General Unsecured Claims and Deficiency Claims will exceed the Debtors' estimates. The Bankruptcy Court has established a Governmental Bar Date on May 23, 2026. The universe of potential senior claims will not be known until that date has passed and all claims of Governmental Units have been filed and adjudicated. Accordingly, the Debtors cannot know with certainty, at this time, the number or amount of Claims senior to the General Unsecured Claims and Deficiency Claims that will ultimately be Allowed. Third, the Debtors cannot know with certainty, at this time, the value of the Retained Estate Claims and Causes of Action or estimate the costs and time required for the prosecution of the Retained Estate Claims and Causes of Action, which costs

may reduce the projected recoveries for General Unsecured Claims and Deficiency Claims. Further, the collectability of a judgment awarded to the Plan Administrator on any of the Retained Estate Claims and Causes of Action is uncertain. <u>Fourth</u>, the Debtors cannot know, at this time, how much money will remain after paying all Allowed Claims which are senior to the General Unsecured Claims and Deficiency Claims.

## B.      Financial Information Disclaimer

The financial information contained in this Plan and Disclosure Statement has not been audited. In preparing this Plan and Disclosure Statement, the Debtors relied on financial data derived from their books and records as of the close of the monthly financials for October 2025 that was available at the time of such preparation. Although the Debtors have used their reasonable business judgment to ensure the accuracy of the financial information provided in this Plan and Disclosure Statement, and while the Debtors believe that such financial information fairly reflects the financial condition of the Debtors, the Debtors are unable to warrant or represent that the financial information contained herein and attached hereto is without inaccuracies.

## C.      Disclosure Statement Disclaimer

### 1.      Information Contained Herein Is for Soliciting Votes

The information contained in this Plan and Disclosure Statement is for purposes of soliciting acceptances of the Plan and may not be relied upon for any other purposes.

### 2.      This Plan and Disclosure Statement Was Not Reviewed or Approved by the Securities and Exchange Commission

This Plan and Disclosure Statement was not filed with the SEC under the Securities Act or applicable state securities laws. Neither the SEC nor any state regulatory authority has passed upon the accuracy or adequacy of this Plan and Disclosure Statement, or the exhibits or the statements contained herein, and any representation to the contrary is unlawful.

### 3.      This Plan and Disclosure Statement May Contain Forward Looking Statements

This Plan and Disclosure Statement may contain "forward looking statements" within the meaning of the Private Securities Litigation Reform Act of 1995. Such statements consist of any statement other than a recitation of historical fact and can be identified by the use of forward-looking terminology such as "may," "expect," "anticipate," "estimate" or "continue" or the negative thereof or other variations thereon or comparable terminology. The reader is cautioned that all forward-looking statements are necessarily speculative and there are certain risks and uncertainties that could cause actual events or results to differ materially from those referred to in such forward-looking statements. The liquidation analysis, Distribution projections or other information contained herein and attached hereto are estimates only, and the timing and amounts of actual Distributions to Holders of Allowed Claims may be affected by many factors that cannot be predicted. Therefore, any analyses, estimates or recovery projections may or may not turn out to be accurate.

### 4.      No Legal or Tax Advice Is Provided to You by this Plan and Disclosure Statement

This Plan and Disclosure Statement is not legal or tax advice to you. The contents of this Plan and Disclosure Statement should not be construed as legal, business or tax advice. Each Holder of a Claim or an Equity Interest should consult his or her own legal counsel and accountant with regard to any legal, tax and other matters concerning his or her Claim or Interest. This Plan and Disclosure Statement may not be

relied upon for any purpose other than to determine how to vote on the Plan or object to Confirmation of the Plan.

**5.      No Admissions Made**

The information and statements contained in this Plan and Disclosure Statement will neither (a) constitute an admission of any fact or liability by any Entity (including, without limitation, the Debtors and the Committee) nor (b) be deemed evidence of the tax or other legal effects of the Plan on the Debtors, the Committee, the Plan Administrator, Holders of Allowed Claims or Interest or any other parties in interest.

**6.      Failure to Identify Litigation Claims or Projected Objections**

No reliance should be placed on the fact that a particular litigation claim, cause of action, avoidance action or projected objection to claim is, or is not, identified in this Plan and Disclosure Statement. Moreover, the Plan Administrator may seek to investigate, file and prosecute litigation claims, causes of action, and avoidance actions and projected objections to claims after the Confirmation or Effective Date of the Plan irrespective of whether this Plan and Disclosure Statement identifies any such claims or objections to claims.

**7.      No Waiver of Right to Object or Right to Recover Transfers and Assets**

The vote by a Holder of an Allowed Claim for or against the Plan does not constitute a waiver or release of any Claims, or rights of the Debtors or the Plan Administrator (or any party-in-interest, as the case may be) to object to that Holder's Allowed Claim, assert any defenses, or recover any preferential, fraudulent or other voidable transfer or assets, regardless of whether any claims or Causes of Action of the Debtors or their respective Estates are specifically or generally identified herein.

**8.      Information Was Provided by the Debtors and Was Relied Upon by the Debtors' Advisors**

Counsel to and other advisors retained by the Debtors have relied upon information provided by the Debtors in connection with the preparation of this Plan and Disclosure Statement. Although counsel to and other advisors retained by the Debtors have performed certain limited due diligence in connection with the preparation of this Plan and Disclosure Statement, they have not verified independently the information contained herein.

**9.      Potential Exists for Inaccuracies, and the Debtors Have No Duty to Update**

The statements contained in this Plan and Disclosure Statement are made by the Debtors as of the date hereof, unless otherwise specified herein, and the delivery of this Plan and Disclosure Statement after that date does not imply that there has not been a change in the information set forth herein since that date. While the Debtors have used their reasonable business judgment to ensure the accuracy of all of the information provided in this Plan and Disclosure Statement, the Debtors nonetheless cannot, and do not, confirm the current accuracy of all statements appearing in this Plan and Disclosure Statement. Further, although the Debtors may subsequently update the information in this Plan and Disclosure Statement, the Debtors have no affirmative duty to do so unless ordered to do so by the Bankruptcy Court.

102

10.        **No Representations Outside the Plan and Disclosure Statement Are Authorized**

No representations concerning or relating to the Debtors, the Chapter 11 Cases or the Plan are authorized by the Bankruptcy Court or the Bankruptcy Code, other than as set forth in this Plan and Disclosure Statement. Any representations or inducements made to secure your acceptance or rejection of the Plan other than as contained in, or included with, this Plan and Disclosure Statement, should not be relied upon by you in arriving at your decision.

**D.        Alternatives to Confirmation and Consummation of the Plan**

The Debtors believe that the Plan affords the Holders of Claims the potential for a better realization on the Debtors' assets than a chapter 7 liquidation, and therefore, is in the best interests of such Holders. If, however, the Plan is not confirmed, the theoretical alternatives include (a) formulation of an alternative plan or plans of liquidation under chapter 11, (b) liquidation of the Debtors under chapter 7 of the Bankruptcy Code, or (c) dismissal of the Chapter 11 Cases. Each of these possibilities is discussed in turn below.

1.        **Alternative Plan(s) of Liquidation**

If the requisite acceptances are not received or if the Plan is not confirmed, the Debtors could attempt to formulate and propose a different plan or plans of liquidation.

With respect to an alternative liquidation plan, the Debtors have explored various other alternatives in connection with the formulation and development of the Plan. The Debtors believe that the Plan enables creditors to realize the greatest possible value under the circumstances, and that, as compared to any alternative plan of liquidation, has the greatest chance of being confirmed and consummated and will maximize recoveries of unsecured creditors.

2.        **Liquidation under Chapter 7**

If the Plan is not confirmed, the Debtors' Chapter 11 Cases could be converted to liquidation cases under chapter 7 of the Bankruptcy Code. In a case under chapter 7 of the Bankruptcy Code, a trustee would be appointed to promptly liquidate the assets of the Debtors. It is impossible to predict precisely how the proceeds of the liquidation would be distributed to the respective Holders of Claims against the Debtors.

The Debtors believe that in a liquidation under chapter 7 of the Bankruptcy Code, before creditors received any distributions, additional administrative expenses involved in the appointment of a trustee and attorneys, accountants, and other professionals to assist such trustee, would cause a substantial diminution in the value of the Estates. The assets available for distribution to Holders of Claims would be reduced by such additional expenses.

3.        **Dismissal of the Chapter 11 Cases**

If the Plan is not confirmed, the Debtors or other parties-in-interest may seek dismissal of the Chapter 11 Cases pursuant to section 1112 of the Bankruptcy Code. Without limitation, dismissal of the Chapter 11 Cases would terminate the automatic stay and might allow certain creditors to attempt to collect on their Claims or otherwise foreclose on the assets of the Debtors. Moreover, the dismissal of the Chapter 11 Cases would severely impair the Debtors' ability to liquidate their largest remaining assets, the Retained Estate Claims and Causes of Action, for the benefit of creditors. Accordingly, the Debtors believe that dismissal of the Chapter 11 Cases would reduce the value of the Debtors' remaining assets.

103

## ARTICLE XX.
## CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN

### A.      General Tax Considerations

The following discussion is a summary of certain material U.S. federal income tax consequences expected to result from the consummation of the Plan for a Holder of a Claim in Class 3, is for general information purposes only, and should not be relied upon for purposes of determining the specific tax consequences of the Plan with respect to a particular Holder of a Claim or Interest.  This discussion does not purport to be a complete analysis or listing of all potential tax considerations.  This discussion does not address aspects of U.S. federal income taxation that may be relevant to a particular Holder of a Claim or Interest subject to special treatment under U.S. federal income tax laws (such as broker dealers; traders in securities that elect to use a mark-to-market method of accounting for securities holdings; banks; thrifts; insurance companies; financial institutions; regulated investment companies; real estate investment trusts; pension plans; partnerships (or other entities or arrangements treated as a partnership for U.S. federal income tax purposes) or a partner, member or owner therein; persons that hold a Claim or Interest as part of a straddle or a hedging, conversion or constructive sale transaction; persons whose functional currency is not the U.S. dollar and other tax exempt investors).  This summary does not discuss any aspects of state, local or foreign tax laws or any U.S. federal estate or gift tax considerations.  Furthermore, this summary does not address all of the U.S. federal income tax consequences that may be relevant to a Holder of a Claim or Interest, such as the potential application of the alternative minimum tax.

This discussion is based on existing provisions of the Internal Revenue Code of 1986, as amended (the "**IRC**"), existing and proposed Treasury Regulations promulgated thereunder, and current administrative rulings and court decisions.  Legislative, judicial, or administrative changes or interpretations enacted or promulgated after the date hereof could alter or modify the analyses set forth below with respect to the federal income tax consequences of the Plan.  Any such changes or interpretations may be retroactive and could significantly affect the federal income tax consequences of the Plan.

No ruling has been or will be requested or obtained from the Internal Revenue Service (the "**IRS**") with respect to any tax aspects of the Plan and no opinion of counsel has been or will be sought or obtained with respect thereto.  No representations or assurances are being made to the Holders of Claims or Interests with respect to the U.S. federal income tax consequences described herein.

**ACCORDINGLY, THE FOLLOWING SUMMARY OF CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN IS FOR INFORMATIONAL PURPOSES ONLY AND IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING OR ADVICE BASED UPON THE INDIVIDUAL CIRCUMSTANCES PERTAINING TO A PARTICULAR HOLDER OF A CLAIM OR INTEREST.  EACH HOLDER OF A CLAIM OR INTEREST IS STRONGLY URGED TO CONSULT WITH ITS OWN TAX ADVISORS REGARDING THE U.S. FEDERAL, STATE, LOCAL AND NON-U.S. INCOME, ESTATE, AND OTHER TAX CONSEQUENCES OF THE PLAN.**

### B.      U.S. Federal Income Tax Consequences to the Debtors

For U.S. federal income tax purposes each of the Debtors is (i) a member of an affiliated group of corporations of which PosiGen, PBC is the common parent and files a single consolidated U.S. federal income tax return (the "**Tax Group**"), or (ii) an entity disregarded as separate from its owner for U.S. federal income tax purposes whose business activities and operations are reflected on the consolidated U.S. federal income tax returns of the Tax Group.

104

C.      **U.S. Federal Income Tax Consequences to Holders of Claims and Interests**

1.      **Consequences to U.S. Holders of Claims**

For purposes of this discussion, a "**U.S. Holder**" is a beneficial owner of a Claim that is, for U.S. federal income tax purposes:

a.      an individual citizen or resident of the United States;

b.      a corporation, or other entity taxable as a corporation, created or organized in or under the laws of the United States, any state therein or the District of Columbia;

c.      an estate, the income of which is subject to U.S. federal income taxation regardless of its source; or

d.      a trust if a court within the United States is able to exercise primary supervision over its administration and one or more United States persons have the authority to control all substantial decisions of the trust or otherwise if the trust has a valid election in effect under current Treasury regulations to be treated as a United States person.

A "**Non-U.S. Holder**" is any Holder that is not a U.S. Holder or a partnership (or other entity treated as a partnership or other pass-through entity for U.S. federal income tax purposes). If a partnership (or other entity treated as a partnership or other pass-through entity for U.S. federal income tax purposes) is a Holder of a Claim, the tax treatment of a partner (or other beneficial owner) generally will depend upon the status of the partner (or other beneficial owner) and the activities of the partner (or other beneficial owner) and the entity. Partners (or other beneficial owners) of partnerships (or other pass-through entities) that are Holders of Claims should consult their respective tax advisors regarding the U.S. federal income tax consequences of the Plan.

The federal income tax consequences of the implementation of the Plan to a U.S. Holder of Claims will depend, among other things, upon the origin of the Holder's Claim, when the Holder receives payment in respect of such Claim, whether the Holder reports income using the accrual or cash method of tax accounting, whether the Holder acquired its Claim at a discount, whether the Holder has taken a bad debt deduction with respect to such Claim, and whether (as intended and herein assumed) the Plan is treated as a plan of liquidation for federal income tax purposes.

Generally, a U.S. Holder of Claims will realize gain or loss on the exchange under the Plan of its Claim for Cash or other property, in an amount equal to the difference between (i) the sum of the amount of any Cash and the fair market value on the date of the exchange of any other property received by the Holder (other than any consideration attributable to a Claim for accrued but unpaid interest) and (ii) the adjusted tax basis of the Claim exchanged therefor (other than basis attributable to accrued but unpaid interest previously included in the Holder's taxable income). With respect to the treatment of accrued but unpaid interest and amounts allocable thereto, *see* Section C.2.c — "Accrued but Unpaid Interest" below. It is possible that any loss, or a portion of any gain, realized by a Holder of a Claim may have to be deferred until all of the distributions to such Holder are received.

When gain or loss is recognized, such gain or loss may be long-term capital gain or loss if the Claim disposed of is a capital asset in the hands of the U.S. Holder and has been held for more than one year (subject to the rules discussed below in Section C.1.c. — "Market Discount"). Each U.S. Holder of a Claim should consult its own tax advisor to determine whether gain or loss recognized by such Holder will be long-term capital gain or loss and the specific tax effect thereof on such Holder.

105

### b.      Accrued but Untaxed Interest

Pursuant to Article IX.M of the Plan, all distributions in respect of Allowed Claims will be allocated first to the principal amount of the Allowed Claim (as determined for federal income tax purposes), with any excess allocated to accrued but unpaid interest.  However, there is no assurance that such allocation would be respected by the IRS for federal income tax purposes.  In general, to the extent any amount received (whether cash or other property) by a U.S. Holder of a debt instrument is received in satisfaction of accrued interest during its holding period, such amount will be taxable to the Holder as interest income (if not previously included in the Holder's gross income under the Holder's normal method of accounting).  Conversely, a U.S. Holder generally recognizes a deductible loss to the extent any accrued interest claimed was previously included in its gross income and is not paid in full.  Each U.S. Holder of Claims is urged to consult its own tax advisor regarding the allocation of consideration and the taxation or deductibility of unpaid interest for tax purposes.

### c.      Market Discount

U.S. Holders of Claims who receive Cash or other property in respect of their Claims may be affected by the "market discount" provisions of the sections 1276 through 1278 of the IRC.  Under these rules, some or all of the gain realized by a U.S. Holder may be treated as ordinary income (instead of capital gain), to the extent of the amount of "market discount" on such Claims.

In general, a debt obligation with a fixed maturity of more than one year that is acquired by a holder on the secondary market (or, in certain circumstances, upon original issuance) is considered to be acquired with "market discount" as to that holder if the debt obligation's stated redemption price at maturity (or revised issue price, in the case of a debt obligation issued with original issue discount) exceeds the tax basis of the debt obligation in the holder's hands immediately after its acquisition.  However, a debt obligation will not be a "market discount bond" if such excess is less than a statutory de minimis amount (equal to 0.25 percent of the debt obligation's stated redemption price at maturity or revised issue price, in the case of a debt obligation issued with original issue discount).

Any gain recognized by a U.S. Holder on the taxable disposition of Claims (determined as described above) that were acquired with market discount should be treated as ordinary income to the extent of the market discount that accrued thereon while the Claims were considered to be held by a U.S. Holder (unless the U.S. Holder elected to include market discount in income as it accrued).

### 2.      Consequences to Non-U.S. Holders of Claims

The following discussion addresses some of the U.S. federal income tax consequences to a beneficial owner of a Claim that is a Non-U.S. Holder.  The following discussion includes only certain U.S. federal income tax consequences of the Plan to Non-U.S. Holders.  This discussion does not include any non-U.S. tax considerations.  The rules governing the U.S. federal income tax consequences to Non-U.S. Holders are complex.  Each Non-U.S. Holder is urged to consult its own tax advisor regarding the U.S. federal, state, local, non-U.S., and non-income tax consequences of the consummation of the Plan to such Non-U.S. Holder.

### a.      Gain Realized / Income Allocated to Non-U.S. Holders

Whether a non-U.S. Holder realizes gain or loss on the exchange and the amount of such gain or loss is generally determined in the same manner as set forth above in connection with U.S. Holders.

106

### b.      Gain / Income Recognition by Non-U.S. Holders

Any gain realized by a Non-U.S. Holder on the exchange of its Claim generally will not be subject to U.S. federal income taxation unless: (a) except as otherwise covered by clause (b) below, (i) with respect to capital gains, the Non-U.S. Holder is an individual who was present in the United States for 183 days or more during the taxable year in which the Plan becomes effective and certain other conditions are met or (ii) with respect to income other than capital gains, the income is otherwise deemed to be derived from U.S. sources, or (b) such gain and/or income is effectively connected with the conduct by such Non-U.S. Holder of a trade or business in the United States (and, if an income tax treaty applies, such gain is attributable to a permanent establishment maintained by such Non-U.S. Holder in the United States).

If the first exception applies, the Non-U.S. Holder generally will be subject to U.S. federal income tax at a rate of 30 percent (or at a reduced rate or exemption from tax under an applicable income tax treaty) on the amount by which such Non-U.S. Holder's capital gains allocable to U.S. sources exceed capital losses allocable to U.S. sources during the taxable year of the exchange. If the second exception applies, the Non-U.S. Holder generally will be subject to U.S. federal income tax with respect to any gain realized on the exchange if such gain is effectively connected with the Non-U.S. Holder's conduct of a trade or business in the United States in the same manner as a U.S. Holder. In order to claim an exemption from withholding tax, such Non-U.S. Holder will be required to provide a properly executed IRS Form W-8ECI (or such successor form as the IRS designates). In addition, if such a Non-U.S. Holder is a corporation, it may be subject to a "branch profits tax" equal to 30 percent (or such lower rate provided by an applicable income tax treaty) of its effectively connected earnings and profits for the taxable year, subject to certain adjustments.

### c.      Accrued Interest

Subject to the discussion of backup withholding and FATCA below, payments to a Non-U.S. Holder that are attributable to accrued but untaxed interest with respect to the Claims generally will not be subject to U.S. federal income or withholding tax; provided that the withholding agent has received or receives, prior to payment, appropriate documentation (generally, IRS Form W-8BEN or W-8BEN-E) establishing that the Non-U.S. Holder is not a U.S. person, unless:

a.      the Non-U.S. Holder actually or constructively owns 10 percent or more of the capital or profits interest in the Owner;

b.      the Non-U.S. Holder is a "controlled foreign corporation" that is a "related person" with respect to the Owner (each, within the meaning of the IRC);

c.      the Non-U.S. Holder is a bank receiving interest described in IRC Section 881(c)(3)(A); or

d.      such interest is effectively connected with the conduct by the Non-U.S. Holder of a trade or business within the United States (in which case, provided the Non-U.S. Holder provides a properly executed IRS Form W-8ECI (or successor form) to the withholding agent, the Non-U.S. Holder (x) generally will not be subject to withholding tax, but (y) will be subject to U.S. federal income tax in the same manner as a U.S. Holder (unless an applicable income tax treaty provides otherwise), and a Non-U.S. Holder that is a corporation for U.S. federal income tax purposes may also be subject to a branch profits tax with respect to such Non-U.S. Holder's effectively connected earnings and profits that are attributable to the accrued interest at a rate of 30% (or at a reduced rate or exemption from tax under an applicable income tax treaty)).

107

A Non-U.S. Holder that does not qualify for the exemption from withholding tax with respect to accrued but untaxed interest that is not effectively connected income generally will be subject to withholding of U.S. federal income tax at a 30% rate (or at a reduced rate or exemption from tax under an applicable income tax treaty) on any payments that are attributable to accrued but untaxed interest. For purposes of providing a properly executed IRS Form W-8BEN or W-8BEN-E, special procedures are provided under applicable Treasury Regulations for payments through qualified foreign intermediaries or certain financial institutions that hold customers' securities in the ordinary course of their trade or business. In addition, a corporate Non-U.S. Holder may, under certain circumstances, be subject to an additional "branch profits tax" at a 30 percent rate (or such lower rate provided by an applicable income tax treaty) on its effectively connected earnings and profits attributable to such interest (subject to adjustments).

The certifications described above must be provided to the applicable withholding agent prior to the payment of interest. Non-U.S. Holders that do not timely provide the applicable withholding agent with the required certification, but that qualify for a reduced rate under an applicable income tax treaty, may obtain a refund of any excess amounts withheld by timely filing an appropriate claim for refund with the IRS. Non-U.S. Holders should consult their tax advisors regarding their entitlement to benefits under any applicable income tax treaty.

### d.     FATCA

Under the Foreign Account Tax Compliance Act ("**FATCA**"), foreign financial institutions and certain other foreign entities must report certain information with respect to their U.S. account holders and investors or be subject to withholding at a rate of 30 percent on the receipt of "withholdable payments."

For this purpose, "withholdable payments" are generally U.S.-source payments of fixed or determinable, annual or periodical income. FATCA withholding will apply even if the applicable payment would not otherwise be subject to U.S. federal nonresident withholding. Each Non-U.S. Holder should consult its own tax advisor regarding the possible impact of these rules on such Non-U.S. Holder's exchange of its Claim.

### D.     Information Reporting and Backup Withholding

Under the backup withholding rules, a Holder of a Claim may be subject to backup withholding with respect to Distributions or payments made pursuant to the Plan unless that Holder: (a) comes within certain exempt categories (which generally include corporations) and, when required, demonstrates that fact, or (b) provides a correct taxpayer identification number and certifies under penalty of perjury that the taxpayer identification number is correct and that the Holder is not subject to backup withholding because of a failure to report all dividend and interest income. Backup withholding is not an additional tax, but merely an advance payment that may be refunded to the extent it results in an overpayment of tax.

The Debtors will withhold all amounts required by law to be withheld from payments of interest and dividends. The Debtors will comply with all applicable reporting requirements of the IRC.

**The foregoing discussion is intended only as a summary of certain income tax consequences of the plan and is not a substitute for careful tax planning with a tax professional. The above discussion is for informational purposes only and is not tax advice. The tax consequences are in many cases uncertain and may vary depending on a Claim Holder's particular circumstances. Accordingly, Claim Holders are urged to consult their tax advisors about the United States federal, state and local, and applicable foreign income and other tax consequences of the Plan.**

E.       **Reservation of Rights**

This tax section is subject to change (possibly substantially) based on subsequent changes to other provisions of the Plan.  The Debtors and their advisors reserve the right to further modify, revise or supplement this Article XIX and the other tax related sections of the Plan prior to the date by which objections to Confirmation of the Plan must be filed and served.

**CONCLUSION, RECOMMENDATION, AND CONFIRMATION REQUEST**

**The Debtors believe that Confirmation of the Plan is in the best interests of all holders of Claims and Interests.  The Debtors urge you to vote to accept the Plan and to evidence such acceptance by returning your Ballot so it will be received by the Voting Deadline.**

The Debtors request Confirmation of this Plan pursuant to section 1129 of the Bankruptcy Code.

Respectfully submitted,

PosiGen, PBC, *et al.*
on behalf of itself and all other Debtors

By:      /s/ *Robert Del Genio*
Name:    Robert Del Genio
Title:    Chief Restructuring Officer

109

**Exhibit A**

Liquidation Analysis

<b><u>LIQUIDATION ANALYSIS</u></b>[1]

## <u>Introduction</u>

Under the "best interests of creditors" test set forth in section 1129(a)(7) of the Bankruptcy Code, the Bankruptcy Court may not confirm a plan of reorganization unless that chapter 11 plan provides, with respect to each impaired class of claims or equity interests, that each holder of a claim or an equity interest in such impaired class either (i) has accepted the plan or (ii) will receive or retain under the plan property of a value that is not less than the amount that the non-accepting holder would receive or retain if the debtors' assets were to be liquidated under chapter 7 of the Bankruptcy Code on the effective date of that chapter 11 plan.

To demonstrate that the Plan satisfies the best interests of creditors test, the Debtors, with the assistance of their Co-Chief Restructuring Officers of FTI Consulting, Inc., have prepared the hypothetical liquidation analysis (the "**Liquidation Analysis**"), which is based upon certain assumptions discussed in the Disclosure Statement and these accompanying notes to the Liquidation Analysis.

The Liquidation Analysis sets forth an estimated range of recovery values for each Class of Claims and Interests upon disposition of assets pursuant to a hypothetical chapter 7 liquidation (the "**Hypothetical Liquidation**").  As illustrated by this Liquidation Analysis, Holders of Claims in Impaired Classes would receive a lower recovery in the Hypothetical Liquidation than they would under the Plan.  Further, no Holder of a Claim or Interest would receive or retain property under the Plan of a value that is less than such Holder would receive in the Hypothetical Liquidation.  Accordingly, and as set forth in greater detail below, the Debtors believe that the Plan satisfies the "best interests of creditors" test set forth in section 1129(a)(7) of the Bankruptcy Code.

## <u>Statement of Limitations</u>

**THE ILLUSTRATIVE LIQUIDATION ANALYSIS PRESENTED HEREIN HAS BEEN PREPARED SOLELY FOR THE PURPOSES AND USE OF THE DISCLOSURE STATEMENT AND DOES NOT REPRESENT OR CLAIM TO REPRESENT ANY ASSUMPTIONS OR COMPARISONS FOR ANY OTHER PURPOSE.  NOTHING CONTAINED IN THE LIQUIDATION ANALYSIS IS INTENDED TO BE OR CONSTITUTES A CONCESSION BY OR ADMISSION OF ANY DEBTOR FOR ANY PURPOSE.**

---

[1] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in *the Modified First Amended Combined Disclosure Statement and Joint Chapter 11 Plan of PosiGen, PBC and its Affiliated Debtors* the "**Disclosure Statement**," "**Plan and Disclosure Statement**," or "**Plan**").

The preparation of a liquidation analysis is an uncertain process involving the use of estimates and assumptions that, although considered reasonable by the Debtors based upon their business judgment and input from their advisors, are inherently subject to significant business, economic, and competitive risks, uncertainties, and contingencies, most of which are difficult to predict and many of which are beyond the control of the Debtors, their management, and their advisors. Inevitably, some assumptions in the Liquidation Analysis would not materialize in an actual chapter 7 liquidation, and unanticipated events and circumstances could materially affect the ultimate results in an actual chapter 7 liquidation. The Liquidation Analysis was prepared for the sole purpose of generating a reasonable, good faith estimate of the proceeds that would be generated if the Debtors' assets were liquidated in accordance with chapter 7 of the Bankruptcy Code. The Liquidation Analysis is not intended and should not be used for any other purpose. The underlying financial information in the Liquidation Analysis and values stated herein have not been subject to any review, compilation, or audit by any independent accounting firm. In addition, various liquidation decisions upon which certain assumptions are based are subject to change. As a result, the actual amount of Claims that would ultimately be Allowed against the Debtors' estates could vary significantly from the estimates stated herein, depending on the nature and amount of Claims asserted during the pendency of the chapter 7 case. Similarly, the value of the Debtors' assets in a liquidation scenario is uncertain and could vary significantly from the values set forth in the Liquidation Analysis.

The Liquidation Analysis should not be used for any other purpose. The Liquidation Analysis does not include estimates for: (i) the domestic tax consequences that may be triggered upon the liquidation and sale of assets, (ii) recoveries resulting from any potential preference, fraudulent transfer, or other litigation or avoidance actions, (iii) certain claims that may be entitled to priority under the Bankruptcy Code, including administrative priority claims under sections 503(b) and 507(b) of the Bankruptcy Code, or (iv) additional unsecured and contract breakage claims arising from a chapter 7 liquidation. More specific assumptions are detailed in the notes below. ACCORDINGLY, NEITHER THE DEBTORS NOR THEIR ADVISORS MAKE ANY REPRESENTATION OR WARRANTY THAT THE ACTUAL RESULTS OF A LIQUIDATION OF THE DEBTORS WOULD OR WOULD NOT, IN WHOLE OR IN PART, APPROXIMATE THE ESTIMATES AND ASSUMPTIONS REPRESENTED HEREIN. THE ACTUAL LIQUIDATION VALUE OF THE DEBTORS IS SPECULATIVE AND RESULTS COULD VARY MATERIALLY FROM ESTIMATES PROVIDED HEREIN.

In preparing the Liquidation Analysis, the Debtors estimated Allowed Claims based upon a review of the Debtors' financial statements to account for other known liabilities, as necessary. In addition, the Liquidation Analysis includes estimates for Claims not currently asserted in the chapter 11 cases, but which could be asserted and allowed in a chapter 7 liquidation, which may include unpaid chapter 11 Administrative Claims, and chapter 7 Administrative Claims such as wind-down costs and trustee fees (together, the "**Wind-Down Expenses**"). To date, the Bankruptcy Court has not estimated or otherwise fixed the total amount of Allowed Claims used

for purposes of preparing this Liquidation Analysis.  Therefore, the Debtors' estimate of Allowed Claims set forth in the Liquidation Analysis should not be relied on for any other purpose, including determining the value of any distribution to be made on account of Allowed Claims and Interests under the Plan.  NOTHING CONTAINED IN THE LIQUIDATION ANALYSIS IS INTENDED TO BE OR CONSTITUTES A CONCESSION OR ADMISSION OF THE DEBTORS.  THE ACTUAL AMOUNT OF ALLOWED CLAIMS IN THE CHAPTER 11 CASES COULD MATERIALLY DIFFER FROM THE ESTIMATED AMOUNTS SET FORTH IN THE LIQUIDATION ANALYSIS.  THE DEBTORS RESERVE THEIR RIGHT TO, BUT ARE NOT OBLIGATED TO, SUPPLEMENT, MODIFY, OR ADJUST ANY PART OF THIS ILLUSTRATIVE LIQUIDATION ANALYSIS, INCLUDING TO REFLECT A CHANGE IN THE UNDERLYING ASSUMPTIONS AND ANALYSIS SET FORTH HEREIN.

**Basis of Presentation**

The Liquidation Analysis has been prepared assuming that the Debtors converted their current chapter 11 cases to cases under chapter 7 of the Bankruptcy Code on or about February 23, 2026 (the "**Liquidation Date**").  Except as otherwise noted herein, the Liquidation Analysis is based upon the unaudited financial statements of the Debtors as of December 31, 2025, rolled forward to the Liquidation Date. The contemplated Claims are based upon the amount as filed in the Debtors' Schedules.  These values, in total, are assumed to be representative of the Debtors' assets and liabilities as of the Liquidation Date.  The Debtors' management team believes that the December 31, 2025, book value of assets and the scheduled value for the Debtors' certain liabilities, are the best available estimate for such book values as of the Liquidation Date.  It is assumed that on the Liquidation Date, the Bankruptcy Court would appoint a chapter 7 trustee (the "**Trustee**") to oversee the liquidation of the Debtors' estates, during which time all of the assets of the Debtors would be sold and the cash proceeds, net of liquidation-related costs, would then be distributed to creditors in accordance with applicable law:  (i) *first*, for payment of liquidation, wind-down expenses, and trustee fees attributable to the Wind-Down Expenses; (ii) *second*, to pay amounts on all Allowed Secured Claims; and (iii) *third*, to pay administrative expenses and priority claims that may exist or result from the termination of the Debtors' business and use of chapter 7 of the Bankruptcy Code for the purpose of liquidation.  Any remaining net cash would be distributed to creditors holding unsecured Claims, including deficiency Claims that arise to the extent of the unsecured portions of Allowed Secured Claims.

The Liquidation Analysis has been prepared assuming that the Debtors converted their current chapter 11 cases to cases under chapter 7 of the Bankruptcy Code on the Liquidation Date.  This Liquidation Analysis assumes operations of the Debtors and certain non-Debtors (the "**Liquidating Entities**") cease as there would be no liquidity to continue to operate to orderly wind down the Debtors' estates under the direction of the chapter 7 trustee.  Accordingly, there can be no assurance that the liquidation would be completed, nor is there any assurance that the recoveries assigned to the assets would in fact be realized.  Under section 704 of the Bankruptcy

Code, a trustee must, among other duties, collect and convert the property of the estates as expeditiously (generally in a distressed process) as is compatible with the best interests of parties-in-interest.  With no liquidity available to effectuate these tasks, the liquidation would fail.

**General Notes to Liquidation Analysis**

A.  ***Dependence on Assumptions***.  The Liquidation Analysis is based on several estimates and assumptions that are inherently subject to significant economic, business, regulatory, and competitive uncertainties and contingencies beyond the control of the Debtors.  Accordingly, there can be no assurance that the values reflected in the Liquidation Analysis would be realized if the Debtors were, in fact, to undergo a Hypothetical Liquidation, and actual results could vary materially and adversely from those contained herein.

B.  ***Additional Claims in a Hypothetical Liquidation***.  A Hypothetical Liquidation itself may trigger certain obligations and priority payments that otherwise would not be due in the ordinary course of business or would otherwise not exist under a chapter 11 plan.  These priority payments must be paid in full before any distribution of proceeds to Holders of unsecured Claims.  A Hypothetical Liquidation would likely prompt certain other events to occur, including the immediate rejection of executory contracts and unexpired leases, defaults under agreements with vendors and customers, the exercise of set-off rights by creditors, and acceleration of severance obligations.  Such events, if triggered, would subject the Debtors' chapter 7 estates to additional Claims.  These Claims have not been estimated by the Debtors and are, thus, excluded from the analysis below.

C.  ***Litigation Claims***.  The Liquidation Analysis does not attribute any value to potential litigation claims that may belong to the Debtors' estates, including any claims to recover potentially avoidable preferential and/or fraudulent transfers, if any.

D.  ***Chapter 7 Liquidation Costs***.  Given no recoverable assets to fund a chapter 7 estate, there are no corresponding chapter 7 liquidation costs contemplated in the Hypothetical Liquidation Analysis.

E.  ***Claim Estimates***.  Claims are estimated as of the Liquidation Date based on a roll-forward of the balance sheet as scheduled in the Debtors' Schedules as of November 24, 2025.

**Detailed Assumptions for PosiGen, PBC Hypothetical Liquidation Analysis[2]**

Asset Recoveries

**[1] Cash & Cash Equivalents**

The cash available at the Effective Date represents the $2 million Plan Trust Cash Contribution funded through the DIP Facility pursuant to the Settlement on the Effective Date.  Absent confirmation of the Plan, there would be no funding available, and all estate cash would have otherwise been consumed, leaving none to effectuate the liquidation.

**[2] Prepaid Expenses and Other Current Assets**

Prepaid and Other Current Assets consist of certain prepaid insurance and other advance payments made that are presently amortizing.  The Debtors assume that certain counterparties would set off amounts of certain deposits and prepayments against the Debtors' liabilities under the contracts or agreements that gave rise to the prepayments, mitigating any potential recovery.  Moreover, a full reconciliation of the Debtors' books and records needs to occur to determine the existence of these prepayments as historically the Debtors have not reconciled prepaid amounts on a recurring basis, leaving the balance subject to uncertainty.

**[3] Property, Plant and Equipment, and Intangibles, net**

Property, Plant and Equipment, and Intangibles, net, is primarily composed of capitalized software and IT project costs that are unrecoverable as the value is an accounting construct that does not represent true monetizable economic value.

**[4] Other Noncurrent Assets**

Other Noncurrent Assets are composed of security deposits that the Debtors believe to be not materially recoverable given the status of various leases that the Debtors have historically occupied and may be rejected under the Plan.

**[5] Prepaid and Current Assets**

Prepaid and Other Current Assets consist of certain prepaid income taxes made that are presently amortizing.  The amounts do not represent values that are monetizable given their nature.  Further, a full reconciliation of the Debtors' books and records needs to occur to determine the existence of these prepayments as historically the Debtors have not reconciled prepaid amounts on a recurring basis, leaving the balance subject to uncertainty.

---

[2]    Please refer to the exhibit with footnote references contained in the "Notes" column.

**[6] Wind Down Costs**

The Wind Down Costs represent the Debtors' illustrative estimate of wind down costs, distributed equally between PosiGen, PBC and the Consolidated Debtors solely for purposes of the Liquidation Analysis. These costs are subject to material change and are shown for illustrative purposes only.

**[7] Chapter 7 Trustee Fees**

The Liquidation Analysis assumes that the chapter 7 trustee would be compensated in accordance with the guidelines of section 326 of the Bankruptcy Code. For the purposes of this Liquidation Analysis, the Debtors assume that such fees would be approximately three percent (3.0%) of gross distributions. Given there is anticipated to be no recoverable assets to fund a chapter 7 case, there are consequentially no forecasted chapter 7 trustee fees.

**[8] Restricted Cash**

The Restricted Cash at the Effective Date represents the cash collateral posted to an indemnity insurance company. Given that these funds were posted in 2018, recovery is not anticipated.

**[9] Operating Lease Right-of-Use Asset, net**

The Operating Lease Right-of-Use Asset, net, represents the debit entry to offset the Debtors' lease liabilities under Accounting Standards Codification ("ASC") 842. It is an accounting construct that does not represent true monetizable economic value.

**[10] Goodwill**

Goodwill is an accounting construct capitalized under ASC 350. It does not represent true monetizable economic value.

**<u>Claims</u>**

Please refer to specific notes regarding proposed treatment of various classes as described and defined in the Plan.

**<u>Conclusion</u>**

Because the distributions to Holders of Claims or Interests under the Liquidation Analysis provide for lower recoveries relative to the recoveries under the Plan, the Debtors believe that Consummation of the Plan will provide greater value to such Holders than would a liquidation under chapter 7 of the Bankruptcy Code.

## Liquidation Analysis Summary – PosiGen, PBC

**PosiGen, PBC**
Hypothetical Liquidation Analysis
*$ thousands*

| | | | Chapter 11 | | | | | Chapter 7 | | | |
| | | Projected | Estimated Recovery $ | | Estimated Recovery % | | Projected | Estimated Recovery $ | | Estimated Recovery % | |
| | Notes | Book Value | Low | High | Low | High | Book Value | Low | High | Low | High |
|---|---|---|---|---|---|---|---|---|---|---|---|
| **I. Gross Liquidation Proceeds** | | | | | | | | | | | |
| Cash & Cash Equivalents | [1] | 1,297 | 1,297 | 1,297 | 100.0% | 100.0% | - | - | - | - | - |
| Restricted Cash | | - | - | - | - | - | - | - | - | - | - |
| Rebates Receivables | | - | - | - | - | - | - | - | - | - | - |
| Accounts and Other Receivables | | - | - | - | - | - | - | - | - | - | - |
| Inventory | | - | - | - | - | - | - | - | - | - | - |
| Prepaid Expenses and Other Current Assets | [2] | 4,511 | - | - | - | - | 4,511 | - | - | - | - |
| Solar Energy Systems, Net | | - | - | - | - | - | - | - | - | - | - |
| Property, Plant and Equipment, and Intangibles, net | [3] | 1,812 | - | - | - | - | 1,812 | - | - | - | - |
| Operating Lease Right-of-Use Asset, net | | - | - | - | - | - | - | - | - | - | - |
| Unbilled Lease Revenues, net | | - | - | - | - | - | - | - | - | - | - |
| Financing Receivables, net | | - | - | - | - | - | - | - | - | - | - |
| Goodwill | | - | - | - | - | - | - | - | - | - | - |
| Other Noncurrent Assets | [4] | 27 | - | - | - | - | 27 | - | - | - | - |
| Prepaid Income Taxes, Noncurrent | [5] | 651 | - | - | - | - | 651 | - | - | - | - |
| **Gross Liquidation Proceeds** | | **8,299** | **1,297** | **1,297** | **15.6%** | **15.6%** | **7,002** | **-** | **-** | **-** | **-** |
| | | | | | | | | | | | |
| **II. Wind-Down and Chapter 7 Liquidation Costs** | | | | | | | | | | | |
| | | | | | | | | | | | |
| Wind Down Costs | [6] | n/a | (435) | (435) | | | n/a | - | - | | |
| Chapter 7 Trustee Fees | [7] | n/a | - | - | | | n/a | - | - | | |
| **Total - Wind Down Costs** | | | **(435)** | **(435)** | | | | **-** | **-** | | |
| | | | | | | | | | | | |
| **Net Liquidation Proceeds Available for Distribution** | | | **862** | **862** | | | | **-** | **-** | | |
| | | | | | | | | | | | |
| **III. Waterfall Analysis** | | | | | | | | | | | |
| | | | | | | | | | | | |
| **Proceeds Available for Administrative Claims** | | | **862** | **862** | | | | **-** | **-** | | |
| | | | | | | | | | | | |
| **Administrative Claims** | | | | | | | | | | | |
| Allowed Administrative Claims | | 385 | 385 | 385 | 100.0% | 100.0% | 385 | - | - | - | - |
| Allowed Priority Tax Claims | | - | - | - | - | - | - | - | - | - | - |
| Allowed Other Priority Claims | | - | - | - | - | - | - | - | - | - | - |
| **Total Administrative Claims and Recovery** | | **385** | **385** | **385** | **100.0%** | **100.0%** | **385** | **-** | **-** | **-** | **-** |
| | | | | | | | | | | | |
| **Proceeds Available for Secured Claims** | | | **114** | **114** | | | | **-** | **-** | | |
| | | | | | | | | | | | |
| **Secured Claims** | | | | | | | | | | | |
| Class 1-A | Other Secured Claims Against PosiGen, PBC | - | - | - | - | - | - | - | - | - | - |
| Class 2-A | Other Priority Claims Against PosiGen, PBC | - | - | - | - | - | - | - | - | - | - |
| Class 3-A | Prepetition Secured Promissory Note Claims Against PosiGen, PBC | 8,152 | 8,000 | 8,000 | 98.1% | 98.1% | 8,152 | 8,000 | 8,000 | 98.1% | 98.1% |
| Class 4-A | Prepetition Secured Convertible Note Claims Against PosiGen, PBC | 73,162 | 113 | 113 | 0.2% | 0.2% | 73,162 | - | - | - | - |
| Class 5-A | Prepetition Battery Loan Claims Against PosiGen, PBC | 2,019 | 860 | 1,289 | 42.6% | 63.8% | 2,019 | 858 | 1,288 | 42.5% | 63.8% |
| **Total Secured Claims and Recovery** | | **83,333** | **8,973** | **9,402** | **10.8%** | **11.3%** | **83,333** | **8,858** | **9,288** | **10.6%** | **11.1%** |
| | | | | | | | | | | | |
| **Proceeds Available for Unsecured Claims** | | | **363** | **363** | | | | **-** | **-** | | |
| | | | | | | | | | | | |
| **Unsecured Claims** | | | | | | | | | | | |
| Class 6-A | Prepetition June Bridge Loan Claims Against PosiGen, PBC | 9,655 | 15 | 15 | 0.2% | 0.2% | 9,655 | - | - | - | - |
| Class 7-A | Prepetition July Bridge Loan Claims Against PosiGen, PBC | 26,229 | 40 | 40 | 0.2% | 0.2% | 26,229 | - | - | - | - |
| Class 8-A | General Unsecured Claims Against PosiGen, PBC | 200,082 | 308 | 308 | 0.2% | 0.2% | 200,082 | - | - | - | - |
| **Total Unsecured Claims and Recovery** | | **235,966** | **363** | **363** | **0.2%** | **0.2%** | **235,966** | **-** | **-** | **-** | **-** |
| | | | | | | | | | | | |
| **Remaining Claims** | | | | | | | | | | | |
| Class 9-A | Intercompany Claims Against PosiGen, PBC | 6,558 | - | - | - | - | 6,558 | - | - | - | - |
| Class 10-A | Section 510 Claims Against PosiGen, PBC | - | - | - | - | - | - | - | - | - | - |
| Class 11-A | Existing Equity Interests in PosiGen, PBC | 249,415 | - | - | - | - | 249,415 | - | - | - | - |
| **Total Remaining Claims** | | **255,974** | **-** | **-** | **-** | **-** | **255,974** | **-** | **-** | **-** | **-** |
| | | | | | | | | | | | |
| **Total Claims and Recoveries** | | **575,657** | **9,720** | **10,150** | **1.7%** | **1.8%** | **575,657** | **8,858** | **9,288** | **1.5%** | **1.6%** |

## Liquidation Analysis Summary – Consolidated Debtors

**Consolidated Debtors**
Hypothetical Liquidation Analysis
*$ thousands*

| | Notes | Chapter 11 Projected Book Value | Chapter 11 Est. Recovery $ Low | Chapter 11 Est. Recovery $ High | Chapter 11 Est. Recovery % Low | Chapter 11 Est. Recovery % High | Chapter 7 Projected Book Value | Chapter 7 Est. Recovery $ Low | Chapter 7 Est. Recovery $ High | Chapter 7 Est. Recovery % Low | Chapter 7 Est. Recovery % High |
|---|---|---|---|---|---|---|---|---|---|---|---|
| **I. Gross Liquidation Proceeds** | | | | | | | | | | | |
| Cash & Cash Equivalents | [1] | 703 | 703 | 703 | 100.0% | 100.0% | - | - | - | - | - |
| Restricted Cash | [8] | 372 | - | - | - | - | 372 | - | - | - | - |
| Rebates Receivables | | - | - | - | - | - | - | - | - | - | - |
| Accounts and Other Receivables | | - | - | - | - | - | - | - | - | - | - |
| Inventory | | - | - | - | - | - | - | - | - | - | - |
| Prepaid Expenses and Other Current Assets | | - | - | - | - | - | - | - | - | - | - |
| Solar Energy Systems, Net | | - | - | - | - | - | - | - | - | - | - |
| Property, Plant and Equipment, and Intangibles, net | [3] | 7,550 | - | - | - | - | 7,550 | - | - | - | - |
| Operating Lease Right-of-Use Asset, net | [9] | 5,689 | - | - | - | - | 5,689 | - | - | - | - |
| Unbilled Lease Revenues, net | | - | - | - | - | - | - | - | - | - | - |
| Financing Receivables, net | | - | - | - | - | - | - | - | - | - | - |
| Goodwill | [10] | 621 | - | - | - | - | 621 | - | - | - | - |
| Other Noncurrent Assets | [4] | 144 | - | - | - | - | 144 | - | - | - | - |
| Prepaid Income Taxes, Noncurrent | | - | - | - | - | - | - | - | - | - | - |
| **Gross Liquidation Proceeds** | | 15,078 | 703 | 703 | 4.7% | 4.7% | 14,375 | - | - | - | - |
| | | | | | | | | | | | |
| **II. Wind-Down and Chapter 7 Liquidation Costs** | | | | | | | | | | | |
| | | | | | | | | | | | |
| Wind Down Costs | [6] | n/a | (435) | (435) | | | n/a | - | - | | |
| Chapter 7 Trustee Fees | [7] | n/a | - | - | | | n/a | - | - | | |
| **Total - Wind Down Costs** | | | (435) | (435) | | | | - | - | | |
| | | | | | | | | | | | |
| **Net Liquidation Proceeds Available for Distribution** | | | 268 | 268 | | | | - | - | | |
| | | | | | | | | | | | |
| **III. Waterfall Analysis** | | | | | | | | | | | |
| | | | | | | | | | | | |
| **Proceeds Available for Administrative Claims** | | | 268 | 268 | | | | - | - | | |
| | | | | | | | | | | | |
| **Administrative Claims** | | | | | | | | | | | |
| Allowed Administrative Claims | | - | - | - | - | - | - | - | - | - | - |
| Allowed Priority Tax Claims | | - | - | - | - | - | - | - | - | - | - |
| Allowed Other Priority Claims | | - | - | - | - | - | - | - | - | - | - |
| **Total Administrative Claims and Recovery** | | - | - | - | - | - | - | - | - | - | - |
| | | | | | | | | | | | |
| **Proceeds Available for Secured Claims** | | | 113 | 113 | | | | - | - | | |
| | | | | | | | | | | | |
| **Secured Claims** | | | | | | | | | | | |
| Class 1-B | Other Secured Claims Against the Consolidated Debtors | 1 | 1 | 1 | 100.0% | 100.0% | 1 | 1 | 1 | 100.0% | 100.0% |
| Class 2-B | Other Priority Claims Against the Consolidated Debtors | - | - | - | - | - | - | - | - | - | - |
| Class 3-B | Prepetition Secured Promissory Note Claims Against the Consolidated Debtors | 8,152 | 8,000 | 8,000 | 98.1% | 98.1% | 8,152 | 8,000 | 8,000 | 98.1% | 98.1% |
| Class 4-B | Prepetition Secured Convertible Note Claims Against the Consolidated Debtors | 73,162 | 112 | 113 | 0.2% | 0.2% | 73,162 | - | - | - | - |
| Class 5-B-1 | Prepetition June Bridge Loan Claims Against the Consolidated Debtors That Are Secured Claims | Up to 4,130 | 1,368 | 1,803 | 33.1% | 43.6% | Up to 4,130 | 1,368 | 1,803 | 33.1% | 43.6% |
| **Total Secured Claims and Recovery** | | 85,445 | 9,481 | 9,917 | 11.1% | 11.6% | 85,445 | 9,369 | 9,804 | 11.0% | 11.5% |
| | | | | | | | | | | | |
| **Proceeds Available for Unsecured Claims** | | | 155 | 155 | | | | - | - | | |
| | | | | | | | | | | | |
| **Unsecured Claims** | | | | | | | | | | | |
| Class 5-B-2 | Prepetition June Bridge Loan Claims Against the Consolidated Debtors That Are Not Secured Claims | Up to 9,655 | 15 | 15 | 0.2% | 0.2% | Up to 9,655 | - | - | - | - |
| Class 6-B | Prepetition July Bridge Loan Claims Against the Consolidated Debtors | 26,229 | 4,653 | 5,971 | 17.7% | 22.8% | 26,229 | 4,620 | 5,940 | 17.6% | 22.6% |
| Class 7-B | General Unsecured Claims Against the Consolidated Debtors | 70,766 | 108 | 109 | 0.2% | 0.2% | 70,766 | - | - | - | - |
| **Total Unsecured Claims and Recovery** | | 106,649 | 4,776 | 6,095 | 4.5% | 5.7% | 106,649 | 4,620 | 5,940 | 4.3% | 5.6% |
| | | | | | | | | | | | |
| **Remaining Claims** | | | | | | | | | | | |
| Class 8-B | Intercompany Claims Against the Consolidated Debtors | 8,146 | - | - | - | - | 8,146 | - | - | - | - |
| Class 9-B | Section 510 Claims Against the Consolidated Debtors | - | - | - | - | - | - | - | - | - | - |
| Class 10-B | Existing Equity Interests in the Consolidated Debtors | - | - | - | - | - | - | - | - | - | - |
| **Total Remaining Claims** | | 8,146 | - | - | - | - | 8,146 | - | - | - | - |
| | | | | | | | | | | | |
| **Total Claims and Recoveries** | | 200,241 | 14,256 | 16,012 | 7.1% | 8.0% | 200,241 | 13,988 | 15,744 | 7.0% | 7.9% |

**Exhibit B**

Organizational Chart



```
                          PosiGen, PBC
                               |
                          PosiGen, LLC
                               |
         ┌─────────────────────┴─────────────────────┐
   PosiGen                                      PosiGen
   Operations, LLC                              Holdings, LLC
         |                                           |
   ┌─────┼──────────────┐                  ┌─────────┴──────────────┐
PosiGen  PosiGen    PosiGen            (Backleverage)         PosiGen
Developer Provider   Backleverage                            Rampart
LLC       LLC        Holdco, LLC                             Holdco, LLC
                         |                                        |
                     PosiGen                                  PosiGen
                     Backleverage, LLC                        Rampart, LLC
```

- PosiGen, PBC
- PosiGen, LLC
  - PosiGen Operations, LLC
    - PosiGen Developer, LLC
    - PosiGen Provider, LLC
    - PosiGen Backleverage Holdco, LLC
      - PosiGen Backleverage, LLC
        - PosiGen Owner, LLC
        - Rooftop Solar I Manager, LLC
          - Rooftop Solar I, LLC
          - Rooftop Solar II, LLC
          - Rooftop Solar III, LLC
          - Rooftop Solar IV, LLC
          - Rooftop Solar V, LLC
        - PosiGen Bienville Manager, LLC
          - PosiGen Bienville Project Company, LLC
        - PosiGen Decatur Manager, LLC
          - PosiGen Decatur Project Company, LLC
          - PosiGen Decatur 2 Project Company, LLC
        - PosiGen Marengo Manager, LLC
          - PosiGen Marengo Project Company, LLC
  - PosiGen Holdings, LLC
    - PosiGen Rampart Holdco, LLC
      - PosiGen Rampart, LLC
        - PosiGen Owner 2, LLC
        - PosiGen Owner 3, LLC

**Legend**

☐ = Debtor

▨ = Non-Debtor

**Exhibit C**

Proposed Form of WARN Action Final Settlement Order

**UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | |
|---|---|
| **In re** | **Chapter 11** |
| **POSIGEN, PBC** *et al.*,[1] | **Case No. 25-90787 (CML)** |
| **Debtors.** | **(Jointly Administered)** |

-----------------------------------------------------------------x

**ALEX RUPERTO and TANISHA SMITH, on behalf of themselves and all others similarly situated,**

       **Plaintiffs,**

**v.**

**Adversary Proceeding No. 25-03833 (CML)**

**POSIGEN, PBC; POSIGEN, LLC; POSIGEN OPERATIONS, LLC; POSIGEN DEVELOPER, LLC; POSIGEN PROVIDER, LLC; POSIGEN HOLDINGS, LLC; POSIGEN RAMPART HOLDCO, LLC; POSIGEN RAMPART, LLC; POSIGEN OWNER 2, LLC; and POSIGEN OWNER 3, LLC,**

       **Defendants.**

-----------------------------------------------------------------x

**FINAL ORDER APPROVING THE WARN ACTION SETTLEMENT
UNDER FEDERAL RULE OF CIVIL PROCEDURE 23 AND FEDERAL
RULES OF BANKRUPTCY PROCEDURE 7023 AND 9019**

**UPON** the Order dated [_____], 2026 [Docket. No. [\_\_\_\_]] (the "Preliminary Settlement Order") preliminarily approving the Joint Motion of Alex Ruperto, Tanisha Smith, Leandro Espinosa, Donald Giamboy, and Robert McGregor (together, the "WARN Action Representative Claimants"), on behalf of themselves and all others similarly situated

---

[1] The last four digits of PosiGen, PBC's tax identification number are 9706. A complete list of each of the Debtors in these chapter 11 cases and the last four digits of their federal tax identification numbers may be obtained on the website of the Debtors' claims and noticing agent at https://cases.ra.kroll.com/PosiGen. The Debtors' service address in these chapter 11 cases is 1000 Elmwood Park Boulevard, Suite A, Harahan, LA 70123.

(the "WARN Action Settlement Class"), on the one hand, and, on the other hand, PosiGen, PBC, PosiGen, LLC, PosiGen Operations, LLC, PosiGen Developer, LLC, PosiGen Provider, LLC, PosiGen Holdings, LLC, PosiGen Rampart Holdco, LLC, PosiGen Rampart, LLC, PosiGen Owner 2, LLC, and PosiGen Owner 3, LLC (the "Debtors" and, together with the WARN Action Representative Claimants, the "Movants"), with the support and agreement of Brookfield (as defined in Docket No. 542 filed in *In re PosiGen, PBC, et al.*, Bankr. Case No. 25-90787 (CML) (Jointly Administered) (Bankr. S.D. Tex. 2025) (the "Bankruptcy Cases")), and the Official Committee of Unsecured Creditors in the Bankruptcy Cases (the "Committee" and, together with WARN Action Representative Claimants, the Debtors, and Brookfield, the "Parties"), by and through their respective counsel, pursuant to section 105 of title 11 of the United States Code, Rule 9019 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and Rule 23 of the Federal Rules of Civil Procedure (the "Civil Rules"), applicable hereto by Bankruptcy Rule 7023, for the entry of an Order: (1) approving the WARN Action Settlement[2] pursuant to Bankruptcy Rule 9019; (2) preliminarily approving the WARN Action Settlement pursuant to Bankruptcy Rule 7023; (3) approving the form and manner of notice of the WARN Action Settlement to the members of the WARN Action Settlement Class; (4) scheduling a fairness hearing to consider final approval of the WARN Action Settlement (the "Fairness Hearing"); (5) finally approving the WARN Action Settlement following the Fairness Hearing; and (6) granting related relief (the "Joint Motion"); the Court having reviewed the Joint Motion and any objections thereto, and being fully advised; the Court finding that: (a) the Court has jurisdiction over this matter pursuant to 28 USC § 1334, (b) this is a core proceeding pursuant

---

[2]    The WARN Action Settlement is described in Article VIII.J of the *Second Amended Combined Disclosure Statement and Joint Chapter 11 Plan of PosiGen, PBC and Its Affiliated* Debtors [Docket No. 581] (the "Plan"). Unless otherwise defined herein, capitalized terms have the meanings provided in the Plan.

to 28 USC § 157(b)(2), (c) notice of the Joint Motion and the hearing thereon was sufficient under the circumstances, and (d) the Court having reviewed the terms of the WARN Action Settlement; and the Court having determined that the legal and factual bases set forth in the Joint Motion establish just cause for the relief granted herein; the Court having determined that the relief sought in the Joint Motion is in the best interest of the Debtors' Estates; and after due deliberations and sufficient cause appearing therefore,

**IT IS HEREBY ORDERED, ADJUDGED AND DECREED THAT:**

1. The Joint Motion is GRANTED in its entirety.

2. All objections to the Joint Motion or the relief requested in the Joint Motion, if any, that have not been withdrawn, waived, or settled, and all reservations of rights in such objections, if any, shall be and hereby are, OVERRULED in all respects on the merits and denied.

3. The WARN Action Settlement terms are APROVED on a final basis, as follows:

    (a) the WARN Action Settlement Class consisting of approximately 470 former employees of the Debtors as identified by WARN Action Class Counsel from the Debtors' books and records who were involuntarily separated from employment on or about August 24, 2025 (each a "WARN Action Settlement Class Member"), but excluding any persons who timely elected to opt out of the WARN Action Settlement, is certified for purposes of settlement pursuant to Bankruptcy Rule 7023 and Civil Rule 23 for the reasons set forth in the Joint Motion;

    (b) the WARN Action Representative Claimants are appointed as class representatives pursuant to Bankruptcy Rule 7023 and Civil Rule 23 for the reasons set forth in the Joint Motion;

    (c) the WARN Action Class Counsel are appointed as class counsel pursuant to Bankruptcy Rule 7023 and Civil Rule 23 for the reasons set forth in the Joint Motion;

    (d) the treatment of the WARN Action Claims herein and under the Plan are in full and final satisfaction of the WARN Action Claims of the WARN Action Representative Claimants and all other members of the WARN Action Settlement Class;

3

(e)     each of the WARN Action Representative Claimants and all other members of the WARN Action Settlement Class release all WARN Action Released Claims against each of the WARN Action Released Parties;

(f)     distributions of the WARN Action Settlement Amount shall be made by the Debtors (within five (5) business days of entry of this Order) or the Plan Administrator (in accordance with the Plan and Plan Trust Agreement on account of this WARN Action Settlement and the WARN Action Claims), as applicable, to the WARN Action QSF according to wiring instructions to be provided by WARN Action Class Counsel;

(g)     the WARN Action QSF shall be established by a settlement administrator chosen by WARN Action Class Counsel;

(h)     the Debtors or the Plan Administrator shall provide to such settlement administrator, contemporaneously with the first payment of WARN Action Settlement Funds to the WARN Action QSF, a tax identification number for each proposed member of the WARN Action Settlement Class who by not opting-out of the WARN Action Settlement Class shall be deemed to consent to the release of this information to the settlement administrator of the WARN Action QSF for use in the administration of the WARN Action Settlement and issuance of IRS Form 1099s reflecting the WARN Action Settlement Payments from the WARN Action QSF;

(i)     the WARN Action Representative Claimants shall receive, in addition to their respective WARN Action Settlement Payments, a combined payment from the WARN Action QSF of $25,000 from the WARN Action Settlement Amount, which shall be allocated equally among the five WARN Action Representative Claimants (*i.e.*, $5,000 each) for the reasons set forth in the Joint Motion;

(j)     WARN Action Class Counsel shall receive payment from the WARN Action QSF in the amount of one-third (1/3) of the aggregate distributions of the WARN Action Settlement Amount to the WARN Action QSF, plus reasonable litigation costs and expenses related to the WARN Action Claims, including without limitation, costs and expenses related to class noticing and administration of the WARN Action Settlement, which payments shall constitute payment in full for WARN Action Class Counsel's work and expenses incurred in connection therewith, for the reasons set forth in the Joint Motion;

(k)     any distributions from the WARN Action QSF to members of the WARN Action Settlement Class that are not deposited or presented for payment within 180 days of such distribution shall be deemed residual funds (the "WARN Action Residual Funds") on the 181st day following the distribution and treated as follows: (i) first, used to make distributions by the WARN Action QSF to additional members of the WARN Action Settlement Class, if any, that may be identified after the initial distribution of the WARN Action Settlement Amount and who qualify as members of the WARN Action Settlement Class but who were not identified by WARN Action Class Counsel; (ii) second, distributed in a supplemental distribution to all members of the WARN

4

Action Settlement Class who cashed or negotiated their initial distribution check, so long as WARN Action Class Counsel determines that such distribution is feasible; and (iii) if any WARN Action Residual Funds remain after distributions to additional members of the WARN Action Settlement Class, if any, or as a supplemental distribution, if any, then last, such WARN Action Residual Funds shall be donated to the Impact Fund, a non-profit section 501(c)(3) charitable organization which advocates on behalf of employees' rights; and

(l)      no WARN Action Residual Funds shall revert to Debtors, the DIP Lenders, the Committee, or the Plan Trust.

4.      This WARN Action Settlement is approved in all respects as being fair, reasonable, and adequate for the reasons set forth in the Joint Motion, including the following:

(a)      Continued litigation of the WARN Actions will be expensive, risky, and time consuming;

(b)      The WARN Action Representative Claimants support the WARN Action Settlement, and WARN Action Class Counsel believe that all of the other WARN Action Settlement Class Members will have a favorable reaction to the WARN Action Settlement and will not object to it;

(c)      The WARN Action Settlement was reached through arms' length negotiations between the Parties and after the Parties thoroughly investigated the facts and weighed the importance of efficient resolution versus continued litigation that would have likely negatively impacted the outcome of the Bankruptcy Cases and any recovery by the WARN Action Settlement Class, therein; and

(d)      When considered in light of the best possible recovery and the attendant risks, the WARN Action Settlement falls well within the range of reasonableness. The WARN Action Settlement provides for distributions of the WARN Action Settlement Amount which could total as much as $3,000,000, which would be a significant recovery on the WARN Actions Claims under the circumstances of the Bankruptcy Cases.

5.      The WARN Action Settlement shall become binding upon the Parties and the WARN Action Settlement Class upon entry of this Order.

6.      The entry of this Order is without prejudice to the relief granted in the Preliminary Settlement Order, and entry of this Order shall not serve to extend or stay the time of filing any appeal regarding any of the relief granted in the Preliminary Settlement Order.

5

7. The Parties are hereby authorized and empowered to take such steps and perform such acts as may be necessary to carry out the terms of this Order and the WARN Action Settlement.

8. This Court shall retain jurisdiction over all matters arising from or related to the interpretation and/or implementation of this Order.

9. This Order is effective immediately upon entry.

Dated: _____, 2026          _____
                                              CHRISTOPHER M. LOPEZ
                                              UNITED STATES BANKRUPTCY JUDGE

6